**EXHIBIT A**

**Unpublished Decisions Cited in South Carolina
Electric & Gas Company's Memorandum of Law**

2004 U.S. Dist. LEXIS 23868, *

LEXSEE 2004 U.S. DIST. LEXIS 23868



Analysis
As of: May 30, 2007

**In re ENRON CORP., et al., Debtors, ENRON POWER MARKETING, INC., Plaintiff, - against - CALIFORNIA POWER EXCHANGE CORP., PACIFIC GAS & ELECTRIC CO., and SOUTHERN CALIFORNIA EDISON CO., Defendants.**

**04 Civ. 8177 (RCC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 23868*

**November 22, 2004, Decided**
**November 23, 2004, Filed**

**DISPOSITION:** [*1] Defendants' motion to withdraw reference granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a group of related corporate debtors filed an adversary complaint and objection to the proof of claim against defendants, public utility companies, seeking turnover of certain funds. The power companies moved for an order withdrawing the reference of the adversary proceeding to the United States Bankruptcy Court for the Southern District of New York in accordance with 28 U.S.C.S. § 157(d).

**OVERVIEW:** In accordance with a tariff-and-rate schedule approved by the United States Federal Energy Regulatory Commission (FERC), the debtors arranged for several banks to post letters of credit in favor of one of the utilities. The utility was holding the proceeds from the letters of credit to secure its claim against the debtors. The debtors sought turnover of these proceeds. This request would have required the bankruptcy court to interpret the public utility's tariff contrary to repeated FERC orders that the utility retain collateral until all outstanding obligations were billed and settled. The bankruptcy court could not adjudicate this objection and determine whether the letter-of-credit proceeds were to be turned over to the bankruptcy estate without substantial and material consideration of federal law beyond Title 11 to determine, at the outset, whether the funds at issue fell within the FERC's exclusive jurisdiction or whether this was a gar-

den-variety bankruptcy case. The district court determined that withdrawal of the reference was proper so that the district court could resolve the threshold jurisdictional issues in accordance with applicable non-bankruptcy federal law.

**OUTCOME:** The district court granted the motion to withdraw the reference of the adversary proceeding to the bankruptcy court on mandatory-withdrawal grounds.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings*
*Governments > Courts > Authority to Adjudicate*
[HN1] Under a standing order, pursuant to 28 U.S.C.S. § 157(c), Chapter 11 cases in the Southern District of New York are automatically referred to the bankruptcy court. 28 U.S.C.S. § 157(a) indicates that the bankruptcy court derives its authority from the reference of the district court. A party can move to withdraw the reference to the bankruptcy court under 28 U.S.C.S. § 157(d), which provides for both discretionary and mandatory withdrawal.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
*Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations*
[HN2] See 28 U.S.C.S. § 157(d).

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
*Civil Procedure > Judicial Officers > General Overview*
[HN3] The mandatory-withdrawal provision of 28 U.S.C.S. § 157(d) requires withdrawal of the reference to a bankruptcy court for any proceeding that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes. The purpose of § 157(d) is to assure that an Article III judge decides issues calling for more than routine application of federal laws outside the Bankruptcy Code. Courts in the Second Circuit have construed § 157(d) narrowly to prevent litigants using it as an "escape hatch" out of bankruptcy court. Mandatory withdrawal is appropriate, however, in cases where substantial and material consideration of non-Bankruptcy Code federal law is necessary for the resolution of the proceeding. To satisfy the substantial-consideration test, the issues of non-bankruptcy law raised by the proceeding need not be unsettled or involve matters of "first impression." What is at issue is the degree to which the bankruptcy judge would have to consider the federal non-bankruptcy law.

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > General Overview*
[HN4] Federal energy tariffs have the force of federal law and are not simply contractual.

*Energy & Utilities Law > Administrative Proceedings > U.S. Federal Energy Regulatory Commission > Duties & Powers*
*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
*Energy & Utilities Law > Electric Power Industry > Rates > Wholesale Rates*
[HN5] Under the Federal Power Act, the United States Federal Energy Regulatory Commission (FERC) has the exclusive authority to pass upon the reasonableness of the structure, terms, and conditions pertaining to the sale and distribution of wholesale electric rates. 16 U.S.C.S. §§ 824, 824d, and 824e.

**COUNSEL:** For Enron Corp., et al, In Re: David F. Williams, Cadwalader, Wickersham & Taft, L.L.P., Washington, DC.

For Enron Corp., et al, Debtor: David F. Williams, Cadwalader, Wickersham & Taft, L.L.P., Washington, DC.

For Enron Power Marketing, Inc., Plaintiff: Edward Smith, Cadwalader, Wickersham & Taft LLP, New York, NY.

For California Power Exchange Corporation, Defendant: Alan J. Kornfeld, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., New York, NY.

For Pacific Gas & Electric Company, Defendant: Dennis M. O'Dea, Heller, Ehrman, White & McAuliffe, LLP, New York, NY.

For Southern California Edison Company, Defendant: Bradley O'Neill, Kramer, Levin Naftalis & Frankel LLP, New York, NY.

**JUDGES:** Richard Conway Casey, U.S.D.J.

**OPINION BY:** Richard Conway Casey

**OPINION:**

**OPINION & ORDER**

**RICHARD CONWAY CASEY, United States District Judge:**

Defendants California Power Exchange Corp. ("CalPX"), Pacific Gas & Electric Co. ("PG&E"), and Southern California Edison Co. ("SCE") move for an order withdrawing the reference of the above-captioned adversary proceeding, Adv. Pro. No. 04-3091 (AJG), to the United States Bankruptcy [*2] Court for the Southern District of New York ("Bankruptcy Court"), in accordance with *28 U.S.C. § 157(d)*. Plaintiff and debtor Enron Power Marketing, Inc. ("Enron") opposes Defendants' motion. For the following reasons, the motion to withdraw is **GRANTED.**

**I. BACKGROUND**

Prior to seeking relief in the Bankruptcy Court in 2001, n1 Enron participated in wholesale power markets operated in the State of California by CalPX, a public utility regulated by the Federal Energy Regulatory Commission ("FERC"). In accordance with a tariff-and-rate schedule approved by the FERC, Enron arranged for several banks to post letters of credit in favor of CalPX. (See Defendants' Mem. Supp. Motion to Withdraw, Oct. 1, 2004 ("Mem. Supp."), Ex. 1, CalPX FERC Electric Service Tariff No. 2 ("CalPX Tariff"), June 7,

2000, Schedule 2 § 2 (requiring market participants to "post collateral for 100% of its requirements in excess of the unsecured line of credit"); id. § 2.1 (allowing "collateral" to take the form of cash, surety bonds, parent guarantees, or letters of credit).) In January 2001 and November 2001, as the letters of credit posted by Enron were about to [*3] expire, CalPX drew down approximately $ 136 million on them.

> n1 Enron petitioned for relief under chapter 11 of the Bankruptcy Code on December 2, 2001; the Enron bankruptcy proceedings are pending before the Honorable Arthur J. Gonzales.

On October 10, 2002, CalPX filed Proof of Claim No. 9112 in Enron's bankruptcy case before Judge Gonzales, asserting that the approximately $ 136 million in letter-of-credit proceeds, which CalPX is currently holding in a segregated escrow account, secure a $ 16,221.36 market-activity claim against Enron as well as "other amounts to which CalPX is entitled under applicable law and the [CalPX] Tariff." The FERC has ordered that CalPX retain collateral posted under the CalPX Tariff pending completion of certain FERC proceedings. See infra pp. 5-6.

On May 26, 2004, Enron filed an adversary complaint and objection to the proof of claim in the Bankruptcy Court, seeking turnover of the letter-of-credit proceeds. (See Enron's Adversary Complaint and Objection to CalPX's [*4] Proof of Claim, May 26, 2004 ("Complaint") at PP1-3.) Specifically, Enron seeks a judgment from the Bankruptcy Court declaring that the approximately $ 136 million in letter-of-credit proceeds are the property of the Enron bankruptcy estate and that CalPX lacks a valid, perfected security interest in the funds. (Id. at PP1-2, 11, 47.)

Two motions to dismiss and one motion for summary judgment have been filed in the matter before Judge Gonzales. On July 1, 2004, CalPX moved to dismiss Enron's complaint in the underlying adversary proceeding on the ground that the Bankruptcy Court lacks subject matter jurisdiction--arguing that such jurisdiction properly lies with the FERC, not the federal courts, because Enron's claims turn on the tariff-and-rate schedule, approved by the FERC pursuant to the FERC's exclusive jurisdiction under the Federal Power Act, 16 U.S.C. § 824 et seq. On August 26, 2004, with Enron's consent, SCE and PG&E were allowed to intervene as defendants. As their responsive pleading, SCE and PG&E filed a motion to dismiss on four grounds: that the Bankruptcy Court lacks subject matter jurisdiction; that Enron's claims are barred by res judicata; [*5] that Enron's complaint represents an improper collateral attack on the CalPX

Tariff as interpreted by the FERC; and that the Bankruptcy Court should defer to the FERC under the doctrine of primary jurisdiction. On September 27, 2004, Enron filed a motion for partial summary judgment.

On October 18, 2004, CalPX, PG&E, and SCE ("Defendants") filed this Motion to Withdraw the Reference to the Bankruptcy Court in accordance with *Federal Rule of Bankruptcy Procedure 5011*, requesting that this Court grant either mandatory or discretionary withdrawal under *28 U.S.C. § 157(d)*. The Court heard oral argument on this motion on November 18, 2004.

## II. DISCUSSION

The Court has subject matter jurisdiction under *28 U.S.C. §§ 1334* and *157(d)*. [HN1] Under a standing order issued in July 1984 by then-Acting Chief Judge Ward pursuant to *28 U.S.C. § 157(c)*, Chapter 11 cases in the Southern District of New York are automatically referred to the Bankruptcy Court. See *Enron Corp. v. Belo Co. (In re Enron Corp.), 317 B.R. 232, 2004 U.S. Dist. LEXIS 22310, 2004 WL 2480405, at *1 (S.D.N.Y. 2004)*; *Enron Power Marketing, Inc. v. Holcim, Inc (In re Enron Corp.), 2004 U.S. Dist. LEXIS 19131, No. 04 Civ. 509 (MBM), 2004 WL 2149124, [*6] at *2 (S.D.N.Y. Sept. 23, 2004)*; see also *28 U.S.C. § 157(a)* (indicating that the Bankruptcy Court derives its authority from the reference of the district court). A party can move to withdraw the reference to the Bankruptcy Court under *28 U.S.C. § 157(d)*, which provides for both discretionary and mandatory withdrawal:

> [HN2] The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

*28 U.S.C. § 157(d)* (emphasis added). Defendants move for both mandatory and permissive withdrawal of the reference of the adversary proceeding to the Bankruptcy Court.

[HN3] The mandatory-withdrawal provision of *28 U.S.C. § 157(d)* requires withdrawal of the reference to a bankruptcy court for any proceeding [*7] "that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple applica-

2004 U.S. Dist. LEXIS 23868, *

tion, of federal laws apart from the bankruptcy statutes." *City of New York v. Exxon Corp., 932 F.2d 1020, 1026 (2d Cir. 1991).* "The purpose of § *157(d)* is to assure that an Article III judge decides issues calling for more than routine application of [federal laws] outside the Bankruptcy Code." *Eastern Airlines, Inc. v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.), 1990 U.S. Dist. LEXIS 741, No. 89 Civ. 8250 (MBM), 1990 WL 5203, at *5 (S.D.N.Y. Jan. 24, 1990).* Courts in this Circuit have construed § 157(d) narrowly to prevent litigants using it as an "escape hatch" out of bankruptcy court. *In re Enron, 2004 U.S. Dist. LEXIS 19131, 2004 WL 2149124, at *4.* Mandatory withdrawal is appropriate, however, in "cases where substantial and material consideration of non-Bankruptcy Code federal [law] is necessary for the resolution of the proceeding." *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.), 922 F.2d 984, 995 (2d Cir. 1990)* (internal quotation marks and citation omitted). To satisfy the substantial-consideration [*8] test, the issues of non-bankruptcy law raised by the proceeding need not be unsettled or involve matters of "first impression." *McCrory Corp. v. 99 [cents] Only Stores (In re McCrory Corp.), 160 B.R. 502, 505 (S.D.N.Y. 1993)* (noting that what is at issue is "the degree to which the bankruptcy judge would have to consider the federal [non-bankruptcy] law" (emphasis added)). It is not clear that only a "simple application" of federal non-bankruptcy law is required of the Bankruptcy Court here. See *Exxon, 932 F.2d at 1026.*

The CalPX Tariff under which the letters of credit were initially posted indicates that the collateral was meant to cover settlement of each market participant's outstanding liabilities in the CalPX-administered power markets. Id. § 2.2 (declaring that participants "shall maintain sufficient collateral to cover the estimated potential . . . aggregate outstanding liabilities to and from [CalPX] between cash clearing cycles or during the true-up period in which the liabilities are incurred and when payment is billed and settled"); id. § 2.3 (declaring that participants' market activity would be reviewed daily and [*9] compared to posted collateral to ensure that each participant met the collateral requirement). [HN4] Federal tariffs "have the force of [federal] law and are not simply contractual." *AT&T v. City of New York, 83 F.3d 549, 552 (2d Cir. 1996).*

On July 30, 2002, the FERC interpreted Schedule 2, Section 2.2 of the CalPX Tariff in *Constellation Power Source, Inc. v. Cal. Power Exch. Corp., 100 F.E.R.C. P61,124, 2002 WL 1764921,* to deny a market participant's request that the FERC direct CalPX to release three letters of credit that had been provided as collateral under the CalPX Tariff, stating:

> The disbursement of the collateral, or any disposition of jurisdictional property . . . must be consistent with the CalPX tariff and, to the extent applicable, subject to review and approval by this Commission under *Section 203 of the FPA.*

Id. P48; see also id. P12, 27-28 (directing the order to all CalPX market participants on the ground that the "billed and settled" language in the CalPX Tariff required collateral to be retained pending the FERC's determination of outstanding liabilities arising from the California energy crisis).

The FERC [*10] has denied several requests from individual market participants to release CalPX collateral and funds on the ground that proper allocation cannot be made until the FERC resolves who owes what to whom in the wake of the California energy crisis. See *Pacific Gas & Electric Co. v F.E.R.C., 362 U.S. App. D.C. 268, 373 F.3d 1315, 1317 (D.C. Cir. 2004)* (noting further that those denials by the FERC are currently on appeal to the D.C. Circuit); see also *Pacific Gas & Electric Co. v. Cal. Power Exch. Corp., 109 F.E.R.C. P61,027, 2004 WL 2260894, P47 (Oct. 7, 2004)* ("The disbursement of funds should wait until a final computation of who owes what to whom."); *Powerex Corp. v. Cal. Power Exch. Corp., 102 F.E.R.C. P61,328, 2003 WL 1605933, P38 (Mar. 27, 2003)* (denying a market participant's request to direct CalPX to release a letter of credit posted as collateral under the CalPX Tariff). The FERC's interpretation of the tariff is that the CalPX collateral covers "outstanding liabilities" arising from CalPX market transactions, including as-yet-to-be-determined refunds:

> Based on our review of CalPX's tariff, we find that the tariff language provides a basis for [*11] retaining the collateral, since outstanding liabilities have not been billed and settled, as required by the tariff. Under the provisions of CalPX's tariff, a market participant is required to post collateral as security for potential defaults arising from this participant's failure to pay its outstanding liabilities to CalPX. Outstanding obligations are not extinguished until they are billed and settled. . . . The final billing and settlement has not yet taken place given the numerous ongoing contested proceedings regarding the transactions that occurred in the CalPX markets. . . . Only after its completion can the Commission begin to determine the liabilities of each supplier. Until those figures are deter-

2004 U.S. Dist. LEXIS 23868, *

mined, the process of final billing and set-tling cannot start.

*PG&E Energy Trading-Power, L.P. v. Cal. Power Exch. Corp., 102 F.E.R.C. P61,091, 2003 WL 245787, P14 (Jan. 30, 2003)*. In requesting that the Bankruptcy Court order CalPx to turn over the letter-of-credit proceeds, Enron invites the Bankruptcy Court to interpret the CalPX Tariff contrary to repeated FERC orders that CalPX retain collateral until all outstanding obligations are billed and settled.

As a [*12] threshold issue, it must be determined who has jurisdiction over the collateral at issue. Such a determination requires an examination of the interrelation between the bankruptcy and federal energy regulatory laws and the spheres of authority that enforce those laws. [HN5] Under the Federal Power Act, the FERC has the exclusive authority to pass upon the reasonableness of the structure, terms, and conditions pertaining to the sale and distribution of wholesale electric rates, see *16 U.S.C. §§ 824, 824d* and *824e*, but Enron casts its requested relief in non-regulatory terms and asserts that the Bankruptcy Court is confronted with a simple bankruptcy case--nothing more than a contractual dispute between the parties raising security-interest issues--such that the Bankruptcy Court can make the determination of whether to turn over the proceeds "under the provisions of the Bankruptcy Code governing secured claims, applicable nonbankruptcy law, and the terms of [Enron's] contractual agreements with [CalPX]."

A federal district court in Texas recently granted a defendant's motion to withdraw the reference from bankruptcy court in a case with virtually identical facts. See [*13] *Mirant Americas Energy Marketing, LP v. Pacific Gas & Electric Co. (In re Mirant Corp.), No. 04-CV-557-A, slip op. at 2 (N.D. Tex. Oct. 22, 2004)*. In Mirant, a participant in the California energy markets that had deposited $ 333,905.34 as "collateral" under the CalPX Tariff filed a complaint against CalPX in its bankruptcy case, *Mirant Americas Energy Marketing, LP v. PG&E (In re Mirant Corp.), 2004 Bankr. LEXIS 1378, Adv. Proc. No. 04-4242 (Bankr. N.D. Tex.)*, seeking an order directing CalPX to turn the collateral over, despite FERC orders "that no distributions be made until [the FERC's] further order." Id. In withdrawing the reference, the district court concluded that "the bankruptcy court would necessarily have to consider the Federal Power Act in ruling on the adversary complaints" and that such consideration would be "more than de minimis." Id. at 1-2.

The Bankruptcy Court cannot adjudicate this objection and determine whether the letter-of-credit proceeds must be turned over to Enron's bankruptcy estate without substantial and material consideration of federal law beyond Title 11 to determine, at the outset, whether the funds at issue fall within the FERC's exclusive jurisdiction or whether this is a garden-variety bankruptcy case. Accordingly, [*14] Defendants' motion to withdraw the reference is granted on mandatory-withdrawal grounds so that this Court may resolve the threshold jurisdictional issues in accordance with applicable non-bankruptcy federal law. The Court need not address the parties' permissive-withdrawal arguments in light of its decision.

### III. CONCLUSION

For the aforementioned reasons, Defendants' Motion to Withdraw the Reference of this adversary proceeding to the Bankruptcy Court is **GRANTED.**

**So Ordered:** New York, New York

November 22, 2004

**Richard Conway Casey, U.S.D.J.**

2003 U.S. Dist. LEXIS 189, *

LEXSEE 2003 U.S. DIST. LEXIS 189



Positive
As of: May 30, 2007

**In re: ENRON POWER MARKETING, INC., Debtor. ENRON POWER MARKETING, INC., Plaintiff, -v-CITY OF SANTA CLARA, a Chartered California Municipal Corporation d/ b/ a/ SILICON VALLEY POWER, Defendant.**

**02 Civ. 7964**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 189*

**January 8, 2003, Decided
January 8, 2003, Filed**

**DISPOSITION:**  [*1]  Defendant's motion to withdraw reference from bankruptcy court to district court denied. Court declined to exercise jurisdiction over defendant's motion to refer certain issues to administrative agency.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff debtor brought an adversary proceeding against defendant city in the United States Bankruptcy Court for the Southern District of New York for breach of electric power purchase agreements. The city moved to withdraw the reference to the bankruptcy court pursuant to *28 U.S.C.S. § 157(d)* and to refer certain issues to the Federal Energy Regulatory Commission (FERC).

**OVERVIEW:** The parties entered into agreements under which the debtor sold electric power to the city. The city failed to make a requested margin payment, suspended performance, and withheld amounts it owed the debtor. The city claimed that withdrawal from the bankruptcy court was necessary because four of its defenses involved the Federal Power Act (FPA). The district court disagreed, finding that § 157(d) did not compel withdrawal. The action was a simple breach of contract claim that the bankruptcy court could resolve by considering the unambiguous language of the agreements. The city had clearly waived its right to apply to the FERC or to rely on the FPA to challenge rates specified in the agreements. The district court also declined to order discretionary withdrawal; although the claims were non-core, the

bankruptcy court had before it a number of cases involving similar issues. Even if the city's right to a jury trial required withdrawal at a later date, it was a more efficient use of judicial resources to keep the case in the bankruptcy court for discovery. Absent withdrawal, the district court lacked jurisdiction to rule on the request for referral to the FERC.

**OUTCOME:** The city's motion to withdraw the reference was denied, and the district court declined to exercise jurisdiction over the city's motion for referral to FERC.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
[HN1] *28 U.S.C.S. § 157* sets forth, inter alia, the circumstances under which a bankruptcy court may hear cases under Title 11 of the United States Code and any proceedings arising under Title 11.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings*
[HN2] See *28 U.S.C.S. § 157(b)(1)*.

*Bankruptcy Law > Liquidations > General Overview*

2003 U.S. Dist. LEXIS 189, *

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings*
*Estate, Gift & Trust Law > Estate Administration > General Overview*
[HN3] "Core proceedings" include, inter alia, (A) matters concerning the administration of the estate and (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under *11 U.S.C.S. chs. 11,* 12, or 13 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under Title 11 of the United States Code. *28 U.S.C.S. § 157(b)(2)(A)*-(B).

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings*
[HN4] Under *28 U.S.C.S. § 157(c)*, a bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under Title 11 of the United States Code.

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings*
*Civil Procedure > Judicial Officers > General Overview*
[HN5] See *28 U.S.C.S. § 157(c)*.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
*Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations*
[HN6] See *28 U.S.C.S. § 157(d)*.

*Bankruptcy Law > Practice & Proceedings > Jury Trials*
*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*
[HN7] *28 U.S.C.S. § 157(e)*.

*Bankruptcy Law > Practice & Proceedings > Jury Trials*

*Civil Procedure > Judicial Officers > Judges > General Overview*
*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*
[HN8] Whereas *28 U.S.C.S. § 157(e)* ratifies the United States Court of Appeals for the Second Circuit's holding that bankruptcy judges can conduct jury trials in core matters, it also makes clear that they can only do so with the express consent of all the parties. However, regardless of whether a proceeding is deemed core or non-core and, relatedly, whether a party is entitled to a jury trial, a judge sitting in bankruptcy may still conduct pretrial matters--especially if a district court concludes that the case is unlikely to reach trial, if the jury demand is without merit, or if the case will necessitate protracted discovery.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Civil Procedure > Judicial Officers > Judges > General Overview*
*Governments > Courts > Judicial Precedents*
[HN9] It is well-settled that mandatory withdrawal pursuant to *28 U.S.C.S. § 157(d)* is narrowly applied, and is appropriate only when "substantial and material" conflicts might exist between non-bankruptcy federal laws and Title 11 of the United States Code. Specifically, this provision of the statute has been interpreted to mandate withdrawal in situations where a bankruptcy judge would be called upon to interpret, rather than simply to apply, federal law apart from the bankruptcy statutes. Situations in which courts have found "substantial and material" issues of federal statutory interpretation include (1) issues of first impression; (2) analyses of tariffs requiring something other than a rote application of existing precedent; and (3) the decision as to whether resort to administrative remedies is a prerequisite to commencing an action in court. In addition, mandatory withdrawal is a fact specific determination, and thus necessarily involves analysis in light of the circumstances involved in each case.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
[HN10] Courts in the Second Circuit have interpreted the mandatory withdrawal provision of *28 U.S.C.S. § 157(d)* narrowly for, if read literally, it would eviscerate much of the work of the bankruptcy courts.

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > General Overview*
[HN11] *18 C.F.R. § 35.15(b)(2)* explicitly exempts power contracts entered into after July 9, 1996, from the notice

2003 U.S. Dist. LEXIS 189, *

provisions of § 35.15(a): Any power sales contract executed on or after July 9, 1996, that is to terminate by its own terms shall not be subject to the provisions of § 35.15(a).

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > General Overview*

[HN12] *18 C.F.R. § 35.15(b)(2)* is clear on its face that the 60-day pre-termination notice under § 35.15(a) does not apply to contracts into after July 9, 1996.

*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*
*Contracts Law > Contract Interpretation > General Overview*

[HN13] It is well-settled under New York law that courts will enforce unambiguous commercial agreements that are entered into between sophisticated parties. Where sophisticated parties negotiate at arm's length, the court cannot and should not rewrite the contract--no matter how poorly drafted--to include language or rights that a party itself was unable to insert.

*Bankruptcy Law > Practice & Proceedings > Contested Matters*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings*

[HN14] The United States Court of Appeals for the Second Circuit has identified a number of factors that courts should consider when determining whether withdrawal "for cause" exists under *28 U.S.C.S. § 157(d)*, including (1) whether the claim is core or non-core; (2) whether the claim is legal or equitable; (3) whether the claim is triable by a jury; (4) the most efficient use of judicial resources; (5) reduction of forum shopping; (6) conservation of estate and non-debtor resources; and (7) uniformity of bankruptcy administration. The question of withdrawal depends on considerations of efficiency, prevention of forum shopping, and uniformity in the administration of bankruptcy law. While the determination of whether withdrawal for cause is warranted turns partly on whether a proceeding is core or non-core, it should be noted that core/non-core status is a mere factor and a finding that a matter is core or non-core does not automatically determine jurisdiction for the action.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings*

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings*

[HN15] In re Orion outlines a two-step test that courts should apply in determining whether a reference should be withdrawn from a bankruptcy court for cause. First, the court should consider whether a claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn. Once a court has made a core/non-core determination, it must then proceed to weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors. However, it is important to note that, even if a proceeding does not fall within *28 U.S.C.S. § 157*'s definitional ambit of "core," under § 157(c) the bankruptcy court may still exercise non-core jurisdiction during the pre-trial phase if the proceeding is clearly a matter which is "otherwise related" to the bankruptcy proceeding. Courts have continued to make a core/non-core determination in accordance with the first step of the In re Orion analysis even with the addition of § 157(e). The core/non-core status of a claim is one factor, among several, that courts should consider when deciding a motion for discretionary withdrawal.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings*
*Bankruptcy Law > Practice & Proceedings > Jury Trials*
*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*

[HN16] A district court is not compelled to withdraw a reference to a bankruptcy court simply because a party is entitled to a jury trial. A rule that would require a district court to withdraw a reference simply because a party is entitled to a jury trial, regardless of how far along toward trial a case may be, runs counter to the policy favoring judicial economy that underlies the statutory scheme governing the relationship between the district courts and bankruptcy courts. Although withdrawal is an important component of this scheme, the court must employ it judiciously in order to prevent it from becoming just another litigation tactic for parties eager to find a way out of bankruptcy court.

*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings*
*Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings*

[HN17] In considering whether to withdraw a reference to a bankruptcy court in a non-core proceeding from the beginning or whether the bankruptcy court should oversee

2003 U.S. Dist. LEXIS 189, *

pretrial matters and only later transfer the case to the district court for trial, courts should take into account the following three factors: (1) whether the case is likely to reach trial; (2) whether protracted discovery with court oversight will be required; and (3) whether the bankruptcy court has familiarity with the issues presented. The party seeking to withdraw reference must demonstrate that withdrawal is in the interests of judicial economy and that it will be prejudiced by having the bankruptcy court oversee pretrial matters.

***Bankruptcy Law > Liquidations > General Overview***
***Energy & Utilities Law > Transportation & Pipelines > Electricity Transmission***
***Estate, Gift & Trust Law > Estate Administration > General Overview***
[HN18] *28 U.S.C.S. § 157(b)(2)(B)* states that allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under *11 U.S.C.S. chs. 11,* 12, or 13 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under Title 11 of the United States Code constitute core proceedings.

***Bankruptcy Law > Estate Property > Noncustodial Turnovers***
[HN19] A turnover proceeding is an action to collect a debt that is indisputably the property of the estate and that is matured, payable on demand, or payable on order. *11 U.S.C.S. § 542(b).*

***Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings***
***Bankruptcy Law > Practice & Proceedings > Jury Trials***
***Civil Procedure > Trials > Jury Trials > Right to Jury Trial***
[HN20] If a case is non-core and a jury demand has been filed, a district court might find that the inability of the bankruptcy court to hold a trial constitutes cause to withdraw the reference. Immediate withdrawal is not favored in a situation where a case is unlikely to reach trial, if the bankruptcy court is already familiar with the proceeding, and/or it would be in the interests of judicial economy to keep the case in the bankruptcy court for the purpose of pretrial oversight.

***Bankruptcy Law > Practice & Proceedings > Contested Matters***

***Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings***
***Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings***
[HN21] Although a literal reading of *28 U.S.C.S. § 157(b)(3)* seems to encompass all matters in which a debtor is involved, courts have construed the section in light of the statute as a whole and have concluded that such a broad reading would be improper. Matters that concern the administration of the bankrupt estate tangentially are related, non-core proceedings.

***Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings***
***Estate, Gift & Trust Law > Estate Administration > General Overview***
[HN22] To hold a claim to be core merely because it is a matter concerning the administration of a bankruptcy estate creates an exception that would swallow the rule as any contract claim would "concern" the administration of the estate.

***Bankruptcy Law > Practice & Proceedings > Jurisdiction > Noncore Proceedings***
***Civil Procedure > Judicial Officers > Judges > General Overview***
***Governments > Courts > Judges***
[HN23] A bankruptcy court can exercise non-core, pretrial jurisdiction under *28 U.S.C.S. § 157(c)* where the proceeding is clearly a matter which is "otherwise related" to the bankruptcy proceeding. The bankruptcy judge may adjudicate pretrial matters not requiring the "final order or judgment" reserved to the district court under § 157(c)(1). Even if a defendant is entitled to a jury trial, withdrawal may take place at a later date--thereby allowing the bankruptcy judge supervision over and management of pretrial matters. A rule that would require a district court to withdraw a reference simply because a party is entitled to a jury trial, regardless of how far along toward trial a case may be, runs counter to the policy favoring judicial economy that underlies the statutory scheme governing the relationship between the district courts and bankruptcy courts.

***Bankruptcy Law > Practice & Proceedings > Contested Matters***
***Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
[HN24] Unless a district court withdraws the reference to a bankruptcy court in whole or in part pursuant to *28*

*U.S.C.S. § 157(d)*, the case is within the subject matter jurisdiction of the bankruptcy court.

**COUNSEL:** For Enron Power Marketing, Inc: Jonathan D Polkes, Cadwalader, Wickersham & Taft, New York, NY USA.

For Enron Power Marketing, Inc: Mark C Ellenberg, Washington, DC USA.

For Enron Power Marketing, Inc, DEBTOR: Jonathan D Polkes, Cadwalader, Wickersham & Taft, New York, NY USA.

For Enron Power Marketing, Inc, DEBTOR: Mark C Ellenberg, Washington, DC USA.

**JUDGES:** Hon. HAROLD BAER, JR., District Judge.

**OPINION BY:** HAROLD BAER, JR.

**OPINION:**

  **OPINION & ORDER**

**Hon. HAROLD BAER, JR., District Judge:**

  The City of Santa Clara d/ b/ a/ Silicon Valley Power ("defendant" or "the City") moves both (1) to withdraw the reference of this adversary proceeding ("proceeding"), brought by Enron Power Marketing, Inc. ("plaintiff" or "Enron") in the Bankruptcy Court for the Southern District of New York, pursuant to *28 U.S.C. § 157(d)*; and (2) upon such withdrawal, to refer certain issues to the Federal Energy Regulatory [*2] Commission (the FERC) for determination under the doctrine of primary jurisdiction. For reasons detailed more fully below, defendant's motion to withdraw the reference is denied, and I decline to exercise jurisdiction over defendant's motion to refer certain issues to the FERC.

**PROCEDURAL BACKGROUND**

  On July 22, 2002, plaintiff commenced this action in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") to recover post-petition debts owed by the City under a pre-petition agreement and subsequent individual agreements that were entered into for the purchase and sale of electrical power. Specifically, the Complaint alleges that the City breached the clear terms of the agreement by (1) failing to post margin as required under the agreement; (2) failing to pay plaintiff for power supplied by plaintiff to the City; (3) improperly suspending performance under the agreement; and (4) failing to pay plaintiff immediately an early termination payment in the amount of $ 146,261,529.50 due as a result of plaintiff's early termination of the agreement.

The second, third, and fourth breaches occurred after plaintiff filed its petition [*3] for relief in Bankruptcy Court on December 2, 2001. The City moves to withdraw the reference to the Bankruptcy Court claiming that, in concert with *28 U.S.C. § 157(d)*, this Court, pursuant to the Federal Power Act ("FPA"), must forward the matter to the FERC. Alternatively, the City contends that the reference should be withdrawn because the adversary proceeding, according to defendant, is not a "core" proceeding and because the defendant is entitled to a jury trial as it would be in any other breach of contract action -- something which the Bankruptcy Court cannot do in the absence of both parties' consent, which is not present here. Finally, the City urges the Court to refer certain issues to the FERC for resolution under the doctrine of primary jurisdiction.

**FACTUAL BACKGROUND**

  On September 10, 1999, the parties entered into the agreement, under which they entered into a number of transactions to buy or sell electric power at a fixed price for a fixed time period. (Ward Decl. P 2). The parties entered into a number of transactions following the execution of the agreement, which transactions were generally for a term of three months or less. [*4] Specifically, on August 29, 2000 and April 17, 2001, the parties entered into individual long-term transactions ("transactions"), under which plaintiff agreed to sell to the City, and the City agreed to pay for, energy delivered by plaintiff at a fixed price. Such transactions were memorialized by written confirmation letters which stated that "the rates for services specified herein shall remain in effect for the term of this Confirmation Letter, and shall not be subject to change through the application of the Federal Energy Regulatory Commission pursuant to provisions of Section 205 and 206 of the Federal Power Act absent the agreement of all parties to this Confirmation Letter." (Id. PP 9, 10, Exs. B, C).

  Section 4.1 of the agreement provides a list of "Events of Default." The parties agreed that if at any point during the term of the agreement, regardless of whether or not an event of default has occurred, the market price of electricity moved such that the early termination payment that would be owed to plaintiff was more than $ 15 million, then plaintiff could request that the City provide performance assurance -- in other words, to post margin -- in an amount equal to [*5] the early termination payment in excess of the $ 15 million. On the other hand, if at any point during the agreement the early termination payment that would be owed to the City was more than $ 20 million, then the City may request that plaintiff provide performance assurance in an amount equal to the early termination payment in excess of the $ 20 million. (Ward Decl. P 8).

Between the time that the parties entered into the transactions and November 2001, the price of electricity dropped dramatically. Consequently, at the end of November 2001 and pursuant to the agreement, plaintiff determined that the City's net obligation to plaintiff as of November 26, 2001 was $ 94,176,291. (Ward Decl. P 12). Accordingly, on November 27, 2001, plaintiff sent the City a letter requesting that the latter make a margin payment of $ 79,250,000 as required under the terms of the agreement. (Id.). This failure by the City to make the payment triggered an event of default under the agreement. (Id. P 13).

Plaintiff filed for bankruptcy on December 2, 2001. Shortly after plaintiff's call for margin, the City triggered the second event of default when it suspended performance under the agreement. [*6] More precisely, by letter dated November 29, 2001, the City requested that plaintiff provide it with performance assurance in the form of a letter of credit in the amount of $ 31,750,000. (Id. P 14). Then, on December 3, 2001, the City informed plaintiff that as of December 5, 2001, the City was suspending further performance under the agreement because plaintiff was in default of the agreement for failure to provide the City with the requested performance assurance. (Id.). Finally, on December 11, 2001, the City triggered yet another event of default when it informed plaintiff that the City would not be paying the monies it owed plaintiff -- $ 1,010,439.50 for electricity purchases during the month of November 2001 -- because it was applying a set off to a portion of the amount it conceded that it owed and was withholding the remaining amount owed as security against plaintiff's future payment obligations. Plaintiff points out that the agreement does not contain a provision that would permit the City to suspend performance or withhold payment. (Id. P 16).

On December 21, 2001, plaintiff informed the City that it was in default under the agreement. (Id. P 17, Ex. H). [*7] After the City failed to cure the defaults, plaintiff sent a letter to the City on December 28, 2001 informing it that plaintiff was terminating any outstanding transactions under the agreement and setting January 2, 2002 as the early termination date. (Id. P 18). Nearly five months later, on May 30, 2002, plaintiff informed the City that, based on plaintiff's application of the early termination payment calculation formula described in section 4.3 of the agreement, and because the market price for energy had dropped between the date of the transactions and the early termination date, plaintiff was entitled to an early termination payment from the City in the amount of at least $ 146,261,529.50. (Id. P 19, Ex. J). The City has not yet provided plaintiff with an early termination payment, and for this reason plaintiff filed this adversary proceeding in the Bankruptcy Court on July 22, 2002. The Complaint asserts a claim for turnover of property under *11 U.S.C. § 542(b)* and breach of contract, and seeks the immediate payment and turnover of the early termination payment. Plaintiff claims that this payment is property of its estate and critical to the administration [*8] and re-organization of the estate in bankruptcy. (Id. P 20).

## ANALYSIS

### 1. Standard Under Title *28 U.S.C. § 157*

*28 U.S.C. § 157* [HN1] sets forth, inter alia, the circumstances under which a bankruptcy court may hear cases under Title 11 and any proceedings arising under Title 11. Specifically, that statute provides, in relevant part, that [HN2] "bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." *28 U.S.C. § 157(b)(1)*. [HN3] "Core proceedings" include, inter alia, "(A) matters concerning the administration of the estate; (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate [*9] for purposes of distribution in a case under title 11 ...." Id. § 157(b)(2)(A-B). [HN4] Under subsection (c), a bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. That subsection states, in pertinent part, that [HN5] "in such proceedings, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." Id. § 157(c). Under subsection (d) of the statute, [HN6] "the district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." Id. § 157(d). Finally, under subsection (e), [HN7] "if the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the [*10] express consent of all the parties." Id. § 157(e). [HN8] Whereas this last section ratified the Second Circuit's holding in In re Ben Cooper, Inc., that bankruptcy judges could conduct jury trials in core matters, it also made clear that they could only do so with the express consent of all the parties. See *896 F.2d 1394, 1398* (2d Cir.), vacated and remanded, *498 U.S. 964 (1990),* reinstated on remand,

2003 U.S. Dist. LEXIS 189, *

*In re Ben Cooper, Inc., 924 F.2d 36* (2d Cir.), cert. denied, *500 U.S. 928, 114 L. Ed. 2d 126, 111 S. Ct. 2041 (1991)*. However, regardless of whether a proceeding is deemed core or non-core and, relatedly, whether a party is entitled to a jury trial, a judge sitting in bankruptcy may still conduct pre-trial matters -- especially if a district court concludes that the case is unlikely to reach trial, if the jury demand is without merit, or if the case will necessitate protracted discovery. See *Keene Corp. v. Williams Bailey & Wesner, L.L.P., 182 B.R. 379, 384 (S.D.N.Y. 1995)* (quoting *In re Orion Pictures Corp, 4 F.3d 1095, 1101-02 (2d Cir. 1993))*.

The City maintains that withdrawal [*11] of the reference to Bankruptcy Court in this case is necessary for the following reasons: (1) withdrawal is mandatory under subsection (d) of the statute; and (2) the reference may be withdrawn for a number of "cause[s] shown" under subsection (d). In addition, upon withdrawal from the Bankruptcy Court, the City requests that this Court refer issues to the FERC under the doctrine of primary jurisdiction.

## 2. Mandatory Withdrawal

[HN9] It is well-settled that mandatory withdrawal pursuant to § 157(d) is narrowly applied, and is appropriate only when "substantial and material" conflicts might exist between non-bankruptcy federal laws and Title 11. See *In re Keene, 182 B.R. at 382.* Specifically, this provision of the statute has been interpreted to mandate withdrawal in situations where a bankruptcy judge would be called upon to interpret, rather than simply to apply, federal law apart from the bankruptcy statutes. See, e.g., *City of New York v. Exxon Corp., 932 F.2d 1020, 1026 (2d Cir. 1991);* see also *In re Keene, 182 B.R. at 382* ("Withdrawal is also warranted when resolution of the matter would require the bankruptcy judge [*12] to 'engage in significant interpretation, as opposed to simple application,' of federal non-bankruptcy statutes") (citation omitted). Situations in which courts have found "substantial and material" issues of federal statutory interpretation include: (1) issues of first impression; (2) analyses of tariffs requiring something other than a rote application of existing precedent; and (3) the decision as to whether resort to administrative remedies is a prerequisite to commencing an action in court. See *Int'l Assoc. of Machinists and Aerospace Workers, AFL-CIO v. Eastern Air Lines, Inc., 103 B.R. 416, 419 (S.D.N.Y. 1989),* aff'd, *925 F.2d 26 (1991).* In addition, mandatory withdrawal is "a fact specific determination, and thus necessarily involves analysis in light of the circumstances involved in each case." *In re Keene, 182 B.R. at 382.*

Defendant's main argument is that withdrawal is mandatory in cases where federal law is a "substantial and material consideration" in the resolution of a proceeding,

and that such is the case here. Specifically, defendant maintains that this case involves more than a simple application of the FPA, that [*13] is, the federal act on which four of the its defenses are based. Those defenses include: (1) whether plaintiff's failure to give notice of termination to the FERC 60 days prior to termination violated a regulation promulgated under the FPA; (2) whether plaintiff's computation of the early termination payment violates the "just and reasonable" as well as the "public interest" standards under the FPA; (3) the extent to which all, or any, of these questions must be referred to the FERC for resolution under the doctrine of primary jurisdiction. In other words, defendant urges that FPA issues are "intertwined" throughout this case, and that for this reason withdrawal from bankruptcy is mandatory and that referral to the FERC is necessary. "The questions of what rates, charges, terms and conditions of service are 'just and reasonable' or 'contrary to the public interest' are not questions for a court." (Def.'s memorandum at 6).

Plaintiff counters that withdrawal is by no means mandated in this particular situation for a number of reasons. As a preliminary matter, plaintiff points to the fact that [HN10] courts in this Circuit have interpreted the mandatory withdrawal provision narrowly, for [*14] "if read literally, [it] would eviscerate much of the work of the bankruptcy courts." *O'Connell v. Terranova, 112 B.R. 534, 536 (S.D.N.Y. 1990).* It is plaintiff's contention that the Bankruptcy Court is the proper forum here because this case involves a relatively simple turnover and breach of contract action and that the Bankruptcy Court can resolve these issues by looking at the parties' agreement -- rather than by considering, let alone "substantially" considering, certain provisions of the FPA. First, and more precisely, plaintiff argues that the FPA's notice provisions, codified at *18 C.F.R. § 35.15(a)*, do not even apply here because the notice statute applies only to power contracts entered into prior to July 9, 1996, and the agreement here was entered into well after that date, on September 10, 1999. n1 Second, plaintiff points out that the rates charged in the agreement have already been approved by the FERC when they were filed and are therefore presumed valid and enforceable. See, e.g., *Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994)* ("a 'filed rate' -- that is, one approved by the governing regulatory [*15] agency -- is per se reasonable and unassailable in judicial proceedings brought by [or against] rate payers"). Third and last, the two confirmation letters, dated August 29, 2000 and April 17, 2001, respectively, are clear and unambiguous on their face that the agreed upon rates "are not subject to change through the application to the Federal Energy Regulatory Commission pursuant to provisions ... of the Federal Power Act." (Ward Decl. Exs. B & C).

2003 U.S. Dist. LEXIS 189, *

n1 That section provides, in pertinent part, that

> when a rate schedule or part thereof required to be on file with the Commission is proposed to be cancelled or is to terminate by its own terms and no new rate schedule or part thereof is to be filed in its place, each party required to file the schedule shall notify the Commission of the proposed cancellation or termination on the form indicated in § 131.53 of this chapter at least sixty days but not more than one hundred-twenty days prior to the date such cancellation or termination is proposed to take effect. *18 C.F.R. § 35.15(a).*

[HN11] Section (b)(2) explicitly exempts power contracts, like the one at issue here, entered into after July 9, 1996: "Any power sales contract executed on or after July 9, 1996 that is to terminate by its own terms shall not be subject to the provisions of paragraph (a) of this section." Id. § 35.15(e).

[*16]

I agree with plaintiff that a mandatory withdrawal is not compelled in the instant case under § 157(d). As plaintiff points out, "this is a simple action for ... breach of contract," one which "the Bankruptcy Court can resolve ... by analyzing and considering the clear and unambiguous language of the [agreement] itself and the facts in this case." (Pl.'s memorandum at 8). The complaint filed by plaintiff in Bankruptcy Court alleges just two causes of action, namely, a turnover cause of action brought under *11 U.S.C. § 542*(b) and a breach of contract cause of action that appears to be the exclusive province of state law. (See Ward Decl. Ex. K). Although defendant maintains that several of its defenses involve both the FPA and the FERC, I do not agree that the federal issues are substantial, let alone substantial issues of "first impression" that preclude resolution by a bankruptcy court judge. With respect to the defense based on the notice provisions under the FPA (see Hatcher Decl. P 17, Seventh Defense), *18 C.F.R. § 35.15(e)* [HN12] is clear on its face that the 60-day pre-termination notice does not apply to contracts, like the [*17] agreement at issue here, entered into after July 9, 1996. Similarly, with respect to the defenses based on the ostensible unreasonableness of the terms and conditions of the agreement allegedly in violation of the §§

205 & 206 of the FPA, (see *id. PP 19-21,* Eighth -- Tenth Defenses), I do not find that interpretation -- let alone substantial interpretation -- of either the FPA or the FERC is necessary. n2 Quite the contrary, the attachments to the two confirmation letters expressly provide that the parties will neither apply to the FERC nor rely on the provisions of the FPA to challenge the rates specified in the agreement. In other words, the clear and unambiguous language of the letters indicate that the City waived its right to challenge the rates charged under the agreement. [HN13] It is well-settled under New York law that courts will enforce unambiguous commercial agreements that are entered into between sophisticated parties. See *Karabu v. Pension Ben. Guar. Corp., 1997 U.S. Dist. LEXIS 19582, 1997 WL 759462,* at *14 (S.D.N.Y. Dec. 10, 1997) (stating that "where, as here, sophisticated parties negotiate at arm's length, the Court cannot and should not rewrite the contract--no matter [*18] how poorly drafted--to include language or rights that a party itself was unable to insert"). Because I agree with plaintiff that this is a relatively simple action for breach of contract that will not necessitate interpretation -- let alone substantial interpretation of issues of first impression -- I find that mandatory withdrawal is not warranted.

n2 Section 205 of the FPA, *16 U.S.C. § 824d(a)*, provides, in pertinent part, that

> all rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful. Id. § 824d(a).

Section 206, *16 U.S.C. § 824e(a)*, provides, in pertinent part, that

> whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission,

or that any rule, regulation, prac-
tice, or contract affecting such rate,
charge, or classification is unjust,
unreasonable, unduly discrimina-
tory or preferential, the Commis-
sion shall determine the just and
reasonable rate, charge, classifica-
tion, rule, regulation, practice, or
contract to be thereafter observed
and in force, and shall fix the same
by order. Id. § 824e(a).

[*19]

### 3. Discretionary Withdrawal

Defendant next contends that the proceeding should
be withdrawn for cause, that is, regardless of whether or
not the Court determines that it involves a core or
non-core matter. Plaintiff maintains not only that this is a
core proceeding, but also that defendant's entitlement to a
jury trial, in and of itself, does not compel immediate
withdrawal of the reference. While I disagree with plain-
tiff that this is a core proceeding, I do agree that this factor
alone is not determinative with respect to whether or not
reference to the Bankruptcy Court must be withdrawn.

Section 157(d) of the statute states, in relevant part,
that "the district court may withdraw ... any case or pro-
ceeding referred [to the bankruptcy court] under this sec-
tion ... for cause shown." Id. [HN14] The Second Circuit
has identified a number of factors that courts should con-
sider when determining whether withdrawal "for cause"
exists under § 157(d), including: (1) whether the claim is
core or non-core; (2) whether the claim is legal or equi-
table; (3) whether the claim is triable by a jury; (4) the
most efficient use of judicial resources; (5) reduction of
forum shopping; [*20] (6) conservation of estate and
non-debtor resources; and (7) uniformity of bankruptcy
administration. See  *Orion Pictures Corp. v. Showtime
Networks, 4 F.3d 1095, 1101 (2d Cir. 1993)*. In re
Orion, the Second Circuit stated that the question of
withdrawal depends on "considerations of efficiency,
prevention of forum shopping, and uniformity in the ad-
ministration of bankruptcy law." *In re Orion, 4 F.3d at
1101*. While the determination of whether withdrawal for
cause is warranted turns partly on whether a proceeding is
core or non-core, "it should be noted that [core/ non-core]
status is a mere factor and 'a finding that a matter is core or
non-core does not automatically determine jurisdiction for
this action.'" *In re Keene, 182 B.R. at 383* (quoting  *In re
Orion, 4 F.3d at 1101)*.

[HN15] The In re Orion court outlined the two-step
test that courts should apply in determining whether a

reference should be withdrawn for cause. First, the court
should consider whether a claim is core or non-core,
"since it is upon this issue that questions of efficiency and
uniformity will turn." *In re Orion, 4 F.3d at 1101*. [*21]
Once a court has made a core/ non-core determination, it
must then proceed to "weigh questions of efficient use of
judicial resources, delay and costs to the parties, uni-
formity of bankruptcy administration, the prevention of
forum shopping, and other related factors." Id. However,
it is important to note that, even if a proceeding does not
fall within the statute's definitional ambit of "core," under
§ 157(c) the bankruptcy court may still exercise non-core
jurisdiction during the pre-trial phase if the proceeding "is
clearly a matter which is 'otherwise related' to the bank-
ruptcy proceeding." *In re Keene, 182 B.R. at 384 n.3*
(quoting § 157(c)). As plaintiff correctly observes, courts
have continued to make a core/ non-core determination in
accordance with the first step of the In re Orion analysis
even with that edition of subsection (e). See, e.g.,  *In re
Keene, 182 B.R. at 383* (noting that the core/ non-core
status of a claim is one factor, among several, that courts
should consider when deciding a motion for discretionary
withdrawal); see also  *In re County Seat Stores, Inc., 2002
U.S. Dist. LEXIS 1555, 2002 WL 141875*, at *4 ("the
threshold inquiry [*22]  is whether a claim is core or
non-core because that determination can affect the re-
mainder of the analysis"). Finally, and perhaps most im-
portant for the purpose of the motion before me, [HN16] a
district court is not compelled to withdraw a reference
"simply because a party is entitled to a jury trial." As the
court stated in In re Kenai, a non-core proceeding:

> A rule that would require a district court to
> withdraw a reference simply because a
> party is entitled to a jury trial, regardless of
> how far along toward trial a case may be,
> runs counter to the policy favoring judicial
> economy that underlies the statutory
> scheme governing the relationship be-
> tween the district courts and bankruptcy
> courts. Although withdrawal is an impor-
> tant component of this scheme, the court
> must employ it judiciously in order to
> prevent it from becoming just another
> litigation tactic for parties eager to find a
> way out of bankruptcy court. *136 B.R. 59,
> 61 (S.D.N.Y. 1992)*.

[HN17] In considering whether to withdraw a reference in
a non-core proceeding from the beginning or whether a
bankruptcy court should oversee pretrial matters and only
later transfer the case to the district court for [*23]  trial,
courts should take into account the following three factors:

2003 U.S. Dist. LEXIS 189, *

"(1) whether the case is likely to reach trial; (2) whether protracted discovery with court oversight will be required; and (3) whether the bankruptcy court has familiarity with the issues presented." *In re Times Circle East, Inc., 1995 U.S. Dist. LEXIS 11642, 1995 WL 489551*, at *3 (S.D.N.Y. Aug. 15, 1995). The party seeking to withdraw reference must demonstrate that withdrawal is in the interests of judicial economy and that it will be prejudiced by having the bankruptcy court oversee pretrial matters. See, e.g., *1995 U.S. Dist. LEXIS 11642*, [WL] at *3 (citing *In re Gaston & Snow, 173 B.R. 302, 307 (S.D.N.Y. 1994)).

Here, defendant maintains that it is entitled to withdrawal for cause under § 157(d) on a number of grounds. First, defendant argues that the proceeding involves non-core issues, namely, breach of contract, that do not relate directly or even tangentially to plaintiff's bankruptcy proceeding. Specifically, defendant claims not only that the agreement was pre-petition and therefore antecedent to plaintiff's bankruptcy, but also that plaintiff is unable to demonstrate that its bankruptcy action even directly affects a core [*24]   function. For instance, plaintiff argues that post-petition breaches of pre-petition contracts are core proceedings because they involve turnover actions and other claims against the estate that subject the parties to the Bankruptcy Court's equitable power. It is plaintiff's view that claims by a Chapter 11 debtor for post-petition breach of contract -- as here -- "are essential to the 'administration of the estate' and, therefore, are core proceedings under *28 U.S.C. § 157(b)(2)(A)*." (Pl.'s memorandum at 13 (quoting *28 U.S.C. § 157(b)(2)(A)*). In addition, plaintiff also claims that defendant is seeking a setoff against plaintiff's estate as one of its affirmative defenses, specifically, defendant's contention that it failed to pay plaintiff a payment in the amount of $ 1,010,439 for delivery of electricity because it was "setting off" this amount against additional amounts that plaintiff allegedly owed defendant. (Def.'s memorandum at 10). Section 157(b)(2)(B) [HN18] states that "allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming [*25]   a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11 ...." constitute core proceedings. Id. Defendant counters that plaintiff has *not* presented the Court with [HN19] a turnover proceeding, that is, an action to collect "a debt that is [indisputably] the property of the estate and that is matured, payable on demand, or payable on order," *11 U.S.C. § 542(b)*, but rather with an action that will require the Court to resolve in the first instance whether or not the claimed debt is even due. (Def.'s memorandum at 13). In addition, defendant submits that it has by no means commenced a core claims allowance proceeding against

plaintiff because defendant has not asserted any setoff or counterclaim against plaintiff. Put more simply, defendant denies that its non-payment of the November invoice was an event of default because, at the time of non-payment, there was a good faith dispute as to whether plaintiff was even owed anything under the agreement. (Def.'s reply memorandum at 6; Hatcher [*26]   reply decl. at PP 22-26).

Second, defendant argues that, even if this Court *did* find that core issues were at stake, withdrawal is still necessary because defendant has requested a jury trial and such trials are not permitted in Bankruptcy Court, in core matters, without the consent of all parties under subsection (e) to the statute, which was added in 1994. In other words, defendant contends that withdrawal is imperative whether the proceeding is core or non-core: if it is core, then withdrawal is made necessary by the fact that defendant has not consented to a jury trial before the bankruptcy judge, as it must under § 157(e); if it is non-core, then a bankruptcy judge cannot try the case in front of a jury in the first place. As the Second Circuit stated in In re Orion, [HN20] "if a case is non-core and a jury demand has been filed, a district court might find that the inability of the bankruptcy court to hold a trial constitutes cause to withdraw the reference." *In re Orion, 4 F.3d at 1101*. Plaintiff counters that defendant's entitlement to a jury trial does not compel *immediate* withdrawal of the reference for the same reasons that the In re Keene court [*27]   determined that immediate withdrawal is not favored in a situation where a case is unlikely to reach trial, if the Bankruptcy Court is already familiar with the proceeding, and/ or it would be in the interests of judicial economy to keep the case in Bankruptcy Court for the purpose of pretrial oversight. See *In re Keene, 182 B.R. at 385*.

Third, defendant argues that the other factors outlined in In re Orion, namely, judicial efficiency and uniformity of bankruptcy administration, favor a withdrawal of reference at this time. Specifically, it is defendant's view that forcing bankruptcy judges to adjudicate non core proceedings -- even if only while in their pre-trial phases -- would represent a wasteful use of "'the time and resources of litigants and judges,' the shifting of cases between bankruptcy court and district court 'that interrupts an ongoing proceeding.'" (Def.'s memorandum at 16, quoting *In re Grabill Corp., 967 F.2d 1152, 1159 (7th Cir. 1992)* (Posner, J., dissenting). However, plaintiff counters that the law in this Circuit clearly suggests otherwise, and I agree.

### i. Core/ Non-Core Distinction in This Case

First, with [*28]   respect to the core/ non-core determination, plaintiff flatly denies that the issues involved in its adversary proceeding are non-core. As with the plaintiff in Keene, plaintiff here claims that because the

adversary proceeding is *central* to the administration of the estate, and will therefore have a great impact on the estate, the proceeding should be deemed core. However, the In re Keene court rejected an identical argument, finding that

> [HN21] although a literal reading of § 157(b)(3) seems to encompass all matters in which the Debtor is involved, courts have construed the section in light of the statute as a whole and have concluded that such a broad reading would be improper. *See Ben Cooper, Inc. v. The Insurance Co. of the State of Pennsylvania (In re Ben Cooper), 896 F.2d 1394, 1398 (2d Cir. 1990).* ("Matters that concern the administration of the bankrupt estate tangentially are related, non-core proceedings.") Moreover, in *In re Orion,* the Second Circuit expressly rejected such a sweeping interpretation, reasoning that it would render any pre-petition action for damages brought by the debtor as being at the "heart" of its administration due [*29] to the possibility of a sum of money being awarded to the estate. *182 B.R. at 383-84.*

Plaintiff cites a line of cases in which the courts have held that a post-petition breach of a pre-petition contract raises issues that fall within the definitional contours of a "core" proceeding. For instance, in In re Seatrain Lines, Inc., this Court stated that "courts in this circuit have held that post-petition causes of action give rise to core proceedings," and found that because the contracts at issue in that case (insurance policies) were executed pre-petition and the estate's cause of action accrued post-petition (when the defendants refused the estate's demand for defense and indemnification) it could properly be deemed a "core" proceeding under § 157(b)(2)(A). See *198 B.R. 45, 51 (S.D.N.Y. 1996);* see also *In re Century Brass Prods., Inc., 1992 U.S. Dist. LEXIS 1277, 1992 WL 22191,* at *2-3 (D. Conn. 1992)* (post-petition claim under pre-petition contract "concerns the administration of the estate and is a 'core' proceeding pursuant to § 157(b)(2)(A)"). Here, plaintiff argues that it has raised core issues within the meaning of § 157 because at least three [*30] of the events triggering its breach of contract action occurred after the petition was filed -- in other words, its complaint is grounded in post-petition claims arising from a pre-petition contract. More precisely, plaintiff filed for bankruptcy protection on December 2, 2001. On December 3, 2001, defendant informed plaintiff that as of December 5, 2001, it was suspending any further per-

formance under the agreement. Further, by letter dated December 11, 2001, defendant informed plaintiff that although it owed plaintiff $ 1,010,439 for electricity during the month of November 2001, it was refusing to pay. Finally, although plaintiff informed defendant by letter dated May 30, 2002 that plaintiff was entitled to an early termination payment in the amount of at least $ 146,261,529, defendant has failed to provide the early termination payment as required under the agreement.

I disagree with plaintiff that defendant's alleged breaches raise core issues under § 157. Plaintiff attempts to marshal case law -- e.g., In re Seatrain -- in support of its contention that issues relating to post-petition breaches of pre-petition contracts are *invariably* considered core under § 157. However, [*31] the cases relied on by plaintiff each involved reasoning that was explicitly rejected by the Second Circuit in In re Orion as well as by subsequent courts in this Circuit. For instance, in In re McMahon, this Court openly criticized In re Seatrain for "misapprehending" In re Orion, insofar as that case *did* involve a post-petition breach of a pre-petition contract. See *In re McMahon, 222 B.R. 205, 208 (S.D.N.Y. 1998).* Indeed, as the In re Orion court asserted, [HN22] "to hold [a] claim to be core merely because it is a matter 'concerning the administration of the estate,' creates an exception 'that would swallow the rule' as any contract claim would 'concern' the administration of the estate." *In re McMahon, 222 B.R. at 208* (quoting *In re Orion, 4 F.3d at 1102)).* Because I find that plaintiff's causes of action are essentially contract claims dressed up as bankruptcy claims, they must be considered "non-core" for the purpose of the present motion to withdraw the reference from Bankruptcy Court.

### ii. Other Considerations in This Case

My inquiry with respect to discretionary withdrawal, however, does [*32] not end with a determination that this is a non-core proceeding. Rather, I must also consider other factors, such as the most efficient use of judicial resources, the uniformity of the administration of the bankruptcy laws, and delay and costs to the parties. Here, I find that the evidence weighs overwhelmingly in plaintiff's favor. On December 20, 2002, plaintiff submitted a supplemental declaration in which it informed this Court that "there are twelve adversary proceedings of which we are aware, not including the instant case, pending in the United States Bankruptcy Court for the Southern District of New York ... before the Honorable Arthur J. Gonzalez, involving Enron Corporation and/ or its affiliates." (Polkes' Decl. P 2). Plaintiff and/ or its affiliates filed the respective complaints in these proceedings between June 5, 2002 and December 10, 2002. (Id.). As evidenced by the complaints that are appended to the declaration, all of these cases involve master agreements for the purchase

and sale of a commodity; while the commodity itself varies -- electrical power, natural gas, coal, crude oil -- the agreements and their underlying provisions are similar in scope. Specifically, [*33] the cases all involve a defendant, like the one here, that has allegedly breached a master agreement by failing to pay plaintiff and/ or its affiliates certain termination payments. As such, each case involves the interpretation of key provisions of the master agreement, including the provisions governing events of default, early termination, suspension of performance and/ or calculation and payment of a termination payment -- provisions that are all at issue in this case. (Id. P 3.) Clearly, then, because Judge Gonzalez is dealing with a number of cases involving analogous claims and issues, the most efficient use of judicial resources would be to keep this case before Judge Gonzalez in the Bankruptcy Court, at least for pre-trial discovery purposes.

It must be noted that my decision in this case need not and does not rest on the core/ non-core distinction or even on the fact that defendant is entitled to a jury trial. As discussed above, the core/ non-core distinction at least for the present purposes is a distinction without a difference: if I found the issues to be non-core, which I do, [HN23] the Bankruptcy Court could still exercise non-core, pre-trial jurisdiction under § 157(c) [*34] because the proceeding "'is clearly a matter which is 'otherwise related' to the bankruptcy proceeding." In re Keene, 182 B.R. at 384 n.3 (quoting § 157(c)). Although In re Keene involved non-core issues, Judge Duffy nevertheless denied defendant's motion to withdraw the reference at that time on the ground that "the bankruptcy judge may adjudicate pretrial matters not requiring the 'final order or judgment' reserved to the district court under § 157(c)(1)." Id. at 385. Even if defendant is entitled to a jury trial, withdrawal may take place at a later date -- thereby allowing the bankruptcy judge supervision over and management of pretrial matters. As Judge Wood stated in In re Kenai, "[a] rule that would require a district court to withdraw a reference simply because a party is entitled to a jury trial, regardless of how far along toward trial a case may be, runs counter to the policy favoring judicial economy that underlies the statutory scheme governing the relationship between the district courts and bankruptcy courts." 136 B.R. at 61.

Of the three pertinent factors that courts typically consider when weighing whether [*35] to withdraw a reference -- is the case likely to reach trial, will protracted discovery with court oversight be required, and does the

bankruptcy court have greater familiarity with the issues presented -- I find that all three fall on plaintiff's side of the scale. Here, the proceeding is only at a preliminary stage and might very well be resolved by dispositive motions. Further, given the nature of the claims and affirmative defenses, there will likely be a large amount of discovery necessitating significant court oversight. Finally, and most importantly, Judge Gonzalez, who is presiding over twelve other cases brought by plaintiff and/ or one of its affiliates and all of which involve similar issues, is familiar with the salient issues in all the cases and is far more able to supervise all of them together, unless and until a jury trial is necessary.

### 4. Referral to the FERC

In denying defendant's motion to withdraw the reference, this case remains entirely within the subject matter of the Bankruptcy Court and I am divested of jurisdiction to rule on defendant's request for referral to FERC under the doctrine of primary jurisdiction. See, e.g., In re Kashani, 190 B.R. 875, 884 (9th Cir. 1995) [*36] [HN24] ("unless the district court withdraws the reference, in whole or in part pursuant to 28 U.S.C. § 157(d), the case is within the subject matter jurisdiction of the bankruptcy court"); In re Burger Boys, Inc., 94 F.3d 755, 762 (2nd Cir. 1996) (district court could not decide factual issues without withdrawing the reference).

### CONCLUSION

For the foregoing reasons, defendant's motion to withdraw the reference from Bankruptcy Court before Judge Gonzalez to this Court under 28 U.S.C. § 157 is denied, and, for this reason, I decline to exercise jurisdiction over defendant's motion to refer certain issues to the FERC. The clerk of the court is instructed to remove this case and any open motions from my docket.

**IT IS SO ORDERED.**

**New York, New York**

**January 8, 2003**

**Harold Baer**

**U.S.D.J.**

2006 Bankr. LEXIS 1963, *

LEXSEE 2006 BANKR. LEXIS 1963



Analysis
As of: May 30, 2007

**In re: NRG ENERGY, INC., et al., Reorganized Debtors.**

**Chapter 11, Case no. 03-13024 (PCB)**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 Bankr. LEXIS 1963*

**May 17, 2006, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Debtor, a wholesale marketer of energy in the California market, filed objections to claims of creditors, various public purchasers of energy, which alleged they were injured by having to pay excessive rates for electricity. The marketer's objections contended the claims were barred by federal preemption doctrines, including conflict preemption, field preemption, and the filed rate doctrine.

**OVERVIEW:** The bankruptcy court had confirmed the marketer's plan, which had become effective in December 2003. The preemption issue centered on the Federal Power Act and whether, under the market-based system of setting wholesale electricity rates, the Federal Energy Regulatory Commission (FERC) was sufficiently active in the regulation of energy rates to justify federal preemption of state laws. The purchasers argued that California's deregulation erased the hold of preemption. However, the Ninth Circuit had recently held that federal preemption applied. The market-based tariff was subject to approval by FERC upon a showing that the seller lacked or had mitigated its market power. FERC also continually monitored the rates by requiring each seller to file quarterly reports detailing the rates charged and the power delivered. Finally, FERC reviewed and approved the detailed tariffs filed by the State's wholesale purchasing entities. The claims were thus barred by field and conflict preemption, and the filed rate doctrine prevented the court from setting a different, hypothetical fair rate against which to measure the amount of the allowable claims.

**OUTCOME:** The marketer's objection was sustained as to all purchasers other than one public utility whose claim was not pursued in the instant action, and the objection to that claim was overruled without prejudice.

**LexisNexis(R) Headnotes**

*Constitutional Law > Supremacy Clause > Federal Preemption*
[HN1] Federal preemption of state law is rooted in the Supremacy Clause, U.S. Const. art. VI, cl. 2.

*Civil Procedure > Federal & State Interrelationships > Federal Common Law > Preemption*
*Constitutional Law > Supremacy Clause > Federal Preemption*
[HN2] Preemption may be express or implied: In the absence of express preemption, federal law may preempt state claims in two ways. Under field preemption, if Congress evidences an intent to occupy a given field, any state law falling within that field is preempted. Alternatively, there is conflict preemption: if Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Energy & Utilities Law > Electric Power Industry > Rates > Filed Rate Doctrine*

[HN3] Under the filed rate doctrine, the terms of the filed tariff are considered to be "the law" and to therefore conclusively and exclusively enumerate the rights and liabilities of the contracting parties. As a result, the filed rate doctrine bars all claims, state and federal, that attempt to challenge the terms of a tariff that a federal agency has reviewed and filed.

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
[HN4] Section 201 of the Federal Power Act, *16 U.S.C.S. § 824d*, delegates to the Federal Energy Regulatory Commission (FERC) the exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce. Congress thereby drew a bright line, easily ascertained, between state and federal jurisdiction such that FERC clearly has exclusive jurisdiction over the rates to be charged to interstate wholesale customers.

*Constitutional Law > Supremacy Clause > Federal Preemption*
*Energy & Utilities Law > Electric Power Industry > Rates > Filed Rate Doctrine*
[HN5] Any cause of action or claim that requires a forum other than Federal Energy Regulatory Commission to compute the reasonable price for wholesale electricity or damages based upon the payment of a price in excess of the reasonable price is barred by the three related doctrines of field preemption, conflict preemption, and the filed rate doctrine.

**COUNSEL:** [*1] For NRG Energy, Inc. aka Newport aka Newport RDF aka Elk River aka Elk River RDF aka Becker Ash Landfill, Debtor: Edward Sassower, Kelly K Frazier, Michael A. Cohen, Kirkland & Ellis, New York, NY; Leonard A. Budyonny, Lisa Laukitis, Matthew Allen Cantor, Samuel Kohn, Kirkland & Ellis LLP, New York, NY; Robbin L. Itkin, Kirkland & Ellis, Los Angeles, CA; Ryan B. Bennett, Kirkland & Ellis, Chicago, IL.

For United States Trustee, U.S. Trustee: Pamela Jean Lustrin, United States Trustee, New York, NY.

For Official Commitee Of Unsecured Creditors, Official Committee of Unsecred Creditors, Creditor Committee: Evan D. Flaschen, Patrick J. Trostle, Renee M. Dailey, Bingham McCutchen LLP, Hartford, CT; Sanford Philip Rosen, Sanford P. Rosen & Associates, P.C., New York, NY.

**JUDGES:** Stuart M. Bernstein, Chief United States Bankruptcy Judge.

**OPINION BY:** Stuart M. Bernstein

**OPINION:**

**MEMORANDUM DECISION SUSTAINING IN PART AND OVERRULING IN PART OBJECTION TO CLAIMS**

**STUART M. BERNSTEIN**

**Chief United States Bankruptcy Judge:**

The debtor, NRG Energy, Inc. ("NRG"), supplemented an earlier objection to certain claims, identified below, contending that they are barred by various [*2] federal preemption doctrines. The claims relate to excessive electricity rates paid by the creditors. For the reasons that follow, the objection is sustained in part and overruled in part.

**BACKGROUND**

At all relevant times prior to the bankruptcy, NRG was engaged, inter alia, in the sale of electricity in the wholesale energy market in California. On May 14, 2003, NRG and its debtor affiliates (collectively, "NRG") filed these chapter 11 cases. On November 24, 2003, the Bankruptcy Court entered an order confirming NRG's plan, and the NRG Plan became effective on December 5, 2003.

**A. The California Energy Market**

The claims at issue arise out of the California energy crisis that occurred earlier this decade. The background is summarized in *California v. Dynegy, Inc., 375 F.3d 831, 835-36 (9th Cir. 2003)*, cert. denied, *544 U.S. 974, 125 S. Ct. 1836, 161 L. Ed. 2d 724 (2005)* and *Public Util. Dist. No. 1 v. Dynegy Power Mktg. Inc., 384 F.3d 756, 758-59 (9th Cir. 2004)*("Snohomish"), cert. denied, *545 U.S. 1149, 125 S. Ct. 2957, 162 L. Ed. 2d 905 (2005)*, and following discussion is distilled from those decisions.

Prior to 1996, California electricity [*3] rates were based on the cost of producing and transmitting electricity plus an expected rate of return. The Federal Energy Regulatory Commission, or FERC, reviewed and approved the cost-based tariffs. The rate schedules had to be published, and the utility could charge only the filed rate.

In 1996, California switched from a cost-based to a market-based system in which rates were determined by competitive forces. Through appropriate legislation, California formed two non-governmental entities, both subject to FERC regulation, to facilitate the transmission and sale of electricity. The Independent Power Exchange ("PX") operated what amounted to a daily market for the purchase and sale of electricity. Wholesale buyers and

sellers of electricity submitted bids, and PX set the market-clearing price based on its evaluation of the bids. Every exchange took place at that price, regardless of the actual "bid" and "asked" prices.

The Independent System Operator ("ISO") was responsible for the efficient functioning of the high-voltage transmission grid. Essentially, ISO operated a spot market that matched the supply and demand at any given time through two distinct programs. First, producers [*4] of electricity would offer to sell ISO "imbalance energy," i.e., energy needed to balance the grid. The sellers' bids had to be made no later than 45 minutes before the operating hour. ISO ranked the bids, and purchased the electricity the market-clearing price. Second, ISO procured "ancillary services." Under this program, producers contracted with ISO to hold capacity in reserve in case it was needed in the future. The producers were compensated for holding the capacity in reserve, and were also compensated if ISO purchased any of the reserved capacity.

The rates in the PX and ISO markets for wholesale electricity rose dramatically during 200 and 2001, and consumer users paid record high rates. This spawned a host of lawsuits. n1 Numerous entities sued various wholesale electricity sellers, including NRG, alleging that the defendants had manipulated the market in violation of California law, and caused the plaintiffs to pay higher prices for electricity. Several of the pending actions were consolidated in the San Diego Superior Court under a Master Complaint, and denominated the Wholesale Electricity I & II Cases. n2 Oscar's Photo Lab, suing on behalf of itself and all other [*5] similarly situated California business and residential ratepayers (the "Ratepayers"), and Borrego Water District, Padre Dam Water District, Ramona Water District, Sweet Water Authority, Valley Center Water District, Vista Irrigation District, Fallbrook Public Utility District and Yuima Water District (collectively, the "Water Districts" and together with the Ratepayers, the "Claimants"), joined as plaintiffs under the Master Complaint. (See Master Complaint, PP 8-10, 12-15, 19, 22 and 72.) NRG was one of many named defendants. (Id., at P 31.)

n1 In addition, FERC commenced refund proceedings, and has conducted investigations into the trading, price manipulation and other activities that form the basis of the lawsuits. See *In re Enron Corp., 326 B.R. 257, 260 (Bankr. S.D.N.Y. 2005).*

n2 A copy of the Master Complaint is annexed as Exhibit 3 to the Answer of Borrego Springs Water District [etc.], dated Apr. 6, 2004 (ECF Doc. # 1308).

The Master Complaint alleged that the defendants' [*6] conduct violated California's antitrust law, *CAL. BUS. & PROF. CODE §§ 16700, et seq.*, and California's unfair competition law. Id., *§§ 17200, et seq.* By order dated July 22, 2005, the California state court dismissed the claims against NRG without prejudice based on these bankruptcy proceedings. n3 The California court subsequently dismissed the entire Master Complaint under the doctrine of federal preemption on October 3, 2005, reasoning that "Congress delegated to FERC [Federal Energy Regulation Commission] the 'exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce.'" (NRG Supplement, Ex. 1, at 2) (quoting *New England Power Co. v. New Hampshire, 455 U.S. 331, 340, 102 S. Ct. 1096, 71 L. Ed. 2d 188 (1982)).* Alternatively, the court concluded that the plaintiffs' claims were barred by the filed rate doctrine. (NRG Supplement, Ex. 1, at 4.)

n3 A copy of the July 22, 2005 order is annexed as Exhibit 2 to NRG's Supplement to Objection of NRG Energy, Inc. to Claims Filed by [the Claimants], dated Jan. 31, 2006 ("NRG Supplement") (ECF Doc. # 1629).

[*7]

## B. The Claims Objections

In the interim, the Claimants filed the following claims in the NRG bankruptcy cases:

| Claimant | Claim Nos. |
| --- | --- |
| Ratepayers | 572, 574, 575, 576 |
| Sweet Water Authority | 271, 1730 |
| Ramona Water District | 272, 1729 |
| Vista Irrigation District | 273, 1728 |
| Yuima Water District | 274 |
| Fallbrook Public Utility District | 1726 |
| Padre Dam Water District | 276, 1725 |

2006 Bankr. LEXIS 1963, *

| Claimant | Claim Nos. |
|----------|-----------|
| Valley Center Water District | 278, 1731 |
| Borrego Water District | 1245, 1732 |

_____

The Ratepayers' claims, which are identical, were filed against four NRG affiliates. Each attached the Master Complaint. The initial claims filed by the Water Districts (other than Fallbrook Public Utility District) n4, (see claim nos. 271-274, 276, 278, 1245), were also identical, except for the amount. Each annexed a declaration executed by Mary E. Coburn, Esq., that referred to and implicitly incorporated the allegations in the Master Complaint. The higher-numbered, later claims filed by Water Districts (except Yuima Water District), (see Claim nos. 1725-26, 1728-32), asserted administrative claims. n5

n4 The Fallbrook claim (No. 1726) may have been included in this supplemental objection by error. In any event, the text of the supplement does not mention Fallbrook, and for this reason, the objection is overruled without prejudice as to Fallbrook. Unless otherwise noted, further references to the Water Districts or their claims does not include Fallbrook.

[*8]

n5 The administrative claims referred to the Water Districts' earlier 2001 complaint rather than the Master Complaint that superseded it.

On or about March 4, 2004, NRG filed its First Omnibus Motion Objecting to Claims (ECF Doc. # 1216), which included the claims of the Claimants. The objection asserted three grounds: (1) the claims are not enforceable against NRG under any agreement or applicable law, (2) NRG's books and records did not indicate any amount owing, and (3) the claims are were unliquidated. The Ratepayers and Water Districts filed opposition, and that motion is still pending before a different judge.

In January 2006, NRG filed this supplement to its earlier objection. In the main, NRG now contends that the claims are barred by federal preemption and the filed rate doctrine. In addition, NRG maintains that the claims of Oscar's Photo Lab ("OPL") are barred by collateral estoppel The Ratepayers' filed a response, in which the Water Districts joined, contending that the state law claims are not preempted, and the filed rate doctrine does not apply because there were no filed rates. [*9]

**DISCUSSION**

**A. Preemption**

[HN1] "Federal preemption of state law is rooted in the *Supremacy Clause*, Article VI, clause 2, or the United States Constitution." *Transmission Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 928 (9th Cir. 2002).* [HN2] Preemption may be express or implied:

In the absence of express preemption, federal law may pre-empt state claims in two ways. . . . Under field preemption, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." *Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).* Alternatively, there is conflict preemption: "[i]f Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." Id. (internal citations omitted).

*California v. Dynegy, Inc., 375 F.3d at 849*; accord *New York v. FCC, 267 F.3d 91, 101 (2d Cir. 2001)* [*10] ("Federal preemption of state law can occur in several different ways: first, Congress may explicitly provide for preemption; second, Congress's intent to preempt state law may be inferred where the federal regulation in a particular area 'left no room for supplementary state regulation;' third, state law is nullified to the extent that it actually conflicts with federal law.")(Citation omitted).

The filed rate doctrine is related to field and conflict preemption:

[HN3] Under the filed rate doctrine, the terms of the filed tariff "are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' "of the contracting parties. *Evanns v. AT & T Corp., 229 F.3d 837, 840 (9th Cir.2000)* (citing *Marcus v. AT & T Co., 138 F.3d 46, 56 (2d Cir.1998))*; see also *Evanns, 229 F.3d at*

*840 n. 9.* As a result, "the filed rate doctrine bars all claims -- state and federal -- that attempt to challenge [the terms of a tariff] that a federal agency has reviewed and filed." *County of Stanislaus v. Pacific Gas & Elec. Co., 114 F.3d 858, 866(9th Cir.1997); Evans, 229 F.3d at 840.* [*11] See also *AT & T Co. v. Central Office Tel., Inc., 524 U.S. 214, 227-28, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998)* (filed rate doctrine barred state law claims for breach of contract and tortious interference with contractual relations).

*California v. Dynegy, Inc., 375 F.3d at 853.*

## B. The Federal Power Act

The preemption in this matter arises from the Federal Power Act (the "FPA"). [HN4] Section 201 of the FPA, *16 U.S.C. § 824d*, delegates to FERC the "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce." *New England Power Co. v. New Hampshire, 455 U.S. 331, 340, 102 S. Ct. 1096, 71 L. Ed. 2d 188 (1982);* see also *Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 962, 106 S. Ct. 2349, 90 L. Ed. 2d 943 (1986).* Congress thereby drew "a bright line [,] easily ascertained, between state and federal jurisdiction" such that "FERC clearly has exclusive jurisdiction over the rates to be charged [to] interstate wholesale customers." *Nantahala, 476 U.S. at 966* (quoting *Fed. Power Comm'n v.S. Cal. Edison Co., 376 U.S. 205, 215, 84 S. Ct. 644, 11 L. Ed. 2d 638 (1964)* ("FPC")); *New York v. FERC, 535 U.S. 1, 6-7, 122 S. Ct. 1012, 152 L. Ed. 2d 47 (2002).* [*12]

As a result of FERC's exclusive authority in the area, [HN5] any cause of action or claim that requires a forum other than FERC to compute the reasonable price for wholesale electricity or damages based upon the payment of a price in excess of the reasonable price is barred by the three related doctrines of field preemption, conflict preemption and the filed rate doctrine. These principles apply even where the claims are asserted solely under state law. Two cases that are factually analogous if not identical to the present case illustrate this principle.

In Snohomish, the plaintiff alleged that the defendants had manipulated the price of wholesale electricity, and caused the plaintiffs to pay higher prices, in violation of California's antitrust and unfair competition laws. The plaintiff sought injunctive relief, disgorgement, restitution, damages and attorney's fees. *Id. at 759-60.* The district court ruled that the claims were barred by the filed rate doctrine and the principles of conflict and field preemption. *Id. at 760.*

On appeal, the plaintiff argued that the preemption doctrines should not apply to the wholesale electricity market because market-based rates, rather [*13] than FERC determined rates, apply. Id. According to the Ninth Circuit Court of Appeals, "[t] he fundamental question in this case is whether, under the market-based system of setting wholesale electricity rates, FERC is doing enough regulation to justify federal preemption of state laws." Id.

Building on its prior decisions in California v. Dynegy, Inc. and *Public Util. Dist. No 1 v. IDACORP, Inc., 379 F.3d 641 (9th Cir. 2004)* ("Grays Harbor"), the Ninth Circuit answered the question in the affirmative. First, each seller was required to file a market-based umbrella tariff. The tariff preauthorized the seller to engage in market based sales, and place the public on notice that the seller might do so. *384 F.3d at 760.* The market-based tariff was subject to approval by FERC "upon a showing that the seller lacked or had mitigated its market power." Id. FERC's determination enforced the belief that the seller will be able to charge only just and reasonable rates. Id. Second, FERC continually monitored the rates by requiring each seller to file quarterly reports detailing the rates charged and the [*14] power delivered. Id. Third, FERC reviewed and approved the detailed tariffs filed by PX and ISO. *Id. at 761.*

Affirming the district court, the Court of Appeals concluded:

> Snohomish's claims in this case allege violations of state antitrust and unfair competition law rather than the state contract law claims involved in Grays Harbor, but Snohomish's claims also ask the district court to determine the rates that "would have been achieved in a competitive market." This is the same determination as the "fair price" determination that we held was barred by preemption principles in Grays Harbor. We therefore hold that Snohomish's claims are barred by the filed rate doctrine, by field preemption, and by conflict preemption.

*Id. at 761.*

*In re Enron Corp., 328 B.R. 75 (Bankr. S.D.N.Y. 2005),* aff'd sub nom., *Oscar's Photo Lab v. Enron Corp., 2006 U.S. Dist. LEXIS 66681, No. 05 Civ. 9981 (MGC) (S.D.N.Y. 2006)*(ECF Doc. # 15), reached the same result on similar facts. There, Oscar's Photo Labs asserted the same claims alleged in this case. Judge Gonzalez ruled that the claims were barred by field preemption, *id. at 80-83,* [*15] conflict preemption, *id. at 83,* and the filed rate doctrine. *Id. at 83-86.* District Judge Cedarbaum

affirmed "on the opinion of the Bankruptcy Court with respect to the filed rate doctrine and preemption based on the conflict between the Federal Power Act, *16 U.S.C. § 824*, and state antitrust and unfair competition laws."

Indeed, the California court dismissed the Master Complaint asserting the same claims by the same Claimants under these preemption doctrines. At oral argument, NRG's counsel acknowledged that the lower state court determination would not be entitled to collateral estoppel effect under California law. Nevertheless, the state court decision is persuasive, and adds to the well-established law in this area.

Undaunted, the Claimants continue to prosecute the same claims that have been rejected by the California state and federal courts, Judge Gonzalez and Judge Cedarbaum. They simply rehash arguments made and rejected in those cases, and require no additional comment. Here, the Claimants' state law antitrust and unfair competition claims essentially require the Court to compute a hypothetical reasonable rate, [*16] and award damages in the form of an allowable claim measured by the difference between the reasonable rate and the market-based rates paid by the purchasers. Congress, however, has granted FERC the exclusive jurisdiction in the field of setting the reasonable rate for the purchase and sale of wholesale electricity, and the Claimants' efforts to enforce their claims in this Court conflict with that Congressional purpose. Accordingly, the claims are barred by field and conflict preemption. In addition, the filed rate doctrine prevents this Court from setting a different, hypothetical fair rate against which to measure the amount of the allowable claims. In light of this conclusion, it is unnecessary to decide whether the claim of Oscar's Photo Labs is also barred by principles of collateral estoppel based on the Enron decision.

Accordingly, NRG's objection is sustained as to all Claimants other than Fallbrook, and the objection to claim no. 1726 is overruled without prejudice. Settle order on notice.

Dated: New York, New York

May 17, 2006

/s/ ***Stuart M. Bernstein***

Chief United States Bankruptcy Judge