**EXHIBIT C**

# ORIGINAL    JONES DAY



51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001-2113
TELEPHONE: (202) 879-3939 • FACSIMILE: (202) 626-1700

FILED
OFFICE OF THE
SECRETARY

2007 APR -6  P 4: 45

FEDERAL ENERGY
REGULATORY COMMISSION

April 6, 2007

**VIA HAND DELIVERY**

Ms. Philis J. Posey
Acting Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

> Re:    South Carolina Electric & Gas Company
>        Docket No. ER03-1398-~~005~~
>        Compliance Filing

Dear Ms. Posey:

    Pursuant to Section 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d,[1] and the Federal Energy Regulatory Commission's ("FERC" or "Commission") March 7, 2007 order in this proceeding, 118 FERC ¶ 61,185 (2007) ("March 2007 Order"), South Carolina Electric & Gas Company ("SCE&G"), hereby submits this filing in compliance with the Commission's directives in the March 2007 Order. Enclosed herewith are an original and five (5) copies of the compliance filing and other materials as required by the March 2007 Order and the Commission's regulations.

    SCE&G submits for the Commission's acceptance the Construction and Maintenance Agreement Between South Carolina Electric & Gas Company and Columbia Energy LLC ("C&M Agreement"), revised pursuant to the March 2007 Order to reflect: (1) the application of transmission credits to charges for service using those facilities that the Commission determined to be network upgrades in its prior order in this proceeding, *South Carolina Electric & Gas Company*, 106 FERC ¶ 61,265 (2004) ("March 2004 Order"); (2) the inclusion in those required credits of any tax gross-up or other tax-related payments associated with the network upgrades; (3) the assignability of the right to credits; and (4) the application of those transmission credits and interest until such time as SCE&G has made a full offset, with interest, of all amounts paid for the upgrades by Columbia Energy LLC ("Columbia"), a subsidiary of Calpine Corporation

---

[1] Because this filing is made pursuant to FPA Section 205, SCE&G anticipates that the Commission will issue an order within 60 days of the date of this filing. FPA Section 205(c) requires that public utilities file "all rates and charges for any transmission or sale subject to the jurisdiction of the Commission . . . together with all [related] contracts[.]" 16 U.S.C. § 824d(c). As the Commission has noted, interconnection is an element of transmission service and is required to be provided pursuant to the Commission's *pro forma* tariff. *See, e.g., Tennessee Power Company*, 90 FERC ¶ 61,238 at 61,761, *reh'g dismissed*, 91 FERC ¶ 61,271 (2000).

WAI-2821763v2
858430 - 030001

ATLANTA  •  BEIJING  •  BRUSSELS  •  CHICAGO  •  CLEVELAND  •  COLUMBUS  •  DALLAS  •  FRANKFURT  •  HONG KONG  •  HOUSTON
IRVINE  •  LONDON  •  LOS ANGELES  •  MADRID  •  MILAN  •  MOSCOW  •  MUNICH  •  NEW DELHI  •  NEW YORK  •  PARIS  •  PITTSBURGH
SAN DIEGO  •  SAN FRANCISCO  •  SHANGHAI  •  SILICON VALLEY  •  SINGAPORE  •  SYDNEY  •  TAIPEI  •  TOKYO  •  WASHINGTON

Ms. Philis J. Posey                                             **JONES DAY**
April 6, 2007
Page 2

("Calpine"). Such revisions, together with the explanations in this letter, implement the
Commision's directives in the March 2007 Order.

The Commission also directed SCE&G to provide a description of each of its
transmission service agreements "with Columbia." March 2007 Order at P 47. SCE&G does not
have, and never has had, any transmission service agreements with Columbia. Columbia sells
the output from the Columbia Energy Center to its affiliated marketer, Calpine Energy Services
L.P. ("CES"), also a Calpine subsidiary.[2] As between these two affiliates, CES, as the purchaser
of its fellow Calpine affiliate's generation output, is the entity that makes the necessary
arrangements for the transmission of that power. In 2001, CES entered into two service
agreements with SCE&G – one for firm point-to-point transmission service and the other for
non-firm point-to-point transmission service ("Service Agreements"). The agreements conform
to the forms of service agreement contained in SCE&G's open-access transmission tariff
("OATT") and allow CES to make firm and non-firm transmission service reservations through
SCE&G's Open Access Same-Time Information System ("OASIS"). Pursuant to such
agreements, CES made short- and long-term reservations for service from the Columbia Energy
Center, including four 103 MW reservations for long-term firm service made prior to the May
2004 start of commercial operation of the Columbia Energy Center and initially set to begin
January 1, 2004 ("Long Term Reservations").[3]

As part of this compliance filing SCE&G demonstrates that, with the contract changes
addressed herein, SCE&G has satisfied all of the obligations imposed by the Commission in both
the March 2004 Order and the March 2007 Order, including complete payment of all of the
credits required by the Commission. SCE&G's issuance of credits is consistent with the March
2004 Order, SCE&G's filing in compliance with that order, the Commission's crediting policy
and Columbia's own request that the C&M Agreement be further revised to allow for the
assignment of credits.

---

[2] *See* Columbia's application for market-based rate authority, which stated that Columbia "sells the
[Columbia Energy Center's] electric output to CES and thermal output to Eastman Chemical Company." *See* March
16, 2006 filing submitted in Docket No. ER06-741-000, transmittal letter at page 4. Such application was granted
by unpublished letter order on April 24, 2006.

[3] Service pursuant to CES' Long-Term Reservations was to commence on January 1, 2004 and to terminate
on January 1, 2005. Pursuant to Section 17.7 of the SCE&G OATT, CES was entitled to, and on two occasions did,
defer commencement of the Long-Term Reservations to the next calendar year by paying a deferral fee, as required
by the OATT. In 2005, CES did not defer the reservations for another calendar year through payment of the fee and
the Long-Term Reservations commenced on January 1, 2006.

Ms. Philis J. Posey                                                **JONES DAY**
April 6, 2007
Page 3


## I.    BACKGROUND

### A.    The C&M Agreement

Pursuant to FPA Section 205, on September 29, 2003, as supplemented on November 4, 2003, SCE&G filed the executed C&M Agreement. The March 2004 Order accepted the C&M Agreement subject to SCE&G making certain modifications. The Commission found that certain facilities, referred to as the "Narrow U Facilities," were network upgrades and that "their cost must be repaid, over time, to Columbia by SCE&G granting Columbia credits against the transmission rates paid by Columbia to SCE&G." March 2004 Order at P 20. On April 21, 2004, SCE&G filed under protest a revised C&M Agreement ("Revised C&M Agreement") that included a new Section 7.2.1 providing credits for the cost of network upgrades in compliance with the March 2004 Order.[4]

On May 12, 2004, Columbia filed a protest to SCE&G's compliance filing ("May 2004 Protest") requesting that the Commission require SCE&G to make certain further modifications to the Revised C&M Agreement including that "Columbia may assign its rights to the credits and repayment rights to any person."[5]

On the same day that SCE&G submitted its compliance filing, SCE&G sought rehearing of the March 2004 Order, and requested, among other relief, that SCE&G be permitted to directly assign, as provided in the original C&M Agreement, the costs of the interconnection facilities constructed by SCE&G to interconnect the Columbia Energy Center with SCE&G's transmission system.

Nearly three years after SCE&G sought rehearing of the March 2004 Order and filed the Revised C&M Agreement in compliance with that order, and after SCE&G had fully credited to CES the cost of the network upgrades with interest, the Commission issued the March 2007

---

[4] Section 7.2.1 of the Revised C&M Agreement provides:

Credits for Transmission Facility Upgrades Required for Interconnection. Customer shall be entitled to transmission credits, equal to the total amount paid to SCE&G for the Transmission Facility Upgrades Required for Interconnection, on a dollar-for-dollar basis for the non-usage sensitive portion of transmission charges, as payments are made under SCE&G's OATT for transmission services with respect to Customer's device that utilizes the Transmission Facility Upgrades Required for Interconnection. Transmission credits shall be applied until such time as the cost of the Transmission Facility Upgrades Required for Interconnection have been fully offset, after which time such offset or credits shall no longer apply. Alternatively, SCE&G may, at its sole discretion, choose to repay to Customer any amounts advanced by Customer for Transmission Facility Upgrades Required for Interconnection not credited to Customer at any time. Any credits shall include interest calculated in accordance with the methodology set forth in FERC's regulations from the date of the payment for the Transmission Facility Upgrades Required for Interconnection until the date the credit is applied.

[5] Protest of Columbia Energy LLC to Filing of South Carolina Electric & Gas Company filed on May 12, 2004 in Docket No. ER03-1398 at pp 5-6.

WAI-2821763v2
858430 - 030001

Ms. Philis J. Posey
April 6, 2007
Page 4

**JONES DAY**

Order, denying SCE&G's rehearing request and accepting the Revised C&M Agreement subject to further modification as directed in the order. The instant filing is made in compliance with the directives of the March 2007 Order.

### B.    Transmission Service Agreements

As noted above, Columbia has never requested transmission service on SCE&G's transmission system and has taken no steps to become a customer eligible for service under SCE&G's OATT. Since the start of the Columbia Energy Center's commercial operation in May 2004 through the present, CES has been the only affiliate of Columbia (*i.e.*, the only Calpine subsidiary) to reserve capacity from the facility.

In compliance with the Commission's March 2004 Order, the Revised C&M Agreement, Commission policy requiring that credits for network upgrades be applied only against charges for transmission from the facility causing the upgrades,[6] and Columbia's own request to be able to assign its right to credits, SCE&G began applying credits against transmission charges incurred by CES for its May 2004 transmission service from the Columbia Energy Center.[7] On June 9, 2004, before sending CES its first invoice, SCE&G assured Columbia via electronic mail that SCE&G would issue credits "on a dollar for dollar basis against [the] non-usage sensitive portion of the transmission charges, as payments are made under SCE&G's Tariff for transmission services with respect to the Generating Facilities connected to the [network upgrades]." That communication also included an invoice for the balance that Columbia owed to SCE&G for the interconnection facilities. Besides paying the balance owed, Columbia made no reply regarding SCE&G's crediting approach presumably because SCE&G's assurance that dollar-for-dollar credits would be applied commensurately with transmission payment accorded not only with Columbia's arrangements with its affiliate CES, whereby CES would take transmission from the Columbia Energy Center, but also with Columbia's express request in its May 2004 Protest that the credits be assignable. SCE&G thus issued credits to CES between

---

[6] In Order No. 2003-A, the Commission revised the Large Generator Interconnection Agreement to prohibit the use of credits for transmission service unrelated to the facility causing the network upgrades so that generators would have the appropriate incentive in making facility siting decisions. *See Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, FERC Stats. & Regs. ¶ 61,146 (2003), *reh'g*, Order No. 2003-A, FERC Stats. & Regs. ¶ 61,160 at PP 614-15 (2004), *reh'g*, Order No. 2003-B, FERC Stats. & Regs. ¶ 31,171 (2005), *reh'g*, Order No. 2003-C, FERC Stats. & Regs. ¶ 31,190 (2005) (stating "it is appropriate that credits be given only for transmission service that includes the Generating Facility as the source of the power transmitted."); *see also Duke Energy Corporation*, 94 FERC ¶ 61,187 at 61,659 (2001) (stating "[t]he purpose of the credit is to compensate the generator for the costs of network upgrades once it begins to take transmission service. While the credit may be transferred to a customer taking network service, the credit is nonetheless appropriately tied to the specific generator.").

[7] SCE&G's invoices to CES for each month of service during the period of May 2004 through September 2006 included this transmission credit as a line item. The invoices' description of the credit varied during that period to include the terms "Credit – FERC Identified Network Upgrades at Columbia Energy Center," "Credit – FERC Identified Network Upgrade" and "FERC Identified Network Credit." In this way, SCE&G demonstrated to CES with each invoice that CES was receiving the credits that had been ordered by the Commission.

Ms. Philis J. Posey
April 6, 2007
Page 5

**JONES DAY**

May 2004 and September 2006. As of the September 2006 invoice, SCE&G had issued credits in the amount of $5,090,089.94, which equals the full amount funded by Columbia, with interest. *See* spreadsheet at Attachment A showing credits issued by month.

On December 20, 2005 ("Petition Date"), Calpine and its subsidiary companies, including Columbia and CES, filed a voluntary petition for Chapter 11 bankruptcy protection.[8] In August 2006, after SCE&G had issued credits to CES for over two years, Columbia, by way of an email from one of its attorneys, asserted that SCE&G had "mistakenly appropriated" such credits by granting them to CES instead of Columbia. The attorney asked to be advised as to when SCE&G would "turnover the property" of the Columbia estate. In that correspondence, the attorney also indicated a willingness to discuss payment of "CES obligations," a reference to charges incurred by CES for transmission service from the Columbia Energy Center that CES had not paid, as described below.[9]

Shortly after Calpine and its subsidiaries Columbia and CES had filed under Chapter 11, SCE&G sought adequate assurance of payment for postpetition transmission services provided to CES. Despite a May 12, 2006 letter in which CES asserted that it had determined that the "Firm Point-to-Point Transmission Agreement out of the Columbia Energy Center" provided no benefit to CES' bankruptcy estate and that CES "releases and relinquishes any right to ongoing service or capacity under the Contract,"[10] CES has not sought approval of either the bankruptcy court or the FERC to reject or terminate its Service Agreements. Therefore, pursuant to the applicable provisions of the OATT, SCE&G remained obligated to provide service pursuant to those agreements, including the reservation of capacity pursuant to the Long Term Reservations, and CES remained obligated to pay SCE&G for such service and reservation charges, including the Long-Term Reservations.

As of the date of this filing, CES has made over 600 reservations, including the Long Term Reservations, under the Service Agreements since the Petition Date. However, with the exception of one payment in the amount of $158,430.46 received by SCE&G in May 2006, CES has failed to pay its monthly invoices from SCE&G during the postpetition period. As a result, CES currently owes SCE&G $3,381,468.95 on account of reservation charges and transmission service provided to CES since the Petition Date (the "Unpaid Postpetition Obligations"), taking into account the credits granted by SCE&G. Despite CES' nonpayment, SCE&G has upheld its

---

[8] *In re: Calpine Corporation, et al.*, Case No. 05-60200 (Bankr. S.D.N.Y., voluntary petition filed Dec. 20, 2005).

[9] In August 2006, SCE&G was informed by the individuals handling payment of CES' invoices that they were instructed by CES' attorneys to withhold payment until Columbia's assertion that SCE&G improperly applied credits to CES was resolved.

[10] The letter, which was signed by Rodney Malcolm, Executive Vice President of CES, and describes CES as a debtor-in-possession in Calpine's bankruptcy proceeding, appears to be an attempt by CES to repudiate its FERC-jurisdictional agreement and payment obligations under SCE&G's OATT.

Ms. Philis J. Posey
April 6, 2007
Page 6

**JONES DAY**

obligation to provide service pursuant to the Service Agreements, including reserving capacity according to the Long Term Reservations.

SCE&G has made repeated attempts to seek payment from CES of the Unpaid Postpetition Obligations, to no avail. By letter dated February 8, 2007, SCE&G made a demand for payment of the Unpaid Postpetition Obligations in an attempt to avoid having to seek relief from the bankruptcy court. Because CES failed to pay the Unpaid Postpetition Obligations pursuant to that demand, on February 15, 2007, SCE&G filed with the bankruptcy court a motion ("Bankruptcy Motion") for an order (a) compelling payment of postpetition obligations; (b) determining adequate assurance of future performance; and (c) granting relief from the automatic stay imposed by operation of Section 362 of the Bankruptcy Code, 11 U.S.C. § 362, to allow SCE&G to pursue its rights at the Commission, including SCE&G's right to seek authority to terminate service to CES.[11] The Bankruptcy Motion currently is scheduled to be heard by the bankruptcy court on May 9, 2007.

## II.    SCE&G'S COMPLIANCE WITH THE MARCH 2004 ORDER

Columbia argued in its May 2004 Protest that it was entitled to credits in the amount that it paid to SCE&G for the cost of the network upgrades. In the March 2004 Order, the Commission directed SCE&G to repay the cost of the network upgrades to Columbia by "granting credits against the transmission rates paid by Columbia to SCE&G." March 2004 Order at P 20. However, as noted earlier, Columbia itself, as opposed to its affiliate CES, has never been a transmission customer of SCE&G and has done nothing to indicate its intent to become a customer eligible for service under SCE&G's OATT. Thus, Columbia has never paid transmission rates against which SCE&G could issue such credits. SCE&G, in compliance with the Commission's directive to issue credits against transmission rates, began issuing such credits to CES, the entity buying the power generated at the Columbia Energy Center and reserving transmission capacity from the facility, as soon as the facility was commercially operational. As of CES' September 2006 invoice, SCE&G had issued credits in the amount of $5,090,089.94 (see Attachment A), the full amount funded by Columbia, with interest. SCE&G's issuance of credits is consistent with the March 2004 Order, the Revised C&M Agreement, the Commission's crediting policy and Columbia's own request in its May 2004 Protest that the Revised C&M Agreement be revised to allow for the assignment of credits.

SCE&G's crediting of CES' reservation charges is consistent with the Commission's interconnection pricing policy, which is intended to (1) ensure that a generator will not be charged twice (through both incremental expansion costs and embedded costs with expansion costs rolled in) for the use of the transmission system with which it interconnects; (2) ensure that a generator's interconnection is treated comparably to the interconnections that a transmission

---

[11] SCE&G reserves the right to seek relief from the Commission regarding CES' Unpaid Postpetition Obligations, which include reservation charges for the Long-Term Reservations.

Ms. Philis J. Posey                                                    **JONES DAY**
April 6, 2007
Page 7

provider completes for its own generating facilities; and (3) enhance competition in bulk power markets by promoting the construction of new generation facilities. Order No. 2003 at P 694; *see also Entergy Services, Inc. v. FERC*, 319 F.3d 536, 543 (D.C. Cir. 2003), *quoting Entergy Services, Inc.*, 96 FERC ¶ 61,311 at 62,203 (2001) (stating that the Commission's crediting policy is intended to "place[] new generators on an equal footing with pre-existing generators owned by utilities.")

By issuing credits against CES' rates for transmission service taken from the Columbia Energy Center, SCE&G ensured that the power from those generators would not be disadvantaged in comparison to other generation connected to SCE&G's system. As a result, the Columbia Energy Center was placed on an equivalent competitive footing with existing generation on SCE&G's system, thereby receiving the benefit that the Commission's policy intends to achieve.

The Commission's crediting policy requires that credits for network upgrades be tied to transmission service from the generating facility necessitating the network upgrades.[12] For example, in *Duke Energy Corporation*, 94 FERC ¶ 61,187 at 61,659 (2001) the Commission stated "[t]he purpose of the credit is to compensate the generator for the costs of network upgrades once it begins to take transmission service. While the credit may be transferred to a customer taking network service, the credit is nonetheless appropriately tied to the specific generator." In Order No. 2003-A, the Commission concluded that "it is appropriate that credits be given only for transmission service that includes the Generating Facility as the source of the power transmitted." Order No. 2003-A at P 614. Because CES takes transmission service from the Columbia Energy Center and Columbia does not, CES is the appropriate entity to receive the transmission credits. Because Columbia has not taken transmission service from the Columbia Energy Center, Columbia has never been eligible to receive transmission credits directly.

SCE&G's crediting also was consistent with Section 7.2.1 of the Revised C&M Agreement, which provides that "Customer shall be entitled to transmission credits, equal to the total amount paid to SCE&G for the Transmission Facility Upgrades Required for Interconnection, on a dollar-for-dollar basis for the non-usage sensitive portion of transmission charges, as payments are made under SCE&G's OATT for transmission services with respect to Customer's device that utilizes the Transmission Facility Upgrades Required for Interconnection."[13] Thus, under the Revised C&M Agreement, Columbia was "entitled" to transmission credits. Columbia, as noted, expressly sought authorization to assign that

---

[12] The Commission has recognized that the owner of the generating facility is "rarely the customer that takes transmission delivery service." Order No. 2003-A at P 676.

[13] Although Section 7.2.1 allows SCE&G "at its sole discretion" to "choose to repay to Customer any amounts advanced by Customer for Transmission Facility Upgrades Required for Interconnection not credited to Customer at any time," it does not require SCE&G to pay credits directly to Columbia, nor does it entitle Columbia to any reimbursement other than transmission credits as payments are made under SCE&G's OATT for transmission services with respect to the Columbia Energy Center.

Ms. Philis J. Posey                                          **JONES DAY**
April 6, 2007
Page 8

entitlement, presumably because Columbia was not itself a transmission customer. Through the arrangement whereby CES made transmission reservations for Columbia Energy Center power, SCE&G fully honored Columbia's entitlement by means of the payment of credits to CES. This crediting mechanism likewise honored Columbia's request for assignability of the crediting entitlement and the commercial relationship between the two Calpine affiliates – the one selling power and the other buying that power and arranging transmission. Because Columbia knew that CES was receiving the transmission credits for service taken from the generators, Columbia could take such credits into account in its arrangement with CES for the purchase of power from the facility. The reduction in transmission rates that CES received as a result of the credits made the power generated at the facility more valuable than if CES had to pay full transmission charges. As such, Columbia could sell the power to CES at a higher rate commensurate with the reduction in transmission charges and thereby receive the economic benefit of its entitlement to transmission credits without having to transmit the power itself.

## III.    DESCRIPTION OF FILING

### A.    Revisions to the Revised C&M Agreement

Pursuant to the directives in the March 2007 Order, SCE&G has made the following revisions to Section 7.2.1 of the Revised C&M Agreement and provides the following explanations:

1.    The March 2007 Order directed SCE&G to further modify the Revised C&M Agreement to reflect the order's discussion concerning the eligibility for transmission revenue credits as between reserved capacity associated with the two generators that utilize the network upgrades and the generator that does not. March 2007 Order at PP 45-47. The order discusses two possible scenarios: (1) the customer taking service from the Columbia Energy Center is required to designate two receipt points in its transmission service agreement – one for the two generators that utilize the network upgrades and one for the generator that does not; or (2) all three generators are deemed to be located at the same receipt point such that the customer need designate only that single point to transmit the output from any or all of the generators. *Id.* at PP 45-46. In the case of the Columbia Energy Center, a transmission customer need designate only a single point as the source of the power.

SCE&G was obligated to issue credits pursuant to the Revised C&M Agreement. Accordingly, SCE&G applied credits against transmission service from the generators connected to the network upgrade facilities. SCE&G applied credits on a percentage basis based on the metered use of the network upgrade facilities so that if in a particular month 20% of the Columbia Energy Center's output flowed over the network upgrade facilities, SCE&G credited 20% of CES' total transmission bill for that month. Where there was a reservation for service but no metered use, *i.e.*, the Long-Term Reservations, then CES received a credit equal to 70% of its total charge for such reservation because the capacity of the generators that utilize the network upgrades represents 70% of the Columbia Energy Center's total capacity.

Ms. Philis J. Posey                                                    **JONES DAY**
April 6, 2007
Page 9

Between the time that the Revised C&M Agreement was filed and the issuance of the March 2007 Order, SCE&G fully credited the cost of the network upgrades with interest. SCE&G believes such crediting is consistent with the discussion in the March 2007 Order. *See* March 2007 Order at PP 45-47. SCE&G has modified the Revised C&M Agreement to clarify the way in which SCE&G applied the credits.

In connection with its crediting discussion, the March 2007 Order directed SCE&G "to provide a description of each of [SCE&G's] transmission service agreements with Columbia . . ." *Id.* at P 47. SCE&G believes that the discussion above and in Section II.B satisfies this directive. However, to the extent the Commission would like additional information, SCE&G will supply such information promptly.

2.      The March 2007 Order directed SCE&G to repay any tax gross-up or other tax related payments and to modify the Revised C&M Agreement accordingly. *Id.* at PP 48, Ordering Para. (C). SCE&G has modified the Revised C&M Agreement to include tax gross-up language consistent with Section 11.4.1 of the Commission's *pro forma* Large Generator Interconnection Agreement ("LGIA") and the language suggested by Columbia in its May 2004 Protest. However, because SCE&G did not include any tax gross-up or other tax-related costs in its calculation of the amount Columbia owed for the construction of the network upgrades, no adjustment to the total amount of credits is necessary as a result of this change to the language of the Revised C&M Agreement.

3.      The March 2007 Order directed SCE&G "to allow the assignment of repayment rights." *Id.* at P 48. SCE&G has modified the Revised C&M Agreement to include language to allow the assignment of the credits consistent with Section 11.4.1 of the LGIA and the language suggested by Columbia in its May 2004 Protest. Although this language was not included in the Revised C&M Agreement, the lack of such language did not hinder Columbia's ability to assign its right to the transmission credits. In fact, as noted, SCE&G's issuance of credits to CES was consistent with Columbia's request in its May 2004 Protest to be able to assign the credits.

4.      The March 2007 Order directed that the Revised C&M Agreement be revised "to make clear that transmission revenue credits and interest shall be applied until such time as all amounts funded by Columbia for network upgrades have been fully offset with interest." *Id.* at P 49. In fact, all amounts funded by Columbia, including interest, have been repaid in the form of transmission credits. Nevertheless, to comply in full with the Commission's order, SCE&G has modified the Revised C&M Agreement to clarify that transmission credits and interest shall be available until such time as the amounts funded by Columbia for network upgrades have been fully offset. SCE&G's modification is consistent with the language suggested in Columbia's May 2004 Protest.

### B.      Documents Submitted

In addition to Attachment A, described above, which shows credit amounts SCE&G provided to CES by month, SCE&G is submitting the following documents as part of this filing:

Ms. Philis J. Posey                                          **JONES DAY**
April 6, 2007
Page 10


1.      Second Substitute Original Service Agreement No. 101, as modified in
compliance with the March 2007 Order, excluding exhibits (Attachment B); and

2.      Redlined sheets showing changes from the Substitute Service Agreement
(referred to herein as the Revised C&M Agreement) (Attachment C).

### C.      Miscellaneous

A copy of this filing has been provided to counsel representing both Columbia and CES
and to all parties on the service list maintained by the Secretary in this proceeding. Consistent
with the March 2004 Order and the March 2007 Order, the effective date of the Second
Substitute Original Service Agreement No. 101 is November 15, 2003. SCE&G respectfully
requests waiver of any of the Commission's regulations necessary to permit this compliance
filing to be accepted as filed.

Communications regarding this filing should be addressed to the following individuals,
who should be entered on the official service list maintained by the Secretary of the Commission
for each docket established with respect to this filing:


Catherine D. Taylor                          Kevin J. McIntyre
South Carolina Electric & Gas Company        Amy W. Beizer
1426 Main Street                             Jones Day
Columbia, South Carolina 29201               51 Louisiana Avenue, NW
Tel: (803) 217-9356                          Washington, DC 20001
cdtaylor@scana.com                           Tel: (202) 879-3939
                                             kjmcintyre@jonesday.com
                                             awbeizer@jonesday.com


Charles A. White
South Carolina Electric & Gas Company
1426 Main Street
Columbia, South Carolina 29201
Tel: (803) 217-9518
cwhite@scana.com

Ms. Philis J. Posey                                          **JONES DAY**
April 6, 2007
Page 11


## IV.    CONCLUSION

Wherefore, SCE&G respectfully requests that the Commission accept this filing in compliance with the March 2004 and March 2007 Orders.

If you have any questions or need further information, please contact the undersigned.

Respectfully submitted,

Kevin J. McIntyre
Amy W. Beizer

Attorneys for South Carolina Electric & Gas
Company

Enclosures

cc:    Iskender H. Catto, Esq. (Counsel for Columbia and CES) (via electronic mail)
       Service List (via electronic mail)

## ATTACHMENT A

### SPREADSHEET SHOWING CREDITS PAID

| Work Order | In-Service Date | Description | Total CIAC Amount | % Direct Assignment For 253.033 | Adjustment to Work Orders |
|---|---|---|---|---|---|
| 400426 | 7/1/2003 | Wateree - Den Ter 230KV Fold-In to CEC | 2,888,176.77 | 0.56 | 353,750.75 | 2,534,426.02 |
| 400427 | 6/30/2003 | CEC - 230KV Fold-In ROW | 61,392.42 | 0.01 | 7,519.49 | 53,872.93 |
| 400492 | 8/31/2003 | CEC - Edenwood 230 Kv Raise Str | 135,383.69 | 0.03 | 16,582.12 | 118,801.57 |
| 500346 | 6/12/2003 | Wateree - Replace Panel | 19,814.40 | 0.00 | 2,426.91 | 17,387.49 |
| 500352 | 6/12/2003 | CEC - Construct Switchyard | 2,017,039.05 | 0.39 | 247,051.73 | 1,769,987.32 |
| | | | 5,121,806.33 | 1.00 | 627,331.00 | (174,494,475.33) |

**Calpine Credits & Interest - Pre and Post Petition**

| | | | |
|---|---|---|---|
| Credit to deferred credit with offset entry to capital work orders | (4,494,475.33) | | |
| JV reduced amount of CIAC to the above work orders - Booked March 2004 | - | | |
| | | | |
| Interest accrued on individual work orders back to in | | | |
| service dates - Booked in March 2004 | (377,618.00) | | |
| April's Interest Calculation and correction | 228,435.00 | | |
| May's Interest Calculation | (15,478.86) | | |
| May's Transmission Credits | 12,801.05 | | |
| June's Interest Calculation | (15,487.79) | | |
| June's Transmission Credits | 89,641.14 | | |
| July's Interest Calculation | (15,240.61) | | |
| July's Transmission Credits | 234,351.02 | | |
| August Interest Calculation | (14,510.24) | | |
| August Transmission Credits | 168,391.82 | | |
| September Interest Calculation | (15,746.96) | | |
| September Transmission Credits | 82,956.05 | | |
| October Interest Calculation | (16,355.76) | | |
| October Transmission Credits | 32,098.13 | | |
| November Interest Calculation | (14,407.00) | | |
| November Transmission Credits | 9,802.00 | | |
| December Interest Calculation | (14,422.93) | | |
| December Transmission Credits | 48,976.52 | | |
| January 05 Interest Calculation | (16,174.90) | | |
| January 05 Transmission Calculation | 81,131.42 | | |
| February 05 Interest Calculation | (15,917.78) | | |
| February 05 Transmission Calculation | 55,083.22 | | |
| March 05 Interest Calculation | (15,762.75) | | |
| March 05 Transmission Calculation | 108,357.00 | | |
| April 05 Interest Calculation | (17,178.95) | | |
| April 05 Transmission Calculation | 3,594.28 | | |
| May 05 Interest Calculation | (17,238.95) | | |
| May 05 Transmission Calculation | 4,518.36 | | |
| June 05 Interest Calculation | (17,295.14) | | |
| June 05 Transmission Calculation | 15,846.36 | | |
| July 05 Interest Calculation | (18,835.82) | | |
| July 05 Transmission Calculation | 137,767.67 | | |
| August 05 Interest Calculation | (18,232.30) | | |
| August 05 Transmission Calculation | 167,970.14 | | |
| September 05 Interest Calculation | (17,543.97) | | |
| September 05 Transmission Calculation | 45,645.92 | | |
| October 05 Interest Calculation | (18,796.55) | | |
| October 05 Transmission Calculation | - | | |
| November 05 Interest Calculation | (18,894.31) | | |
| November 05 Transmission Calculation | - | | |
| December 05 Interest Calculation | (18,992.40) | | |
| December 05 Transmission Calculation | - | | |
| January 06 Interest Calculation | (20,776.41) | | |
| January 06 Transmission Calculation | 369,668.24 | | |
| February 06 Interest Calculation | (18,805.17) | | |
| February 06 Transmission Calculation | 369,668.24 | | |
| March 06 Interest Calculation | (16,822.79) | | |
| March 06 Transmission Calculation | 369,668.24 | | |
| April 06 Interest Calculation | (15,966.56) | | |
| April 06 Transmission Calculation | 369,668.24 | | |
| May 06 Interest Calculation | (13,814.87) | | |
| May 06 Transmission Calculation | 383,818.30 | | |
| June 06 Interest Calculation | (11,565.24) | | |
| June 06 Transmission Calculation | 468,424.31 | | |
| July 06 Interest Calculation | (9,315.58) | | |
| July 06 Transmission Calculation | 629,524.79 | | |
| August 06 Interest Calculation | (5,315.23) | | |
| August 06 Transmission Calculation | 591,277.96 | | |
| September 06 Interest Calculation | (1,535.77) | | |
| September 06 Transmission Calculation | 369,668.24 | | |
| September 06 Transmission Calculation | (130,028.72) | | |
| Balance in 253.0033 | (0.00) | Total: | |
| | | GL: | - |
| | | Difference | (0.00) |

| | | |
|---|---|---|
| Transmission C | 5,090,089.94 | |
| Interest | (595,614.61) | |
| | 4,494,475.33 | |

**Calpine Pre-Petition Credits**

| 2004 | | | |
|---|---|---|---|
| | May-04 | $ | 12,801.05 |
| | June-04 | $ | 89,641.14 |
| | July-04 | $ | 234,351.02 |
| | August-04 | $ | 168,391.82 |
| | September-04 | $ | 82,956.05 |
| | October-04 | $ | 32,098.13 |
| | November-04 | $ | 9,802.00 |
| | December-04 | $ | 48,976.52 |
| 2005 | January-05 | $ | 81,131.42 |
| | February-05 | $ | 55,083.22 |
| | March-05 | $ | 108,357.00 |
| | April-05 | $ | 3,594.28 |
| | May-05 | $ | 4,518.36 |
| | June-05 | $ | 15,846.36 |
| | July-05 | $ | 137,767.67 |
| | August-05 | $ | 167,970.14 |
| | September-05 | $ | 45,645.92 |
| | October-05 | $ | - |
| | November-05 | $ | - |
| | December-05 | $ | - |
| | | $ | 1,298,932.10 |

**Calpine Pre-Petition Interest**

| | | |
|---|---|---|
| Accrued prior to March 2004 | $ | (377,618.00) |
| April's Interest Calculation & correction | $ | 228,435.00 |
| | $ | (15,478.86) |
| | $ | (15,487.79) |
| | $ | (15,240.61) |
| | $ | (14,510.24) |
| | $ | (15,746.96) |
| | $ | (16,355.76) |
| | $ | (14,407.00) |
| | $ | (14,422.95) |
| | $ | (16,174.90) |
| | $ | (15,917.78) |
| | $ | (15,762.75) |
| | $ | (17,178.95) |
| | $ | (17,238.95) |
| | $ | (17,295.14) |
| | $ | (18,835.82) |
| | $ | (18,232.30) |
| | $ | (17,543.97) |
| | $ | (18,796.55) |
| | $ | (18,894.31) |
| | $ | (18,992.40) |
| | $ | (481,696.99) |

**Calpine Post-Petition Credits**

| 2006 | | | |
|---|---|---|---|
| | January-06 | $ | 369,668.24 |
| | February-06 | $ | 369,668.24 |
| | March-06 | $ | 369,668.24 |
| | April-06 | $ | 369,668.24 |
| | May-06 | $ | 383,818.30 |
| | June-06 | $ | 468,424.31 |
| | July-06 | $ | 629,524.79 |
| | August-06 | $ | 591,277.96 |
| | September-06 | $ | 239,639.52 |
| | October-06 | $ | - |
| | November-06 | $ | - |
| | December-06 | $ | - |
| | | $ | 3,791,157.84 |

**Calpine Post-Petition Interest**

| | | |
|---|---|---|
| | $ | (20,776.41) |
| | $ | (18,805.17) |
| | $ | (16,822.79) |
| | $ | (15,966.56) |
| | $ | (13,814.87) |
| | $ | (11,565.24) |
| | $ | (9,315.58) |
| | $ | (5,315.23) |
| | $ | (1,535.77) |
| | $ | (113,917.62) |

| | | | |
|---|---|---|---|
| Total Credits Issued | $ | 5,090,089.94 | |
| Total Interest Accrued | | | (595,614.61) |

**ATTACHMENT B**

CONSTRUCTION AND MAINTENANCE AGREEMENT
BETWEEN SOUTH CAROLINA ELECTRIC AND GAS COMPANY
AND COLUMBIA ENERGY LLC – CLEAN VERSION

SOUTH CAROLINA ELECTRIC & GAS COMPANY
FERC Electric Tariff
Second Revised Volume No. 5

Second Substitute Original Service
Agreement No. 101

CONSTRUCTION AND MAINTENANCE AGREEMENT
BETWEEN
SOUTH CAROLINA ELECTRIC AND GAS COMPANY
AND
COLUMBIA ENERGY LLC

Issued by: Charles A. White                    Effective Date: November 15, 2003
Issued on: April 6, 2007
Filed to comply with order of the Federal Energy Regulatory Commission, Docket Nos. ER03-1398-003, *et. al.*, *South Carolina Electric & Gas Company*, 118 FERC ¶ 61,185 (March 7, 2007)

CONSTRUCTION AND

MAINTENANCE AGREEMENT

FOR INTERCONNECTION FACILITIES

By and Between

COLUMBIA ENERGY LLC

And

SOUTH CAROLINA ELECTRIC & GAS CO.

Dated as of May 8, 2001

WAI-2821673v1

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Article I | Definitions | 4 |
| Article II | Term Termination, Service and Changes | 10 |
| Article III | Interconnection Facilities | 11 |
| Article IV | Metering, Metered Data and Communications | 15 |
| Article V | Testing | 16 |
| Article VI | Interconnection Requirements and Maintenance | 16 |
| Article VII | Payment and Security Requirements | 19 |
| Article VIII | Tax Liability and Security | 23 |
| Article IX | Force Majeure | 26 |
| Article X | Assignment | 27 |
| Article XI | Liability and Indemnification | 29 |
| Article XII | Insurance | 31 |
| Article XIII | Notices | 32 |
| Article XIV | Preservation of Books and Records | 34 |
| Article XV | Representations and Warranties | 34 |
| Article XVI | Dispute Resolution | 36 |
| Article XVII | Severability and Renegotiation of Material Provisions | 37 |
| Article XVIII | Miscellaneous | 38 |

WAI-2821673v1

Exhibits

| Exhibit 1 | Interconnection Study |
|-----------|----------------------|
| Exhibit 2 | Work Plan, Deliverables and Monthly Status Reports |
| Exhibit 3 | Generator Capacity Curves |
| Exhibit 4 | Testing of the Interconnection Facilities |
| Exhibit 5 | Metering Pulse Agreement |
| Exhibit 6 | Interconnection Facilities |
| Exhibit 7 | Security Schedule |

# CONSTRUCTION AND
# MAINTENANCE AGREEMENT FOR
# INTERCONNECTION FACILITIES

This Agreement is made this 8th day of May, 2001 (the "Effective Date"), by and between Columbia Energy LLC, a Delaware limited liability company with a principal place of business at 650 Dundee Road, Suite 350, Northbrook, IL 60062 ("Customer"), and South Carolina Electric & Gas Co. ("SCE&G"), a South Carolina corporation with a principal place of business at 1426 Main Street, Columbia, SC 29201.

## WITNESSETH

WHEREAS, Customer intends to construct, own and operate the Facility (as defined in Article I) in Calhoun County, South Carolina, for the generation and sale of electric energy and steam; and

WHEREAS, SCE&G has performed, at Customer's request, a Feasibility Study dated September 3, 1999 that demonstrates a need for new facilities to interconnect the Facility with SCE&G's Transmission System; and SCE&G has performed, at Customer's request, an Interconnection Study dated August 11, 2000 and an amended Interconnection Study dated December 22, 2000 (Exhibit 1) that more thoroughly analyze the required construction effort for SCE&G's Interconnection Facilities and associated equipment, including the cost and description of SCE&G's Interconnection Facilities; and

WHEREAS, Customer desires to have SCE&G provide for the design, engineering, procurement, construction and commissioning of SCE&G's Interconnection Facilities and to provide for the maintenance thereof, in accordance with the terms of this Agreement; and

WHEREAS, Customer is entering into the Operating Agreement with SCE&G concurrently herewith and intends to enter into separate agreement(s) for the provision of transmission service.

NOW THEREFORE, in consideration of and subject to the mutual covenants contained herein the receipt, sufficiency and adequacy of which are hereby acknowledged, Customer and SCE&G agree as follows:

## ARTICLE I
## DEFINITIONS

The following capitalized terms, whether in the singular or the plural or in the present or past tense, shall have the meanings set forth below whenever such terms appear in this Agreement.

"AAA" shall have the meaning given to it in Section 16.2.

"Abandon" means the voluntary relinquishment of all possession and control of either (i) the Facility by Customer or complete cessation of work on the Facility for sixty (60) consecutive days by Customer and Customer's contractors, or (ii) the Work by SCE&G or complete cessation of the Work for sixty (60) consecutive days, by SCE&G and SCE&G's contractors, but, in either case, only if such relinquishment or cessation is not caused by or directly attributable to an event of Force Majeure.

"Actual Costs" shall have the meaning given to it in Section 7.1.2.

"Affiliate" means with respect to any Party, any other person or entity (other than an individual) that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such person or entity. For purposes of the foregoing definition, "control" means the direct or indirect ownership of fifty percent (50%) or more of the outstanding capital stock or other equity interests of the entity having ordinary voting power.

"Agreement" means this Construction & Maintenance Agreement for Interconnection Facilities composed of (i) the Preamble, Recitals and Articles 1 though 18 of this Construction & Maintenance Agreement for Interconnection Facilities; (ii) any appendices, attachment, exhibits and schedules attached hereto, which are made a part hereof for all purposes; and (iii) any amendments hereto or thereto executed pursuant to the provisions of the Agreement.

"Anticipated Payment Date" shall have the meaning given to it in Section 7.1.4.

"CIAC Tax Liability" means any actual federal, state and/or local tax liability, associated actual tax liability for tax gross-ups, and actual liability for interest or penalties, if any, that would be due if payments and/or other transfers of property under this Agreement were deemed by the IRS or other taxing authority with jurisdiction to be taxable contributions in aid of construction or other Taxable Events to SCE&G or SCANA Corporation.

"Collateral Assignee" shall have the meaning given to it in Section 10.2.

"Commercial Operation Date" shall be the date that Customer begins the regular generation, for sale, of electric power from the Facility, which date shall be notified by Customer to SCE&G.

"Customer's Interconnection Facilities" means all Interconnection Facilities between the 230kV and 115kV high voltage bushings on each generator step-up transformer at the Facility, including equipment for switching, protective relaying and cable terminations, up to the Interconnection Points.

"Customer's Interconnection Facilities In-Service Date" means the date on which the Customer's Interconnection Facilities are completely tested and certified by Customer as ready for operation up to their maximum design rating.

"Delayed Payment Rate" shall have the meaning set forth in Section 7.1.2.

"Effective Date" shall have the meaning given to in the Preamble hereto.

"Emergency" means a condition or situation that in the sole judgment of SCE&G using Good Utility Industry Practice (i) presents an imminent physical threat of danger to life, or significant threat to health or property or (ii) is likely to cause a significant disruption on or significant damage to SCE&G's Interconnection Facilities or SCE&G's Transmission System (or any material portion thereof); *provided, however*, the lack of sufficient generation capacity to meet SCE&G's Active Load shall not constitute an Emergency *except* to the extent the lack of sufficient generation capacity results in the conditions or situation set forth above.

"Extraordinary Maintenance" shall mean maintenance which entails the repair or replacement of one or more major units of utility property required for purposes of the Interconnection Facilities and performance of SCE&G's obligations under the Agreement that exceeds five thousand dollars ($5,000).    The limit of $ 5,000 shall be escalated in accordance with escalation factor calculated in Section 7.3.3.

"Escrow Account" shall have the meaning given to it in Section 7.6.

"Escrow Deficiency" shall have the meaning given to it in Section 7.6.

"Escrowing Party" shall have the meaning given to it in Section 7.6.

"Facilities Fee Multiplier" shall have the meaning given to it in Section 7.3.

"Facility" means Customer's nominally rated 580 MW electricity generation facility located in Calhoun County, South Carolina, comprised of two (2) combustion turbine generators, two (2) heat recovery steam generators, one (1) steam turbine generator, and associated equipment up to the 230kV and 115kV transformer high voltage bushings and including the Customer's Interconnection Facilities. Ratings of the combustion turbine-generators and steam turbine-generator are listed in Exhibit 3.

"FCR" means SCE&G's Facility Connection Requirements dated September 21, 1999, as may be amended from time to time including any future facility  connection requirements of a Third Party System Operator.

"FERC" means the Federal Energy Regulatory Commission or any successor to its authority.

"Force Majeure" shall have the meaning given to it in Section 9.2.

"Functional Test Date" means the date on which SCE&G's Interconnection Facilities are electrically energized and functionally prepared to allow for backfeed to the Facility from SCE&G's Transmission System for the purpose of functional testing of the Facility.

"Good Utility Industry Practice(s)" means the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety

WAI-2821673v1

and expedition. Good Utility Industry Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to be acceptable practices, methods, or acts generally accepted in the relevant region.

"GSU" shall have the meaning given to it in paragraph 3.1 of Exhibit 4.

"Indemnified Party" shall have the meaning given to it in Section 11.6.

"Indemnifying Party" shall have the meaning given to it in Section 11.6.

"In-Service Date" shall mean, as applicable, the SCE&G's Interconnection Facilities In-Service Date or Customer's Interconnection Facilities In-Service Date.

"Interconnection Committee" shall have the meaning given to it in Section 6.5.1

"Interconnection Facilities" means all the land, easements, rights of way, materials, equipment and installed facilities necessary for the purpose of interconnecting the Facility and SCE&G's Transmission System so as to permit the transfer of electric energy in either direction, including, but not limited to, connection, transformation, switching, metering, relaying, and communication and safety equipment.

"Interconnection Point(s)" means the physical point(s) at which electrical interconnection is made between the Customer's Interconnection Facilities and SCE&G's Interconnection Facilities. For the purposes of this Agreement, the Interconnection Point(s) shall be defined as the attachment of the incoming bus line(s) from Customer's Interconnection Facilities to SCE&G's Interconnection Facilities bus(es) or conductor(s) immediately below the line catchoff point(s) as identified in Exhibit 6.

"Interconnection Study" means the study results, dated as of December 22, 2000, containing SCE&G's good faith estimate of the costs associated with the construction of SCE&G's Interconnection Facilities a copy of which is attached hereto as Exhibit 1, as such estimate of costs have been revised in Exhibit 1A.

"IRS" means the United States Internal Revenue Service.

"Lender(s)" means the financial institutions or other lender(s) providing financing, refinancing of any such financing, or any letter of credit, line of credit, guaranty, credit insurance, or credit support for or in connection with such financing or refinancing, in connection with the development, design, construction, ownership, operation, or maintenance of the Facility, or any part thereof, or SCE&G's Transmission System, as applicable, whether by way of debt instruments or lease instruments, and any fiscal agents, trustees, or other nominees acting on their behalf.

"Monthly Facilities Fee" shall have the meaning given to it in Section 7.3.

"Monthly Status Reports" shall have the meaning given to it in Section 3.3.3

"NERC" means the North American Electric Reliability Council and any successor(s) thereto.

"New Capital Additions" means any additions to be made to SCE&G's Interconnection Facilities that would not be required but for the Facility and performance of obligations under this Agreement.

"Operating Agreement" means that certain Operating Agreement for Interconnected Generation by and between Customer and SCE&G and executed concurrently herewith.

"Party" means SCE&G or Customer, as the context requires, and "Parties" means SCE&G and Customer, collectively.

"Points of Delivery" shall have the meaning given to it in Section 4.1.1.

"Potential CIAC Tax Liability" shall have the meaning given to it in Section 8.1.

"Regional Transmission Organization" or "RTO" has the meaning contained in FERC Order No. 2000, and its progeny including the regulations promulgated thereunder.

"Remote Terminal Unit" or "RTU" shall have the meaning given to it in Section 6.1.3.

"Revenue Metering Devices" means properly compensated, calibrated and programmed electric metering equipment, used to measure electrical energy being transferred at the Interconnection Point from Customer's Interconnection Facilities to SCE&G's Interconnection Facilities for the purpose of billing.

"SCE&G's Active Load" means all obligations of SCE&G to supply energy within SCE&G's Control Area during the hour in question and includes all energy being sold within the SCE&G Control Area by SCE&G as well as all economy and opportunity transactions entered into by SCE&G.

"SCE&G's Control Area" means the electric production, transmission and distribution facilities operated and coordinated by SCE&G's SCC under NERC operating policies, and any operating policies of a Third-Party System Operator.

"SCE&G's Interconnection Facilities" means all Interconnection Facilities between the Interconnection Point and SCE&G's Transmission System as more particularly described in Alternative 3A of Exhibit 1, Exhibit 1A and Exhibit 6.

"SCE&G's Interconnection Facilities In-Service Date" means the date on which the SCE&G Interconnection Facilities are completely tested and certified by SCE&G as ready for operation up to their maximum design rating.

"SCE&G's OATT" means SCE&G's Open Access Transmission Tariff or successor Tariff, which may be amended from time to time pursuant to FERC procedure.

WAI-2821673v1

"SCE&G's Transmission System" means the facilities owned by SCE&G and operated and controlled by SCE&G, its successors, or a Third Party System Operator that are used to provide electric transmission service in SCE&G's Control Area.

"SCE&G's SCC" means SCE&G's System Control Center in Columbia, South Carolina or its successor.

"Security Instrument" means an instrument such as: (a) a standby letter of credit, or a surety bond with terms and conditions for a payment similar to those of a standby letter of credit, issued by an issuer that shall be approved in advance by SCE&G, such approval not to be unreasonably withheld, conditioned or delayed, which instrument includes requirements for: (i) renewal pursuant to the terms of Article VIII hereof; and (ii) immediate notice to SCE&G from the issuer and Customer in the event that the Security Instrument is not renewed pursuant to the terms of Article VIII hereof, or is discontinued, or if the sums held as security by virtue of such Security Instrument are or become less than the then-required amount; or (b) a guaranty from Calpine Corp. having a credit rating for long term unsecured indebtedness by Standard & Poors of "BBB-" or better, such guaranty being in form and substance acceptable to SCE&G.

"Standards" means any standards, guidelines, criteria, or other requirements that: (a) govern the design, construction, operation, appurtenant facilities, inspection, testing, maintenance, metering, data gathering requirements, or communications capabilities of Interconnection Facilities consistent with Good Utility Industry Practice; (b) are promulgated, adopted, or imposed by a state, regional or national regulatory or standard-setting body; and (c) are directly applicable to a Party or its obligations hereunder and are consistent with Good Utility Industry Practice.

"Tax Factor" shall have the meaning given to it in Exhibit 7.

"Taxable Event" shall have the meaning given to it in Section 8.1.

"Term" shall have the meaning given to it in Section 2.1.

"Third Party System Operator" means any third party or parties responsible for operating transmission facilities, operating one or more control areas or acting as a security coordinator, including a Regional Transmission Organization authorized by FERC that has functional control of SCE&G's Transmission System, whose responsibilities are related to and control SCE&G's obligations under this Agreement.

"Transmission Facility Upgrades Required for Interconnection" means the Interconnection Facilities comprising the fold-in on the Wateree to Edenwood 230 kV transmission facility known as the "Narrow "U" Configuration" as identified by the FERC in its March 22, 2004 order in Docket No. ER03-1398-000, 106 FERC ¶ 61,265 (2004).

(Alternatively, rather than referring to FERC order, SCE&G can replace Exhibit 6 with a new Exhibit 6 identifying the facilities that are the narrow "U" facilities, similar to what FERC did in the diagram attached to its order and then reference Exhibit 6).

WAI-2821673v1

"Work" means: (i) the design, engineering and construction of SCE&G's Interconnection Facilities as defined in Alternative 3A of Exhibit 1 and Exhibit 1A; (ii) the procurement of materials, equipment, supplies and related services for SCE&G's Interconnection Facilities; (iii) the review and approval of all service providers who may be involved in SCE&G's Interconnection Facilities construction activities; (iv) all quality assurance services associated with construction of SCE&G's Interconnection Facilities; (v) the acceptance testing and commissioning of SCE&G's Interconnection Facilities; and (vi) interconnection of SCE&G's Interconnection Facilities to SCE&G's Transmission System.

"Work Plan" shall include the detailed workscope, a comprehensive project schedule defining the timing of all required Work tasks of SCE&G, beginning with engineering activities and concluding with station energization, and that defines major milestones and identifies critical paths, resource requirements, and project budget, as more fully set forth in Exhibit 2.

ARTICLE II
TERM, TERMINATION, SERVICE, AND CHANGES

2.1  Base Term and Renewal.  The Term of this Agreement shall commence upon the Effective Date and shall continue, unless earlier terminated in accordance with Section 2.3, for a period of forty (40) years from the Commercial Operation Date, and year to year thereafter, until either Party terminates this Agreement with not less than one year notice. Upon the expiration or earlier termination of this Agreement, the provisions of Section 3.6 shall apply.

2.2  Service.  SCE&G shall perform the Work and maintain SCE&G's Interconnection Facilities.  For the avoidance of doubt, Customer acknowledges and agrees that this Agreement does not constitute a representation concerning availability of transmission service or obligate SCE&G to accept or deliver energy at or beyond the Interconnection Point and on SCE&G's Transmission System.  Accordingly, SCE&G shall have no obligation as a consequence of this Agreement to:

2.2.1  pay Customer any wheeling or other charges for electric power and/or energy transferred through the Facility to the Interconnection Point; and

2.2.2  supply Customer with any transmission service or any ancillary service under SCE&G's OATT (or successor transmission tariff).

2.3  Termination. This Agreement may be terminated by either Party as follows: (i) if the Facility is Abandoned at any time, upon notification to the other Party; (ii) upon material breach by the other Party of any of its obligations (other than payment) hereunder if the breaching Party has not cured (or has not initiated proceedings in good faith to effect to cure) such breach within forty-five (45) days following written notice of such breach to the other Party; or (iii) under Section 7.8.

2.3.1  Effect of Termination.  Upon termination of this Agreement and in addition to the provisions of Section 3.6, Customer shall pay SCE&G for all Work performed to the date of termination and for all reasonable, non-cancelable expenses or commitments previously incurred by SCE&G and shall reimburse SCE&G for any liability arising from such non-cancelable commitments.  SCE&G will use its reasonable efforts to mitigate non-cancelable expenses.

WAI-2821673v1

2.4  Project Schedule Changes.  Each Party shall use its reasonable best efforts to maintain the project schedule set forth in the Work Plan.  Each Party is responsible to keep the other advised of any significant actual or potential project schedule changes or impacts that might occur with respect to the Facility, Customer's Interconnection Facilities, or SCE&G's Interconnection Facilities, as applicable.  If an event of Force Majeure affects the project schedule, including the target In-Service Date for SCE&G's Interconnection Facilities, the Parties shall agree to adjust the Work Plan in accordance with the effects of the Force Majeure. Should key milestones of the project schedule change from those indicated in SCE&G's original Work Plan, discussions regarding the impact of such changes shall be held promptly between the Parties, and if appropriate, the Parties shall develop and implement a reasonable strategy to mitigate any potential delay therefrom, and agree to appropriate amendments required to be set forth in Exhibit 2.

2.5  Preservation of Rights Under Federal Power Act.  In executing this Agreement and only to the extent FERC assumes jurisdiction over this Agreement, the Parties acknowledge that: (i) SCE&G may, at any time during the term of this Agreement after notice to Customer, petition the FERC for changes in the rates, charges, classification, rules, regulations, and practices set forth herein or relating to this Agreement, to the extent such rates are within the jurisdiction of the FERC, as more particularly set forth in Section 205 of the Federal Power Act 16 U.S.C. §824d, and (ii) Customer may, at any time during the term of this Agreement after notice to SCE&G, petition the FERC, in the form of a complaint, for a determination that any such rate, charge, classification, rule, regulation or practice is unjust, unreasonable, unduly discriminatory, or preferential, as more particularly set forth in Section 206 of the Federal Power Act 16 U.S.C. §824e, and no provision of this Agreement shall be construed to limit or abridge those rights, unless explicitly agreed to by the Parties in writing.

## ARTICLE III
## INTERCONNECTION FACILITIES

3.1  Land and Access Rights.

3.1.1  SCE&G shall (at Customer's expense) obtain all land and access rights that are necessary for SCE&G to perform the Work and maintain SCE&G's Interconnection Facilities.

3.1.2  Notwithstanding the foregoing Section 3.1.1, Customer or its Affiliates shall, at Customer's expense, grant, or cause an entity with requisite authority to grant, to SCE&G, in form and substance satisfactory to SCE&G, all easements or rights-of-way upon, over, and across lands owned or controlled by Customer or its Affiliates or property owned or controlled by Eastman Chemical Company-Carolina Operations or its successors for the Term, so that SCE&G shall have free and unobstructed access reasonably necessary for the purpose of construction, operation and maintenance of SCE&G's Interconnection Facilities and shall also include the right to remove or replace SCE&G's Interconnection Facilities including any decommissioning or removal pursuant to Section 3.6.  SCE&G's obligation to  continue the Work and perform its obligations hereunder is expressly conditioned upon SCE&G's prior receipt of the rights and interests contemplated by this Section 3.1.2.

3.1.2.1 SCE&G shall have the right at all times to enter onto the easement areas described in this Section 3.1.2 for the purpose of taking such action as may be reasonably necessary to exercise SCE&G's rights and perform its obligations under this Agreement. SCE&G will keep records of all visits onto the easement areas described in this Section 3.1.2 outside of normal working hours. For purposes of this Agreement, "normal working hours" means the hours of 8:00 am to 5:00 pm.

3.1.3 Customer shall be responsible for maintaining all common use roadways and access facilities to SCE&G's Interconnection Facilities to the extent that such roadways and access facilities are located on land owned or controlled by Customer or Eastman Chemical Company-Carolina Operations or its successors. Notwithstanding Section 11.1, SCE&G shall reimburse Customer for reasonable expenses incurred by Customer for all damage (excluding wear and tear consistent with Good Utility Industry Practice) to such roadways and access facilities solely attributable to SCE&G or its contractors.

3.1.4 Customer shall grant, or cause an entity with requisite authority to grant to SCE&G, any modifications, expansions, additional easements or rights-of-way that Customer may have over property owned or controlled by Customer; provided that such additional easements, rights-of-way, modifications or expansions are reasonably required by SCE&G to exercise its rights or carry out its obligations pursuant to this Agreement in accordance with Good Utility Industry Practice.

3.2 Customer's Interconnection Facilities. Customer shall be responsible for the design, construction, installation, ownership, operation and maintenance of the Customer's Interconnection Facilities. Customer's Interconnection Facilities shall meet all applicable safety, engineering, regulatory codes, requirements and Standards. Customer shall provide SCE&G with one-line drawings of the proposed Customer's Interconnection Facilities, and Customer shall promptly provide SCE&G with any proposed revisions to said drawings. SCE&G's review of data provided by Customer, or SCE&G requested inspection or testing with respect to the design, construction, operation or maintenance of Customer's Interconnection Facilities shall not constitute a representation, warranty or assumption of responsibility or liability with respect to the economic or technical feasibility, operational capability or reliability of Customer's Interconnection Facilities. Customer is solely responsible for the economic and technical feasibility, operational capability and reliability of the Facility.

3.3 SCE&G's Interconnection Facilities.

3.3.1 SCE&G shall be responsible for the design, construction, installation, ownership, operation and maintenance of SCE&G's Interconnection Facilities. SCE&G's Interconnection Facilities shall meet all applicable Standards.

3.3.2 The estimated costs (exclusive of any regulatory approval costs and/or fees) for SCE&G to perform the Work are set forth in the Interconnection Study at Part V in Exhibit 1 as revised by Exhibit 1A. Customer shall pay SCE&G (i) the total actual and documented costs for the performance of the Work and (ii) the Monthly Facilities Fees, as set forth in Article VII.

3.3.3 SCE&G shall provide Customer with the following: (i) a Work Plan, to be delivered to Customer within sixty (60) days after execution of this Agreement, which Work

Plan shall include the information set forth in Part A of Exhibit 2; (ii) monthly reports on the status of the Work ("Monthly Status Reports"), which Monthly Status Reports shall be delivered by SCE&G to Customer by the fifteenth (15th) of each month and which shall be in the form set forth in Part C of Exhibit 2; and (iii) notification as soon as reasonably practicable of any significant problems or issues with regard to the Work, including any proposed changes pursuant to Section 3.3.5. The project schedule in the Work Plan shall have a target In-Service Date for SCE&G's Interconnection Facilities of eighteen months from the date of this Agreement.

    3.3.4  In performing the Work, SCE&G shall: (i) use reasonable best efforts to perform the Work in accordance with the project schedule set forth in the Work Plan in accordance with Good Utility Industry Practice; and (ii) cooperate with all contractors of Customer involved with the construction of the Facility and/or Customer's Interconnection Facilities.

    3.3.5  In the event that either Party, during performance of the Work, in good faith believes that a significant change to the Work is needed for the safe and efficient transfer of electric energy from the Customer's Interconnection Facilities to SCE&G's Transmission System or to comply with any change in Standards, whether such change is to scope, specification, cost or schedule, the Party identifying such change shall promptly notify the other Party of the proposed change in writing and provide written documentation of the need for, and scope, specification, cost and schedule of, such change to the other Party. Following the other Party's review of the proposed change, the Parties shall meet and mutually determine whether the proposed change is necessary for the safe and efficient transfer of electric energy from the Customer's Interconnection Facilities to SCE&G's Transmission System or to comply with any change in Standards. If the Parties in good faith and exercising reasonable judgment determine a proposed change to the Work is necessary for the safe and reliable transfer of electric energy from the Customer's Interconnection Facilities to SCE&G's Transmission System or to comply with any change in Standards, such proposed change shall promptly be implemented and the costs for such work shall be added to the Actual Cost. If the Parties in good faith and exercising reasonable judgment fail to mutually agree that a proposed change to the Work is necessary for the safe and reliable transfer of electric energy from the Customer's Interconnection Facilities to SCE&G's Transmission System or to comply with any change in Standards, such proposed change may be implemented and a Party may submit such matter for resolution pursuant to Article XVI. The arbitrator shall base his/her decision on whether the expenditure is necessary for the safe and reliable transfer of electricity or to comply with any change in Standards, whether it complies with Good Utility Industry Practice, whether it complies with the FCR, and is otherwise consistent with this Agreement.

    3.3.6  The following items shall be documented and communicated by the originating Party to the other Party in conjunction with the Monthly Status Reports provided for in Section 3.3.3(ii): (i) all significant proposed changes; and (ii) positive cost variances in excess of ten thousand dollars ($10,000) above the total original estimate set forth in the Interconnection Study description set forth in Exhibit 1 as revised by Exhibit 1A, which cost variances do not result from a significant proposed change. A "significant" proposed change shall be any change to the scope, specification, cost, or schedule of the Work that: (i) results in a material modification to a major technical feature of the Interconnection Facilities; or (ii) results in any material change to systems that are part of or associated with protection schemes; (iii) is likely to result in a positive cost variance in excess of fifty thousand dollars ($50,000); or (iv) results in a change in any milestone in the Work Plan project schedule.

3.3.7   SCE&G shall notify Customer at least 30 days in advance of the SCE&G Interconnection Facilities In-Service Date. Customer shall notify SCE&G at least 30 days in advance of the Customer's Interconnection Facilities In-Service Date.  Promptly following notification of the applicable In-Service Date, SCE&G and Customer shall inspect SCE&G's Interconnection Facilities,  or Customer's Interconnection Facilities, as applicable, and review any appropriate documentation and shall identify any outstanding items that may be in need of further attention by either or both of the Parties with respect thereto.

3.4   Changes to Interconnection Facilities. In the event that either Party desires to make changes to its Interconnection Facilities, or have changes made to the Interconnection Facilities of the other Party, after review by the Parties as set forth in Section 3.3.7 and completion of any outstanding items identified thereby that would reasonably be expected to affect the other Party's Interconnection Facilities, the Facility or SCE&G's Transmission System, the Party desiring such change shall promptly notify the other Party of the proposed change in writing and provide written documentation of the need for, and scope, specification, cost, and schedule of, such change, to the other Party.  Following the other Party's review of the proposed change, the Interconnection Committee shall determine whether the proposed change should be implemented, and if such change is to be implemented, how such change will be implemented and the portion of the cost of such change to be paid by each Party.  If the Interconnection Committee is unable to reach unanimous agreement on whether such proposed change should be implemented or the method of implementing such change or the portion of the cost of such change to be paid by each Party, the matter shall be submitted for resolution pursuant to Article XVI.

3.5   Changes to Facility.  Customer shall have the right to make any changes to the Facility it deems necessary or desirable; *provided, however*, Customer shall take any and all actions necessary to ensure that such changes do not have a material adverse affect on SCE&G's Interconnection Facilities or SCE&G's Transmission System, or SCE&G's exercise of its rights or performance of its obligations under this Agreement. If Customer desires to make changes to the Facility, to the extent that such changes may affect SCE&G's Interconnection Facilities or SCE&G's Transmission System or SCE&G's exercise of its rights or performance of its obligations under this Agreement, Customer shall provide SCE&G with appropriate plans, drawings, or specifications for SCE&G's review and comment.

3.6  Decommissioning Costs.  Upon expiration or earlier termination of this Agreement, SCE&G shall at its sole option:  (1) retain title to any or all of SCE&G's Interconnection Facilities and pay Customer the fair market value of the material and equipment procured on behalf of Customer for the Works and forming part of SCE&G's Interconnection Facilities, such fair market value not to exceed the depreciated book value; *provided, however*, that Sections 7.5, 7.6, 7.7, and 7.8 hereof shall apply to SCE&G as payor of such costs; or (2) transfer title to Customer of any or all of SCE&G's Interconnection Facilities and Customer shall pay all reasonable documented costs of SCE&G to decommission and/or remove SCE&G's Interconnection Facilities no longer required for interconnection of the Facility to SCE&G's Transmission System in the event that SCE&G elects or is required to remove  SCE&G's Interconnection Facilities to comply with a judicial or regulatory agency order or with requirements promulgated or enacted by a Federal, state or local government body.   The decommissioning and/or removal shall be accomplished in a manner that restores the full