functionality of SCE&G's Transmission System within eighteen (18) months following the expiration or termination of this Agreement in a manner that is consistent with Good Utility Industry Practice. Customer shall reimburse SCE&G for such actual, reasonable costs within sixty (60) days of invoice by SCE&G; *provided, however*, that the provisions of Sections 7.5, 7.6, 7.7, and 7.8 hereof shall apply to the payment of said decommissioning and/or removal costs by Customer.

ARTICLE IV
METERING, METERED DATA AND COMMUNICATIONS

4.1  Installation of Revenue Metering Device.  A Revenue Metering Device shall be installed on SCE&G's Interconnection Facilities for each generator of the Facility.  Such Revenue Metering Device(s), shall be owned, installed, operated, and maintained by SCE&G. These devices are included as part of SCE&G's Interconnection Facilities at Customer's expense in accordance with Section 3.3.

4.1.1  Points of Delivery.  The physical points of delivery ("Points of Delivery") shall be on the connectors of the last SCE&G structure of SCE&G's Interconnection Facilities before Customer's generator step-up breaker as shown in Exhibit 6.

4.2  Meter Testing and Inspection.  Revenue Metering Devices shall be tested at least annually.  At Customer's request SCE&G will test its Revenue Metering Devices at no charge to Customer provided SCE&G has not performed a test within the last six months. If the Revenue Metering Device has been tested within the last six months and the requested test reveals that such Revenue Metering Device is accurate within the limits of plus or minus 1%, Customer will reimburse SCE&G for the cost of the requested test.

4.3  Adjustment of Inaccurate Meters and Meter Readings.

4.3.1   If any Revenue Metering Device is found to be defective or registering inaccurately, it shall be repaired, replaced, and/or recalibrated as soon as possible to as nearly as practicable to a condition of zero (0) error by SCE&G.

4.3.2  If any Revenue Metering Device fails to register, or if the measurements made by a Revenue Metering Device are found upon testing to be inaccurate by more than one percent (1.0%), such Revenue Metering Device shall be repaired, replaced, and/or recalibrated as near as practicable to a condition of zero (0) error by SCE&G; *provided,* that the costs of the test shall be for the account of SCE&G.

4.3.3   Adjustment to any Revenue Metering Device shall be made correcting all measurements for both the amount of the inaccuracy and the period of the inaccuracy, in the following order of priority: (i) as may be agreed upon by the Parties; (ii) in the event that the Parties cannot agree on the amount of the adjustment necessary to correct the measurements made by any inaccurate or defective Revenue Metering Device, the Parties shall use metering devices as may be installed by SCE&G, if registering accurately within the limits of plus or minus 1%, to determine the amount of such inaccuracy;  (iii) if the metering devices as may be installed by SCE&G are also found to be inaccurate by more than one percent (1.0%), the Parties shall estimate the amount of the necessary adjustment on the basis of energy deliveries during

periods of similar operating conditions when such Revenue Metering Device was registering accurately.

4.3.4   SCE&G will provide Customer with meter pulses from the Revenue Metering Devices for its use. These meter pulses will be provided in accordance with the provisions in Exhibit 5.

4.4   Metered Data.   SCE&G shall provide, at Customer's expense, all equipment necessary to allow the following continuous data values generated at the Facility to be telemetered to SCE&G's SCC, pursuant to a mutually agreeable protocol for telemetry of operating data: (i) a generator breaker status (open or closed) digital signal for each generator of the Facility, (ii) an electric generator output MW analog signal for each generator of the Facility, (iii) an electric generator input/output MVAR analog signal for each generator of the Facility, (iv) three electric generator output amperes (3-phase) analog signals for each generator of the Facility, (v) an integrated net MWh digital signal from each Revenue Metering Device, and (vi) an integrated net MVARh digital signal from each Revenue Metering Device.

## ARTICLE V
## TESTING

Testing of the Interconnection Facilities shall be conducted in accordance with Exhibit 4 as may be amended or modified by the Interconnection Committee from time to time.

## ARTICLE VI
## INTERCONNECTION REQUIREMENTS AND MAINTENANCE

6.1  Interconnection Requirements.

6.1.1    Customer's Interconnection Facilities shall be connected to SCE&G's Interconnection Facilities in accordance with the FCR. When the FCR is modified, the Interconnection Committee shall seek to reach agreement on what changes, if any, and when such changes, if agreed upon, will be made to the Customer's Interconnection Facilities or SCE&G's Interconnection Facilities. The costs of implementing the required changes, if any, to SCE&G's Interconnection Facilities shall be at Customer's cost and expense; provided that such required changes are consistent with Good Utility Industry Practice and have been approved by any regulatory body having approval authority over the amended or modified FCR. If the Interconnection Committee is unable to reach agreement on any matter under this Section 6.1.1, such matter shall be subject to resolution pursuant to the provisions of Article XVI.

6.1.2  SCE&G's Interconnection Facilities must be capable of accepting electric energy from the Customer's Interconnection Facilities up to the capability levels shown in Exhibit 3. The Customer may submit a request for a supplemental Generation Interconnection Study to determine the cost, if any, for SCE&G's Interconnection Facilities to accept electric energy that exceeds the capability levels shown in Exhibit 3. The costs of any improvements to SCE&G's Interconnection Facilities to accommodate such increased electric energy shall be treated as New Capital Additions under Section 7.2 of this Agreement. For the avoidance of doubt, nothing in this Agreement shall be construed as a representation or obligation that SCE&G will accept onto

WAI-2821673v1

SCE&G's Transmission System and transmit any amount of electric energy from SCE&G's Interconnection Facilities. Any obligation of SCE&G to accept electric energy onto and transmit such electric energy through SCE&G's Transmission System shall be subject to agreement by the Parties to a separate transmission service agreement.

6.1.3  Remote Terminal Unit. Prior to the Commercial Operation Date, a Remote Terminal Unit ("RTU") or equivalent data collection and transfer equipment acceptable to both Parties shall be included in SCE&G's Interconnection Facilities at Customer's expense in accordance with Section 3.3.  The RTU shall be capable of gathering accumulated and instantaneous data to be telemetered to a location(s) designated by SCE&G or Third Party System Operator through use of a dedicated point-to-point data circuit(s) as indicated in Section 6.3.3.

6.1.4  Switching and Tagging Rules. The Parties shall abide by their respective switching and tagging rules for obtaining clearances for work or for switching operations on equipment. Such switching and tagging rules shall be developed in accordance with OSHA Standard 29 CFR part 1910 or successor standards.

6.2     Maintenance of Interconnection Facilities.   The Parties shall each operate, maintain, repair and replace their respective Interconnection Facilities in a safe, prudent, reliable, and efficient manner, consistent with Good Utility Industry Practices and Standards.

6.3  Facility Requirements.

6.3.1  Protective Equipment.

6.3.1  Customer acknowledges that any protective devices installed in SCE&G's Interconnection Facilities may not isolate or protect equipment beyond the high tension power circuit breaker located in Customer's Interconnection Facilities from any unexpected electrical events such as electrical faults or non-routine switching. Thus, suitable protective devices shall be installed by Customer at Customer's expense to properly isolate the Facility from SCE&G's Transmission System.

6.3.2  SCE&G acknowledges that any protective devices installed in Customer's Interconnection Facilities may not isolate or protect equipment beyond the high tension power circuit breaker located in SCE&G's Interconnection Facilities from any unexpected electrical events such as electrical faults or non-routine switching. Thus, suitable protective devices shall be installed by SCE&G at Customer's expense on SCE&G's Interconnection Facilities in order to properly isolate any facilities beyond Customer's Interconnection Facilities.

6.3.3  Communications. At Customer's expense, SCE&G shall install and maintain communication lines required to transmit information from the RTU to SCE&G's SCC, and (if required) to a Third Party System Operator. The cost and maintenance for these communication lines shall be billed to the Customer in separate line items on the monthly bill provided pursuant to Section 7.4. Customer shall provide a phone line to the SCE&G substation fence for use by SCE&G to collect metering data from the Revenue Metering Devices.

6.4  Reporting Obligations.

6.4.1   Customer shall, as soon as reasonably practicable, disclose to SCE&G any known condition or circumstances at the Facility that could reasonably be expected to materially and adversely impact or result in damage to SCE&G's Transmission System or SCE&G's Interconnection Facilities.  SCE&G shall at all times have the right to temporarily disconnect Customer's Interconnection Facilities in order to prevent an Emergency. In the event of an Emergency, SCE&G will give Customer as much advance notice as practicable under the circumstances before SCE&G disconnects Customer's Interconnection Facilities.  SCE&G shall reconnect Customer's Interconnection Facilities as soon as reasonably practicable following the events which gave rise to the Emergency.

6.4.2   SCE&G shall, as soon as reasonably practicable, disclose to Customer any known condition or circumstances related to SCE&G's Interconnection Facilities or SCE&G's Transmission System that could reasonably be expected to materially and adversely impact or result in damage to the Facility or to Customer's Interconnection Facilities.

6.4.3   Customer and SCE&G shall use due diligence to correct any such condition or circumstance at the Facility or the Customer's Interconnection Facilities, or SCE&G's Transmission System or SCE&G's Interconnection Facilities, respectively.

6.5  Interconnection Committee.

6.5.1   SCE&G and Customer shall each appoint one representative and one alternate representative to act in matters relating to the performance of the Work and/or the maintenance of the Facility, the Interconnection Facilities and/or SCE&G's Transmission System (the "Interconnection Committee") as provided for herein. The Parties shall notify each other in writing of such appointments and any changes thereto.

6.5.2 The Interconnection Committee shall meet at least monthly until the Commercial Operation Date and thereafter  at least once every six months. Additional meetings may be arranged by any representative of the Interconnection Committee.

6.5.3   Matters referred to the Interconnection Committee shall be determined by agreement of both representatives; *provided, however*, that the Interconnection Committee shall have no power to alter or amend this Agreement except with respect to Exhibit 4. All decisions by the Interconnection Committee shall comport with the provisions of this Agreement including, but not limited to, provisions allocating the cost responsibility of each of the Parties. Nothing in this Section shall limit either Party's right to initiate dispute resolution under Article XVI.

6.6   Maintenance Outage Coordination.   Two (2) months after the Commercial Operation Date and thereafter on an annual basis at least thirty (30) days prior to the end of each calendar year during the Term, SCE&G shall provide to Customer a forecast of planned maintenance activities and outages for SCE&G's Interconnection Facilities that are expected to exceed one (1) day each during the upcoming calendar year.  This forecast shall be adjusted and communicated with the Customer on an as-needed basis during the year.

## ARTICLE VII
## PAYMENT AND SECURITY REQUIREMENTS

7.1 The Work.

7.1.1 Good Faith Estimates for the Work. As referenced in the Interconnection Study, the good faith estimate of SCE&G (*excluding* interest) for SCE&G to perform the Work on SCE&G's Interconnection Facilities is $7,837,659. This estimate is subject to all assumptions and conditions set forth in the Interconnection Study, and includes the following components: development costs of engineering package; equipment and material costs; construction and labor costs; allocations of shared and overhead costs, all as more fully set forth in the Interconnection Study.

7.1.2 Actual Costs for the Work. Customer shall pay SCE&G for SCE&G's reasonable, documented actual costs for the Work ("Actual Costs"), including: (i) allocations of shared and overhead costs; and (ii) interest accrued on the total cost of construction at the end of each month during construction (as set forth in the Work Plan) calculated pursuant to the methodology specified for interest on refunds in 18 C.F.R.  § 35.19a(a)(2)(iii) ("Delayed Payment Rate"). For prepaid amounts, interest accrued on the unused portions at the end of each month during construction (as set forth in the Work Plan) calculated at the Delayed Payment Rate shall reduce the Actual Costs. Actual Costs will be determined separately for SCE&G's Interconnection Facilities.

7.1.3 Payment for the Work. Customer shall make the payments to SCE&G shown in Exhibit 2. Within ninety (90) days following SCE&G's Interconnection Facilities In-Service Date or within a reasonable period of time after such Actual Costs are known, SCE&G shall provide Customer with an invoice that includes a breakdown of the Actual Costs, including supporting documentation for same. The invoice will show prior payments as a credit. In the event that the Actual Costs to be paid by Customer under Section 7.1.2 are more or less than the payments made in accordance with this Section 7.1.3 and Exhibit 2, Customer or SCE&G, as the case may be, will reimburse or pay the other the difference in one (1) lump sum payment within sixty (60) days of such invoice. All amounts not otherwise disputed pursuant to Section 7.5 shall be payable within said 60-day period. During said 60-day period before payment is due Customer shall review SCE&G's invoice and supporting documentation, audit any reasonably available information in SCE&G's possession related to the construction of SCE&G's Interconnection Facilities not previously provided to Customer, and provide SCE&G with written objection to any costs or charges included in SCE&G's invoice, and the Parties shall meet at either Party's request to review same. Promptly following such meeting, SCE&G shall notify Customer of SCE&G's acceptance or rejection of each of Customer's objections. If SCE&G does not agree to all of Customer's objections, Customer may submit any or all such objections for resolution pursuant to Section 7.5.

7.1.4 Furnishing of Security Instrument or Prepayment. Within forty-five (45) days after the Effective Date, Customer shall provide SCE&G with a Security Instrument to secure payment for the Work in a form reasonably acceptable to SCE&G and with respect to a Security Instrument in the form of a letter of credit or surety bond only in an amount equal to twenty (20) percent of the good faith estimate of Actual Costs pursuant to Section 7.1.1 for SCE&G to perform the Work. A Security Instrument in the form of a surety bond or standby letter of credit

shall have a minimum term sufficient to ensure that it is effective to cover the period through the date upon which it is reasonably anticipated that Customer will be required to make payments for the Work including any payments pursuant to a final invoice to be issued pursuant to Section 7.1.3 ("Anticipated Payment Date") plus ninety (90) days. The Security Instrument shall also provide that in the event the Anticipated Payment Date changes and (i) the expiration date of the Security Instrument is no longer more than ninety (90) days after the new Anticipated Payment Date, and (ii) such Security Instrument is not renewed, extended or replaced so that its expiration date is at least 90 days after the new Anticipated Payment Date, on or before thirty (30) days prior to the expiration date of such Security Instrument, SCE&G may draw the full amount of the security and hold such sum as security for payment for the Work.    SCE&G's obligation to commence performance of the Work is conditioned upon receipt by SCE&G of a Security Instrument pursuant to this Section 7.1.4.

   7.1.5  Draws Upon Security.  If Customer fails to make the payments shown in Exhibit 2 or fails to pay SCE&G for sums uncontested by Customer and properly invoiced hereunder when due, or fails to place disputed sums into escrow pursuant to Section 7.6, SCE&G shall be entitled to draw upon the security then required to be in place for such sums, plus interest at the Delayed Payment Rate from the date due, after giving Customer notice and fifteen (15) days from the date of such notice to pay any such unpaid sums.  In the event that a partial or full draw is made by SCE&G on said security, Customer shall be required to restore said security to the total amount required pursuant to Section 7.1.4 within fifteen (15) days of the date of said partial or full draw. If partial draws are not permitted against the security, then SCE&G shall immediately refund to Customer any amounts in excess of the amount due SCE&G at the time of SCE&G's draw against the security.

   7.1.6  Security No Limitation.  The amount of the security required under this Article VII shall in no event be construed as a limitation on any sums that may be due to SCE&G or which SCE&G may claim as damages for Customer's breach of this Agreement. Notwithstanding anything to the contrary herein, neither Party shall be liable for consequential, incidental, special, punitive, exemplary or indirect damages, lost profits or other business interruption damages, by statute, in tort or contract, under any indemnity provision or otherwise with respect to any claim, controversy or dispute arising under this Agreement.

   7.2    New Capital Additions.    Customer shall be responsible for the reasonable, documented actual costs of New Capital Additions only when the necessity for such additions: (i) arises primarily from safety or reliability considerations related to SCE&G's Interconnection Facilities or to SCE&G's Transmission System or both; (ii) does not primarily result from the load or facilities of other wholesale or retail customers on SCE&G's Transmission System, including load growth or system expansion and (iii) are consistent with Good Utility Industry Practice; provided that, if no changes have been made to the Facility consistent with Standards, Customer shall not be responsible for costs related to SCE&G's Transmission System.   In addition, Customer shall be responsible for the reasonable documented actual costs of New Capital Additions where said New Capital Additions arise from a decision to replace components of SCE&G's Interconnection Facilities. Customer shall pay SCE&G the actual costs of the New Capital Additions for which the Customer is responsible, including any improvements pursuant to Section 6.1.2, in one lump-sum payment in accordance with Section 7.4, which shall be subject to interest and tax gross-up if applicable. Customer will receive transmission credits as set forth in Section 7.2.1 if such New Capital Additions are at or beyond the point of

interconnection(s) as identified by the FERC in its March 22, 2004 order in Docket No. ER03-1398-000, 106 FERC ¶ 61,265 (2004). The actual costs for the New Capital Additions shall include interest accrued on the total cost of constructing the New Capital Additions at the end of each month during construction calculated  at the Delayed Payment Rate.  The Monthly Facilities Fee set forth in Section 7.3 hereof shall be adjusted to include the costs of New Capital Additions (that are the responsibility of Customer) in the actual costs to which the Facilities Fee Charge Multiplier, as defined in Section 7.3, is applied.

7.2.1  Credits for Transmission Facility Upgrades Required for Interconnection.  Customer shall be entitled to transmission credits, equal to the total amount paid to SCE&G for the Transmission Facility Upgrades Required for Interconnection, including any tax gross-up or other tax-related payments associated with the Transmission Facility Upgrades Required for Interconnection, to be paid on a dollar-for-dollar basis for the non-usage sensitive portion of transmission charges with respect to the utilization of the Transmission Facility Upgrades Required for Interconnection, as payments are made under SCE&G's OATT for transmission services with respect to the Facility.  The credits shall be applied on a percentage basis based on the metered use of the Transmission Facility Upgrades Required for Interconnection.  Any time there is a reservation for transmission service but no metered use, credits shall be applied against 70 percent of the total charge for such transmission reservations because the capacity of the generators that utilize the Transmission Facility Upgrades Required for Interconnection represents 70 percent of the Facility's total capacity.  Transmission credits shall be applied until such time as all amounts advanced to SCE&G by Customer for the Transmission Facility Upgrades Required for Interconnection have been fully offset, after which time such offset or credits shall no longer apply.  Alternatively, SCE&G may, at its sole discretion, choose to repay to Customer any amounts advanced by Customer for Transmission Facility Upgrades Required for Interconnection not credited to Customer at any time.  Any credits shall include interest calculated in accordance with the methodology set forth in FERC's regulations from the date of the payment for the Transmission Facility Upgrades Required for Interconnection until the date the credit is applied.  Customer may assign its rights to credits or repayment hereunder to any person.

7.3.1  Monthly Facilities Fee.  Customer shall pay to SCE&G a monthly fee ("Monthly Facilities Fee") that will cover SCE&G's Maintenance, repairs, property tax, miscellaneous taxes, and insurance, for SCE&G's Interconnection Facilities, not to include Transmission Facility Upgrades Required for Interconnection, for the Term of this Agreement, beginning with the calendar month following SCE&G's Interconnection Facilities In-Service Date.  The Monthly Facilities Fee shall be payable no later than the tenth day of each month.  To the extent that SCE&G's Interconnection Facilities are utilized by one or more third parties, the Monthly Facilities Fee shall be prorated to account for the usage by such third party(ies). The Monthly Facilities Fee shall be the sum equal to the Actual Costs as determined pursuant to Section 7.1.2 (as may be adjusted pursuant to Section 7.2) multiplied by the Facilities Fee Charge Multiplier of 0.225% per month.  The Parties acknowledge and agree that the Facilities Fee Charge Multiplier has been agreed based on an overall balance of consideration of the terms of this Agreement.  Prior to final resolution of the Actual Costs in accordance with Section 7.1.3, the Monthly Facilities Fee will be calculated and applied based upon the good faith estimate for SCE&G's Interconnection Facilities set forth in the Interconnection Study as revised by Exhibit 1A, which is $7,837,659.  Following said final resolution of the Actual Costs, the Monthly Facilities Fee will be recalculated and applied based on the Actual Costs (as may be adjusted pursuant to

Section 7.2 hereof), and SCE&G shall refund Customer for any prior overpayment or Customer shall pay SCE&G for any prior underpayment, with interest calculated at the Delayed Payment Rate within fifteen (15) days of notice of such recalculation.

7.3.2 <u>Payment for Extraordinary Maintenance</u>. In the event SCE&G incurs Extraordinary Maintenance to the Interconnection Facilities, SCE&G will make such replacement or repair (by mutual agreement with Customer). .SCE&G will prepare a separate bill to be presented to Customer for the documented costs of the Extraordinary Maintenance in the month following completion of the Extraordinary Maintenance. The amount of costs billed to Customer shall be based on SCE&G's reasonable, documented, actual costs, including allocations of shared and overhead costs, for Extraordinary Maintenance to SCE&G's Interconnection Facilities; *provided, however*, that Customer shall not be responsible for such Extraordinary Maintenance when such Extraordinary Maintenance is primarily caused by SCE&G's failure to operate SCE&G's Transmission System or SCE&G's Interconnection Facilities in accordance with Good Utility Industry Practice or to the extent otherwise covered by insurance

7.3.3 <u>Escalation for Monthly Facilities Fee Multiplier</u>. Effective January 1, 2004 and January 1 of each succeeding calendar year during the Term (each such date being herein referred to as an "Adjustment Date"), the amount of the Monthly Facilities Fee Multiplier for the then current calendar year shall be the Monthly Facilities Fee Multiplier for the preceding calendar year adjusted in accordance with the following formula:

$$\text{Monthly Facilities Fee Multiplier (as adjusted)} =$$
$$\text{Monthly Facilities Fee Multiplier } [.50(Lc/Lb) + .50(Pc/Pb)]$$

Where:

$Lc$ = the final Labor Index for the preceding July.
$Lb$ = the final Labor Index for the base month of July 2003.
$Pc$ = the Handy Whitman Index for the preceding July.
$Pb$ = the Handy Whitman Index for the base month of July 2003.

"Handy Whitman Index" shall mean the Handy Whitman Index of Public Utility Construction Costs, transmission plant – FERC Acct. 353, South Atlantic Region, as published by Whitman, Requardt & Assoc. LLP. If the Handy Whitman Index ceases to be published or is otherwise unavailable, a comparable index will be used as mutually agreed to by the Parties at that time.

"Labor Index" shall mean "not seasonally adjusted", data type AHE (average hourly earnings) for Manufacturing A 1-digit Industry, state and area employment, hours, and earnings for the State of South Carolina as published by the United States Department of Labor, Bureau of Labor Statistics (Series ID: SAU3700003000016). If the Labor Index ceases to be published or is otherwise unavailable, a comparable index will be used as mutually agreed to by the Parties at that time.

7.4 Charges and Payments (other than Actual Cost of the Work).    Within ten (10) days after the end of each calendar month, SCE&G shall provide Customer with an invoice for all charges and payments due under this Agreement (but excluding charges and payments for the

Work pursuant to Section 7.1.2 and 7.1.3) for the preceding billing period, including, but not limited to, payment for New Capital Additions, charges for the Monthly Facilities Fees, charges for leased telephone lines under Section 6.3.3 and interest accrued on unpaid amounts and supporting documentation regarding same. If such invoice reflects a net payment due from SCE&G to Customer, SCE&G shall pay such invoice within twenty (20) days of its date. If such invoice reflects a net payment from Customer to SCE&G, Customer shall pay such invoice within twenty (20) days of Customer's receipt of such invoice and supporting documentation.

   7.5  Disputed Charges and Payments.

   7.5.1  Customer may dispute any charges by or payments from SCE&G set forth in this Article VII. If Customer disputes any charges or payments pursuant to this Article VII, Customer shall pay all undisputed charges. Customer shall notify SCE&G in writing of any disputed amounts, including the amount in dispute, the reason for the dispute, and a proposed resolution and shall pay all such disputed amounts into an escrow account pursuant to Section 7.6. If the dispute involves a payment from SCE&G to the Customer, the Customer shall notify SCE&G of the additional sums claimed by the Customer to be owed to it by SCE&G, and SCE&G shall deposit such sums into the escrow account pursuant to Section 7.6. If the Customer fails to pay the computed amount or to place disputed amounts in an escrow account by the due date for payment of such computed amount or otherwise when such payment is due, Customer shall be in default of this Agreement pursuant to Section 7.8, and such unpaid amounts will accrue interest at the Delayed Payment Rate.

   7.5.2  In the event that Customer disputes the calculation of any charges of, or payments to be made by, SCE&G, such dispute shall be subject to resolution pursuant to the provisions of Article XVI. Payment disputes shall be resolved in accordance with the provisions of this Agreement, including but not limited to provisions allocating the cost responsibility of each of the Parties. Immediately following the resolution of such dispute, SCE&G or Customer, as the case may be, shall make any payment or refund required hereunder to the other plus interest at the Delayed Payment Rate no later than the twentieth (20) day after the final resolution of such dispute.

   7.6  Escrow of Disputed Sums. All disputed sums shall be deposited into an interest-bearing escrow account at a federally insured banking institution (the "Escrow Account"). The Escrow Account will authorize the escrow agent to disburse funds from the Escrow Account upon receipt of either (i) a disbursement authorization signed by both Parties or (ii) a court order entering an award rendered by the arbitrators pursuant to Sections 16.3 and 16.4. The Party depositing the disputed amounts into the Escrow Account ("Escrowing Party") shall be entitled to receive any funds remaining in the Escrow Account attributable to a particular disputed amount following final resolution of such disputed amount. In the event that the funds in the Escrow Account are insufficient to pay all amounts that are determined to be owed by the Escrowing Party to the other Party, including interest at the Delayed Payment Rate (the "Escrow Deficiency"), the Escrowing Party shall pay the other Party the Escrow Deficiency within twenty days of the Escrowing Party's receipt of written notice of such Escrow Deficiency by the other Party.

   7.7  Interest on Unpaid and Escrowed Amounts. Interest shall accrue on: (i) any unpaid amounts invoiced or otherwise due to a Party pursuant to the terms hereunder from the

applicable due date for payment of such invoice and (ii) escrowed amounts from the applicable due date of the underlying invoice, until the date paid, with interest at the Delayed Payment Rate.

7.8  Default for Failure to Pay Invoiced Amounts.  Should either Party fail to pay any sums due hereunder or fail to deposit disputed sums into escrow, by the applicable due date for payment, such Party shall be in default of this Agreement and the other Party may, after written notice to the defaulting Party giving it thirty (30) days to remedy such breach by paying or escrowing the disputed sums, as applicable, plus interest, terminate this Agreement and pursue any or all regulatory, legal, or equitable remedies that may be available. Notwithstanding the foregoing, should Customer fail to make any of the payments in accordance with the payment schedule to be provided in Exhibit 2 on the date due, other than amounts disputed in good faith pursuant to Section 7.5, SCE&G shall have the right to suspend performance of the Work until such payment has been made. Such remedy shall be in addition to any other remedies SCE&G may have hereunder.

## ARTICLE VIII
## TAX LIABILITY AND SECURITY

8.1   The Parties acknowledge that under current federal income tax law, including Internal Revenue Service ("IRS") notices and rulings, (i) payments made by Customer to SCE&G with respect to the construction and installation of new facilities or improvements and/or (ii) the transfer, if any, from Customer to SCE&G of SCE&G's Interconnection Facilities or other facilities or improvements, may, under certain circumstances, be considered gross income to SCE&G. Customer agrees to assure SCE&G recovery of any CIAC Tax Liability if the payments or transfer described above are ultimately determined to be gross income to SCE&G (hereinafter referred to as a "Taxable Event"). Customer expressly agrees to indemnify and save SCE&G harmless from and against any increase in actual federal and/or state income tax liability, CIAC Tax Liability, including all interest or penalty claims (as well as all taxes incurred by SCE&G as a result of amounts paid to SCE&G under this indemnity) related to any CIAC Tax Liability incurred as a result of Customer's payments to SCE&G with respect to the construction and installation of the new facilities or improvements and/or the transfer of facilities and/or improvements to SCE&G, under this Agreement ("Potential CIAC Tax Liability").

8.2   Security Arrangements.

8.2.1  In order to provide SCE&G with the assurance set forth in Section 8.1, the Customer agrees to provide SCE&G with a Security Instrument for the Potential CIAC Tax Liability on the earlier of March 15, 2003 or the Commercial Operation Date. Such Security Instrument shall cover an amount calculated in accordance with the terms of Section 8.3 hereof. If Customer fails to provide SCE&G with the Security Instrument by the date required pursuant to this Section 8.2.1, SCE&G may disconnect the Facility from SCE&G's Interconnection Facilities until such Security Instrument is in place. A Security Instrument in the form of a standby letter of credit or surety bond shall have a minimum term of one (1) year and shall be renewed, extended or replaced, as appropriate, at least thirty (30) days prior to expiration, continuously for the Term or until sooner released or reduced pursuant to Section 8.2.2 hereof.

If the Security Instrument is in the form of a letter of credit, it shall designate SCE&G as beneficiary with authority to draw drafts on the issuer for the secured amount. Such Security Instrument shall also provide that SCE&G may draw the full amount of the security in the event it has not been renewed, extended or replaced on or before thirty (30) days prior to the expiration date of such Security Instrument.

8.2.2 If at any time during the term of the Security Instrument under Section 8.2.1 there is a change in federal tax law or any other event that , in a legal opinion of nationally recognized tax counsel addressed to SCE&G in form and substance reasonably satisfactory to SCE&G, will eliminate the Potential CIAC Tax Liability, and/or with respect to a decrease in the value of the security to be provided pursuant to Section 8.3, receipt of an opinion of an independent qualified appraiser, in form and substance reasonably satisfactory to SCE&G. SCE&G agrees to release to the Customer said Security Instrument or any portion of said Security Instrument in excess of SCE&G's Potential CIAC Tax Liability, or to reduce the secured amount required pursuant to Section 8.3, as may be appropriate.

8.3 Determination of Secured Amount.

8.3.1 The determination of the amount of the Security Instrument to be supplied pursuant to this Article VIII shall be based upon the fair market value of SCE&G's Interconnection Facilities constructed, installed or modified hereunder. The Parties agree that the fair market value of SCE&G's Interconnection Facilities is deemed to be the depreciated replacement cost of such SCE&G's Interconnection Facilities, as prescribed by IRS Notice 90-60 and set out in Exhibit 7. The Parties hereby agree that Exhibit 7 shall be amended from time to time as appropriate to reflect additions, deletions or other changes to SCE&G's Interconnection Facilities and/or federal income tax law.

8.3.2 Customer shall initially provide security in an amount equal to the product of the depreciated replacement cost of SCE&G's Interconnection Facilities times SCE&G's Tax Factor (net federal and state tax rate) as set forth in Exhibit 7 for the calendar year in which the Security Instrument is first provided, subject to a gross-up for payments, if any, made by Customer to SCE&G pursuant to this Article 8. SCE&G shall, within thirty (30) days after the execution of this Agreement, provide Customer with an initial estimate of the value of the Security Instrument, based upon the estimate set forth in Section 7.1.1. These projected figures, however, shall be adjusted to reflect actual construction costs.

8.3.3 SCE&G reserves the right, in appropriate circumstances, to request that Customer increase the value of the Security Instrument during its term under Section 8.2.1 to reflect changed circumstances including, but not limited to, an increase in the taxable value of SCE&G's Interconnection Facilities or other direct assignment facilities directly attributable to Customer or changes in tax law that may affect SCE&G's tax position vis-à-vis the construction and installation of New Capital Additions , to ensure that the existing security is sufficient to cover the Potential CIAC Tax Liability. Such request shall be submitted with supporting documentation showing a change in the depreciated replacement cost of SCE&G's Interconnection Facilities, calculated in accordance with standard utility accounting practices. The Customer shall increase the secured amount within thirty (30) days of receipt of notice and supporting documentation from SCE&G of any such adjustment to these costs. If Customer does not agree with the request, then Customer shall have the right to show that, in a legal

opinion of nationally recognized tax counsel addressed to SCE&G and in form and substance reasonably satisfactory to SCE&G, and/or an opinion of an independent qualified appraiser in form and substance reasonably satisfactory to SCE&G, the increase will not ultimately be required. In the event that the Customer fails to increase the value of the Security Instrument and SCE&G has not received an opinion pursuant to the foregoing sentence reasonably acceptable to SCE&G within thirty (30) days of the receipt of notice from SCE&G, SCE&G shall have the right to seek termination of and/or may suspend its service to the Customer until it increases the secured amount to the level requested by SCE&G .

8.4  Payment of Tax and Reconciliation.

8.4.1  In the event that a Taxable Event occurs, SCE&G shall invoice Customer in accordance with Section 7.4, and upon the failure of Customer to pay such amounts in accordance with Section 7.4, SCE&G may exercise its rights under the security arrangement and draw upon all amounts necessary to pay the applicable taxes. If, in SCE&G's judgment, there are insufficient funds from such security to pay the applicable taxes, the Customer agrees to provide SCE&G with the balance of the funds needed within thirty (30) days notice from SCE&G of such insufficiency.  Any excess funds held as security hereunder shall remain at SCE&G's disposal until SCE&G has received a final determination from the taxing authorities as to the taxes applicable as a result of such Taxable Event.

8.4.2  Upon such final determination, there shall be a reconciliation of the actual tax liability payable by SCE&G as a result of the Taxable Event, including any interest or penalties (only if due to a failure of the Customer), and amounts provided by the Customer, in the form of security or otherwise.  If the funds provided by the Customer prove insufficient to cover SCE&G's actual tax liability, the Customer shall pay SCE&G the amount of the underpayment within thirty (30) days notice from SCE&G of the additional amount owed. If SCE&G receives a refund from the taxing authorities of any amounts paid in connection with the Taxable Event, SCE&G shall refund to the Customer such amount refunded to SCE&G within thirty (30) days of SCE&G's receipt of such refund. In the event that said actual tax liability had not as yet been fully paid by SCE&G, in the form of estimated tax payments or otherwise, SCE&G shall refund the amount paid by the Customer in excess of SCE&G's actual tax liability. Interest shall be computed and paid from the date of collection by SCE&G from Customer until the date of refund by SCE&G to Customer pursuant to the provisions of 18 C.F.R. §35.19a. Once the Customer has fulfilled all of its obligations with respect to the final determination of the actual tax liability payable and SCE&G is no longer subject to any Potential CIAC Tax Liability, SCE&G shall release the Customer from its obligation to provide the Security Instrument under Section 8.2.

8.5  Independent Engineer Report.   On or before the Commercial Operation Date, Customer shall provide a report from an independent engineer establishing that during the first ten taxable years beginning as of the Commercial Operation Date, no more than five (5) percent of the projected total power flows over the Interconnection Facilities will flow to the Facility. "Total power flows" for purposes of this Section 8.5 means power flows to or from the Facility over the Interconnection Facilities. Such report shall meet the requirements of the "5% test" as set forth in IRS Notice 88-129, as amended by IRS Notice 90-60.

8.6  IRS Private Letter Ruling.

-26-

8.6.1 Upon written request by the Customer, SCE&G shall, at Customer's sole cost and expense, request and diligently prosecute a Private Letter Ruling ("PLR") from the IRS on the taxable nature of the transactions contemplated by this Agreement on behalf of SCE&G. Customer must submit such written request prior to the Commercial Operation Date. SCE&G shall (i) allow Customer to review and comment on the PLR request and (ii) provide Customer with copies of all filings. Customer shall be responsible for all reasonable actual and documented costs that SCE&G incurs in pursuing the Private Letter Ruling, including but not limited to, retaining outside tax counsel with expertise in such matters, all regulatory, filing and application fees and any other reasonable expenses, including apportioned salary and overhead costs, deemed appropriate and necessary for preparing, managing and obtaining the ruling. SCE&G shall bill Customer monthly for such costs in accordance with Section 7.4. SCE&G shall not be responsible for pursuing or continuing to pursue the Private Letter Ruling if the Customer has not complied with these payment provisions.

8.6.2 SCE&G shall, in its sole discretion, control the outcome of the PLR request, including, without limitation, any decision to forego the issuance of a non-favorable PLR and to pursue any available legal remedies.

## ARTICLE IX
## FORCE MAJEURE

9.1 Applicability of Force Majeure. In the event either Party is rendered unable, wholly or in part, by Force Majeure to carry out its obligations under this Agreement, other than the obligation to pay money when due, it is agreed that on such Party's giving notice and reasonably full particulars of such Force Majeure in writing or by means of electronic transmission of written text, which notice shall be given to the other Party within forty-eight (48) hours of the determination by the affected Party that a condition or event of Force Majeure has occurred, but in no event later than thirty (30) days from the date of the occurrence of the condition or event of Force Majeure relied on, the obligations of the Party giving such notice, to the extent that they are affected by such Force Majeure, shall be suspended pursuant to this Article IX during the continuance of any inability so caused , but for no longer period, and such cause shall be remedied with all reasonable dispatch and the Party claiming Force Majeure shall give the other Party prompt notice of such Force Majeure being remedied. In no event will any delay or failure of performance caused by any condition or event of Force Majeure extend this Agreement beyond its stated term. In the event that a Party's performance hereunder is excused by a condition or event of Force Majeure, the other Party's obligations related to such excused performance shall be likewise excused other than any obligation to pay money when due.

9.2 Definition of Force Majeure. An event of Force Majeure means any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, material breakage or accident to machinery or equipment, any curtailment, order, regulation or restriction imposed by governmental authorities, or any other cause reasonably beyond a Party's control. A Force Majeure event does not include: (i) the bankruptcy or insolvency of a Party; or (ii) an act of negligence or intentional wrongdoing or any rules, procedures and protocols of any Third Party System Operator. Neither Party will be considered in default as to any obligation under this Agreement if prevented from fulfilling the obligation due to an event of Force

Majeure. However, a Party whose performance under this Agreement is hindered by an event of Force Majeure shall make all reasonable efforts to perform its obligations under this Agreement.

# ARTICLE X
# ASSIGNMENT

10.1  Assignment.

10.1.1  Except as otherwise provided in Sections 10.1.2, 10.1.3 and 10.2, either Party may assign this Agreement, or any portion thereof, only upon fulfillment of the following conditions: (i) prior notice of any such proposed assignment shall be provided to the other Party; (ii) any assignee shall expressly and in writing assume assignor's obligations hereunder; (iii) assignee shall replace the security given by Customer hereunder in compliance with Article VII, if applicable; (iv) the assignor or assignee shall first have obtained such approvals, if any, as are required by all applicable regulatory bodies prior to such assignment becoming effective; and (v) the non-assigning Party, and, if applicable, the non-assigning Party's Lender(s), consent to the assignment in writing, provided such consent, if the conditions set forth in subparts (i) through (iv) of this Section 10.1.1 are fulfilled, shall not be unreasonably withheld, conditioned or delayed; *provided, however,* that SCE&G may freely delegate its obligations hereunder, in whole or in part, to one or more of its Affiliates, but SCE&G shall remain liable for the proper performance of its obligations under this Agreement notwithstanding such delegation.

10.1.2  Notwithstanding the provisions of Section 10.1.1 above, Customer may transfer or assign its interest hereunder to an Affiliate, or to a successor in interest of Customer (or its parent) by virtue of a merger, acquisition or other similar corporate transaction involving all or substantially all of the assets of Customer, without obtaining the consent of SCE&G, *provided* that the assignee has a credit status which, in SCE&G's reasonable opinion, is at least as sound as that of Customer and the condition contained in Section 10.1.1(ii) has been satisfied.  Further, if (i) SCE&G is reconfigured or reorganized, or if any successor Affiliate, organization or transmission supplier succeeds to SCE&G's responsibilities for interconnection agreements generally, and (ii) the conditions set forth in Sections 10.1.1(i), (ii) and (iv) have been satisfied prior to the effective date of such assignment, then SCE&G may assign this Agreement to such Affiliate, organization or successor transmission provider without the written consent of Customer or its Lender(s).

10.2  Financing Agreement.  Notwithstanding any other provision of this Agreement, either Party shall have the right to collaterally assign this Agreement to any Lender or any Lender's agent (each such assignee being referred to herein as a "Collateral Assignee"); *provided, however,* that no such assignment shall be effective for purposes of this Section until the assigning Party shall have notified the other Party of such assignment, which notice shall include the name and address of the Collateral Assignee.  So long as any assignment of which the other Party has been notified, or any consolidation, modification, or extension of any such assignment, shall remain outstanding, the following provisions shall apply:

10.2.1  A Party shall, upon serving upon an assigning Party any notice of default under this Agreement, also serve a copy of such notice upon each Collateral Assignee at the address

provided for in the notice referred to above. No notice of default under this Agreement shall be deemed to have been duly given unless and until a copy thereof shall have been so served.

10.2.2 The making of a collateral assignment pursuant to this Section 10.2 shall not be deemed to constitute an assignment or transfer of this Agreement, nor shall any Collateral Assignee, as such, be deemed to be an assignee or transferee of this Agreement so as to require such Collateral Assignee, as such, to assume the performance of any of the terms or conditions on the part of the assigning Party to be performed hereunder; provided however such Collateral Assignee shall have the right (i) to assign its security interest in this Agreement; (ii) to enforce its lien by any lawful means; (iii) to foreclose its security interest on the Agreement and to perform all obligations to be performed by the assigning Party hereunder, or to cause a receiver to be appointed to do so; and (iv) to acquire the assigning Party's interest in this Agreement by an assignment in lieu of foreclosure and, subject to the following sentence, thereafter to assign or transfer such interest in the Agreement to a third party and with respect to Customer, provided such transfer is in connection with any sale of the Facility, SCE&G's prior written consent shall be required for the acquisition by a third party (other than a Collateral Assignee) of Customer's interest in the Agreement by foreclosure or assignment in lieu of foreclosure; provided that SCE&G agrees not to unreasonably withhold, delay or condition its consent if such third party agrees to assume and to perform all of Customer's duties and obligations under this Agreement.

10.2.3 Any election by any Collateral Assignee to assume this Agreement, any sale of this Agreement in any proceeding for the foreclosure of any assignment, or the assignment or transfer of this Agreement in lieu of the foreclosure of any assignment shall be deemed to be a permitted sale, transfer, or assignment of this Agreement, provided such Collateral Assignee, assignee or transferee, as the case may be, agrees to assume and perform all of the assigning Party's duties and obligations under this Agreement and this Agreement shall continue in full force and effect following any such assumption, sale, transfer, or assignment.

10.2.4 At either Party's request, the other Party shall amend this Agreement to include any provision which may reasonably be requested by a Lender; provided, however, that such amendment does not impair any of such Party's rights under this Agreement or materially increase the burdens or obligations of such Party hereunder, as determined by such Party.

10.3 The Parties agree to execute and deliver such documents (including any amendments hereto) pursuant to Section 10.2 as may be reasonably requested by the requesting Party at the requesting Party's cost and expense including any legal fees reasonably incurred by the non-requesting Party.

## ARTICLE XI
## LIABILITY AND INDEMNIFICATION

11.1 Each Party shall be responsible for direct physical damage to the real or personal property, equipment, or systems of the other Party or third parties, or for injury or death to any person, and any claims therefor, only to the extent such damage results from the intentional misconduct or the negligent acts or omissions of that Party, and each Party hereby agrees to defend, indemnify, and hold harmless the other Party and its Affiliates and their agents, employees, directors, and representatives, from all suits, actions, or claims arising therefrom.

WAI-2821673v1

11.2  When the concurrent negligence or intentional misconduct of the Parties, or of one Party and a third party, results in a direct loss or claim for which either Party could incur liability as set forth in Section 11.1, each Party shall be liable for, and shall defend, indemnify and hold harmless the other Party and its Affiliates and their agents, employees, directors, and representatives from, all suits, actions, or claims, to the extent such loss or damage results directly from the negligence or intentional misconduct of that Party.

11.3  Environmental.

11.3.1 Customer shall indemnify and hold harmless SCE&G against any and all claims, demands, losses, liabilities, expenses, fines, and penalties, including interest and attorneys' fees, resulting from any alleged violation or violation of applicable federal, state, or local environmental laws or regulations arising out of the design, construction, operation, maintenance or ownership of the Facility or the SCE&G switchyard adjacent to the Facility, including the site upon which the foregoing are located, *except* to the extent the presence of such environmental contamination results from the negligence or intentional misconduct of SCE&G or its Affiliates.

11.3.2 *SCE&G shall indemnify and hold harmless Customer against any and all claims*, demands, losses, liabilities, expenses, fines, and penalties, including interest and attorneys' fees, resulting from any alleged violation or violation of applicable federal, state, or local environmental laws or regulations arising out of the design, construction, operation, maintenance or ownership of the  SCE&G's Interconnection Facilities, including the site upon which the foregoing are located, *except* to the extent the presence of such environmental contamination results from the negligence or intentional misconduct of Customer, its affiliates, or Eastman Chemical Company-Carolina Operations or any of its employees, directors, officers, agents, representatives, affiliates, successors and assigns.

11.4  **[Intentionally omitted.]**

11.5  Notwithstanding any other provisions of this Article XI, each Party shall be liable for any suits, actions, or claims for occupational injuries (including death) to its own employees, agents, or representatives arising from the performance of the Work hereunder, from which each Party hereby agrees to defend, indemnify, and hold harmless the other Party, its Affiliates and their agents, employees, and representatives. Each Party expressly acknowledges and agrees that its indemnification under this Section 11.5 shall be in full force and effect whether or not the other Party, its Affiliates, or their agents, employees, and representatives was or is claimed to be passively, actively, solely, jointly, or concurrently negligent, and regardless of whether liability without fault is imposed or sought to be imposed on the other Party or its Affiliates, agents, employees, and representatives; *provided, however*, neither Party shall be liable for or have any indemnity obligation to the extent such suits, actions, or claims for occupational injuries (including death) to its own employees, agents, or representatives that result from the negligence or willful misconduct of the other Party.

11.6  Promptly upon receipt by a Party of any claim or notice of the commencement of any action, administrative or legal proceeding, or investigation as to which the indemnity provided for in this Article XI may apply, the Party entitled to indemnification ("Indemnified Party") shall notify the other Party ("Indemnifying Party") in writing of such fact.   The Indemnifying Party shall promptly assume the defense thereof with counsel chosen by the

Indemnifying Party and reasonably satisfactory to the Indemnified Party; *provided, however,* that if the defendants in any such action include both the Indemnified Party and the Indemnifying Party and the Indemnified Party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to, or inconsistent with, those available to the Indemnifying Party, the Indemnified Party shall have the right to select and be represented by separate counsel, at the Indemnifying Party's expense. If the Indemnifying Party fails to assume the defense of a claim meriting indemnification, the Indemnified Party may, at the sole expense of the Indemnifying Party, contest, settle or pay such claim, *provided* that settlement or full payment of any such claim may be made only following consent of the Indemnifying Party or, absent such consent, written opinion of the Indemnified Party's counsel that such claim is meritorious or warrants settlement. In the event that a Party is obligated to indemnify and hold the other Party and its successors and assigns harmless under this Article X, the amount owing to the Indemnified Party will be the amount of the Indemnified Party's actual loss net of any insurance proceeds received by the Indemnified Party following a reasonable effort by the Indemnified Party to obtain such insurance proceeds.

11.7  Other Indemnification

11.7.1  Customer shall indemnify and hold harmless SCE&G, its Affiliates, employees, directors, officers, agents, representatives, successors and assigns from and against all claims, actions and alleged liability of any kind arising directly or indirectly, in whole or in part, from Customer's failure to properly and adequately construct, maintain or operate its Facility in accordance with Good Utility Industry Practice, and whether or not the same is caused by negligence of SCE&G, its Affiliates, employees, directors, officers, agents, representatives, successors or assigns provided that this provision shall not apply to Customer's Interconnection Facilities to the extent caused by the intentional misconduct or negligence of SCE&G.

11.7.2  SCE&G shall indemnify and hold harmless Customer, its Affiliate, employees, directors, officers, agents, representatives, successors and assigns from and against all claims, actions and alleged liability of any kind arising directly or indirectly, in whole or in part, from SCE&G's failure to properly and adequately construct, maintain or operate SCE&G's Transmission System in accordance with Good Utility Industry Practice, and whether or not the same is caused by negligence of Customer, its Affiliates, employees, directors, officers, agents, representatives, successors or assigns provided that this provision shall not apply to SCE&G's Interconnection Facilities to the extent caused by the intentional misconduct or negligence of Customer.

11.8  Notwithstanding any of the foregoing, neither Party shall be liable to the other, based on contract, tort (including negligence, intentional acts, or strict liability), warranty, or any other theory of liability, for any consequential, indirect, punitive, special, or incidental loss or damage, loss of use of property or equipment or systems, loss by reason of Facility or SCE&G's Transmission System shutdown or service interruption, costs of capital, loss of profits or revenues, cost of purchased or replacement power (including additional expenses incurred in using existing power facilities), claims by customers of either Party, or for any other indirect or consequential loss connected with, relating to or arising out of this Agreement, and each Party hereby expressly releases the other Party from and indemnifies the other Party for liability for all such losses and damages.

WAI-2821673v1

## ARTICLE XII
## INSURANCE

12.1  The Parties shall provide and maintain the following insurance in full force and effect during the term of this Agreement with responsible insurance carriers authorized to do business in the State of South Carolina with a Best's rating of AVII or better or other non-rated companies acceptable to both Parties:

12.1.1   Workers Compensation Insurance covering the insured Party's employees as required by the laws of the State of South Carolina and Employers Liability Insurance with limits of one million dollars ($1,000,000) per occurrence. Such coverage shall waive subrogation.

12.1.2  Automobile Bodily Injury and Property Damage Liability Insurance covering automobiles owned, non-owned, hired or leased by the insured Party with limits as follows:

|  |  |  |
|---|---|---|
| a. | Bodily Injury: | $1,000,000 each occurrence; and |
| b. | Property Damage: | $1,000,000 each occurrence. |

12.1.3  Commercial General Liability insurance with bodily injury and property damage combined single limit of one million dollars ($1,000,000) per occurrence and a one million dollar ($1,000,000) annual aggregate limit. Insurance shall include, but not necessarily be limited to specific coverage for contractual liability encompassing this Agreement, explosion, collapse and underground hazards, broad form property damage liability, and personal injury.

12.1.4  Excess Umbrella Liability insurance with a limit of ten million dollars ($10,000,000) per occurrence and annual aggregate for combined bodily injury and property damage.

12.1.5  Property All Risk insurance in amounts equal to the replacement cost value of their respective Interconnection Facilities, including Boiler & Machinery coverage for Customer.

12.1.6  SCE&G shall maintain Property, Commercial General Liability and Excess Umbrella Liability insurance coverage on SCE&G's Interconnection Facilities with terms and conditions mutually acceptable to both Parties at the expense of Customer. The costs of such insurance specifically procured or maintained by SCE&G for this purpose will be included as part of the Monthly Facilities Fee. Said coverage shall be applied to insurable losses to SCE&G's Interconnection Facilities.

12.2  The liability coverage specified in Section 12.1 above may be on a claims-made or occurrence basis, with a minimum twelve (12) month discovery period.

12.3  Subject to the provision of Section 12.1.5, all policies of general, automobile, and excess liability insurance to be maintained by the Parties shall provide for waivers of subrogation, set-off or counterclaim, or other deduction, and provide that the other Party is named as an additional insured.

12.4  Subject to the provisions of Section 12.1.5, all premiums and deductibles shall be the sole responsibility of and for the account of the insured Party.  If at any time any of the insurance coverage obtained pursuant to this Article XII shall fail to comply with the requirements set forth herein, the insured Party shall within twenty-four (24) hours apply for a new policy that complies with such requirements.  Any new policy or legal proof of insurance shall be submitted immediately to the other Party.  Failure of a Party to provide or maintain any insurance required under this Agreement shall not relieve that Party from any liability under this Agreement.  Either Party may use self-insurance to fulfill the insurance requirements set forth herein where consistent with the provisions of this Article XII and for types of insurance coverage for which self-insurance is customarily used by the Party in question.

12.5  Evidence of insurance required pursuant to this Agreement in the form of insurance certificates, showing that the other Party is named as an additional insured, shall be furnished to the other Party prior to commencement of the Work.  All such insurance certificates shall provide that the policies may not be cancelled or materially changed without thirty (30) days prior written notice to the other Party.

## ARTICLE XIII
## NOTICES

13.  Notices.  Any notice required or authorized to be given hereunder or any other communications between the Parties provided for under the terms of this Agreement shall be in writing (unless otherwise provided) and shall be served personally or by reputable express courier service or by facsimile transmission addressed to the relevant Party at the address stated below or at any other address notified by the Party to the other as its address for service.  Any notice so given personally shall be deemed to have been served on delivery, any notice so given by express courier service shall be deemed to have been served two (2) working days after the same shall have been delivered to the relevant courier, and any notice so given by facsimile transmission shall be deemed to have been served on dispatch.  As proof of such service it shall be sufficient to produce a receipt showing personal service, the receipt of a reputable courier company showing the correct address of the addressee or an activity report of the sender's facsimile machine showing the correct facsimile number of the Party on whom notice is served and the correct number of pages transmitted and the date of dispatch.

13.1  Notices and communications from Customer to SCE&G shall be addressed to:

South Carolina Electric & Gas Company
Mail Code 144
1426 Main Street
Columbia, South Carolina  29201
(803) 217-8879 (Telephone)
(803) 217-7115 (Facsimile)
Attn: Manager, Operations Planning

With copy to:

South Carolina Electric & Gas Company

-33-

Mail Code 032
1426 Main Street
Columbia, South Carolina 29201
(803) 217-9518 (Telephone)
(803) 217-9600 (Facsimile)
Attn: General Manager, Transmission Planning & System Control

13.2  Notices and communications by SCE&G to Customer shall be addressed to:

Columbia Energy LLC
650 Dundee Road, Suite 350
Northbrook, IL 60062
Tel: 847-559-9800
Fax: 847-559-1805
Attn: President


With copy to:

Columbia Energy LLC
c/o SkyGen Energy LLC
650 Dundee Road, Suite 350
Northbrook, Illinois 60062
(847) 557-9800 (Telephone)
(847) 557-1805 (Facsimile)
Attn: Vice President Operations and Asset Management


ARTICLE XIV
PRESERVATION OF BOOKS AND RECORDS

14.1  Each Party shall retain its books, records and data relating to the performance of this Agreement for not less than thirty-six (36) months after the month to which such books, records or data relate, and, after such thirty-six (36) month period, all such books, records, and data, and any payments made in reliance thereon, shall be deemed final, and no adjustments shall be made with respect thereto. Each Party shall retain, for the prescribed duration and in the prescribed format, such records as may be required by state or federal governmental authorities.

14.2  Each Party and its representatives shall have the right, at its sole expense, upon reasonable notice and during normal working hours, to examine the records of the other Party to the extent reasonably necessary to verify the accuracy of any statement, charge or computation made pursuant to this Agreement. If any such examination reveals any inaccuracy in any statement, the necessary adjustments in such statement and the payments thereof shall be promptly made and shall bear interest calculated at the Delayed Payment Rate from the date the overpayment or underpayment was made until paid; provided, however, that no adjustment of any statement or payment shall be made unless objection to the accuracy thereof is made prior to the lapse of three (3) years from the date of the statement; and provided, further, that this Section 14.2 shall survive any expiration or other termination of the Agreement for a period of three (3)

-34-

years from the date of such termination for the purpose of such statement and payment objections.

## ARTICLE XV
## REPRESENTATIONS AND WARRANTIES

15.1   Customer's Representations and Warranties.   Customer makes the following additional representations and warranties the basis for the benefits and obligations contained in this Agreement.

15.1.1   Customer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, that it is qualified to do business in the State of South Carolina and that it has the power and authority to own its properties, to carry on its business as now being conducted and to enter into this Agreement and carry out the transactions contemplated hereby and perform and carry out all covenants and obligations on its part to be performed under and pursuant to this Agreement.

15.1.2   The execution, delivery and performance by Customer of this Agreement has been duly authorized by all necessary corporate action, and does not and will not require any consent or approval of Customer's managers or members, other than those which have been obtained.

15.1.3   The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of and compliance with the provisions of this Agreement, do not and will not conflict with or constitute a breach of or a default under, any of the terms, conditions or provisions of any law, regulation, rule, order or other requirement of any governmental authority, or any partnership agreement, deed of trust, mortgage, loan agreement, other evidence of indebtedness or any other agreement or instrument to which Customer is a party or by which it or any of its property is bound, or result in a breach of or a default under any of the foregoing.

15.1.4   This Agreement is the legal, valid and binding obligation of the Customer and is enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditor's rights generally or by general equitable principles, regardless of whether such enforceability is considered in a proceeding in equity or at law.

15.1.5   There is no pending or, to the knowledge of Customer, threatened action or proceeding affecting Customer before any governmental authority which purports to affect the legality, validity or enforceability of this Agreement as in effect on the date hereof.

15.1.6   The Facility is a "qualifying facility" within the meaning of PURPA and meets the criteria as defined in Title 18, Code of Federal Regulations, Section 292.201 through 292.207.

WAI-2821673v1

15.2   SCE&G's Representations and Warranties.   SCE&G makes the following additional representations and warranties as the basis for the benefits and obligations contained in this Agreement:

15.2.1   SCE&G is a corporation duly organized, validly existing and in good standing under the laws of the State of South Carolina and that it has the power and authority to own its properties, to carry on its business as now being conducted and to enter into this Agreement and carry out the transactions contemplated hereby and perform and carry out all covenants and obligations on its part to be performed under and pursuant to this Agreement.

15.2.2   The execution, delivery and performance by SCE&G of this Agreement has been duly authorized by all necessary corporate action, and does not and will not require any consent or approval of SCE&G's Board of Directors or shareholders, other than those which have been obtained.

15.2.3   The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of and compliance with the provisions of this Agreement, do not and will not conflict with or constitute a breach of or a default under, any of the terms, conditions or provisions of any law, regulation, rule, order or other requirement of any governmental authority, or any partnership agreement, deed of trust, mortgage, loan agreement, other evidence of indebtedness or any other agreement or instrument to which SCE&G is a party or by which it or any of its property is bound, or result in a breach of or a default under any of the foregoing.

15.2.4   This Agreement is the legal, valid and binding obligation of the SCE&G and is enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditors' rights generally or by general equitable principles, regardless of whether such enforceability is considered in a proceeding in equity or at law.

15.2.5   There is no pending or, to the knowledge of SCE&G, threatened action or proceeding affecting SCE&G before any governmental authority which purports to affect the legality, validity or enforceability of this Agreement as in effect on the date hereof.

15.3   Survival of Representations and Warranties.   All representations and warranties made by Customer and by SCE&G in or under this Agreement shall survive the execution and delivery of this Agreement and any action taken pursuant hereto.


ARTICLE XVI
DISPUTE RESOLUTION

16.   The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by use of the following procedures, in the order listed below.

16.1 Initiation of Process.   Should any dispute, controversy or claim, involving or related to this Agreement or its performance, prove incapable of being resolved by the Interconnection

Committee where applicable or by such other representatives of the Parties normally responsible for administration of this Agreement, such dispute shall then be sought to be resolved by negotiations between senior executives of the Parties who have authority to settle the controversy. The disputing Party shall give the other Party written notice of the dispute. Within twenty (20) calendar days after receipt of said notice, the receiving Party shall submit to the other Party a written response. The notice and response shall include (i) a statement of such Party's position and a summary of the evidence and arguments supporting its position, and (ii) the name and title of the executive who will represent that Party. The executives shall meet at a mutually acceptable time and place within fifteen (15) calendar days of the date of the receipt of the Party's written response to the notice and thereafter as often as they reasonably deem necessary to exchange relevant information and to attempt to resolve the dispute.

16.2 Mediation. If the dispute has not been resolved pursuant to Section 16.1 within sixty (60) calendar days of the disputing Party's notice, or if the Party receiving said notice fails to name an executive that meets the above requirements or fails to submit a written response within the twenty (20) day period specified, or either Party cannot or will not meet within the time period specified, either Party may initiate mediation of the dispute in accordance with the Construction Industry Mediation Rules of the American Arbitration Association ("AAA"). In the event the Parties cannot agree to a mediator, the mediator shall be selected from the AAA Roster of Neutrals.

16.3 Arbitration. If the matter has not been resolved pursuant to the aforesaid mediation procedure within sixty (60) calendar days of the initiation of such mediation procedure, or if either Party refuses to participate in the mediation, the controversy shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association ("Rules") mutually agreed by the Parties, or failing such agreement pursuant to the Rules by a sole arbitrator, if the claim or dispute involves less than $100,000; or, if the dispute involves $100,000 or more, three arbitrators, of whom each Party shall appoint one and the third shall be appointed by the first two arbitrators named by the Parties and shall act as the chairperson of the arbitral proceedings.

16.4 General Rules and Procedures. The place of arbitration shall be Columbia, South Carolina. Except to the extent the Parties' remedies may be limited by the terms of this Agreement, the arbitrator(s) shall be empowered to award any remedy available under the laws of the state of South Carolina. The decision of the arbitrator(s) pursuant to Section 16.3 shall be final and binding. The dispute resolution procedures in this Article XVI shall be the sole and exclusive procedures for the resolution of disputes between the Parties arising out of or relating to this Agreement; *provided, however*, that a Party may seek a preliminary injunction or other preliminary judicial relief if in its judgment such action is necessary to avoid irreparable damage. Despite the seeking of a preliminary injunction or other preliminary judicial relief, the Parties shall continue to participate in good faith in the procedures specified in this Article XVI. Judgment rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. All applicable statutes of limitation shall be tolled while the procedures specified in this Article XVI are pending. The Parties will take such action, if any, required to effectuate such tolling.

16.5 Continued Performance. During the conduct of dispute resolution procedures pursuant to this Article, the Parties shall continue to perform their respective obligations under this Agreement.

## ARTICLE XVII
## SEVERABILITY AND RENEGOTIATION OF MATERIAL PROVISIONS

17. Severability. In the event that any provision of this Agreement or the application thereof, shall be held invalid, illegal or unenforceable under applicable law, by FERC or any court or arbitrator having jurisdiction, the remainder of such provisions and their application shall not be affected thereby and shall remain in full force and effect. If the invalidation of the provision would deprive a Party of a material benefit under this Agreement, the Parties shall negotiate in good faith to substitute a new term for the invalidated term and otherwise to amend the Agreement as necessary to effect the purpose of this Agreement and to restore the balance of consideration under this Agreement to the extent permitted by applicable law. If the Parties are unable to reach a mutually agreeable resolution of such matters, they shall submit the matters for resolution under Article XVI of this Agreement. This provision shall apply where a provision of this Agreement is rendered invalid, illegal or unenforceable due to changes in statute or regulation, including, but not limited to, those resulting from federal or state restructuring of the electric industry.

## ARTICLE XVIII
## MISCELLANEOUS

18.1 Waiver. Any waiver of a Party's rights with respect to a breach or failure of a Party to comply with any of the terms or conditions of this Agreement shall not constitute a future waiver or relinquishment of the right to enforce such terms or conditions. All waivers must be in writing and signed by an authorized representative of the Party granting the waiver.

18.2 Access to Interconnection Facilities. Upon reasonable prior notice to the other Party, appropriate representatives of either Party shall, at all reasonable times, have access to the other Party's Interconnection Facilities, to conduct operational reviews, if any, required to facilitate the reviewing Party's performance of this Agreement. While at the other Party's Interconnection Facilities, the reviewing Party's representatives shall: (i) at all times be accompanied by a representative of the other Party (such Party to ensure a representative is made available for such purpose); (ii) observe such safety precautions as may be specified by the other Party; and (iii) conduct themselves in a manner that will not endanger themselves or others or materially interfere with or endanger the operation of the Facility, the Interconnection Facilities or SCE&G's Transmission System.

18.3 Relationship of the Parties. This Agreement shall not be interpreted to create an association, joint venture, partnership, agreement for employment or trust between the Parties nor to impose any trust or partnership duty, obligation or liability upon or with regard to either Party. Neither Party shall have any right, power or authority to enter into any agreement or undertaking for, or act on behalf of, or to act as an agent or representative of, the other Party.

18.4 External Communications; Filings; Confidentiality.

18.4.1 Each Party agrees to coordinate with the other Party all press, news, or other releases to the media related to this Agreement and to allow the other Party to review such *releases prior to release.*

18.4.2 The Parties shall provide each other with copies of any filings normally available to the public that it makes with governmental or regulatory agencies directly related to this Agreement.

18.4.3 The Parties acknowledge and agree that: (i) by virtue of this Agreement and their having representatives on the Interconnection Committee, the Parties may become privy to confidential and proprietary information regarding the Facility and SCE&G's Transmission System and their operation and/or the business of the other Party; (ii) the other Party would be irreparably injured by disclosure of such confidential and proprietary information; (iii) each Party shall hold as strictly confidential and shall not disclose or permit the disclosure of the terms and conditions of this Agreement and all information disclosed by one Party to the other or obtained by a Party by operation of this Agreement (other than to its Affiliates, and their employees, officers, attorneys and agents provided such persons agree to be bound by the terms of this Section 18.4); *provided, however,* that a Party shall not be obligated to treat as confidential information that: (y) is or becomes publicly known by means other than disclosure by or permitted by said Party; or (z) is required to be disclosed pursuant to the requirements of a court or regulatory authority, or by operation of law, or by listing agreements with national security exchanges. In the event a Party has a need to disclose information to a Lender or potential lender, or in the event either Party has a need to disclose information to an assignee or transferee, or potential assignee or transferee, said Party shall not so disclose any confidential or proprietary information of the other Party unless and until the party or parties that will receive the information have executed a confidentiality agreement customary for transactions of the type contemplated hereby. Notwithstanding any provision to the contrary, in the event of any breach or threatened breach of the provisions of this Section 18.4.3 and Article XIV, the Party whose information has been or may be disclosed shall be entitled to equitable relief, including injunctive relief and specific performance, in addition to any actual damages said Party may have suffered as a result of such breach or threatened breach.

18.5  Survival of Obligations.  In order to give the Parties the benefit of their bargain under this Agreement, the terms and conditions of this Agreement, including, warranties, remedies, and indemnities, shall survive (for a period required by applicable law) the cancellation, expiration or earlier termination of this Agreement, and the Parties shall not be relieved of any obligations incurred prior to such cancellation, expiration, or termination.

18.6  Complete Agreement; Amendments.  The terms and provisions contained in this Agreement and the Operating Agreement constitute the entire understanding and agreement between SCE&G and Customer and shall supersede all previous and contemporaneous communications, representations, or agreements, either verbal or written. No amendment or modification to this Agreement shall be binding unless it shall be set forth in writing and duly executed by both Parties.

18.7  Binding Effect.  This Agreement, as may be amended from time to time pursuant to Section 18.6, shall be binding upon and inure to the benefit of the Parties and their respective legal representatives, successors-in-interest and permitted assigns.

WAI-2821673v1

18.8  Headings.  Captions and headings used in the Agreement are for ease of reference only and do not constitute a part of nor shall they be used in interpretation of this Agreement.

18.9  *Exhibits and Appendices.  Any appendices, attachments, exhibits, schedules or other documents referred* to in this Agreement are expressly incorporated herein by reference as if set forth herein in full, whether or not attached hereto.  In the event of any conflict between the terms and conditions of this Agreement and the terms and conditions of any such appendices, attachment, exhibit, schedule or other documents, the terms and conditions of this Agreement shall govern and control.

18.10  No Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties and is not for the benefit of any third party other than the Parties' respective successors and permitted assigns.

18.11  Counterparts.  This Agreement may be executed in any number of counterparts, each of which when taken together shall constitute but one and the same agreement and each of which shall have the same force and effect as an original instrument.

18.12  Governing Law.  This Agreement and the performance of the Parties hereunder will be governed by and construed in accordance with the laws of the State of South Carolina, without reference to conflicts of law rules that might direct the application of the law (other than Federal law) of another jurisdiction.

[Signature Page Follows]

WAI-2821673v1

IN WITNESS WHEREOF, the Parties' duly authorized representatives have executed this Agreement as of the Effective Date.

**SOUTH CAROLINA ELECTRIC & GAS COMPANY**                    **COLUMBIA ENERGY LLC,**

By: _____                By: _____

Name: Charles A. White                      Name: James J. Shield

Title: General Manager, Transmission Planning        Title: Vice-President of Project
      & System Control                              Management

-41-

# ATTACHMENT C

## REDLINED CHANGES TO
## CONSTRUCTION AND MAINTENANCE AGREEMENT
## BETWEEN SOUTH CAROLINA ELECTRIC AND GAS COMPANY
## AND COLUMBIA ENERGY LLC

SOUTH CAROLINA ELECTRIC & GAS COMPANY          Second Substitute Original Service
FERC Electric Tariff                                                    Agreement No. 101
Second Revised Volume No. 5




CONSTRUCTION AND MAINTENANCE AGREEMENT
BETWEEN
SOUTH CAROLINA ELECTRIC AND GAS COMPANY
AND
COLUMBIA ENERGY LLC

Issued by: Charles A. White                          Effective Date:  November 15, 2003
Issued on:  April 21, 20046, 2007
Filed to Ccomply with order of the Federal Energy Regulatory Commission, Docket Nos. ER03-1398-003, et. al.,:
*South Carolina Electric & Gas Company,*
106 FERC ¶ 61,265 (2004) (March 22, 2004)118 FERC ¶ 61,185 (March 7, 2007)
Docket No. ER03-1398-000

interconnection(s) as identified by the FERC in its March 22, 2004 order in Docket No. ER03-1398-000, 106 FERC ¶ 61,265 (2004). The actual costs for the New Capital Additions shall include interest accrued on the total cost of constructing the New Capital Additions at the end of each month during construction calculated    at the Delayed Payment Rate.    The Monthly Facilities Fee set forth in Section 7.3 hereof shall be adjusted to include the costs of New Capital Additions (that are the responsibility of Customer) in the actual costs to which the Facilities Fee Charge Multiplier, as defined in Section 7.3, is applied.

7.2.1    Credits for Transmission Facility Upgrades Required for Interconnection.    Customer shall be entitled to transmission credits, equal to the total amount paid to SCE&G for the Transmission Facility Upgrades Required for Interconnection, including any tax gross-up or other tax-related payments associated with the Transmission Facility Upgrades Required for Interconnection, to be paid on a dollar-for-dollar basis for the non-usage sensitive portion of transmission charges with respect to the utilization of the Transmission Facility Upgrades Required for Interconnection, as payments are made under SCE&G's OATT for transmission services with respect to the Facility. Customer's device that utilizes the Transmission Facility Upgrades Required for Interconnection. The credits shall be applied on a percentage basis based on the metered use of the Transmission Facility Upgrades Required for Interconnection. Any time there is a reservation for transmission service but no metered use, credits shall be applied against 70 percent of the total charge for such transmission reservations because the capacity of the generators that utilize the Transmission Facility Upgrades Required for Interconnection represents 70 percent of the Facility's total capacity. Transmission credits shall be applied until such time as the cost of all amounts advanced to SCE&G by Customer for the Transmission Facility Upgrades Required for Interconnection have been fully offset, after which time such offset or credits shall no longer apply. Alternatively, SCE&G may, at its sole discretion, choose to repay to Customer any amounts advanced by Customer for Transmission Facility Upgrades Required for Interconnection not credited to Customer at any time. Any credits shall include interest calculated in accordance with the methodology set forth in FERC's regulations from the date of the payment for the Transmission Facility Upgrades Required for Interconnection until the date the credit is applied. Customer may assign its rights to credits or repayment hereunder to any person.

7.3.1    Monthly Facilities Fee.    Customer shall pay to SCE&G a monthly fee ("Monthly Facilities Fee") that will cover SCE&G's Maintenance, repairs, property tax, miscellaneous taxes, and insurance, for SCE&G's Interconnection Facilities, not to include Transmission Facility Upgrades Required for Interconnection, for the Term of this Agreement, beginning with the calendar month following SCE&G's Interconnection Facilities In-Service Date.    The Monthly Facilities Fee shall be payable no later than the tenth day of each month. To the extent that SCE&G's Interconnection Facilities are utilized by one or more third parties, the Monthly Facilities Fee shall be prorated to account for the usage by such third party(ies). The Monthly Facilities Fee shall be the sum equal to the Actual Costs as determined pursuant to Section 7.1.2 (as may be adjusted pursuant to Section 7.2) multiplied by the Facilities Fee Charge Multiplier of 0.225% per month. The Parties acknowledge and agree that the Facilities Fee Charge Multiplier has been agreed based on an overall balance of consideration of the terms of this Agreement. Prior to final resolution of the Actual Costs in accordance with Section 7.1.3, the Monthly Facilities Fee will be calculated and applied based upon the good faith estimate for SCE&G's Interconnection Facilities set forth in the Interconnection Study as revised by Exhibit 1A, which is $7,837,659. Following said final resolution of the Actual Costs, the Monthly Facilities Fee

WAI-2821673v1