**EXHIBIT D**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

|                                   |   |                        |
|-----------------------------------|---|------------------------|
|                                   | ) |                        |
| In re Calpine Energy Services, L.P. | ) | Docket No. IN07-24-000 |
|                                   | ) |                        |

STIPULATION AND CONSENT AGREEMENT

### I.    INTRODUCTION

The staff of the Office of Enforcement ("Enforcement") of the Federal Energy
Regulatory Commission (the "Commission") and Calpine Energy Services, L.P., ("CES")
an affiliate of Calpine Corporation ("Calpine"), enter into this Stipulation and Consent
Agreement ("Agreement") to resolve all outstanding issues of fact and law arising from a
non-public, preliminary investigation pursuant to Part 1b of the Commission's
regulations, 18 C.F.R. Part 1b (2006), into violations of the Commission's "shipper-must-
have-title" requirement.

### II.    STIPULATION

Enforcement and Calpine hereby stipulate and agree to the following:

### A.    Background

1.    Calpine was established in 1984 and, together with its direct and indirect
subsidiaries (the "Calpine Companies"), is an integrated power company owning,
operating and developing power generation facilities and selling electricity, capacity and
related electricity products and services, primarily in the United States and Canada.  The
Calpine Companies operate the largest fleet of natural gas-fired power plants in North
America, and have utilized both firm and interruptible natural gas transportation and
storage services on approximately 45 pipelines in the United States and Canada under
approximately 110 separate contracts.

2.    CES was formed in 2000 for the purpose of consolidating the Calpine
Companies' natural gas and power marketing activities into a single subsidiary.  CES acts
as the fuel manager for its affiliates, many of which hold title to interstate pipeline
capacity.  CES, not the individual generating plants, manages transportation capacity,
including capacity procurement.  Where a plant holds gas transportation capacity in its
own name, CES acts on behalf of the plant by nominating and scheduling service.

3.    On or about December 20, 2005, Calpine and certain of the Calpine Companies ("Calpine Debtors") filed voluntary petitions for relief under title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). The Calpine Debtors are currently operating as debtors-in-possession under the Bankruptcy Code. On August 1, 2006, the Commission filed a proof of claim ("Proof of Claim") in the Calpine bankruptcy proceeding, as a regulator, on behalf of energy customers and other energy market participants. Among other matters, the Proof of Claim includes the present investigation.

4.    CES' violations came to light as a result of an internal review of contracts performed in connection with its bankruptcy. In March 2006, Calpine discovered that CES was utilizing the firm natural gas transportation contracts held by Rumford Power Associates, LP on the Portland Natural Gas Transmission System to transport gas owned by CES to another Calpine entity. CES ceased using the Rumford pipeline capacity in this manner after it discovered the misuse of the capacity. At that time, CES also engaged outside counsel to assist in an investigation to explore whether there were other violations of the "shipper-must-have-title" requirement. For the time period March 2006 through June 2006, CES and its outside counsel conducted an internal investigation to ascertain the facts. CES self-reported its findings to Enforcement on June 29, 2006, and delivered its written self-report to Enforcement on July 27, 2006, in which CES described "shipper-must-have-title" violations on eight interstate pipelines.

5.    Enforcement opened a preliminary, non-public investigation into the reported violations. The period investigated by Enforcement is January 2003 through September 2006. During the course of the investigation, Calpine representatives demonstrated exemplary cooperation with staff, promptly responding to data requests, keeping staff apprised of new developments, and providing expeditious and complete answers to all questions.

B.    **Violations**

6.    In order to promote pipeline open-access and to prevent undue discrimination in the primary and secondary markets for capacity, the Commission adopted various rules and requirements governing capacity release. Among them was the "shipper-must-have-title" requirement, which mandates that "all shippers shall have title to the gas at the time the gas is delivered to the transporter and while it is being transported by the transporter."[1]

---

[1] *Rendezvous Gas Services LLC*, 113 FERC ¶ 61,169, at P 40 (2005); *see also Enron Energy Services, Inc.*, 84 FERC ¶ 61,222, at 60,063 (1998); *Consolidated Gas Transmission Corp.*, 38 FERC ¶ 61,150, at 61,408 (1987) (citing *Texas Eastern Transmission Corp.*, 37 FERC ¶ 61,260, at 61,683-85 (1986)).

7.     As part of the implementation of Order No. 636, pipelines revised their tariffs to include "shipper-must-have-title" provisions in the General Terms and Conditions. These provisions, all of which require shippers to warrant that they hold good title to the gas shipped utilizing their capacity, are included in the tariffs of the eight pipelines on which CES shipped natural gas utilizing capacity held by a Calpine affiliate.

8.     CES violated the "shipper-must-have-title" requirement by transporting gas to which it held title using capacity rights of other Calpine affiliates. CES' violations are attributable to relevant CES personnel lacking adequate knowledge of the "shipper-must-have-title" requirement. The violations self-reported by CES involve Calpine affiliate-held transportation on eight interstate pipelines.

9.     CES' violations involve numerous transactions representing approximately 156.5 Bcf of natural gas, and occurring over a period of years dating back to at least January 2003. Those violations fall into three categories of transactions: (1) transactions involving CES selling gas to an affiliated generating plant that holds pipeline capacity rights, with the delivery point in the gas sales agreement being the inlet to the affiliated shipper's plant rather than the inlet to the applicable interstate pipeline on which the generating plant holds capacity; (2) transactions involving CES holding title to the gas transported, and using capacity rights of certain Calpine affiliates to deliver gas to other Calpine affiliates; and (3) transactions involving CES using capacity rights of Calpine affiliates to transport gas for deliveries to unaffiliated third parties on three interstate pipelines. The bulk of CES' "shipper-must-have-title" violations result from cases in which CES held title to the gas being transported either to a Calpine plant holding pipeline capacity, or to another Calpine affiliate using capacity held by a different Calpine affiliate.

10.     CES' first category of violations did not demonstrably harm third parties because the gas was delivered to the generating affiliate holding the pipeline capacity, and was used to generate electricity. CES' second category of violations generally deprived market participants of information on the alternate use made of the plants' pipeline capacity, but these intra-company transactions did not result in identifiable financial harm to third parties because the transactions could have been pre-arranged as maximum rate releases and, thus, need not have been subject to competitive bidding.

11.     The third category of transactions did not harm third parties because, although CES violated the requirement, CES could have accomplished the transactions through pre-arranged capacity releases at maximum rates and, in addition, the pipelines on which the gas was transported all appear to have had capacity available at the time CES engaged in the transactions. Thus, the commodity sales could have been accomplished without CES using its affiliates' capacity to transport the gas on three interstate pipelines.

12.    Notwithstanding the foregoing, by failing to follow capacity release requirements, such as a release followed by Internet website postings by the pipelines, CES shielded from other market participants relevant information concerning the use being made of capacity held by Calpine affiliates. In this way, CES undermined the market transparency necessary for the Commission's open-access policies to function properly.

### C.    CES' Actions Following the Violations

13.    Upon learning of its violations of the Commission's "shipper-must-have-title" requirement, CES moved quickly to investigate its use of interstate pipeline capacity, self-report its violations, and take corrective action.

14.    CES has ceased all uses of pipeline capacity that are inconsistent with the Commission's "shipper-must-have-title" requirement. As part of its self-corrective actions, CES : (1) retained outside counsel to assist in its investigation and conduct formal training on the Commission's policies, including the "shipper-must-have-title" policy; (2) retained an independent auditor to review its self-report and ensure its corrective measures are appropriate, and that as of September 2006, CES is no longer violating the Commission's "shipper-must-have-title" requirement; (3) created an in-house compliance position; (4) updated its training protocols; and (5) committed to updating its risk management procedures manuals.

### III.    REMEDIES AND SANCTIONS

For purposes of settling any and all civil and administrative disputes arising from Enforcement's investigation into the "shipper-must-have-title" matters self-reported by CES, Enforcement and CES agree that on and after the effective date of this Agreement, CES shall take the following actions:

15.    As a civil penalty, CES shall provide the Commission with an allowed pre-petition, unsecured claim in its bankruptcy proceeding of $4,500,000.00.

16.    Except to the extent allowed by Paragraph 15 herein, that portion of the Proofs of Claim filed by the Commission relating to this investigation is deemed satisfied upon the Effective Date of this Agreement.

17.    CES shall make two semi-annual reports to Enforcement staff, the first to be submitted no later than ten days after the end of the second calendar quarter after the quarter in which the Effective Date of this Agreement falls. The second report is to be submitted six months thereafter. The compliance reports shall: (1) advise staff whether any further violation of the "shipper-must-have-title" requirement has occurred; (2) provide a detailed update of all compliance training administered and compliance

4

measures instituted in that period, including a description of the training provided to all relevant personnel concerning the Commission's capacity release program, including the "shipper-must-have-title" requirement, and a statement of the personnel that have received such training, and when the training took place; and (3) include an affidavit executed by Calpine's General Counsel that the compliance reports are true and accurate. Upon request by staff, CES shall provide to staff all backup documentation supporting its reports. After the receipt of the second semi-annual report, staff will determine whether CES will be required to submit semi-annual reports for one additional year.

### IV.    TERMS

18.    The "Effective Date" of this Agreement shall be the later of the date on which the Commission issues an order approving this Agreement without material modification or the date of Bankruptcy Court approval of this Agreement without material modification. CES agrees promptly to take the steps necessary to obtain a ruling from the Bankruptcy Court, and promptly to transmit such ruling to Enforcement staff. When effective, this Agreement shall resolve the matters specifically addressed herein as to the Calpine Companies and any affiliated entity, its agents, officers, directors and employees, both past and present, and any successor in interest to the Calpine Companies.

19.    Commission and Bankruptcy Court approval of this Agreement without material modification shall release the Calpine Companies and forever bar the Commission from holding the Calpine Companies liable for any and all administrative or civil claims arising out of, related to, or connected with the "shipper-must-have-title" violations addressed in this Agreement.

20.    Failure to comply with the compliance program agreed to herein, or any other provision of this Agreement, shall be deemed a violation of a final order of the Commission issued pursuant to the Natural Gas Act (NGA), and may subject CES to additional action under the enforcement and penalty provisions of the NGA.

21.    The signatories to this Agreement agree that they enter into the Agreement voluntarily and that, other than the recitations set forth herein, no tender, offer or promise of any kind by any member, employee, officer, director, agent or representative of Enforcement or CES has been made to induce the signatories or any other party to enter into the Agreement.

22.    Unless the Commission and the Bankruptcy Court issue orders approving the Agreement in its entirety and without material modification, the Agreement shall be null and void and of no effect whatsoever, and neither Enforcement nor CES shall be bound by any provision or term of the Agreement, unless otherwise agreed to in writing by Enforcement and CES.

5

23.    In connection with the pre-petition claim provided for herein, CES agrees that the Commission's order approving the Agreement without material modification shall be a final and unappealable order assessing a civil penalty under Section 22(a) of the NGA, 15 U.S.C. § 717t-1(a) (2005). CES waives findings of fact and conclusions of law, rehearing of any Commission order approving the Agreement without material modification, and judicial review by any court of any Commission order approving the Agreement without material modification.

24.    Each of the undersigned warrants that he or she is an authorized representative of the entity designated, is authorized to bind such entity and accepts the Agreement on the entity's behalf.

25.    The undersigned representative of CES affirms that he has read the Agreement, that all of the matters set forth in the Agreement are true and correct to the best of his knowledge, information and belief, and that he understands that the Agreement is entered into by Enforcement in express reliance on those representations.

26.    The Agreement may be signed in counterparts.

27.    This Agreement is executed in duplicate, each of which so executed shall be deemed to be an original.

Agreed to and accepted:

_____          _April 18, 2007_____
Susan J. Court, Director                                            Date
Office of Enforcement
Federal Energy Regulatory Commission

_____          _____
Gregory L. Doody                                                   Date
Executive Vice President
General Counsel and Secretary
Calpine Corporation

6

23.    In connection with the pre-petition claim provided for herein, CES agrees that the Commission's order approving the Agreement without material modification shall be a final and unappealable order assessing a civil penalty under Section 22(a) of the NGA, 15 U.S.C. § 717t-1(a) (2005). CES waives findings of fact and conclusions of law, rehearing of any Commission order approving the Agreement without material modification, and judicial review by any court of any Commission order approving the Agreement without material modification.

24.    Each of the undersigned warrants that he or she is an authorized representative of the entity designated, is authorized to bind such entity and accepts the Agreement on the entity's behalf.

25.    The undersigned representative of CES affirms that he has read the Agreement, that all of the matters set forth in the Agreement are true and correct to the best of his knowledge, information and belief, and that he understands that the Agreement is entered into by Enforcement in express reliance on those representations.

26.    The Agreement may be signed in counterparts.

27.    This Agreement is executed in duplicate, each of which so executed shall be deemed to be an original.


Agreed to and accepted:


_____          _____
Susan J. Court, Director                                      Date
Office of Enforcement
Federal Energy Regulatory Commission


_____          18 Apr 2007
Gregory L. Doody                                               Date
Executive Vice President
General Counsel and Secretary
Calpine Corporation

6