**EXHIBIT F**

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900
Richard M. Cieri (RC 6062)
David R. Seligman (admitted pro hac vice)
Edward Sassower (ES 5823)

and

655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
Neil L. Levy (admitted pro hac vice)

Counsel for the Debtors

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Calpine Corporation, et al., | ) |
| | ) Case No.   05-60200 (BRL) |
| Debtors. | )         (Jointly Administered) |
| | ) |
| Columbia Energy LLC, | ) |
| | ) Ad. Proc. No. 07-_____ |
| Plaintiff, | ) |
| v. | ) |
| South Carolina Electric & Gas Company, | ) |
| Defendant. | ) |

**COMPLAINT FOR TURNOVER OF PROPERTY, DAMAGES,
AND DECLARATORY RELIEF**

Columbia Energy LLC ("Columbia"), one of the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned jointly administered Chapter 11 cases, hereby alleges for its Complaint as follows:

**Nature of the Action**

1.  This is an adversary proceeding brought pursuant to Fed. R. Bankr. P. 7001(1) and 7001(9) against South Carolina Electric & Gas Company ("SCEG") to recover property, damages, and seek declaratory relief to redress SCEG's wrongful offsetting of credits owed to one Debtor, Columbia, against prepetition claims SCEG has against another Debtor, Calpine Energy Services, LP ("CES").

2.  The credits at issue, which are in excess of several million dollars, stem from certain agreements entered into by Columbia and SCEG governing the transmission of electric power generated by Columbia-owned facilities on SCEG's transmission system (which delivers electricity to homes and businesses in South Carolina). By definitive ruling of the Federal Energy Regulatory Commission ("FERC" or the "Commission"), Columbia is entitled to certain credits against SCEG transmission charges; such credits serving to reimburse Columbia, over time, for costs that it incurred to upgrade SCEG's transmission network as part of the interconnection of the Columbia generating facility with the SCEG transmission system.

3.  To the extreme prejudice of Columbia, its estate and other creditors, SCEG has improperly applied those credits to satisfy certain amounts (described below) purportedly owed to SCEG by CES. In doing so, SCEG has knowingly and willfully violated the automatic stay and the Bankruptcy Code's prohibition on triangular setoffs codified in Section 553. In further violation of the automatic stay, SCEG recently asked FERC to approve the very triangular

2

setoffs that the Bankruptcy Code forbids.

4. SCEG's unlawful self-help and end-run around the Bankruptcy Code necessitates this action, through which Debtors seek to restore the credits to the proper account of Columbia.

## Parties and Jurisdiction

5. On December 20, 2005, the Debtors filed voluntary petitions for relief in this Court under Chapter 11 of the Bankruptcy Code.

6. Plaintiff Columbia, one of the Debtors, is a limited liability company organized under the laws of Delaware with its principal place of business in Northbrook, Illinois.

7. Defendant SCEG is a corporation organized under the laws of South Carolina with its principal place of business in Columbia, South Carolina.

8. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (E) and (O).

9. Venue is proper in this District pursuant to 28 U.S.C. § 1409.

10. The statutory bases for the relief requested herein are Sections 105, 362, 542 and 553 of the Bankruptcy Code, 28 U.S.C. §§ 2201-2202, and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

## Factual Background

**A.**   *The Columbia Generating Facility*

11. In September 2001, Columbia began construction of a new power plant in Calhoun County, South Carolina. The public utility that owns and operates the electricity transmission grid in and around the area of the power plant is SCEG. In order for Columbia to generate and sell electricity from its new facility, that facility first needed to be connected to

SCEG's grid. Thus, Columbia and SCEG entered into a series of agreements (the "Interconnection Agreements") governing the construction, interconnection and operation of the Columbia generating facility with SCEG's transmission system.

### B. *The Transmission Credits Owed to Columbia*

12. A dispute subsequently arose regarding whether certain components constructed as part of this process were properly characterized as part of the Columbia interconnection facilities or, rather, as upgrades to SCEG's transmission network—upgrades that, while necessitated by the interconnection service to the Columbia generating facility, benefited the SCEG network as a whole. This distinction was significant for purposes of determining which party bore ultimate financial responsibility. The construction and operation and maintenance costs of interconnection facilities were directly assigned to Columbia. But consistent with FERC policy, amounts paid by Columbia for upgrades to the SCEG transmission network must be repaid through credits against transmission rates.

13. On March 22, 2004, FERC resolved this dispute in favor of Columbia, holding that the so-called "U" facilities in dispute were "network upgrades, and their cost must be repaid, over time, to Columbia, via SCE&G granting Columbia credits against the transmission rates paid by Columbia to SCE&G," plus interest. A copy of this order (the "Columbia Credits Order") is attached hereto as Exhibit A.

14. The Columbia Credits Order required SCEG to revise the Interconnection Agreements to specifically provide for the issuance of credits *to Columbia* (hereafter the "Transmission Credits") that could be used to offset the cost of transmitting electricity over that portion of the SCEG transmission network upgraded *by Columbia*.

15. SCEG filed the revised agreements (the "Compliance Filing") on April 21, 2004.

4

(A copy of the Compliance Filing is attached hereto as Exhibit B.) Paragraph 7.2.1 of the Compliance Filing, entitled "Credits for Transmission Facility Upgrades Required for Interconnection," provides that "Customer shall be entitled to transmission credits for the Transmission Facility Upgrades Required for Interconnection…." Notably, in the preamble on page 4 of the Compliance Filing, "Customer" is defined as Columbia.

16. This Compliance Filing was done under protest, with SCEG requesting a rehearing of the issues. Pending a decision on rehearing, the Columbia Credits Order remained binding and effective on SCEG. *See* 16 U.S.C. § 8251(c) (2005). FERC ultimately denied SCEG's rehearing request on March 7, 2007 ("Rehearing Denial Order," attached hereto as Exhibit C). The Rehearing Denial Order further upheld a request by Columbia that the Interconnection Agreements be revised to clarify that the Transmission Credits could be assigned by Columbia. This revision, FERC agreed, would ensure "that the use of the repayment rights is not unnecessarily restricted." (Rehearing Denial Order at 19.)

17. The amount of the Transmission Credits is $4,721,619 plus interest. While Columbia and SCEG have not fully reconciled the interest accrual, the Debtors believe that the total amount of the Transmission Credits, including interest, is approximately $5.7 million.

    **C.**   *The Transmission Service Contracts Between SCEG and CES*

18. Debtor CES is the entity which coordinates the sale of electricity and electricity transmission services for many of the Debtors' power plants, including the Columbia generating facility described above. In 2001, CES entered into both a firm transmission service agreement (the "Firm Agreement") and a non-firm transmission service agreement (the "Non-Firm Agreement") with SCEG. These agreements function as master service agreements pursuant to which CES is able to make firm and non-firm transmission service reservations through SCEG's

Open Access Same-Time Information System ("OASIS").

19.     When used in reference to energy contracts, the word "firm" generally denotes a contract that guarantees a fixed capacity. In this case, the Firm Agreement gave CES a first-priority right to the contract volume of transmission capacity. Because parties who hold "firm" contracts typically pay reservation or capacity charges regardless of whether they actually use the service, service providers typically also offer "non-firm" or "interruptible" contracts, whereby counterparties can purchase capacity, typically at a lower price, subject to the service provider's obligation to first meet all requirements under firm contracts.

20.     Pursuant to the Firm Agreement, in 2001, CES and SCEG entered into four long-term reservations (the "Prepetition Reservations") for one year of firm transmission service. The Prepetition Reservations were originally scheduled to go into effect on January 1, 2004, however, CES had the ability to pay a fee to delay the effectiveness of the Prepetition Reservations. Ultimately, the Prepetition Reservations became effective on January 1, 2006, and expired on December 31, 2006.

21.     The Prepetition Reservations required CES to pay SCEG approximately $528,000 per month (the "Capacity Charges") for the firm right to approximately 412 MW of transmission capacity. CES was billed this amount on each monthly invoice received from SCEG during calendar year 2006, regardless of whether or not CES scheduled transmission services during that month. In fact, as set forth below, CES never once scheduled transmission under the Prepetition Reservations.

22.     While CES posted a letter of credit in the approximate amount of one month's charges under the Prepetition Reservations, no other collateral was required. The parties could have negotiated for the Transmission Credits to serve as collateral for the Capacity Charges

under the Prepetition Reservations, but did not.

        **D.**    *SCEG Unlawfully Offsets the Columbia Transmission Credits Against CES Prepetition Obligations*

23.    When the Prepetition Reservations became effective in January 2006—against the backdrop of the Debtors having filed for bankruptcy just a few weeks earlier in December 2005—SCEG began unlawfully paying itself for the Capacity Charges through misapplication of the Transmission Credits owed to Columbia.

24.    From January to September 2006 (when SCEG deemed the Transmission Credits exhausted), SCEG applied the Transmission Credits to offset the monthly Capacity Charges plus other charges billed to CES, notwithstanding that the Columbia Credits Order expressly provided that the Transmission Credits be awarded to ***Columbia***, and despite the absence of any relevant and necessary assignment of Transmission Credits from Columbia to CES.

25.    SCEG's unilateral taking of credits owed to one Debtor and misapplication of those credits against claims SCEG has against another Debtor, violates both the prohibition on triangular setoffs codified in Section 553 of the Bankruptcy Code and the automatic stay codified in Section 362 of the Bankruptcy Code.

26.    Through this unlawful self-help machination, SCEG effectively sought to secure the equivalent of full payment on an administrative priority basis for the monthly Capacity Charges under the Prepetition Reservations. Indeed, SCEG has filed a motion in this Court seeking payment of the remaining Capacity Charges (those that exceeded the amount of available Transmission Credits) as administrative expense claims.

27.    But these remaining Capacity Charges, like the Capacity Charges purportedly reconciled through the improper setoff of Transmission Credits, stem from prepetition service agreements that (a) the Debtors ***have never*** used on a postpetition basis and (b) have provided no

7

benefit to the Debtors' estates. Accordingly, the Capacity Charges are not subject to administrative expense priority.

28. Every time transmission services were needed postpetition for the Columbia generating facility, CES made new reservations through the OASIS system pursuant to either the Firm Agreement or Non-Firm Agreement (the "Postpetition Reservations"). For eight of the twelve months in calendar year 2006, CES scheduled no transmission service at all with SCEG. During the months of May, June, July and August, CES did schedule service on either a daily or an hourly basis by making Postpetition Reservations through the OASIS system, and CES was separately billed for those services. Each of the invoices for May, June, July and August, 2006, clearly list charges for daily and hourly service that are *separate from and in addition to* the fixed monthly Capacity Charges.

29. Additionally, SCEG utilizes a service provider known as Open Access Technology International, Inc. ("OATI") to schedule and coordinate transmission. OATI assigns specific numbers to each reservation of capacity. The Debtors recently contacted OATI to determine whether OATI had scheduled any transmission under the reservation numbers associated with the Prepetition Reservations, and were informed by OATI that no transmission has ever been scheduled under the Prepetition Reservations.

30. The Debtors have agreed to pay all valid charges related to the Postpetition Reservations as administrative expense claims. The Debtors do not agree, however, to pay any Capacity Charges as administrative expense claims, as the Capacity Charges relate solely to the Prepetition Reservations that CES never actually used. The Capacity Charges will be treated along with other similarly-situated unsecured prepetition claims pursuant to the Debtors' plan of reorganization. SCEG has attempted to side-step this process, and thus gain preferential

treatment over other general unsecured creditors, but it cannot.

31. As early as May 2006, Debtors notified SCEG that the Prepetition Reservations provided no benefit to the Debtors' estates and that, as a result, CES would not accept service under the contract and released and relinquished any right to ongoing service or capacity under the Prepetition Reservations. Despite this notice, SCEG continued to offset the Transmission Credits against the Capacity Charges arising under the Prepetition Reservations in violation of the Bankruptcy Code and common law.

32. Because the Debtors never used the Prepetition Reservations (entered into more than four years before the Petition Date), and because the Prepetition Reservations provided no actual benefit to the Debtors' estates, SCEG is incapable of establishing administrative expense priority for the Capacity Charges. Even if, contrary to settled law, SCEG could establish some basis for administrative expense payment of some or all of the Capacity Charges owed by CES, this would not justify SCEG's unlawful misappropriation of Transmission Credits belonging distinctly to Columbia.

33. Columbia has made repeated requests that SCEG turn over the misapplied Transmission Credits and restore them to the account of Columbia. To date, however, SCEG has refused to comply.

    E. *SCEG Asks FERC to Approve the Triangular Setoffs Prohibited by the Bankruptcy Code*

34. On February 15, 2007, SCEG filed a motion in this Court seeking, among other things, relief from the automatic stay to petition FERC to resolve the dispute between the parties regarding the misapplication of the Transmission Credits. Notably, at page 17 of that motion, SCEG stated that it had "not sought a determination from the FERC that SCE&G's application of the credits against transmission charges incurred by CES was in compliance with the FERC

9

Order." By its motion, SCEG conceded that the automatic stay precluded it from doing so.

35. But on April 6, 2007, without a grant of relief of the stay, SCEG went ahead and sought this very determination from FERC anyway, under the guise of SCEG's compliance filing (the "Second Compliance Filing") in response to FERC's March 2007 Rehearing Denial Order. (A copy of the Second Compliance Filing is attached hereto as Exhibit D.)

36. SCEG's April 6 letter to the Commission stated that "[a]s part of this compliance filing, SCE&G demonstrates that … [it] has satisfied all of the obligations imposed by the Commission in both the March 2004 Order and the March 2007 Order, *including complete payment of all of the credits required by the Commission*." (Second Compliance Filing at p.2 (emphasis added).) Although not necessarily required by any FERC directive, the Second Compliance Filing gratuitously detailed the process by which SCEG applied Columbia's Transmission Credits to offset the Capacity Charges and other charges incurred by CES and, moreover, purported to explain why SCEG's conduct in this regard was proper. Indeed, the bulk of SCEG's 10-page letter submission to FERC was devoted to justifying SCEG's application of the Transmission Credits.

37. Thus, the Second Compliance Filing achieved the very thing that SCEG sought approval for—disingenuously as it turns out—from this Court in SCEG's motion for relief from the automatic stay.

38. Worse, by virtue of this end-run around the automatic stay and this Court's jurisdiction, SCEG effectively has asked FERC to sanction the very triangular setoffs that the Bankruptcy Code prohibits.

## Claims for Relief

### COUNT I

### (Declaratory Relief)

39. Columbia incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

40. An actual and justiciable controversy within the jurisdiction of this Court exists between Columbia and SCEG concerning the parties' rights and obligations with respect to the Transmission Credits.

41. A prompt resolution of this dispute is in the public's best interest and necessary to determine the lawful rights of the parties, and to facilitate the administration of the bankruptcy estate and successful reorganization of the Debtors.

42. Because of the acts and omissions complained of herein, Columbia is entitled to a declaration, under Fed. R. Bank. P. 7001 and 28 U.S.C. § 2201, that (a) SCEG unlawfully applied Transmission Credits rightfully owed to Columbia against claims SCEG has against CES in violation of both the prohibition on triangular setoffs codified in Section 553 of the Bankruptcy Code and the automatic stay codified in Section 362 of the Bankruptcy Code, and (b) Columbia is entitled to have any Transmission Credits that were unlawfully setoff restored to its account.

43. Columbia also seeks such further relief as the Court deems necessary and proper under 28 U.S.C. § 2202 based on the foregoing declaration.

### COUNT II

### (Violation of the Automatic Stay)

44. Columbia incorporates by reference the allegations of all preceding paragraphs as

if fully set forth herein.

45. SCEG's misapplication of Transmission Credits rightfully owed to Columbia to offset claims SCEG asserts against CES is prohibited by Sections 362(a)(7) and 553 of the Bankruptcy Code.

46. Such unlawful triangular setoffs constitute acts to obtain possession of, or exercise control over, property of Columbia's estate in violation of Section 362(a)(3) of the Bankruptcy Code.

47. SCEG further violated the automatic stay by virtue of its Second Compliance Filing, which seeks approval from FERC for the triangular setoffs implemented by SCEG and prohibited by the Bankruptcy Code.

48. Pursuant to Section 542 of the Bankruptcy Code, SCEG is required to turn over and account to Columbia's estate for the Transmission Credits misapplied as triangular setoffs in violation of the Bankruptcy Code.

49. Additionally, Columbia has been injured by SCEG's violations of the automatic stay for which Columbia is entitled to damages pursuant to Sections 105 and 542 of the Bankruptcy Code.

## COUNT III

### (Turnover of Property)

50. Columbia incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

51. The Transmission Credits are in possession, custody, or control of SCEG and are the property of Columbia's estate.

52. The Transmission Credits are property that Columbia may use, sell, or lease under

Section 363 of the Bankruptcy Code.

53. Columbia has repeatedly requested that SCEG turn over the Transmission Credits and restore them to the account of Columbia.

54. Despite a legal duty to turnover such property, SCEG has refused the Debtors' repeated requests to turn over the Transmission Credits.

55. The Transmission Credits are of significant value and benefit to Columbia's estate.

56. SCEG has full knowledge of the Debtors' petition filed under Chapter 11 of the Bankruptcy Code.

57. Pursuant to Section 542 of the Bankruptcy Code, SCEG is required to turn over and account to Columbia's estate for the Transmission Credits.

## COUNT IV

### (Conversion)

58. Columbia incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

59. By virtue of its conduct described herein, SCEG has converted to its own use Transmission Credits, representing millions of dollars, that pursuant to definitive FERC ruling belong to Columbia in that they should, and if not for SCEG's conduct otherwise would, reimburse Columbia for costs that it incurred to upgrade SCEG's transmission network as part of the interconnection of the Columbia generating facility with the SCEG transmission system.

60. SCEG unlawfully applied Transmission Credits that belong to Columbia to claims that SCEG asserts against separate Debtor CES.

61. SCEG's unauthorized dominion and control over Columbia's Transmission

Credits has been to the exclusion and prejudice of Columbia's lawful rights in the Transmission Credits.

62. Columbia has repeatedly requested that SCEG restore the misapplied and unlawfully converted Transmission Credits to the account of Columbia.

63. Columbia's estate has been injured by SCEG's conversion of Columbia's Transmission Credits. Such damages include, but are not limited to, actual and consequential damages against Defendant in an amount to be determined.

### **Prayer for Relief**

**WHEREFORE**, Columbia respectfully prays for judgment in its favor and against SCEG:

(a) declaring that (i) SCEG unlawfully applied Transmission Credits rightfully owed to Columbia against claims SCEG has against CES in violation of both the prohibition on triangular setoffs codified in Section 553 of the Bankruptcy Code and the automatic stay codified in Section 362 of the Bankruptcy Code, and (ii) Columbia is entitled to have those Transmission Credits that were unlawfully setoff restored to its account;

(b) determining that SCEG must turnover and restore to the account of Columbia the Transmission Credits wrongfully applied to the Capacity Charges as a triangular setoff in violation of Sections 362 and 553 of the Bankruptcy Code;

(c) awarding Columbia damages, including but not limited to actual and consequential damages, in an amount to be determined arising from SCEG's violations of Sections 362 and 553 of the Bankruptcy Code, and conversion of Transmission Credits;

(d) awarding Columbia its costs in this action and attorneys' fees arising out of SCEG's violation of Section 362 of the Bankruptcy Code; and

   (e)  granting Columbia such other and further relief as the Court deems proper and just.

Dated: April 30, 2007     Respectfully submitted,
    New York, New York

              /s/ Neil L. Levy
              Richard M. Cieri (RC 6062)
              David R. Seligman (admitted pro hac vice)
              Edward O. Sassower (ES 5823)
              KIRKLAND & ELLIS LLP
              153 East 53rd Street
              New York, New York 10022-4611
              Telephone: (212) 446-4800
              Facsimile: (212) 446-4900

              and

              655 Fifteenth Street, N.W.
              Washington, D.C. 20005-5793
              Telephone: (202) 879-5000
              Facsimile: (202) 879-5200
              Neil L. Levy (admitted pro hac vice)

              Counsel for the Debtors