with the provisions of this Agreement, do not and will not conflict with or constitute a breach of or a default under, any of the terms, conditions or provisions of any law, regulation, rule, order or other requirement of any governmental authority, or any partnership agreement, deed of trust, mortgage, loan agreement, other evidence of indebtedness or any other agreement or instrument to which Customer is a party or by which it or any of its property is bound, or result in a breach of or a default under any of the foregoing.

15.1.4  This Agreement is the legal, valid and binding obligation of the Customer and is enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditor's rights generally or by general equitable principles, regardless of whether such enforceability is considered in a proceeding in equity or at law.

15.1.5  There is no pending or, to the knowledge of Customer, threatened action or proceeding affecting Customer before any governmental authority which purports to affect the legality, validity or enforceability of this Agreement as in effect on the date hereof.

15.1.6  The Facility is a "qualifying facility" within the meaning of PURPA and meets the criteria as defined in Title 18, Code of Federal Regulations, Section 292.201 through 292.207.

15.2  SCE&G's Representations and Warranties.  SCE&G makes the following additional representations and warranties as the basis for the benefits and obligations contained in this Agreement:

15.2.1  SCE&G is a corporation duly organized, validly existing and in good standing under the laws of the State of South Carolina and that it has the power and authority to own its properties, to carry on its business as now being conducted and to enter into this Agreement and carry out the transactions contemplated hereby and perform and carry out all covenants and obligations on its part to be performed under and pursuant to this Agreement.

15.2.2  The execution, delivery and performance by SCE&G of this Agreement has been duly authorized by all necessary corporate action, and does not and will not require any consent or approval of SCE&G's Board of Directors or shareholders, other than those which have been obtained.

15.2.3  The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of and delivery of this Agreement, the consummation of the transactions contemplated hereby and the fulfillment of and compliance with the provisions of this Agreement, do not and will not conflict with or constitute a breach of or a default under, any of the terms, conditions or provisions of any law, regulation, rule, order or other requirement of any governmental authority, or any partnership agreement, deed of trust, mortgage, loan agreement, other evidence of indebtedness or any other agreement or instrument to which SCE&G is a party or by which it or any of its property is bound, or result in a breach of or a default under any of the foregoing.

15.2.4  This Agreement is the legal, valid and binding obligation of the SCE&G and is enforceable in accordance with its terms, except as such enforceability may be limited by

bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditors' rights generally or by general equitable principles, regardless of whether such enforceability is considered in a proceeding in equity or at law.

15.2.5  There is no pending or, to the knowledge of SCE&G, threatened action or proceeding affecting SCE&G before any governmental authority which purports to affect the legality, validity or enforceability of this Agreement as in effect on the date hereof.

15.3  Survival of Representations and Warranties.  All representations and warranties made by Customer and by SCE&G in or under this Agreement shall survive the execution and delivery of this Agreement and any action taken pursuant hereto.

### ARTICLE XVI
### DISPUTE RESOLUTION

16.  The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by use of the following procedures, in the order listed below.

16.1  Initiation of Process.  Should any dispute, controversy or claim, involving or related to this Agreement or its performance, prove incapable of being resolved by the Interconnection Committee where applicable or by such other representatives of the Parties normally responsible for administration of this Agreement, such dispute shall then be sought to be resolved by negotiations between senior executives of the Parties who have authority to settle the controversy. The disputing Party shall give the other Party written notice of the dispute. Within twenty (20) calendar days after receipt of said notice, the receiving Party shall submit to the other Party a written response.  The notice and response shall include (i) a statement of such Party's position and a summary of the evidence and arguments supporting its position, and (ii) the name and title of the executive who will represent that Party.  The executives shall meet at a mutually acceptable time and place within fifteen (15) calendar days of the date of the receipt of the Party's written response to the notice and thereafter as often as they reasonably deem necessary to exchange relevant information and to attempt to resolve the dispute.

16.2  Mediation.  If the dispute has not been resolved pursuant to Section 16.1 within sixty (60) calendar days of the disputing Party's notice, or if the Party receiving said notice fails to name an executive that meets the above requirements or fails to submit a written response within the twenty (20) day period specified, or either Party cannot or will not meet within the time period specified, either Party may initiate mediation of the dispute in accordance with the Construction Industry Mediation Rules of the American Arbitration Association ("AAA"). In the event the Parties cannot agree to a mediator, the mediator shall be selected from the AAA Roster of Neutrals.

16.3  Arbitration.  If the matter has not been resolved pursuant to the aforesaid mediation procedure within sixty (60) calendar days of the initiation of such mediation procedure, or if either Party refuses to participate in the mediation, the controversy shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association ("Rules") mutually agreed by the Parties, or failing such agreement pursuant to the

Rules by a sole arbitrator, if the claim or dispute involves less than $100,000; or, if the dispute involves $100,000 or more, three arbitrators, of whom each Party shall appoint one and the third shall be appointed by the first two arbitrators named by the Parties and shall act as the chairperson of the arbitral proceedings.

16.4  General Rules and Procedures.  The place of arbitration shall be Columbia, South Carolina.  Except to the extent the Parties' remedies may be limited by the terms of this Agreement, the arbitrator(s) shall be empowered to award any remedy available under the laws of the state of South Carolina.  The decision of the arbitrator(s) pursuant to Section 16.3 shall be final and binding.  The dispute resolution procedures in this Article XVI shall be the sole and exclusive procedures for the resolution of disputes between the Parties arising out of or relating to this Agreement; *provided, however*, that a Party may seek a preliminary injunction or other preliminary judicial relief if in its judgment such action is necessary to avoid irreparable damage. Despite the seeking of a preliminary injunction or other preliminary judicial relief, the Parties shall continue to participate in good faith in the procedures specified in this Article XVI. Judgment rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. All applicable statutes of limitation shall be tolled while the procedures specified in this Article XVI are pending.  The Parties will take such action, if any, required to effectuate such tolling.

16.5  Continued Performance. During the conduct of dispute resolution procedures pursuant to this Article,  the Parties shall continue to perform their respective obligations under this Agreement.

## ARTICLE XVII
## SEVERABILITY AND RENEGOTIATION OF MATERIAL PROVISIONS

17.  Severability.  In the event that any provision of this Agreement or the application thereof, shall be held invalid, illegal or unenforceable under applicable law, by FERC or any court or arbitrator having jurisdiction, the remainder of such provisions and their application shall not be affected thereby and shall remain in full force and effect.  If the invalidation of the provision would deprive a Party of a material benefit under this Agreement, the Parties shall negotiate in good faith to substitute a new term for the invalidated term and otherwise to amend the Agreement as necessary to effect the purpose of this Agreement and to restore the balance of consideration under this Agreement to the extent permitted by applicable law.  If the Parties are unable to reach a mutually agreeable resolution of such matters, they shall submit the matters for resolution under Article XVI of this Agreement.  This provision shall apply where a provision of this Agreement is rendered invalid, illegal or unenforceable due to changes in statute or regulation, including, but not limited to, those resulting from federal or state restructuring of the electric industry.

## ARTICLE XVIII
## MISCELLANEOUS

18.1  Waiver.  Any waiver of a Party's rights with respect to a breach or failure of a Party to comply with any of the terms or conditions of this Agreement shall not constitute a future

waiver or relinquishment of the right to enforce such terms or conditions. All waivers must be in writing and signed by an authorized representative of the Party granting the waiver.

18.2 Access to Interconnection Facilities. Upon reasonable prior notice to the other Party, appropriate representatives of either Party shall, at all reasonable times, have access to the other Party's Interconnection Facilities, to conduct operational reviews, if any, required to facilitate the reviewing Party's performance of this Agreement. While at the other Party's Interconnection Facilities, the reviewing Party's representatives shall: (i) at all times be accompanied by a representative of the other Party (such Party to ensure a representative is made available for such purpose); (ii) observe such safety precautions as may be specified by the other Party; and (iii) conduct themselves in a manner that will not endanger themselves or others or materially interfere with or endanger the operation of the Facility, the Interconnection Facilities or SCE&G's Transmission System.

18.3 Relationship of the Parties. This Agreement shall not be interpreted to create an association, joint venture, partnership, agreement for employment or trust between the Parties nor to impose any trust or partnership duty, obligation or liability upon or with regard to either Party. Neither Party shall have any right, power or authority to enter into any agreement or undertaking for, or act on behalf of, or to act as an agent or representative of, the other Party.

18.4 External Communications; Filings; Confidentiality.

18.4.1 Each Party agrees to coordinate with the other Party all press, news, or other releases to the media related to this Agreement and to allow the other Party to review such releases prior to release.

18.4.2 The Parties shall provide each other with copies of any filings normally available to the public that it makes with governmental or regulatory agencies directly related to this Agreement.

18.4.3 The Parties acknowledge and agree that: (i) by virtue of this Agreement and their having representatives on the Interconnection Committee, the Parties may become privy to confidential and proprietary information regarding the Facility and SCE&G's Transmission System and their operation and/or the business of the other Party; (ii) the other Party would be irreparably injured by disclosure of such confidential and proprietary information; (iii) each Party shall hold as strictly confidential and shall not disclose or permit the disclosure of the terms and conditions of this Agreement and all information disclosed by one Party to the other or obtained by a Party by operation of this Agreement (other than to its Affiliates, and their employees, officers, attorneys and agents provided such persons agree to be bound by the terms of this Section 18.4); *provided, however*, that a Party shall not be obligated to treat as confidential information that: (y) is or becomes publicly known by means other than disclosure by or permitted by said Party; or (z) is required to be disclosed pursuant to the requirements of a court or regulatory authority, or by operation of law, or by listing agreements with national security exchanges. In the event a Party has a need to disclose information to a Lender or potential lender, or in the event either Party has a need to disclose information to an assignee or transferee, or potential assignee or transferee, said Party shall not so disclose any confidential or proprietary information of the other Party unless and until the party or parties that will receive the

information have executed a confidentiality agreement customary for transactions of the type contemplated hereby. Notwithstanding any provision to the contrary, in the event of any breach or threatened breach of the provisions of this Section 18.4.3 and Article XIV, the Party whose information has been or may be disclosed shall be entitled to equitable relief, including injunctive relief and specific performance, in addition to any actual damages said Party may have suffered as a result of such breach or threatened breach.

18.5 Survival of Obligations. In order to give the Parties the benefit of their bargain under this Agreement, the terms and conditions of this Agreement, including, warranties, remedies, and indemnities, shall survive (for a period required by applicable law) the cancellation, expiration or earlier termination of this Agreement, and the Parties shall not be relieved of any obligations incurred prior to such cancellation, expiration, or termination.

18.6 Complete Agreement; Amendments. The terms and provisions contained in this Agreement and the Operating Agreement constitute the entire understanding and agreement between SCE&G and Customer and shall supersede all previous and contemporaneous communications, representations, or agreements, either verbal or written. No amendment or modification to this Agreement shall be binding unless it shall be set forth in writing and duly executed by both Parties.

18.7 Binding Effect. This Agreement, as may be amended from time to time pursuant to Section 18.6, shall be binding upon and inure to the benefit of the Parties and their respective legal representatives, successors-in-interest and permitted assigns.

18.8 Headings. Captions and headings used in the Agreement are for ease of reference only and do not constitute a part of nor shall they be used in interpretation of this Agreement.

18.9 Exhibits and Appendices. Any appendices, attachments, exhibits, schedules or other documents referred to in this Agreement are expressly incorporated herein by reference as if set forth herein in full, whether or not attached hereto. In the event of any conflict between the terms and conditions of this Agreement and the terms and conditions of any such appendices, attachment, exhibit, schedule or other documents, the terms and conditions of this Agreement shall govern and control.

18.10 No Third Party Beneficiaries. This Agreement is for the sole benefit of the Parties and is not for the benefit of any third party other than the Parties' respective successors and permitted assigns.

18.11 Counterparts. This Agreement may be executed in any number of counterparts, each of which when taken together shall constitute but one and the same agreement and each of which shall have the same force and effect as an original instrument.

18.12 Governing Law. This Agreement and the performance of the Parties hereunder will be governed by and construed in accordance with the laws of the State of South Carolina, without reference to conflicts of law rules that might direct the application of the law (other than Federal law) of another jurisdiction.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the Parties' duly authorized representatives have executed this Agreement as of the Effective Date.


**SOUTH CAROLINA ELECTRIC & GAS COMPANY**

**COLUMBIA ENERGY LLC,**


By: _____

By: _____

Name: Charles A. White

Name: James J. Shield

Title: General Manager, Transmission Planning
     & System Control

Title: Vice-President of Project
     Management

# EXHIBIT 1

## INTERCONNECTION STUDY

**CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS**



**A SCANA COMPANY**

# Interconnection Study
# for
# SKYGEN Columbia Project
# (Supplement)

**Prepared for:**
**SKYGEN Energy LLC**

December 22, 2000

**Prepared by:**
**SCE&G Transmission Planning**
**SCE&G Power Delivery Engineering**

**CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS**

# TABLE OF CONTENTS

I.    General Description ...................................................................................Page 1

II.   Transmission Study ...................................................................................Page 2

III.  Stability Study ...........................................................................................Page 2

IV.   Engineering Design ...................................................................................Page 3

     1.  Transmission Layout

     2.  Substation Layout

     3.  Cost Estimate

        a.  Transmission Cost

        b.  Substation Cost

V.    Conclusion .................................................................................................Page 15

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

Interconnection Study

# for SkyGen Columbia Project
# (Supplement)

### General Description

This report is a supplement study result of an additional alternative to connect 595 MW of Skygen's generation to the existing SCE&G transmission grid. In this study SCE&G analyzed two generation units connecting to SCE&G's 230 kV system, and one unit (gas turbine) connecting to SCE&G's 115 kV system. This new alternative is to be labeled 3A. As in previous alternatives 1B, 2A & 2B, SCE&G engineers will study feasible layouts of alternative 3A with detailed description of power characteristic analysis, device protection & operations, engineering design and cost estimates in the following categories:

I.      Alternatives
II      Transmission Study
III.    Stability Study
IV.     Engineering Design
V.      Conclusion

### I.      Alternatives

In our previous study scope, SCE&G proposed two preliminary alternatives:

Alternative 1B – A transmission fold-in and out of SCE&G's Wateree – Edenwood 230 kV line.  Upgrade Edenwood – SkyGen to B-795 ACSR.

Alternative 2A – Same as Alternative #1B but instead of upgrading Edenwood – SkyGen.  Construct a new 230 kV circuit from SkyGen to Edenwood with B-795 ACSR.

Alternative 2B – Same as Alternative #1B but construct an additional new 230 kV circuit from SkyGen to Edenwood with B-795 ACSR.

Alternative 3A - New Alternative

---

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

A transmission fold-in and out of SCE&G's Wateree – Edenwood 230 kV line. Connecting two generation units (395 MW max.) to the 230 kV fold-in.

Construct approximately 7 miles of 115 kV radial line with 1272 ACSR, parallel to the existing Edenwood – Eastman Chemical Company-Carolina Operations 115kV corridor. Connecting the third generation unit (200 MW max.) radially from Skygen to the Edenwood 115 kV bus.

II.    Transmission Study

1. Power Flow Analysis

SCE&G System Criteria Study

We have tested Alternative 3A with NERC Transmission Planning Standard Criteria and SCE&G's Transmission Planning Criteria. We have checked both 2003 and 2010 power flow cases with alternative 3A. We do not find any criteria violations with the Alternative 3A interconnection proposal using the currently planned system in these years.

2. Short Circuit Report

Alternative 3A

| Location of Fault | Max Available 3 phase Fault Current in MVA | Max Available 1 phase Fault Current in MVA |
|---|---|---|
| SkyGen 230kV Bus | 7,321 | 6,604 |
| SkyGen 18kV Bus #1 | 2,179 | 1,991 |
| SkyGen 18kV Bus #2 | 2,612 | 2,613 |
| SkyGen 115kV Bus | 2,606 | 2,369 |
| SkyGen 18kV Bus | 1,851 | 1,802 |

3. Voltage Profile & Historic Operation Record

-2-

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

For the 230 kV connections, we examined a 24 hour voltage profile between Wateree and Edenwood, we discovered the voltage variation between a typical peak load day and a typical light load night is about 2% at the Edenwood end, and it is about 0.7% at the Wateree end.

For the past ten years, we had only three operations on the Wateree – Edenwood 230 kV line. One instantaneous operation due to a storm and two other incidents resulted in outage durations of (29 hrs. 39 min. and 17 hrs. 37 min. respectively), both were caused by storms.

The 115 kV radial connection will be new construction and SCE&G Transmission engineers are going to design this line with concrete single pole to provide high reliability.

## III. Stability Study Update

The stability study for the SkyGen Columbia Energy Center was updated using the proposed 115kV connection for one internal combustion turbine (ICT) and a 230kV connection for the remaining ICT and steam turbine. In addition, the output of the generators was redispatched with 170 MW each for the two ICT'S and 195.5 MW for the steam turbine.

Normal clearing of a fault at either the 115kV or 230 kV SkyGen terminal resulted in no unacceptable system conditions. It was noted however, that any fault which results in circuit breaker operation at either the SkyGen or Edenwood end of the radial 115kV line which connects the SkyGen ICT to the 115kV system will result in the loss of that generator.

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

Delayed clearing of faults on the transmission lines that connect to the 115kV or 230kV terminals will result in an out of step condition for the generator(s) connected to the affected terminal. Consequently, out of step protection should be provided for the SkyGen generators in order to protect those generators and to minimize the effects of delayed clearing of those faults on the SCE&G transmission system. In addition, it was noted that any condition that results in the loss of the steam generator will also result in the loss of the two ICT's. This will increase the impact of 230kV system events on the local 115kV system.


IV.    Engineering Design


1. Transmission Layout

-4-



Unofficial FERC-Generated PDF of 20040423-0260 Received by FERC OSEC 04/21/2004 in Docket#: ER03-1398-000

## 2. Substation Layout



CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

## 3. Cost Estimate

### A. Transmission

Construct approximately 6.5 miles of new 1272 45/7 ACSR transmission line from Edenwood substation to new SkyGen Substation. Line would be constructed in an existing (Eastman Chemical Company (Carolina Operation) 115 kV #1 line & Wateree-Denny Terrace 230 kV line corridors) right-of-way easement.

Right-of-way specifics: For approximately 3.01 miles (Edenwood to Eastman Jct.—no additional right-of-way); for approximately 1.2 miles adjacent to gas line, no additional right-of-way. From Eastman Jct. to interSection with gas line (.73 miles) -add 25' of additional right-of-way; from location where gas line switches to other side of right-of-way to Eastman Chemical Company-Carolina Operations property line (.5 miles) – add 25' of additional right-of-way; from Eastman Chemical Company-Carolina Operations property to sub site (.9 miles) – no additional right-of-way. A small amount of additional right-of-way may be needed at Edenwood sub. Line is proposed to be 115 kV braced post, vertical construction for entire length. Utilize steel and/or concrete pole construction. Termination into Edenwood sub would be to the proposed, new 115 kV terminal.

For the 230 kV construction, the existing 230 kV line (Wateree – Denny Terrace 230 kV (Wateree - Edenwood Section) from Edenwood to Eastman Jct would be utilized as-is (approximately 3.01 miles). A new Section of 1272 45/7 ACSR 230 kV transmission line would be constructed from Eastman Jct. to the SkyGen sub site. An additional amount of right-of-way would be added to that discussed in Alternative 1B for this Section (Eastman Jct to SkyGen site) to allow for this new 1272 45/7 Section. (Specific widths to accommodate the 1272 line are available if needed.) This new Section of 1272 45/7 (Edenwood side) would occupy the same corridor as the new 1272 45/7, 115kV line and existing Eastman Chemical Company-Carolina Operations 115 kV #1 line. Line is proposed to be 230kV braced post, vertical construction for entire length. Utilize steel and/or concrete pole construction.

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

For the 1272 45/7 fold-in Section from the Wateree - Edenwood 230 kV line (on the Wateree side), an approximate 3.0 mile Section of new 1272 45/7 ACSR transmission line would be constructed from Hunt Club Jct. to the SkyGen site along the existing Westinghouse - Eastman Chemical Company-Carolina Operations 115 kV corridor. An additional 60' of right-of-way would be added. Line is proposed to be 230 kV braced post, vertical construction for entire length. Utilize steel and/or concrete pole construction.

Estimate for Alternative 3A:

| | |
|---|---|
| Right-of-way | $595,000 |
| Line Construction—(includes estimated PSC permitting, special adders for wetlands, river crossing and special construction need areas, labor (survey, engineering, construct), materials, & overheads) | $3,350,000 |
| Total: | $3,945,000 |

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

## B.    Substation

**COST ESTIMATE**                                              27-Dec-00
================                                               04:31 PM

TITLE:  WATEREE(OPTION 3A)1-230KV TERMINALS,AUGR.FND.     DONE BY => RET
        (PRICES INCLUDE SALES TAX) USE EXISTING BREAKER AND RELOCATE WAVE    COST FOR:  03/31/02
        TRAP TO SKYGEN                                   ESCAL. FACTOR ====>

| QUANT. | DESCRIPTION | UNIT COST | | STORES COST | PURCHASES |
|-----|-------------------------------|--------|---|------|--------|
| 1 | CARRIER PANEL | | | | 21,600 |
| | | 20,000 | | | |
| 1 | WAVE TRAP, 230KV | | | | 5,100 |
| | | 4,750 | | | |
| 1 | COUPLING CAPACITOR VOLTAGE TRANSFORMER, 230KV | | | | 8,100 |
| | | 7,500 | | | |
| 1 | INSTRUMENT ENCLOSURES | | | | 300 |
| | | 320 | | | |
| 1 | CONTROL CABLE, ALL | | | 450 | 0 |
| | | 400 | | | |
| 1 | CONDUIT, ALL | | | 110 | 0 |
| | | 100 | | | |
| 1 | GROUNDING | | | 220 | 0 |
| | | 200 | | | |

| | STRUCTURES | UNIT COST | C.Y. | COST | FOUND. |
|-----|-------------------------------|--------|------|-------|--------|
| 1 | STRUCTURE, COUPLING CAPACITOR/ POTENTIAL TRANSF | 1,590 | 4.8 | 1,717 | 334 |
| | STRUCTURE TOTALS | | 4.8 | 1,717 | 334 |
| | STRUCTURES | | | | | 1,700 |
| | FOUNDATIONS | | | | | 300 |

| | BUS, INSULATORS & CONNECTORS | UNIT COST | COST | | |
|-----|-------------------------------|--------|--------|--|--|
| 3 | INSULATOR, 230KV STATION POST, HIGH STRENGTH,5" BOLT CIRCLE | 553 | 1,792 | | |
| 15 | TERMINAL, ONE 1272 KCM ACSR TO 4 HOLE PAD | 28 | 454 | | |
| 3 | BUS SUPPORT FOR ONE 1272 KCM ON 5" BOLT CIRCLE | 42 | 136 | | |
| ALL | WIRE | 2,000 | 2,160 | | |
| | MISC. BOLTS, BUS & CONN. - 5% OF COST SUB TOTAL => | 4,541 | 200 | | |
| | BUS, INSULATORS & CONN. TOTALS | | 4,741 | | |
| | BUS, INSULATORS & CONNECTORS | | | 200 | 4,700 |

| | | STORES COST | PURCHASES |
|---|-------------------------|------|--------|
| | SUB TOTAL | 980 | 41,800 |
| | MISCELLANEOUS - 5% OF MAT'L SUB TOTAL | 0 | 900 |
| | TOTALS: | 980 | 42,700 |

-9-

**CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS**

**MATERIAL**

| | | |
|---|---|---|
| PURCHASES | | 42,700 |
| STOCK ISSUES | | 10,000 |
| STORES EXPENSE | 10,000 | 700 |
| LABOR | | |
| CONTRACT LABOR =====================> | | |
| PAYROLL(16,560 OPER)(11,040 RELAY) (5,000 ENGR.) | | 32,600 |
| PAYROLL EXPENSE | 32,600 | 15,300 |
| TRUCKING | 32,600 | 4,137 |
| | | ---------- |
| | SUB TOTAL | 105,437 |
| E & A OVERHEAD | 105,437 | 26,400 |
| | | ---------- |
| | SUB TOTAL | 131,837 |

NUMBER OF MONTHS FOR PROJECT DURATION IS ====>      5

INTEREST AFUDC - (0.008133) X (NO. OF MO'S) X      131,837      5,400

TOTAL PROJECT      137,237

## COST

18-Dec-00

## ESTIMATE

04:42 PM

DONE BY  RET =>

COST  03/31/02 FOR:

ESCAL. FACTOR ====>      1.08

TITLE:   EDENWOOD (ALTERNATIVE 3A)1-EXISTING 230KV and 1-NEW 115KV TERMINAL,AUGR.FND., (PRICES INCLUDE SALES TAX) EXISTING 230KV WAVE TRAP AND C.CAP. WILL BE USED.

| QUANT. | DESCRIPTION | UNIT COST | | | | STORES COST | PURCHASES |
|---|---|---|---|---|---|---|---|
| 1 | POWER CIRCUIT BREAKER, 115KV | 47,675 | | | | | 51,500 |
| 2 | SWITCH, 115KV CENTERBREAK | 4,690 | | | | | 10,100 |
| 2 | CARRIER PANELS, FOR 230KV AND 115KV | 20,000 | | | | | 43,200 |
| 1 | WAVE TRAP, 115KV | 4,750 | | | | | 5,100 |
| 1 | CCVT-115KV | 2,988 | | | | | 3,200 |
| 1 | LINE TUNER | 3,600 | | | | | 3,900 |
| 1 | INSTRUMENT ENCLOSURE | 451 | | | | | 490 |
| 1 | CONTROL CABLE, ALL | 1,000 | | | | 864 | 200 |
| 1 | CONDUIT, ALL | 250 | | | | 270 | 0 |
| 1 | GROUNDING | 250 | | | | 270 | 0 |

| QUANT. | STRUCTURES | UNIT COST | C.Y. | COST | FOUND | | |
|---|---|---|---|---|---|---|---|
| 2 | STRUCTURE, 115KV C.B. SWITCH | 3,000 | 4.8 | 6,480 | 668 | | |
| 1 | PWR.CKT.BREAKER FND | | 7.5 | 0 | 522 | | |
| 1 | DEADEND, 115KV | 8,200 | 21.8 | 8,856 | 1,516 | | |
| 1 | STRUCTURE, COUPLING CAPACITOR/WAVE TRAP,115KV | 1,590 | 4.8 | 1,717 | 334 | | |
| | STRUCTURE TOTALS | | 38.9 | 17,053 | 3,039 | | |

STRUCTURES      1,700

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

FOUNDATIONS                                                                                    300

| | BUS, INSULATORS & CONNECTORS | UNIT COST | COST | | |
|---|---|---|---|---|---|
| 4 | INSULATOR, 115KV STATION POST, HIGH STRENGTH,5" BOLT CIRCLE | 450 | 1,944 | | |
| 3 | BUS SUPPORT FOR TWO 1272 KCM ON 5" BOLT CIRCLE | 45 | 146 | | |
| 30 | TERMINAL, TWO 1272 KCM ACSR TO 4 HOLE PAD | 50 | 1,620 | | |
| ALL | WIRE | 2,000 | 2,160 | | |
| | | | 0 | | |
| | MISC. BOLTS, BUS & CONN. | 5,870 | 300 | | |
| | BUS, INSULATORS & CONN. TOTALS | | 6,170 | | |
| | BUS, INSULATORS & CONNECTORS | | | 300 | 6,700 |
| | SUB TOTAL | | | 1,704 | 126,390 |
| | MISCELLANEOUS | | | 100 | 3,400 |
| | TOTALS: | | | 1,804 | 129,790 |

MATERIAL

| | | |
|---|---|---|
| PURCHASES | | 129,790 |
| STOCK ISSUES | | 10,000 |
| STORES EXPENSE | 10,000 | 700 |

LABOR

CONTRACT LABOR

| | | |
|---|---|---|
| PAYROLL(40,000 OPER)(18500,000 RELAY) (5,000 ENGR.) | | 63,500 |
| PAYROLL EXPENSE | 45,000 | 21,200 |
| TRUCKING | 63,500 | 7,169 |
| | SUB TOTAL | 232,359 |
| E & A OVERHEAD | 232,359 | 58,100 |
| | SUB TOTAL | 290,459 |

| PROJECT | NUMBER OF MONTHS FOR | DURATION IS: | 5 | |
|---|---|---|---|---|
| | INTEREST AFUDC - (0.008133) X (NO. OF MO'S) X | | 290,459 | 11,800 |
| | | TOTAL PROJECT | | 302,259 |

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

**COST ESTIMATE**

22-Dec-00
03:26 PM

DONE BY    RET
=>
COST FOR:  03/31/02
ESCAL FACTOR --==>    1.08

TITLE:    SKYGEN(ALTERNATIVE 3A)2-230KV AND 1-115KV TERMINALS,GROUND MESH & WELDED BUS,AUGR.FND.
(PRICES INCLUDE SALES TAX)(USING AN EXISTING WAVETRAP FROM WATEREE)

| QUANT | DESCRIPTION | UNIT COST | STORES COST | PURCHASES |
|---|---|---|---|---|
| 3 | POWER TRANS., 125/156/214MVA, 19KV-230KV,BY CUSTOMER | 0 | | 0 |
| 2 | POWER CIRCUIT BREAKER, 230KV | 99,125 | | 214,100 |
| 3 | CARRIER PANELS | 20,000 | | 64,800 |
| 1 | WAVE TRAP, 115KV | 4,750 | | 5,100 |
| 1 | WAVE TRAP, 230KV | 4,750 | | 5,100 |
| 1 | BUS DIFFERENTIAL PANELS FOR 230KV BUS | 13,300 | | 14,400 |
| 1 | SYNCHRONIZING PANEL | 2,073 | | 2,200 |
| 1 | ANNUNCIATOR PANEL | 2,104 | | 2,300 |
| 1 | SCADA RTU | 14,000 | | 15,100 |
| 2 | COUPLING CAPACITOR, 230KV | 7,500 | | 16,200 |
| 1 | COUPLING CAPACITOR, 115KV | 4,100 | | 4,400 |
| 2 | DC CABINET | 3,000 | | 6,500 |
| 1 | AC CABINET | 2,000 | | 2,200 |
| 2 | INSTRUMENT ENCLOSURES | 320 | | 700 |
| 1 | POWER POTENTIAL TRANSFORMER 230KV | 55,000 | | 59,400 |
| 1 | POWER POTENTIAL TRANSFORMER 121KV | 30,000 | | 32,400 |
| 3 | POTENTIAL TRANSFORMER, 230KV | 11,500 | | 37,300 |
| 3 | POTENTIAL TRANSFORMER, 115KV | 4,600 | | 14,900 |
| 6 | CURRENT TRANSFORMER, 230KV | 14,000 | | 90,700 |
| 3 | CURRENT TRANSFORMER, 115KV | 8,400 | | 27,200 |
| 4 | LIGHTNING ARRESTER, 230KV | 3,500 | | 15,100 |
| 4 | LIGHTNING ARRESTER, 115KV | 750 | | 3,200 |
| 8 | SWITCH, 230KV, C.B. | 9,900 | | 84,200 |
| 1 | SWITCH, 115KV, C.B.(TWO IF NO FUTURE BUS EXTENSION) | 5,100 | | 5,500 |
| 1 | SWITCHHOUSE. | 80,000 | | 86,400 |
| 2 | BATTERY,125VOLT | 12,000 | | 25,900 |
| 2 | BATTERY CHARGER, 125 VOLT | 3,600 | | 7,800 |
| 1 | STATION SERVICE,THROWOVER | 450 | | 500 |
| 1 | CONTROL CABLE, ALL | 20,000 | 15,000 | 5,000 |
| 1 | CONDUIT, ALL | 3,500 | 3,600 | 0 |
| 1 | GROUNDING | 20,000 | 20,000 | 0 |
| 1 | GROUNDING MESH | 20,000 | | 21,600 |
| 3 | METERING | 5,500 | 100 | 17,800 |
| 1 | GRAVEL, ALL | 8,000 | | 8,600 |

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

| | | UNIT COST | C.Y. | COST | FOUND. | |
|---|---|---|---|---|---|---|
| 1 | FENCE, ALL | 24,000 | | | | 25,900 |
| 1 | GRADING AND CLEARING FOR SUBSTATION AND DRIVE | | | | | 16,200 |
| | STRUCTURES | 15,000 | | | | |
| 4 | STRUCTURE, C.B. SW., 230KV, 29' HIGH | 4,770 | 27.3 | 20,806 | 7,695 | |
| 2 | STRUCTURE, C.B. SW., 230KV, 19' HIGH | 3,710 | 11.7 | 8,014 | 1,828 | |
| 1 | STRUCTURE, C.B. SW., 115KV, 19' HIGH(TWO IF NO FUT.BUS EXT.) | 3,000 | 19.5 | 3,240 | 1,366 | |
| 2 | STRUCTURE, DEADEND, 230KV | 14,859 | 109.0 | 32,096 | 15,162 | |
| 1 | STRUCTURE, DEADEND, 115KV | 8,200 | 21.8 | 8,856 | 1,518 | |
| 6 | STRUCTURE, BUS SUPPORT, 45DEG., 16' BUS HT.,230kv | 2,500 | 18.4 | 16,200 | 7,679 | |
| 2 | STRUCTURE, BUS SUPPORT, 45DEG, 29'BUS HT.,230kv | 3,000 | 2.7 | 6,480 | 376 | |
| 3 | STRUCTURE, BUS SUPPORT, 45DEG, 16'BUS HT.,115kv | 2,600 | 7.0 | 6,424 | 1,451 | |
| 1 | STRUCTURE, BUS SUPPORT, STRAIGHT, 16'BUS HT.230kv | 2,000 | 1.6 | 2,160 | 111 | |
| 2 | STRUCTURE, BUS SUPPORT, STRAIGHT, 29'BUS HT.230kv | 2,500 | 2.7 | 6,400 | 376 | |
| 2 | STRUCTURE, BUS SUPPORT, STRAIGHT, 29'BUS HT.115kv | 2,100 | 2.7 | 4,538 | 376 | |
| 2 | STRUCTURE, COUPLING CAPACITOR POTENTIAL TRANSF,230kv | 1,590 | 3.2 | 3,434 | 445 | |
| 1 | STRUCTURE, COUPLING CAPACITOR POTENTIAL TRANSF,115kv | 800 | 1.6 | 864 | 111 | |
| 3 | STRUCTURE, POTENTIAL TRANSFORMER, 230KV | 795 | 6.4 | 2,576 | 1,335 | |
| 3 | STRUCTURE, POTENTIAL TRANSFORMER, 115KV | 795 | 4.8 | 2,576 | 1,002 | |
| 1 | STRUCTURE, POWER POTENTIAL TRANSFORMER, 230KV | 795 | 6.4 | 859 | 445 | |
| 1 | STRUCTURE, POWER POTENTIAL TRANSF., 115KV(BACKUP ONLY) | 795 | 4.8 | 859 | 334 | |
| 6 | STRUCTURE, CURRENT TRANSFORMER, 230KV | 795 | 6.4 | 5,152 | 2,671 | |
| 3 | STRUCTURE, CURRENT TRANSFORMER, 121KV | 795 | 6.4 | 2,576 | 1,335 | |
| 4 | STRUCTURE, LIGHTNING ARRESTER, 230KV | 460 | 6.4 | 1,987 | 1,781 | |
| 4 | STRUCTURE, LIGHTNING ARRESTER, 115KV | 460 | 4.8 | 1,987 | 1,335 | |
| 6 | GROUND PLATES | 86 | 0.5 | 734 | 278 | |
| 2 | POWER CIRCUIT BREAKER PAD,230KV | - | 20.0 | 1,600 | 2,782 | |
| 1 | PULL BOXES | 450 | 0.0 | 485 | 0 | |
| 81 | CABLE TRENCH, WITH COVERS | 635 | 0.0 | 55,637 | 0 | |

| | | | | | |
|---|---|---|---|---|---|
| | STRUCTURE TOTALS | | 311.1 | 198,538 | 66,489 |
| | STRUCTURES | | | | | 298,743 |
| | FOUNDATIONS | | | | | 99,092 |

| | BUS, INSULATORS & CONNECTORS | UNIT COST | COST |
|---|---|---|---|
| 29 | TUBE,4" SCHEDULE (40' LENGTHS) | 460 | 14,407 |
| 15 | TUBE 3" SCHEDULE(30' LENGTHS) | 136 | 2,236 |
| 6 | INSULATOR, 230KV STATION POST, HIGH STRENGTH,5" BOLT CIRCLE | 553 | 3,563 |
| 18 | INSULATOR, 115KV STATION POST,EXTRA HIGH STRENGTH,7" BOLT CIRCLE | 782 | 14,813 |
| 3 | INSULATOR, 115KV STATION POST, HIGH STRENGTH,5" BOLT CIRCLE | 553 | 1,782 |
| 30 | INSULATOR, 230KV STATION POST,EXTRA HIGH STRENGTH,7" BOLT CIRCLE | 782 | 24,680 |
| 22 | COUPLING CONNECTORS FOR 4" AL.TUBE,WELDED | 110 | 2,614 |
| 45 | BUS SUPPORT, 5" AL.WELDED,7" B.C. | 55 | 2,673 |
| 12 | INTERNAL END PLUGS FOR 4"AL. TUBE, WELDED | 15 | 194 |
| 24 | GROUND STUDS FOR 4" AL. TUBE | 90 | 2,333 |
| 30 | BRANCH CONNECTORS FOR 4" MAIN TO 3" BRANCH @ 15 DEGREES | 90 | 2,916 |

-13-

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

| | | | |
|---|---|---|---|
| 15 | VEE CONNECTORS FOR 4" MAIN TO TWO 3" AL. TUBE @ 15 DEGREES | 90 | 1,458 |
| 15 | TERMINAL, 4" EXPANSION | 180 | 2,916 |
| 32 | VIBRATION DAMPERS | 140 | 4,838 |
| 9 | TERMINAL, 4" TO 4 HOLE PAD, NO EXPANSION | 85 | 826 |
| 15 | BUS SUPPORT, 1272 KCM ACSR ON 5" BOLT CIRCLE | 42 | 680 |
| 93 | TERMINAL, 1272 KCM ACSR TO 4 HOLE PAD | 28 | 2,612 |
| 15 | TERMINAL, TWO 1272 KCM ACSR TO 4 HOLE PAD | 50 | 810 |
| 4 | TEE, 1272 KCM ACSR RUN AND TAP | 68 | 294 |
| 3 | BUS SUPPORT FOR TWO 1272 KCM ON 5" BOLT CIRCLE | 87 | 282 |
| ALL | WIRE | 1,500 | 1,620 |
| | | | 0 |
| | MISC. BOLTS, BUS & CONN. - | 86,755 | 4,300 |
| | BUS, INSULATORS & CONN. TOTALS | | 93,187 |

| | | | | | |
|---|---|---|---|---|---|
| BUS, INSULATORS & CONNECTORS | | | 4,400 | 93,200 | 99,400 |
| SUB TOTAL | | | 43,300 | 1,347,935 | 99,400 |
| MISCELLANEOUS – MAT'L SUB TOTAL | | | 2,200 | 31,300 | 15,300 |
| TOTALS: | | | 45,500 | 18,79,235 | 114,700 |
| MATERIAL | | | | | |
| PURCHASES | | | | 1,378,235 | |
| STOCK ISSUES | | | | 38,600 | |
| STORES EXPENSE | | | 38,600 | 2,700 | |
| LABOR | | | | | |
| CONTRACT LABOR | | | | | |
| PAYROLL (180,500 OPER)(28,000 RELAY) (18,000 ENGR.) | | | | 210,000 | |
| PAYROLL EXPENSE - | | | 242,760 | 98,700 | |
| TRUCKING - | | | 242,760 | 41,328 | |
| SUB TOTAL | | | | 1,770,563 | |
| E & A OVERHEAD | | | 1,770,563 | 442,600 | |
| SUB TOTAL | | | | 2,213,163 | |

| | | |
|---|---|---|
| NUMBER OF MONTHS FOR PROJECT DURATION IS ———> | | 5 |
| INTEREST AFUDC - (0.006183) X (NO. OF MO'S) X | 2,213,163 | 90,000 |
| TOTAL PROJECT | | 2,303,163 |

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

## V. Conclusion

| | |
|---|---|
| The estimated total cost of the substation construction: | $2,742,659 |
| The estimated total cost of the transmission construction: | $3,945,000 |

Total project cost:    $6,687,659

Compared with the three previous alternatives, 3A is the least cost alternative. It has the advantage of delivering power to the 230 kV and 115 kV transmission grid of SCE&G's system.

The total time needed for preparing Transmission and Substation work, including 230 kV construction permit, sub and transmission design, purchasing and construction, is about 18 months, if we assume there is no unforeseen obstacles, such as right of way problems, environmental issues or late shipment of equipment etc.

The line of demarcation for the 230 kV connection is between the SCE&G's 230 kV bus and SkyGen's generator step-up transformer high side 230 kV breakers, please refer to the attached fig. V-1. The line of demarcation for the 115 kV connection is the utility's side of SkyGen's generator step-up transformer high side 115 kV breaker as indicated in fig. V-2. SCE&G will design and include the disconnect switches indicated in both 230 and 115 kV configurations. SCE&G will also provide a design for the SkyGen side of the line of demarcation including equipment that SkyGen should own and maintain. If SkyGen desires to provide its own design, then SCE&G must approve the design. Also, SCE&G will require that SkyGen properly maintain the high side transformer breakers by meeting or exceeding SCE&G's maintenance practices for breakers.

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

# FIGURES  V-1 & V-2



**Exhibit 1A**

**CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS**

# Revised Cost Estimate for Transmission Lines

Transmission Report:
Skygen
Discussion/Estimates:

Option-3A:
Construct approximate (total) 6.5 miles of new 1272 45/7 ACSR transmission line from Edenwood substation to new Skygen Substation. Line would be constructed for the most part in an existing (Carolina Eastman 115kv #1 line & Wateree-Denny Terrace 230kv line corridors) right-of-way easement.
Right-of-way specifics: for approximately 3.01 miles (Edenwood to Eastman Jct.—no additional right-of-way); for approximately 1.2 miles adjacent to gas line , no additional right-of-way. From Eastman Jct. to intersection with gas line (.73 miles) -add 25' of additional right-of-way; from location where gas line switches to other side of right-of-way to Carolina Eastman property line (.5 miles) – add 25' of additional right-of-way; from Carolina Eastman property to sub site (.9 miles) – no additional right-of-way. A small amount of additional right-of-way may be needed at Edenwood sub. Line is proposed to be 115kv braced post, vertical construction for entire length. Utilize steel and/or concrete pole construction. Termination into Edenwood sub would be to the proposed, new 115kv terminal.
For the 230kv construction, the existing 230kv line (Wateree – Denny Terrace 230kv (Wateree-Edenwood Section) from Edenwood to Eastman Jct would be utilized as-is. (approximately 3.01 miles) A new section of 1272 45/7 ACSR 230kv transmission line would be constructed from Eastman Jct. to the Skygen sub site. An additional amount of right-of-way would be added to that discussed in option 1B for this section (Eastman Jct to Skygen site) to allow for this new 1272 45/7 section. (Specific widths to accommodate the 1272 line are available if needed.) This new section of 1272 45/7 (Edenwood side) would occupy the same corridor as the new 1272 45/7, 115kv line and existing Carolina Eastman 115kv #1 line. Line is proposed to be 230kv braced post, vertical construction for entire length. Utilize steel and/or concrete pole construction.
For the 1272 45/7 fold-in section from the Wateree-Edenwood 230kv line (on the Wateree side), an approximate 3.0 mile section of new 1272 45/7 ACSR transmission line would be constructed from Hunt Club Jct. to the Skygen site along the existing Westinghouse-Carolina Eastman 115kv corridor. An additional 60' of right-of-way would be added. Line is proposed to be 230kv braced post, vertical construction for entire length. Utilize steel and/or concrete pole construction.
Estimate for Option 3A:
Right-of-way-----$595,000
Line Construction—(includes estimated PSC permitting, special adders for wetlands, river crossing and special construction need areas, labor (survey, engineering, construct), materials, & overheads)-
$ 4,500,000
Total:   $5,095,000


RCL –11-20-00
RCL- 12-13-00 (Revised Right-of-way estimate to include an amount for "existing" right-of-way use.)
RCL-3-28-01 (Revised Line construction estimate after realization of a transcribing error.)

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

## EXHIBIT 2

## WORK PLAN, DELIVERABLES AND MONTHLY STATUS REPORTS

### Part A – Work Plan

Pursuant to Section 3.3.3 of this Agreement, SCE&G shall provide the Customer with a Work Plan that includes the following information relating to the performance of the Work described in the Interconnection Study:

1.  Interconnection Study

2.  Project Schedule

3.  Major Milestones

    - Functional Test Date

    - SCE&G's Interconnection Facilities In-Service Date

    - Customer's Interconnection Facilities In-Service Date (provided by Customer)

4.  Deliverables – As described in Part B of this Exhibit 2.

5.  Form of Monthly Report  - As described in Part C of this Exhibit 2.

6.  Grading Plan

7.  General Arrangement

8.  One-Line  Drawing

9.  Terms and Conditions

### Part B - Deliverables

The following deliverables shall be provided by SCE&G to Customer under the terms and conditions of this Agreement:

1.  Monthly Project Status Report

2.  Copies of the following Major Equipment Purchase Orders:

-18-
**CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS**

- Circuit Breakers

- Structures and Equipment

- Protection Panel

3.      Design Drawings for Review and Final Certified Drawings for Record:

- Substation arrangement

- One-line diagram

- AC and DC schematics

- Ground grid and details

- Raceway and details

- Control building general arrangement

- Wiring diagrams

- Foundation design and details

- RTU I/O loop drawings

- Transmission line profile

Part C – Form of Monthly Status Report

SCE&G shall provide Customer with a Monthly Status Report in the following form by the fifteenth (15th) day of each calendar month:

1. Overall Project Status.

Provide a written description of the overall project status as of the last day of the calendar month being reported and a breakdown of SCE&G's percentage of completion of the Work as compared to the Project Schedule as depicted below:

|  | Scheduled % | Actual % |
|---|---|---|
| • Engineering | x % | x % |
| • Procurement | x % | x % |

-19-

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

- Construction                              x %                        x %

2. Major Accomplishments.

Provide a description of the major tasks accomplished during the month being reported.

3. Status of Outstanding Key Issues.

Provide a status update of key issues remaining unresolved from previous Monthly Status Report. Provide discussion on revised course of action to reach resolution of issue and identify whether or not additional effects on the scope, specification, cost or schedule will result from further delay.

4. New Issues.

Provide a description, in sufficient detail, of new key issues arising during the reporting month and their effect on the scope, specification, cost or schedule. Most important issues shall be denoted with an asterisk.

5. Scope Changes and Change Orders.

Identify Scope Changes for which notification was provided to Customer in accordance with Section 3.3.5 of this Agreement and the status of such proposed change.

6. Project Schedule Update.

Attach updated version of Project Schedule with all activities stated as percentage complete.

7. Project Costs.

### SCHEDULE OF QUARTERLY PAYMENTS

| Date Due | Total Payment Due |
| --- | --- |

Total Payment Amounts and due dates to be provided with Work Plan in accordance with Section 3.3.3 of the Agreement.

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

## EXHIBIT 3

### GENERATOR CAPACITY CURVES



**CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS**

## EXHIBIT 4

### TESTING

1.0    Testing of SCE&G's Interconnection Facilities.    SCE&G shall conduct all functional testing and commissioning activities for SCE&G's Interconnection Facilities as set forth in this Exhibit 4.

1.1    Commission testing requires a complete functional test of all systems associated with the safe and reliable operation of SCE&G's Interconnection Facilities.

1.2    Prior to initial energization, the following systems require complete functional tests to verify their operation:

Communications (both locally and at remote locations);
Relay and Control (both locally and at remote locations);
Telemetry (both locally and at remote locations);
Metering (locally); and
Power circuit breakers (locally).

1.3    Prior to functional testing, thorough inspection of all components to be energized shall be conducted to assure their reliable operation once voltage has been applied.    Phase agreement shall be inspected visually, and once energized, confirmed via voltage measurement.

1.4    Final commissioning shall consist of sequential energizing of various portions of SCE&G's Interconnection Facilities until all of SCE&G's Interconnection Facilities are energized.    Upon such complete energization, those portions of SCE&G's Interconnection Facilities that could not be adequately tested in the de-energized state shall undergo functional testing to verify their proper operation.

1.5    SCE&G shall extend to Customer, at least thirty (30) days prior to the start of final commissioning activities, the opportunity to discuss and gain understanding of commissioning and testing procedures, including, but not limited to, the opportunity to witness any aspect of commissioning activity, *provided* there shall be no significant risk of adverse impact on the commissioning schedule or the safe and effective conduct of the test procedure.

1.6    SCE&G shall test all protective systems associated with facilities owned by Customer, but on, or a part of, the SCE&G Interconnection Facilities, in a similar manner to the tests to be conducted on SCE&G's Interconnection Facilities.    These protective systems shall include the bus line differential schemes associated with the Customer's Interconnection Facilities.    Following the conclusion of successful commissioning and testing procedures as set forth above with respect to SCE&G's Interconnection Facilities, SCE&G shall notify Customer of the completion of activities associated with the Functional Test Date.    Promptly thereafter, SCE&G and Customer shall inspect SCE&G's Interconnection Facilities and review any appropriate documentation, and shall identify any outstanding items that may require additional

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

attention by either or both of the Parties. Upon completion of those items that are necessary for SCE&G's Interconnection Facilities to be available for service to Customer, SCE&G shall notify Customer of the In-Service Date of SCE&G's Interconnection Facilities.

2.0    Functional Testing of Customer's Interconnection Facilities. Prior to energizing any component of Customer's Interconnection Facilities, SCE&G reserves the right, upon reasonable prior notice in writing, to inspect and witness any necessary proof testing of any portion of Customer's Interconnection Facilities that could reasonably be expected to have a material and adverse impact upon the operation of SCE&G's Transmission System. This opportunity to inspect and/or witness shall include, but not be limited to, testing of the following components: (i) the bus lines carrying the Facility's output between the Facility's generators and SCE&G's Interconnection Facilities; (ii) all protective relay and control schemes between the generator breakers and SCE&G's Interconnection Facilities; (iii) all telemetry /data collection systems that would provide pertinent data back to the SCC; and (iv) all metering installations. Should any unusual condition or test results arise that could reasonably be expected to have a material and adverse impact on the safe and reliable operation of the Customer's Interconnection Facilities in accordance with Good Utility Industry Practices, SCE&G shall reserve the right to require resolution of such condition or results consistent with Good Utility Industry Practices prior to interconnection to SCE&G's Transmission System.

3.0    Functional Testing of Facility. Prior to the start of any functional testing activity, the Facility shall be properly commissioned and made ready for service as set forth in this Section.

3.1  Facility commissioning requirements should address safe and reliable operation of all generator step-up ("GSU") transformers as well as the Facility's auxiliary power system.

3.2  Prior to the start of any functional testing of the Facility, coordination with SCE&G's SCC will be required including the scheduling of any test energy output.

3.3  During functional start-up and testing of any generator, should Customer desire any special switching at SCE&G's Interconnection Facilities to mitigate any exposure the Facility might have from, or impact it might have on, SCE&G's Transmission System, a request for such switching shall be made. This request must be received by SCE&G no later than the Wednesday prior to the week or such shorter period as may be agreed upon by the Parties, when such switching will be required. SCE&G shall perform all switching activities in SCE&G's Interconnection Facilities.

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

## EXHIBIT 5

### METERING PULSE AGREEMENT

1. Customer requests that SCE&G furnish and install equipment in conjunction with its Revenue Metering equipment, to generate and make energy and time pulses available to Customer. Such equipment is included in the cost of SCE&G Interconnection Facilities.

2. SCE&G agrees to furnish and install the equipment necessary for generating the pulses consisting of relay contact closures in an interface enclosure at a point near Revenue Metering. Customer shall be responsible for installation of communication circuits to take the signals into its Facility. Separate pulses will be provided from each meter and Customer will be responsible for totalizing the pulses to satisfy its system requirements; time pulses will be set as nearly to the same interval as practical, but exact coincidence cannot be guaranteed. SCE&G also agrees to furnish and install Isolation Relay equipment.

3. Customer shall limit pulse circuit loading to 1 ampere maximum, at not more than 28 volts DC or 120 volts AC, and will protect each pulse circuit with a standard (not slo-blow) fuse rated at not more than 1 ampere.

4. SCE&G reserves the right to change the pulse values when and if it is required to enlarge its service facilities or replace its associated metering equipment, and Customer will be responsible for making any necessary accommodations in its system to utilize the changed values. SCE&G can assume no responsibility or liability for interruption or malfunction of its pulse equipment, but will give Customer as much advance notice as practical of any known or planned interruption of pulses, within its control.

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

**EXHIBIT 6**

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS



## CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

**EXHIBIT 7**

**Security Schedule**

| Year | Depreciated Replacement Cost | Year | Depreciated Replacement Cost |
|------|------------------------------|------|------------------------------|
| 2003 | 7,744,524 | 2023 | 7,904,016 |
| 2004 | 7,785,317 | 2024 | 7,823,640 |
| 2005 | 7,821,912 | 2025 | 7,835,789 |
| 2006 | 7,889,993 | 2026 | 7,739,822 |
| 2007 | 7,965,583 | 2027 | 7,634,829 |
| 2008 | 8,010,985 | 2028 | 7,583,966 |
| 2009 | 8,031,308 | 2029 | 7,461,908 |
| 2010 | 8,046,242 | 2030 | 7,330,525 |
| 2011 | 8,097,233 | 2031 | 7,190,042 |
| 2012 | 8,101,940 | 2032 | 7,040,284 |
| 2013 | 8,100,381 | 2033 | 6,948,165 |
| 2014 | 8,092,498 | 2034 | 6,899,548 |
| 2015 | 8,077,817 | 2035 | 6,724,249 |
| 2016 | 8,139,917 | 2036 | 6,539,380 |
| 2017 | 8,162,661 | 2037 | 6,345,423 |
| 2018 | 8,129,766 | 2038 | 6,142,240 |
| 2019 | 8,089,188 | 2039 | 5,997,915 |
| 2020 | 8,040,864 | 2040 | 5,776,062 |
| 2021 | 7,964,370 | 2041 | 5,545,042 |
| 2022 | 7,975,926 | 2042 | 5,305,179 |
|      |           | 2043 | 5,190,680 |

Where $X_a$ = Depreciated Replacement Cost for SCE&G's Interconnection Facilities. To calculate the Security Instrument for a given year, $X_a$ is multiplied by SCE&G's Tax Factor for the given year. This sum will be grossed up for incremental tax liability to produce the Security Instrument requirement for the given year; and where "Tax Factor" for any given year shall be the sum of (i) the maximum corporate income tax rate under Section 11 of the Internal Revenue Code of 1986, as amended, and (ii) the maximum South Carolina corporate income tax rate.

CONFIDENTIAL COMMERCIALLY SENSITIVE TRADE SECRETS

**ATTACHEMENT B**

**REDLINED CHANGES TO
REVISED CONSTRUCTION AND MAINTENANCE
AGREEMENT**

"SCE&G's OATT" means SCE&G's Open Access Transmission Tariff or successor Tariff, which may be amended from time to time pursuant to FERC procedure.

"SCE&G's Transmission System" means the facilities owned by SCE&G and operated and controlled by SCE&G, its successors, or a Third Party System Operator that are used to provide electric transmission service in SCE&G's Control Area.

"SCE&G's SCC" means SCE&G's System Control Center in Columbia, South Carolina or its successor.

"Security Instrument" means an instrument such as: (a) a standby letter of credit, or a surety bond with terms and conditions for a payment similar to those of a standby letter of credit, issued by an issuer that shall be approved in advance by SCE&G, such approval not to be unreasonably withheld, conditioned or delayed, which instrument includes requirements for: (i) renewal pursuant to the terms of Article VIII hereof; and (ii) immediate notice to SCE&G from the issuer and Customer in the event that the Security Instrument is not renewed pursuant to the terms of Article VIII hereof, or is discontinued, or if the sums held as security by virtue of such Security Instrument are or become less than the then-required amount; or (b) a guaranty from Calpine Corp. having a credit rating for long term unsecured indebtedness by Standard & Poors of "BBB-" or better, such guaranty being in form and substance acceptable to SCE&G.

"Standards" means any standards, guidelines, criteria, or other requirements that: (a) govern the design, construction, operation, appurtenant facilities, inspection, testing, maintenance, metering, data gathering requirements, or communications capabilities of Interconnection Facilities consistent with Good Utility Industry Practice; (b) are promulgated, adopted, or imposed by a state, regional or national regulatory or standard-setting body; and (c) are directly applicable to a Party or its obligations hereunder and are consistent with Good Utility Industry Practice.

"Tax Factor" shall have the meaning given to it in Exhibit 7.

"Taxable Event" shall have the meaning given to it in Section 8.1.

"Term" shall have the meaning given to it in Section 2.1.

"Third Party System Operator" means any third party or parties responsible for operating transmission facilities, operating one or more control areas or acting as a security coordinator, including a Regional Transmission Organization authorized by FERC that has functional control of SCE&G's Transmission System, whose responsibilities are related to and control SCE&G's obligations under this Agreement.

"Transmission Facility Upgrades Required for Interconnection"- means the Interconnection Facilities comprising the fold-in on the Wateree to Edenwood 230 kV transmission facility known as the "Narrow "U" Configuration" as identified by the FERC in its March 22, 2004 order in Docket No. ER03-1398-000, 106 FERC ¶ 61,265 (2004).

7.2   New Capital Additions.   Customer shall be responsible for the reasonable, documented actual costs of New Capital Additions only when the necessity for such additions: (i) arises primarily from safety or reliability considerations related to SCE&G's Interconnection Facilities or to SCE&G's Transmission System or both; (ii) does not primarily result from the load or facilities of other wholesale or retail customers on SCE&G's Transmission System, including load growth or system expansion and (iii) are consistent with Good Utility Industry Practice; provided that, if no changes have been made to the Facility consistent with Standards, Customer shall not be responsible for costs related to SCE&G's Transmission System.   In addition, Customer shall be responsible for the reasonable documented actual costs of New Capital Additions where said New Capital Additions arise from a decision to replace components of SCE&G's Interconnection Facilities. Customer shall pay SCE&G the actual costs of the New Capital Additions for which the Customer is responsible, including any improvements pursuant to Section 6.1.2, in one lump-sum payment in accordance with Section 7.4, which shall be subject to interest and tax gross-up if applicable. Customer will receive transmission credits as set forth in Section 7.2.1 if such New Capital Additions are at or beyond the point of interconnection(s) as identified by the FERC in its March 22, 2004 order in Docket No. ER03-1398-000, 106 FERC ¶ 61,265 (2004). The actual costs for the New Capital Additions shall include interest accrued on the total cost of constructing the New Capital Additions at the end of each month during construction calculated at the Delayed Payment Rate. The Monthly Facilities Fee set forth in Section 7.3 hereof shall be adjusted to include the costs of New Capital Additions (that are the responsibility of Customer) in the actual costs to which the Facilities Fee Charge Multiplier, as defined in Section 7.3, is applied.

7.2.1   Credits for Transmission Facility Upgrades Required for Interconnection. Customer shall be entitled to transmission credits, equal to the total amount paid to SCE&G for the Transmission Facility Upgrades Required for Interconnection, on a dollar-for-dollar basis for the non-usage sensitive portion of transmission charges, as payments are made under SCE&G's OATT for transmission services with respect to Customer's device that utilizes the Transmission Facility Upgrades Required for Interconnection. Transmission credits shall be applied until such time as the cost of the Transmission Facility Upgrades Required for Interconnection have been fully offset, after which time such offset or credits shall no longer apply. Alternatively, SCE&G may, at its sole discretion, choose to repay to Customer any amounts advanced by Customer for Transmission Facility Upgrades Required for Interconnection not credited to Customer at any time. Any credits shall include interest calculated in accordance with the methodology set forth in FERC's regulations from the date of the payment for the Transmission Facility Upgrades Required for Interconnection until the date the credit is applied.

7.3.1   Monthly Facilities Fee.   Customer shall pay to SCE&G a monthly fee ("Monthly Facilities Fee") that will cover SCE&G's Maintenance, repairs, property tax, miscellaneous taxes, and insurance for SCE&G's Interconnection Facilities, not to include Transmission Facility Upgrades Required for Interconnection, for the Term of this Agreement, beginning with the calendar month following SCE&G's Interconnection Facilities In-Service Date. The Monthly Facilities Fee shall be payable no later than the tenth day of each month. To the extent that SCE&G's Interconnection Facilities are utilized by one or more third parties, the Monthly Facilities Fee shall be prorated to account for the usage by such third party(ies). The Monthly Facilities Fee shall be the sum equal to the Actual Costs as determined pursuant to Section 7.1.2 (as may be adjusted pursuant to Section 7.2) multiplied by the Facilities Fee Charge Multiplier of

**ATTACHEMENT C**

**NOTICE**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

South Carolina Electric & Gas Company                 Docket No. ER03-1398-

NOTICE OF FILING

(                    )

Take notice that on April 21, 2004, South Carolina Electric & Gas Company (SCE&G) filed with the Federal Energy Regulatory Commission a revised Construction & Maintenance Agreement for Interconnection Facilities Between Columbia Energy LLC and SCE&G, in compliance with the Commission's March 22, 2004 order in this proceeding. South Carolina Electric and Gas Company, 106 FERC ¶ 61,265 (2004). SCE&G has requested an effective date of November 15, 2003.

Any person desiring to intervene or to protest this filing should file with the Federal Energy Regulatory Commission, 888 First Street, N.E., Washington, D.C. 20426, in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure (18 CFR 385.211 and 385.214). Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make protestants parties to the proceeding. Any person wishing to become a party must file a motion to intervene. All such motions or protests should be filed on or before the comment date, and, to the extent applicable, must be served on the applicant and on any other person designated on the official service list. This filing is available for review at the Commission or may be viewed on the Commission's web site at http://www.ferc.gov, using the eLibrary (FERRIS) link. Enter the docket number excluding the last three digits in the docket number field to access the document. For assistance, please contact FERC Online Support at FERCOnlineSupport@ferc.gov or toll-free at (866)208-3676, or for TTY, contact (202)502-8659. Protests and interventions may be filed electronically via the Internet in lieu of paper; see 18 CFR 385.2001(a)(1)(iii) and the instructions on the Commission's web site under the "e-Filing" link. The Commission strongly encourages electronic filings.

Comment Date:

Linda Mitry
Acting Secretary