**EXHIBIT C**

**EXHIBIT C**

118 FERC ¶ 61,185
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Joseph T. Kelliher, Chairman;
                       Suedeen G. Kelly, Marc Spitzer,
                       Philip D. Moeller, and Jon Wellinghoff.

South Carolina Electric & Gas Company          Docket Nos. ER03-1398-003
                                                           ER03-1398-004

ORDER ON REHEARING AND COMPLIANCE FILING

(Issued March 7, 2007)

1.  This order addresses a request for rehearing filed by South Carolina Electric & Gas Company (SCE&G) of the Commission's March 22, 2004 Order,[1] which accepted, as modified, certain agreements between SCE&G and Columbia Energy LLC (Columbia) relating to the interconnection of the Columbia generating facility (Facility) with the SCE&G transmission system. This order also addresses the April 21, 2004 compliance filing by SCE&G to the March 22 Order. For the reasons set forth below, the Commission denies rehearing, and accepts the April 21, 2004 compliance filing, subject to further modification.

I.   **Background**

2.  In mid-1999, Columbia contacted SCE&G to arrange for the interconnection of the Facility to the SCE&G transmission system in an area south of Columbia, South Carolina. The parties discussed a radial 230 kV transmission line to the existing Edenwood-Wateree 230 kV transmission line, but Columbia rejected the proposal. The parties then agreed on an alternative configuration in which the Facility's two generating units were connected to SCE&G's 230 kV transmission line via a "U" configuration, thereby removing 100 feet of existing transmission line. In its place, two, parallel lines, three miles long and 100 feet apart, were connected to the Facility.

---

[1] *South Carolina Electric & Gas Company*, 106 FERC ¶ 61,265 (2004) (March 22 Order).

Docket Nos. ER03-1398-003 and ER03-1398-004                                      2

3.      Thus, the Facility consists of a gas turbine generator which is electrically connected to the SCE&G transmission system at the Edenwood 115 kV Bus 2 line (115 kV Facilities) and a steam generator and a gas turbine generator which are electrically connected to the SCE&G transmission system via two parallel 230 kV lines that link the generators to existing transmission lines between the Edenwood substation and the Wateree substation ("U" Configuration or "U" Facilities) as shown on the Appendix attached to the March 22 Order.

4.      On September 29, 2003, SCE&G filed agreements (collectively, the IAs)[2] relating to this interconnection. The IAs set forth the rates, terms, and conditions for the construction, maintenance, and operation of the 115 kV Facilities and the "U" Facilities, which SCE&G claims are needed for the interconnection of the Facility to the SCE&G transmission grid as described above. The IAs characterized these as interconnection facilities, and directly assigned the construction and operation and maintenance (O&M) costs to Columbia.[3]

## A.      Initial Pleadings Filed

5.      Columbia protested SCE&G's September 29, 2003 filing.[4] The Public Service Commission of South Carolina (South Carolina Commission) filed a notice of intervention and comments generally supporting SCE&G's characterization of the Facility. The parties filed a number of other pleadings including SCE&G's response to Commission Staff's December 23, 2003 letter requesting that SCE&G furnish additional information.

---

[2] The IAs consist of: Construction and Maintenance Agreement Between South Carolina Electric and Gas Company and Columbia Energy LLC (Construction IA); Operating Agreement between South Carolina Electric and Gas Company and Columbia Energy LLC (Operating Agreement); Consent to Collateral assignment among South Carolina Electric and Gas Company, Columbia Energy LLC, and Credit Suisse First Boston, New York Branch; and Calpine Corporation Guaranty Among Calpine Corporation, as Guarantor, and South Carolina Electric and Gas Company.

[3] *See* Construction IA, Definitions.

[4] Although Columbia's protest refers to both the 115 kV Facilities and the "U" Facilities, the subsequent pleadings make clear that its protest relates only to the "U" Facilities. Accordingly, this order will only discuss the "U" Facilities.

Docket Nos. ER03-1398-003 and ER03-1398-004                                                    3

6.      Columbia argued that SCE&G erroneously classified the "U" Facilities, which are beyond the point of interconnection, as direct assignment facilities. It asserted that, under Commission policy, the "U" Facilities should be classified as network upgrades eligible for transmission credits with interest.

7.      SCE&G's position, supported by the South Carolina Commission, was that it agreed to Columbia's request for the alternative configuration of the interconnection on the condition that Columbia pays for those facilities without any transmission credits. The alternative configuration, SCE&G argued, provided no benefit to SCE&G, or to any of its customers other than Columbia. Moroever, SCG&E argued that the alternative configuration was more than what was minimally necessary for the interconnection.[5]

### B.      The March 22 Order

8.      The March 22 Order accepted SCE&G's IAs, as modified, effective November 15, 2003, subject to SCE&G submitting a compliance filing. In the order, the Commission reiterated its policy rejecting the direct assignment of improvements to integrated grid facilities (network upgrades), even if those facilities would not have been installed but for a particular request for interconnection service.[6] The Commission explained that network facilities include all facilities "at or beyond the point" where the generator connects to the grid because these facilities provide system-wide benefits.[7] Thus, the interconnecting customer must initially pay the cost of network upgrades at or beyond the point where it interconnects with the transmission system, but that customer must be repaid, over time, through transmission credits.

---

[5] In its January 22, 2004 response, SCE&G set the cost of the "U" Configuration as $4,721,619 (actual), and the rejected "T" configuration as $4,356,000 (estimated). SCE&G also stated that, since March 15, 2000, the two interconnections it has made with respect to its own generating facilities more closely resemble the "U" Configuration.

[6] March 22 Order, 106 FERC ¶ 61,265 at P 18 (*citing Consumers Energy Company*, 95 FERC ¶ 61,233, *order on reh'g*, 96 FERC ¶ 61,132 (2001) (*Consumers*) (Commission rejected the direct assignment of improvements to integrated grid facilities even if those facilities would not have been installed but for a particular request for service)).

[7] *Id.* at P 19 (*citing Entergy Gulf States, Inc.*, 98 FERC ¶ 61,014, *reh'g denied*, 99 FERC ¶ 61,095 (2002) (*Entergy Gulf States*); *Entergy Services, Inc.*, 95 FERC ¶ 61,437, *reh'g denied*, 96 FERC ¶ 61,311 (2001), *aff'd*, *Entergy Services, Inc. v. FERC*, 319 F.3d 536 (D.C. Cir. 2003) (*Entergy Services*)).

Docket Nos. ER03-1398-003 and ER03-1398-004                                    4

9.     Based on this policy, the Commission found that the IAs erroneously directly assigned the "U" Facilities to Columbia because they were at or beyond the point where Columbia interconnects with SCE&G's integrated transmission system.  The Commission explained that the point of interconnection was where the "U" Facilities attach beyond the meters at the Facility, which was labeled as the "Point of Interconnection" on the Appendix attached to the order.  Therefore, the Commission held that "the 'U' Facilities are network upgrades, and their cost must be repaid, over time, to Columbia, via SCE&G granting Columbia credits against the transmission rates paid by Columbia to SCE&G."[8]

10.    In addition, the Commission found that the IAs did not provide for interest on monies paid from the date of collection until the transmission service credit was reimbursed.  Thus, the Commission required that SCE&G file revised IAs, within 30 days of the date of the order, that:  provide Columbia with credits for any New Capital Additions (defined in the Construction IA) at or beyond the point of interconnection; provide that the credits will reflect interest on monies paid from the date of collection until credits are applied to transmission costs in the Construction IA; refrain from assigning to Columbia O&M costs associated with the network upgrades; and refund, with interest, to Columbia any O&M charges previously assessed with respect to the network upgrades.

## II.    Request for Rehearing and Motions to Lodge

11.    On April 21, 2004, SCE&G filed a request for rehearing of the March 22 Order.  On October 7, 2005, as supplemented on October 21, 2005, SCE&G filed a motion to lodge, in furtherance of its petition for rehearing.

### A.    SCE&G Rehearing Request

12.    On rehearing, SCE&G argues that the Commission's generator interconnection cost allocation policy is an arbitrary and capricious departure from longstanding Commission policy and precedent.[9]  It argues that, under the Commission's prior established policy, facilities built solely to enable a generator to interconnect to the transmission system (as opposed to reliability or safety-related additions to the system)

---

[8] *Id.* at P 20.

[9] SCE&G Rehearing Request at 6-7 (*citing Western Massachusetts Electric Company*, 77 FERC ¶ 61,268, at 62,119 (1996), *aff'd*, *Western Massachusetts Electric Company v. FERC*, 165 F.3d 922 (D.C. Cir. 1999)).

Docket Nos. ER03-1398-003 and ER03-1398-004                                               5

were directly assigned because they benefited only the interconnecting customer. SCE&G contends that it relied on this policy when executing the IAs and that only after the execution of the IAs did the Commission change its methodology for allocating interconnection costs and adopt the "at or beyond" nomenclature.

13. SCE&G argues that the Commission is obligated to explain its departure from past Commission policy and the new "at or beyond" test. It asserts that the March 22 Order does not acknowledge, much less explain, the new standard for allocating interconnection costs. SCE&G also asserts that the Commission never offered a reasoned explanation for the location of the point of interconnection, but instead offered a single sentence stating: "We find that the point of interconnection [to the transmission system] here is where the "U" facilities attach beyond the meters at the Facility, which is labeled as the 'Point of Interconnection' on the Appendix attached to this order."[10] SCE&G asserts that the order merely pronounces where the point of interconnection is located; it does not explain why that particular point is chosen.

14. SCE&G also contends that the "at or beyond" test is a bad policy in the context of this case because it violates that basic maxim of ratemaking that costs should be assigned to the party causing them to be incurred. It argues that, instead of turning on who benefits from a facility, the test makes the allocation determination turn entirely on the physical location of a piece of equipment vis-à-vis the point at which the Commission (sometimes arbitrarily, such as here) determines that the generator interconnects to the transmission system. Further, it states that all of the examples the Commission cites as support in the March 22 Order involve enhancements to the pre-existing grid. In contrast, SCE&G states that this case does not involve reliability-related upgrades to the pre-existing system; it involves facilities that merely interconnect the generator to the grid, without any enhancement to the pre-existing grid. In fact, SCE&G contends, not only does its system not benefit from the interconnection, but its other customers are harmed, as "the addition of these facilities has modestly increased exposure to possible outages on SCE&G's transmission system, with concomitant effect on service to SCE&G's other customers."[11]

15. SCE&G argues that the "at or beyond" test is bad policy in this case for the additional reason that it sends transmission providers and interconnecting customers powerful and diametrically opposing signals. It states that blind application of the "at or beyond" test to the facts of this case sends a signal to generators to seek gold-plated

---

[10] SCE&G Rehearing Request at 12.

[11] Id. at 1-2.

Docket Nos. ER03-1398-003 and ER03-1398-004                                              6

interconnection facilities, since others will be paying. SCE&G also asserts that blindly applied without any consideration of either the facts of the case or the impact of its application, "at or beyond" becomes not a tool to aid the Commission's analysis but a crutch to avoid it. It argues that application of the "at or beyond" test is particularly egregious in the circumstances of this case, where SCE&G went well out of its way, in good faith, to accommodate an interconnecting generator's demands – presumably, behaving precisely as the Commission would have wanted.

16.     Finally, SCG&E points out that the Commission has recognized that the "at or beyond" test need not apply in all circumstances and that this case is the type of situation where that policy should not apply.[12] Further, it argues that the decision here is contrary to other recent Commission decisions involving the same issue, citing *PG&E I*[13] and *PG&E II*.[14] SCE&G contends that these cases involved narrow "U" facilities similar to the facilities at issue in this case, and in both cases the Commission found these narrow "U" facilities to be direct assignment facilities.

### B.     Motion to Lodge

17.     In its motion to lodge, SCE&G states that, since it filed for rehearing, the Commission has provided further guidance on its interconnection policy. SCE&G explains that the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded for further explanation the Commission's "at or beyond" policy.[15] On remand, in *Nevada Power I*,[16] SCE&G states that the Commission clarified that the presumption that a facility at the point of interconnection to the grid is part of the grid is rebuttable. SCE&G requests that the Commission factor into its rehearing consideration the "new 'rebuttable presumption'" test for interconnection cost allocation.[17]

---

[12] SCE&G Rehearing Request at 11 *citing United Illuminating Co.*, 107 FERC ¶ 61,003 (2004) (upholding direct assignment of conceded network upgrades).

[13] *Pacific Gas & Electric Company*, 106 FERC ¶ 61,240 (2004) (*PG&E I*).

[14] *Pacific Gas and Electric Company*, 106 FERC ¶ 61,303 (2004) (*PG&E II*).

[15] *Entergy Services, Inc. v. FERC*, 391 F.3d 1240 (D.C. Cir. 2004) (*Entergy*), *reh'g and reh'g en banc denied*, No. 02-1199 (D.C. Cir. Feb. 11, 2005).

[16] *Nevada Power Co.*, 111 FERC ¶ 61,161 (2005) (*Nevada Power I*).

[17] SCE&G Motion to Lodge at 2.

Docket Nos. ER03-1398-003 and ER03-1398-004                                      7

18.     In support, SCE&G points to *Tampa Electric Company*,[18] where the Commission allowed the transmitting utility to rebut the presumption regarding metering equipment located inside the substation fence. It explains that the metering equipment in *Tampa* measured the output of the generation facility and, thus, its costs were charged to the generator because the metering equipment benefited only the generator, not the grid. SCE&G argues that, just like the metering facilities in *Tampa*, the "U" Facilities here benefit only Columbia, not the grid. Therefore, it argues that the "U" Facilities represent special circumstances rebutting the "at or beyond" presumption and their costs should be directly assigned to Columbia.

19.     In its supplemental motion to lodge, SCE&G argues that, in *Nevada Power II*,[19] the Commission provides further explanation, suggesting that the issue may be analyzed in terms of a waiver of the "at or beyond" test. SCE&G asserts that the "U" Facilities are an example of a situation that justifies waiving the strictly locational "at or beyond" test.

   **C.    Commission Determination**

20.     First, we will address SCE&G's argument that the Commission's generator interconnection cost allocation policy is an arbitrary and capricious departure from longstanding policy and precedent. We will deny SCE&G's request for rehearing on this issue. As discussed below, our policy that network upgrades include all facilities at or beyond the point where the generator connects to the grid, which the Commission reiterated in numerous cases, is not a new policy.[20]

21.     As SCE&G notes, in *Entergy*, the D.C. Circuit addressed the issue of whether the Commission's "at or beyond the point of interconnection" rule is an unjustified departure from Commission precedent.[21] However, SCE&G misunderstands the scope of the

---

[18] 99 FERC ¶ 61,192, at 61,796-97 (2002) (*Tampa*).

[19] *Nevada Power Co.*, 113 FERC ¶ 61,007 (2005) (*Nevada Power II*), *appeal pending sub nom. Entergy Services Inc., et al. v. FERC*, No. 05-1238, *et al.*, (D.C. Cir. July 5, 2005).

[20] *See Tampa*, 99 FERC ¶ 61,192 at 61,797. *See also Nevada Power Company*, 100 FERC ¶ 61,077, *order on reh'g*, 101 FERC ¶ 61,036, at P 9 (2002); *Southern Company Services, Inc.*, 108 FERC ¶ 61,220, *order dismissing reh'g*, 109 FERC ¶ 61192 (2004).

[21] *Entergy*, 391 F.3d at 1247.

Docket Nos. ER03-1398-003 and ER03-1398-004                                                                 8

court's concern. The court remanded the order to the Commission for further explanation regarding the "at" portion of the "at or beyond" test, noting that substantial evidence appeared to support the purely locational "from" (*i.e.*, "beyond" the point of interconnection) test. The court also acknowledged that, in *Entergy Services*, it had found that "the Commission had reasonably explained its crediting pricing policy," as spelled out in *Consumers*, generally.[22] Here, regarding the "U" Facilities configuration, the circuit breakers are located *beyond* the physical point where Columbia interconnects with SCE&G's transmission system.[23]

22.     Moreover, on remand, in *Nevada Power I*, the Commission clarified that we had not departed from past Commission policy and that our "at or beyond" test was a reasonable one.[24] The Commission explained that, when we first articulated the locational test for determining whether a facility is a network facility, we used the vague term "from" the point of interconnection rather than the more precise "at or beyond" the point of interconnection used in later orders. The Commission explained that "our adoption of the clearer terminology was not a change in policy," it was a more precise way of stating our precedent, rather than a departure from it.[25] The Commission upheld this finding in *Nevada Power II*.[26]

23.     Further, in a recent order upholding Order Nos. 2003, 2003-A, 2003-B, and 2003-C, the D.C. Circuit found that, on remand of *Entergy*, the Commission in *Nevada Power I* and *II* had explained its test and "prior anomalies in its rulings…[and that] since then the Commission has continued to adhere to the 'the At or Beyond' approach."[27] The court

---

[22] *Id.* at 1248 (*citing Entergy Services*, 319 F.3d at 543).

[23] *See* Exhibit 6 to the Construction IA, Exhibit 2 to the Operating Agreement. *See also* SCE&G Rehearing Request at 3; Operating Agreement at 6, Definition of "Interconnection Point(s)".

[24] *Nevada Power I*, 111 FERC ¶ 61,161 at P 12, 16.

[25] *Id.* at P 16.

[26] *Nevada Power II*, 113 FERC ¶ 61,007 at P 12, 19.

[27] *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 68 Fed. Reg. 49,845 (Aug. 19, 2003), FERC Stats. & Regs. ¶ 31,146 (2003), *order on reh'g*, Order No. 2003-A, 69 Fed. Reg. 15,932 (Mar. 26, 2004), FERC Stats. & Regs. ¶ 31,160 (2004), *order on reh'g*, Order No. 2003-B, 70 Fed. Reg. 265 (Jan. 4, 2005), FERC Stats. & Regs. ¶ 31,171 (2004), *order on reh'g*, Order No. 2003-C,

(continued)

Docket Nos. ER03-1398-003 and ER03-1398-004                                          9

found that "[i]n short, the 'At or Beyond' rule can no longer be considered an unexplained departure from FERC precedent."[28]

24.     We reject SCE&G's arguments that the March 22 Order is inconsistent with *PG&E I* and *PG&E II* for similar reasons. In *PG&E I* and *PG&E II*, the Commission explained that, since the circuit breaker and associated facilities are located prior to the physical point of interconnection with PG&E's transmission system, they should be directly assigned to the generator.[29] The Commission stated that this "is unlike other configurations where circuit breakers are located at or beyond the physical point of interconnection."[30] As noted above, here the interconnections are located beyond the physical point where Columbia interconnects with SCE&G's transmission system. While SCE&G argues that there *could* have been a different point of interconnection under its original proposal, which Columbia rejected, that arrangement is not the one that exists.[31]

25.     Next, SCE&G repeats its argument that the "U" Facilities do not provide system-wide benefits and thus their cost should not be spread to all transmission customers. We disagree and see no reason to depart from the Commission's long-standing policy that the network cannot be dismembered or directly assigned; even if a customer causes the addition of a grid facility (*i.e.*, it would not be needed "but for" the customer's request),

---

70 Fed. Reg. 37,661 (Jun. 30, 2005), FERC Stats. & Regs. ¶ 31,190 (2005), *aff'd, National Association of Regulatory Utility Commissioners v. FERC*, No. 04-1148, *et al.*, slip op. at 14-15 (D.C. Cir. Jan. 12, 2007) (*NARUC*).

[28] *NARUC*, No. 04-1148, *et al.*, slip op. at 15.

[29] 106 FERC ¶ 61,240 at P 25; 106 FERC ¶ 61,303 at P 6.

[30] *PG&E I*, 106 FERC ¶ 61,240 at P 25.

[31] SCE&G de-energized and grounded a segment of its transmission system at the previously uninterrupted Edenwood to Wateree 230 kV transmission line and installed two parallel lines (each approximately three miles long) down to the physical points of attachment of the U Facilities' incoming bus lines to SCE&G's 230 kV bus. Regardless of SCE&G's characterization of this configuration, it is nothing more than an extension of SCE&G's transmission. Therefore, the point of interconnection is the point at which the U Facility conductors physically connect to SCE&G's bus, which is identified in SCE&G's exhibits as the 230 kV point of delivery.

Docket Nos. ER03-1398-003 and ER03-1398-004                                  10

the addition is a system expansion used by and benefiting all users due to the integrated nature of the grid.[32]

26.     Additionally, we note that SCE&G's "benefits" argument is similar to the arguments that were raised and fully addressed in the Commission's orders in Order No. 2003 and the D.C. Circuit in *NARUC*. Although we see no reason to repeat those entire discussions here, we find that the same reasoning applies.[33] In sum, as we discussed in Order No. 2003-A, the court, in *Entergy Services*, clearly affirmed the Commission's reasoning underlying rolled-in transmission rates and our view that all transmission customers benefit from an expanded, and thus more reliable, transmission system.[34] In Order No. 2003-A, we also explained that, in assessing the benefits of the network upgrades needed to interconnect new generating capacity, we look beyond the direct usage-related benefits and recognize the reliability benefits of a stronger transmission infrastructure and more competitive power markets that result from a policy that removes unnecessary obstacles to the interconnection of new generating facilities.[35] We added that the transmission system is a cohesive, integrated network that operates as a single piece of equipment, and that network facilities are not "sole use" facilities, but rather facilities that benefit all transmission customers. We noted that we have consistently priced the transmission service of a non-independent transmission provider based on the cost of the grid as a whole, and have rejected proposals to directly assign the cost of network upgrades.[36]

27.     Further, the D.C. Circuit, in *NARUC*, dismissed petitioners' claims that the addition of unnecessary new facilities causes interruptions with power lines and decreases the network's reliability. There, the court found that petitioners' argument offered no specific basis for drawing into question or undermining "the Commission's long-held understanding that Network Upgrades provide system-wide benefits."[37] For

---

[32] *Entergy Services*, 319 F.3d at 543-4; March 22 Order, 106 FERC ¶ 61,265 at P 19.

[33] Notwithstanding that Order No. 2003 does not apply to this case, the same reasoning discussed there does.

[34] *Entergy Services*, 319 F.3d at 543-4.

[35] Order No. 2003 at P 583-584.

[36] *Id.* at P 585.

[37] *NARUC*, No. 04-1148, *et al.*, slip op. at 15.

20070307-3003 Issued by FERC OSEC 03/07/2007 in Docket#: ER03-1398-003
Case 1:07-cv-04709-LAK    Document 3-12    Filed 06/04/2007    Page 12 of 20

Docket Nos. ER03-1398-003 and ER03-1398-004                                   11

this reason, we will reject SCE&G's unsupported claim that other customers are harmed by the addition of these facilities.

28.     In Order No. 2003-A, the Commission also responded in detail to concerns such as the one SCE&G raises here that the Commission's interconnection policy sends the wrong locational pricing signals to interconnecting generators. There, we recognized the need for such price signals, but balanced that need with the need to promote competition and infrastructure development, protect the interests of interconnection customers, and protect native load and other transmission customers.[38] Recently, in *NARUC*, the D.C. Circuit also rejected such siting arguments. There, the court stated that, because the generator supplies, up-front, the entire cost of the link between the generator and the transmission facility, most or all of the risk of non-recovery is on the generator; "that presumably, is the cost most affected by siting choices."[39] We find that the same reasoning applies here and deny rehearing on this issue.

29.     Finally, SCE&G argues that, regardless of the merit of the Commission's interconnection policy, it is bad as applied to the facts of this case. SCE&G argues that, consistent with *Nevada Power I* and *II*, the Commission's "new 'rebuttable presumption' test" for interconnection cost allocation applies to the "U" Facilities because they represent special circumstances.[40] We disagree.

30.     In *Nevada Power II*, the Commission explained that the option to rebut a presumption that a facility at the point of interconnection to the grid is part of the grid allows an entity to prove that certain facilities are in fact not grid facilities and should be treated differently. Moreover, the Commission explained that:

> direct assignment is allowed only for those transmission facilities that fall into what we have referred to as an "exceptional category" of facilities that are so isolated from the grid that they are and will remain non-integrated.[41] Thus, the

---

[38] Order No. 2003-A at P 579-60; 614-16; 627. *See also Nevada Power II*, 113 FERC ¶ 61,007 at P 23.

[39] *NARUC*, No. 04-1148, *et al.*, slip op. at 16.

[40] SCE&G Motion to Lodge at 2.

[41] *See Public Service Company of Colorado*, 59 FERC ¶ 61,311 (1992), *reh'g denied*, 62 FERC ¶ 61,013, at 61,061 (1993) (*citing Idaho Power Company*, 3 FERC ¶ 61,108, at 61,295-96 (1978) (concerning the direct assignment of unusually long lines ranging from 67-110 miles from utility's main system)).

Docket Nos. ER03-1398-003 and ER03-1398-004                                           12

> Commission anticipates that there it will be very rare for facilities at or beyond the point of interconnection not to be network facilities. We cannot predict every circumstance in which that may be the case, but it is reasonable for the Commission to acknowledge the possibility that, *in rare circumstances*, we could waive the strictly locational "at or beyond" test.[42]

The Commission further explained that we would leave it to parties to determine what type of evidence to present to persuade us that their facilities that are at the point of interconnection fall into this "exceptional category" of facilities and, therefore, should be treated as direct assignment facilities rather than as network upgrades.

31.     Here, in support of its argument that the Commission's "at or beyond" policy should not apply to this case, SCE&G argues that Columbia chose the narrow "U" Facilities configuration to interconnect its generating units to SCE&G's grid, which was more costly than a single radial interconnection, that this configuration increases exposure to possible outages on the SCE&G transmission system, and only provides Columbia with an additional benefit (*i.e.*, additional reliability).[43] SCE&G adds that, like the facilities in *Tampa*, the "U" Facilities benefit only Columbia, not the grid, and should be directly assigned.

32.     We disagree. SCE&G bases this argument on its deduction that the Commission's cost assignment conclusion in *Tampa* "followed naturally from the fact that the metering equipment benefited only the generator, not the grid."[44] This is not necessarily the case. Neither in *Tampa*, nor in *Nevada Power II*, did the Commission discuss the type of evidence parties should present to persuade us that their facilities fall into the "exceptional category" of facilities. Therefore, in order to determine whether SCE&G rebuts the presumption (and, thus the "U" Facilities fall into the "exceptional category" of facilities that should be treated as direct assignment) or whether the "U" Facilities are

---

[42] *Nevada Power II*, 113 FERC ¶ 61,007 at P 26 (emphasis added).

[43] SCE&G Rehearing Request at 5. We note that, in March 22 Order, the Commission rejected SCE&G's main argument, *i.e.*, that these facilities are not at or beyond the point where the generator interconnects to the grid because the facilities were added at Columbia's request. March 22 Order, 106 FERC ¶ 61,265 at P 20 n.11 ("[t]he point of interconnection is a physical location, and it is not determined by who initiated the construction process.").

[44] SCE&G Motion to Lodge at 3.

Docket Nos. ER03-1398-003 and ER03-1398-004                                    13

integrated with the rest of the network, we will apply the five *Mansfield* factors.[45] These factors are:

    (1)    Whether the facilities are radial, or whether they loop back into the transmission system;

    (2)    Whether energy flows only in one direction, from the transmission system to the customer over the facilities, or in both directions, from the transmission system to the customer, and from the customer to the transmission system;

    (3)    Whether the transmission provider is able to provide transmission service to itself or other transmission customers . . . over the facilities in question;

    (4)    Whether the facilities provide benefits to the transmission grid in terms of capability or reliability, and whether the facilities can be relied on for coordinated operation of the grid; and

    (5)    Whether an outage on the facilities would affect the transmission system.[46]

In analyzing these factors, as they apply to the "U" Facilities, we find that the "U" Facilities are now part of SCE&G's integrated transmission system because: (1) the facilities are looped in into the transmission system and thus are not radial in nature; (2) energy flows in both directions over the facilities; (3) SCE&G is able to provide transmission service to itself and other transmission customers over these facilities; (4) they provide benefits to the transmission grid in terms of capability or reliability (*e.g.*, they enhance the safety and reliability of the system); and (5) an outage on these facilities would affect the transmission system.

33.    Thus, we find that SCE&G does not provide us with convincing evidence that the "U" Facilities fall into the "exceptional category" of facilities that qualify as direct assignment facilities. As noted above, the Commission's long-standing policy is that the network cannot be dismembered or directly assigned; even if a customer causes the addition of a grid facility (*i.e.*, it would not be needed "but for" the customer's request),

---

[45] *Mansfield Municipal Electric Dept.*, Opinion No. 454, 97 FERC ¶ 61,134 at 61,613-14 (2001), *reh'g denied*, Opinion No. 454-A, 98 FERC ¶ 61,115 (2002) (*Mansfield*).

[46] *Id.*.

Docket Nos. ER03-1398-003 and ER03-1398-004                                        14

the addition is a system expansion used by and benefiting all users due to the integrated nature of the grid.[47] Therefore, because SCE&G has not proved that the "U" Facilities should be treated differently, the presumption is not rebutted.

34.    We also note that, in support of its motion to lodge, SCE&G refers to the Commission's "new" rebuttable presumption. However, as the Commission explained in *Nevada Power II*, our rebuttable presumption that a facility at the point of interconnection to the grid is part of the grid, "is not a new ruling…[e]ntities have always had an option to seek waiver of Commission policy, which we have granted when there is good reason to do so."[48] We find that, as a general matter, SCE&G had the opportunity to raise the rebuttable presumption argument earlier in this proceeding. It would be inappropriate to accept evidence at this extremely late date in this proceeding (after a dispositive order has been issued), since it would effectively deny parties the opportunity to respond to the evidence. In any event, because we deny SCE&G's request for rehearing on this issue, its motion to lodge is moot.

35.    Accordingly, consistent with the discussion above, we deny SCE&G's request for rehearing.

### III.    SCE&G's Compliance Filing

#### A.    SCE&G's Compliance Filing

36.    On April 21, 2004, SCE&G submitted its compliance filing in response to the March 22 Order, under protest. SCE&G makes a number of revisions to the IAs, including a new section 7.2.1 to the Construction IA, which provides a method for Columbia to receive transmission service credits, plus interest, for the network upgrades. The new section 7.2.1 reads as follows:

> Credits for Transmission Facility Upgrades Required for Interconnection.
>
> Customer shall be entitled to transmission credits equal to the total amount paid to SCE&G for the Transmission Facility

---

[47] *Entergy Services*, 319 F.3d at 543-4; March 22 Order, 106 FERC ¶ 61,265 at P 19.

[48] *Nevada Power II*, 113 FERC ¶ 61,007 at P 26. *See City of Fremont v. FERC*, 336 F.3d 910, 917 (9th Cir. 2003).

20070307-3003 Issued by FERC OSEC 03/07/2007 in Docket#: ER03-1398-003
Case 1:07-cv-04709-LAK     Document 3-12     Filed 06/04/2007     Page 16 of 20

Docket Nos. ER03-1398-003 and ER03-1398-004                                          15

> Upgrades Required for Interconnection, on a dollar-for-dollar basis for the non-usage sensitive portion of transmission services with respect to Customer's device that utilizes the Transmission Facility Upgrades Required for Interconnection. Transmission credits shall be applied until such time as the cost of the Transmission Facility Upgrades Required for Interconnection have been fully offset, after which time such offset or credits shall no longer apply. Alternatively, SCE&G may, at its sole discretion, choose to repay to Customer any amounts advanced by Customer for Transmission Facility Upgrades Required for Interconnection not credited to Customer at any time. Any credits shall include interest calculated in accordance with the methodology set forth in FERC's regulations from the date of the payment for the Transmission Facility Upgrades Required for Interconnection until the date the credit is applied.[49]

### B. Notice of Filing and Responsive Pleadings

37. Notice of SCE&G's compliance filing was published in the *Federal Register*, 69 Fed. Reg. 25,380 (2004), with interventions and protests due on or before May 12, 2004.

38. On May 12, 2004, Columbia submitted a protest in response to SCE&G's compliance filing objecting to the language in added section 7.2.1. Columbia argues that, by limiting the use of transmission credits to service "with respect to [Columbia's] device that utilizes the [network upgrades]," section 7.2.1 denies Columbia the ability to apply transmission credits to *all service taken* from the Facility, as required by the March 22 Order.[50] Columbia asserts that SCE&G seemingly intends to implement the regulations established in Order No. 2003-A, which limit transmission credits to transmission service "that includes the Generating Facility as the source of the power transmitted."[51] However, it argues that neither Commission precedent nor Order No. 2003-A permits a transmission provider to restrict the application of transmission credits only to service

---

[49] Compliance Filing, Attachment A at 21.

[50] Columbia Protest at 4.

[51] Order No. 2003-A at P 614-15. *See also Pro Forma* Large Generator Interconnection Agreement (LGIA) at section 11.4.1.

Docket Nos. ER03-1398-003 and ER03-1398-004                                16

specifically making use of the network upgrades for which transmission credits have been established. In fact, Columbia argues, Commission policy requires that transmission credits apply to service taken from the relevant facility as a whole, and does not limit such credits to service utilizing only particular components of the facility.

39. Columbia further argues that section 7.2.1 must be revised to ensure that: (1) transmission service credits include any tax-related payments made by Columbia in connection with the network upgrades at issue; (2) Columbia may assign its rights to the credits and repayment to any person; and (3) credits must be available until all amounts funded by Columbia for the network upgrades are offset.

40. On May 27, 2004, SCE&G filed an answer to Columbia's protest. SCE&G argues that Columbia's position turns on the definition of "Generating Facility," which Columbia considers to be three separate generating units. SCE&G argues that article 1 of the Order No. 2003-A *pro forma* LGIA defines "Generating Facility" as an "Interconnection Customer's *device* for the production of electricity identified in the Interconnection Request, but shall not include the Interconnection Customer's Interconnection Facilities."[52] It argues that the definition's use of the word "device" refers to the equipment for the production of electric energy, not the place where the equipment happens to be installed. Thus, SCE&G argues that "the Columbia Energy Center is not a Generating Facility within the meaning of Order No. 2003-A; rather, it is simply a piece of real estate where three separate 'Generating Facilities' (*i.e.*, devices) happen to be located."[53]

41. SCE&G also points out that the generator sending power to the 115 kV transmission system (115 kV Generator) is electrically isolated from the two generators sending power to the 230 kV transmission system (230 kV Generators), since the 115 kV Generator is connected to the SCE&G transmission system via a radial line to a lower voltage bus that is separate from the other two units. Thus, it explains that the 115 kV Generator does not make use of the "U" Facilities. It explains that Columbia erroneously contends that it should be permitted to use transmission credits for any transmissions emanating from the Facility, regardless of whether the transmissions actually make use of the "U" Facilities. However, SCE&G asserts that, per Order 2003-A, a transmission

---

[52] SCE&G Answer at 4 (emphasis added).

[53] *Id*.

Docket Nos. ER03-1398-003 and ER03-1398-004                              17

customer is permitted to use credits for transmission service emanating only from the Generating Facility that was the source of the power being transmitted.[54]

### C. Discussion

#### 1. Procedural Matters

42.     Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure,[55] Columbia's timely, unopposed motion to intervene serves to make it a party to this proceeding.

43.     Rule 213(a)(2) of the Commission's Rules of Practice and Procedure,[56] prohibits an answer to a protest unless otherwise ordered by the decisional authority.  We will accept SCE&G's answer because it provides information that assists us in our decision-making process.

#### 2. Commission Determination

44.     First, we will consider the issue of whether transmission credits for the network upgrades should be limited to payments for service taken from the portions of the generating plant transmitting power over the "U" Facilities.  SCE&G asserts in its answer that this matter turns largely on the question of whether the power plant in question should be considered one generating facility or three, separate, generating facilities.  SCE&G argues that the Columbia Facility is actually multiple facilities.

45.     In general, the Commission's policy is that, as long as the interconnection customer or other entity taking transmission service identifies the generating facility as the point of receipt for that service, the interconnection customer is entitled to a credit toward the cost of that service.[57]  Accordingly, the matter concerns whether or not the customer (here, Columbia) is required to designate two receipt points in its transmission service agreement:  one for the two generators that utilize the "U" facilities and one for the generator that does not utilize the "U" Facilities.  Presumably, if the first two generators are considered to be at one receipt point while the other generator is located at

---

[54] SCE&G Answer at 6.

[55] 18 C.F.R. § 385.214 (2006).

[56] 18 C.F.R. § 385.213(a)(2) (2006).

[57] *See* Order No. 2003-C at P 22.

Docket Nos. ER03-1398-003 and ER03-1398-004                           18

a second, separate receipt point, then SCE&G, the transmission provider, could require that the customer designate both receipt points in its transmission service agreement. In this case, only the reserved capacity associated with the receipt point of the first two generators would be eligible for credits attributable to the upfront payment for the cost of the "U" Facilities.

46.    If, alternatively, all three generators are deemed to be located at the same receipt point, then presumably the customer (Columbia) would need to designate only that single receipt point in order to transmit the output of any or all of the generators. But, if the transmission service agreement specifies an amount of reserved capacity that exceeds the capacity of the two generators that utilize the "U" Facilities (for example, to allow all three generators to operate at the same time), then it would be reasonable to allow credits for only that portion of the reserved capacity that reflects the capacity of the generators that utilize the "U" Facilities. For example, suppose those two generators have a combined capacity of 70 MW, the third generator has a capacity of 30 MW, and the transmission service agreement specifies a reserved capacity of 100 MW. Because the capacity of the generators that utilize the "U" Facilities represents only 70 percent of the reserved transmission capacity, the customer (Columbia) should be entitled to a credit equal to only 70 percent of its total charge for transmission service.

47.    The key principle here is that the customer should receive transmission credits for an amount of reserved capacity up to the capacity of the generators that utilize the "U" Facilities. Any amount of capacity reserved for transmission service that exceeds the combined capacity of these two generators should *not* be entitled to credits.[58] Thus, we will direct SCE&G to revise section 7.2.1 of the Construction IA to reflect the above discussion concerning eligibility for transmission revenue credits and to provide a description of each of its transmission service agreements with Columbia, within 30 days of the date of this order.

48.    Next, we address the issue of whether the IAs should explicitly define rights for transmission service credits for tax-related payments and the assignability of the credits and repayment rights. With respect to these issues, we find that section 7.2.1 of the Construction IA is deficient. We agree with Columbia that it is just and reasonable to require SCE&G to repay any tax gross-up or other tax-related payments associated with network upgrades not otherwise refunded, and to allow the assignment of repayment

---

[58] This example assumes point-to-point service. However, the same general principle would apply to network service.

Docket Nos. ER03-1398-003 and ER03-1398-004                                                    19

rights.[59]  Such rights ensure that Columbia is fully compensated for the costs of network upgrades and that the use of the repayment rights is not unnecessarily restricted.[60]

49.     Finally, we turn to Columbia's argument that the IAs need to be revised to state that transmission service credits must be available until all amounts funded by Columbia for the network upgrades are offset.  The second sentence of section 7.2.1 states: "Transmission credits shall be applied until such time as the cost of the Transmission Facility Upgrades Required for Interconnection have been fully offset, after which time such offset or credits shall no longer apply."  We will direct SCE&G to revise section 7.2.1 to make clear that transmission revenue credits and interest shall be applied until such time as all amounts funded by Columbia for network upgrades have been fully offset with interest.

The Commission orders:

   (A)   SCE&G's request for rehearing is hereby denied, as discussed in the body of this order.

   (B)   SCE&G's compliance filing is hereby accepted, as modified, as discussed in the body of this order.

   (C)   SCE&G is hereby directed to file, within 30 days of the date of this order, revised IAs reflecting the modifications discussed in the body of this order.

By the Commission.

( S E A L )


                              Philis J. Posey,
                              Acting Secretary.

---

[59] *See* Pro Forma LGIA article 11.4.1.

[60] *See* Order No. 2003-A at P 338-42, 676.  SCE&G may wish to utilize the *pro forma* language that is provided in article 11.4.1 of the LGIA.