"Abandon" means the voluntary relinquishment of all possession and control of either (i) the Facility by Customer or complete cessation of work on the Facility for sixty (60) consecutive days by Customer and Customer's contractors, or (ii) the Work by SCE&G or complete cessation of the Work for sixty (60) consecutive days, by SCE&G and SCE&G's contractors, but, in either case, only if such relinquishment or cessation is not caused by or directly attributable to an event of Force Majeure.

"Actual Costs" shall have the meaning given to it in Section 7.1.2.

"Affiliate" means with respect to any Party, any other person or entity (other than an individual) that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such person or entity. For purposes of the foregoing definition, "control" means the direct or indirect ownership of fifty percent (50%) or more of the outstanding capital stock or other equity interests of the entity having ordinary voting power.

"Agreement" means this Construction & Maintenance Agreement for Interconnection Facilities composed of (i) the Preamble, Recitals and Articles 1 though 18 of this Construction & Maintenance Agreement for Interconnection Facilities; (ii) any appendices, attachment, exhibits and schedules attached hereto, which are made a part hereof for all purposes; and (iii) any amendments hereto or thereto executed pursuant to the provisions of the Agreement.

"Anticipated Payment Date" shall have the meaning given to it in Section 7.1.4.

"CIAC Tax Liability" means any actual federal, state and/or local tax liability, associated actual tax liability for tax gross-ups, and actual liability for interest or penalties, if any, that would be due if payments and/or other transfers of property under this Agreement were deemed by the IRS or other taxing authority with jurisdiction to be taxable contributions in aid of construction or other Taxable Events to SCE&G or SCANA Corporation.

"Collateral Assignee" shall have the meaning given to it in Section 10.2.

"Commercial Operation Date" shall be the date that Customer begins the regular generation, for sale, of electric power from the Facility, which date shall be notified by Customer to SCE&G.

"Customer's Interconnection Facilities" means all Interconnection Facilities between the 230kV and 115kV high voltage bushings on each generator step-up transformer at the Facility, including equipment for switching, protective relaying and cable terminations, up to the Interconnection Points.

"Customer's Interconnection Facilities In-Service Date" means the date on which the Customer's Interconnection Facilities are completely tested and certified by Customer as ready for operation up to their maximum design rating.

"Delayed Payment Rate" shall have the meaning set forth in Section 7.1.2.

"Effective Date" shall have the meaning given to in the Preamble hereto.

WAI-2821673v1

"Emergency" means a condition or situation that in the sole judgment of SCE&G using Good Utility Industry Practice (i) presents an imminent physical threat of danger to life, or significant threat to health or property or (ii) is likely to cause a significant disruption on or significant damage to SCE&G's Interconnection Facilities or SCE&G's Transmission System (or any material portion thereof); *provided, however*, the lack of sufficient generation capacity to meet SCE&G's Active Load shall not constitute an Emergency *except* to the extent the lack of sufficient generation capacity results in the conditions or situation set forth above.

"Extraordinary Maintenance" shall mean maintenance which entails the repair or replacement of one or more major units of utility property required for purposes of the Interconnection Facilities and performance of SCE&G's obligations under the Agreement that exceeds five thousand dollars ($5,000). The limit of $ 5,000 shall be escalated in accordance with escalation factor calculated in Section 7.3.3.

"Escrow Account" shall have the meaning given to it in Section 7.6.

"Escrow Deficiency" shall have the meaning given to it in Section 7.6.

"Escrowing Party" shall have the meaning given to it in Section 7.6.

"Facilities Fee Multiplier" shall have the meaning given to it in Section 7.3.

"Facility" means Customer's nominally rated 580 MW electricity generation facility located in Calhoun County, South Carolina, comprised of two (2) combustion turbine generators, two (2) heat recovery steam generators, one (1) steam turbine generator, and associated equipment up to the 230kV and 115kV transformer high voltage bushings and including the Customer's Interconnection Facilities. Ratings of the combustion turbine-generators and steam turbine-generator are listed in Exhibit 3.

"FCR" means SCE&G's Facility Connection Requirements dated September 21, 1999, as may be amended from time to time including any future facility connection requirements of a Third Party System Operator.

"FERC" means the Federal Energy Regulatory Commission or any successor to its authority.

"Force Majeure" shall have the meaning given to it in Section 9.2.

"Functional Test Date" means the date on which SCE&G's Interconnection Facilities are electrically energized and functionally prepared to allow for backfeed to the Facility from SCE&G's Transmission System for the purpose of functional testing of the Facility.

"Good Utility Industry Practice(s)" means the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety

and expedition. Good Utility Industry Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to be acceptable practices, methods, or acts generally accepted in the relevant region.

"GSU" shall have the meaning given to it in paragraph 3.1 of Exhibit 4.

"Indemnified Party" shall have the meaning given to it in Section 11.6.

"Indemnifying Party" shall have the meaning given to it in Section 11.6.

"In-Service Date" shall mean, as applicable, the SCE&G's Interconnection Facilities In-Service Date or Customer's Interconnection Facilities In-Service Date.

"Interconnection Committee" shall have the meaning given to it in Section 6.5.1

"Interconnection Facilities" means all the land, easements, rights of way, materials, equipment and installed facilities necessary for the purpose of interconnecting the Facility and SCE&G's Transmission System so as to permit the transfer of electric energy in either direction, including, but not limited to, connection, transformation, switching, metering, relaying, and communication and safety equipment.

"Interconnection Point(s)" means the physical point(s) at which electrical interconnection is made between the Customer's Interconnection Facilities and SCE&G's Interconnection Facilities. For the purposes of this Agreement, the Interconnection Point(s) shall be defined as the attachment of the incoming bus line(s) from Customer's Interconnection Facilities to SCE&G's Interconnection Facilities bus(es) or conductor(s) immediately below the line catchoff point(s) as identified in Exhibit 6.

"Interconnection Study" means the study results, dated as of December 22, 2000, containing SCE&G's good faith estimate of the costs associated with the construction of SCE&G's Interconnection Facilities a copy of which is attached hereto as Exhibit 1, as such estimate of costs have been revised in Exhibit 1A.

"IRS" means the United States Internal Revenue Service.

"Lender(s)" means the financial institutions or other lender(s) providing financing, refinancing of any such financing, or any letter of credit, line of credit, guaranty, credit insurance, or credit support for or in connection with such financing or refinancing, in connection with the development, design, construction, ownership, operation, or maintenance of the Facility, or any part thereof, or SCE&G's Transmission System, as applicable, whether by way of debt instruments or lease instruments, and any fiscal agents, trustees, or other nominees acting on their behalf.

"Monthly Facilities Fee" shall have the meaning given to it in Section 7.3.

"Monthly Status Reports" shall have the meaning given to it in Section 3.3.3

"NERC" means the North American Electric Reliability Council and any successor(s) thereto.

"New Capital Additions" means any additions to be made to SCE&G's Interconnection Facilities that would not be required but for the Facility and performance of obligations under this Agreement.

"Operating Agreement" means that certain Operating Agreement for Interconnected Generation by and between Customer and SCE&G and executed concurrently herewith.

"Party" means SCE&G or Customer, as the context requires, and "Parties" means SCE&G and Customer, collectively.

"Points of Delivery" shall have the meaning given to it in Section 4.1.1.

"Potential CIAC Tax Liability" shall have the meaning given to it in Section 8.1.

"Regional Transmission Organization" or "RTO" has the meaning contained in FERC Order No. 2000, and its progeny including the regulations promulgated thereunder.

"Remote Terminal Unit" or "RTU" shall have the meaning given to it in Section 6.1.3.

"Revenue Metering Devices" means properly compensated, calibrated and programmed electric metering equipment, used to measure electrical energy being transferred at the Interconnection Point from Customer's Interconnection Facilities to SCE&G's Interconnection Facilities for the purpose of billing.

"SCE&G's Active Load" means all obligations of SCE&G to supply energy within SCE&G's Control Area during the hour in question and includes all energy being sold within the SCE&G Control Area by SCE&G as well as all economy and opportunity transactions entered into by SCE&G.

"SCE&G's Control Area" means the electric production, transmission and distribution facilities operated and coordinated by SCE&G's SCC under NERC operating policies, and any operating policies of a Third-Party System Operator.

"SCE&G's Interconnection Facilities" means all Interconnection Facilities between the Interconnection Point and SCE&G's Transmission System as more particularly described in Alternative 3A of Exhibit 1, Exhibit 1A and Exhibit 6.

"SCE&G's Interconnection Facilities In-Service Date" means the date on which the SCE&G Interconnection Facilities are completely tested and certified by SCE&G as ready for operation up to their maximum design rating.

"SCE&G's OATT" means SCE&G's Open Access Transmission Tariff or successor Tariff, which may be amended from time to time pursuant to FERC procedure.

"SCE&G's Transmission System" means the facilities owned by SCE&G and operated and controlled by SCE&G, its successors, or a Third Party System Operator that are used to provide electric transmission service in SCE&G's Control Area.

"SCE&G's SCC" means SCE&G's System Control Center in Columbia, South Carolina or its successor.

"Security Instrument" means an instrument such as: (a) a standby letter of credit, or a surety bond with terms and conditions for a payment similar to those of a standby letter of credit, issued by an issuer that shall be approved in advance by SCE&G, such approval not to be unreasonably withheld, conditioned or delayed, which instrument includes requirements for: (i) renewal pursuant to the terms of Article VIII hereof; and (ii) immediate notice to SCE&G from the issuer and Customer in the event that the Security Instrument is not renewed pursuant to the terms of Article VIII hereof, or is discontinued, or if the sums held as security by virtue of such Security Instrument are or become less than the then-required amount; or (b) a guaranty from Calpine Corp. having a credit rating for long term unsecured indebtedness by Standard & Poors of "BBB-" or better, such guaranty being in form and substance acceptable to SCE&G.

"Standards" means any standards, guidelines, criteria, or other requirements that: (a) govern the design, construction, operation, appurtenant facilities, inspection, testing, maintenance, metering, data gathering requirements, or communications capabilities of Interconnection Facilities consistent with Good Utility Industry Practice; (b) are promulgated, adopted, or imposed by a state, regional or national regulatory or standard-setting body; and (c) are directly applicable to a Party or its obligations hereunder and are consistent with Good Utility Industry Practice.

"Tax Factor" shall have the meaning given to it in Exhibit 7.

"Taxable Event" shall have the meaning given to it in Section 8.1.

"Term" shall have the meaning given to it in Section 2.1.

"Third Party System Operator" means any third party or parties responsible for operating transmission facilities, operating one or more control areas or acting as a security coordinator, including a Regional Transmission Organization authorized by FERC that has functional control of SCE&G's Transmission System, whose responsibilities are related to and control SCE&G's obligations under this Agreement.

"Transmission Facility Upgrades Required for Interconnection" means the Interconnection Facilities comprising the fold-in on the Wateree to Edenwood 230 kV transmission facility known as the "Narrow "U" Configuration" as identified by the FERC in its March 22, 2004 order in Docket No. ER03-1398-000, 106 FERC ¶ 61,265 (2004).

(Alternatively, rather than referring to FERC order, SCE&G can replace Exhibit 6 with a new Exhibit 6 identifying the facilities that are the narrow "U" facilities, similar to what FERC did in the diagram attached to its order and then reference Exhibit 6).

"Work" means: (i) the design, engineering and construction of SCE&G's Interconnection Facilities as defined in Alternative 3A of Exhibit 1 and Exhibit 1A; (ii) the procurement of materials, equipment, supplies and related services for SCE&G's Interconnection Facilities; (iii) the review and approval of all service providers who may be involved in SCE&G's Interconnection Facilities construction activities; (iv) all quality assurance services associated with construction of SCE&G's Interconnection Facilities; (v) the acceptance testing and commissioning of SCE&G's Interconnection Facilities; and (vi) interconnection of SCE&G's Interconnection Facilities to SCE&G's Transmission System.

"Work Plan" shall include the detailed workscope, a comprehensive project schedule defining the timing of all required Work tasks of SCE&G, beginning with engineering activities and concluding with station energization, and that defines major milestones and identifies critical paths, resource requirements, and project budget, as more fully set forth in Exhibit 2.

## ARTICLE II
## TERM, TERMINATION, SERVICE, AND CHANGES

2.1 Base Term and Renewal. The Term of this Agreement shall commence upon the Effective Date and shall continue, unless earlier terminated in accordance with Section 2.3, for a period of forty (40) years from the Commercial Operation Date, and year to year thereafter, until either Party terminates this Agreement with not less than one year notice. Upon the expiration or earlier termination of this Agreement, the provisions of Section 3.6 shall apply.

2.2 Service. SCE&G shall perform the Work and maintain SCE&G's Interconnection Facilities. For the avoidance of doubt, Customer acknowledges and agrees that this Agreement does not constitute a representation concerning availability of transmission service or obligate SCE&G to accept or deliver energy at or beyond the Interconnection Point and on SCE&G's Transmission System. Accordingly, SCE&G shall have no obligation as a consequence of this Agreement to:

2.2.1 pay Customer any wheeling or other charges for electric power and/or energy transferred through the Facility to the Interconnection Point; and

2.2.2 supply Customer with any transmission service or any ancillary service under SCE&G's OATT (or successor transmission tariff).

2.3 Termination. This Agreement may be terminated by either Party as follows: (i) if the Facility is Abandoned at any time, upon notification to the other Party; (ii) upon material breach by the other Party of any of its obligations (other than payment) hereunder if the breaching Party has not cured (or has not initiated proceedings in good faith to effect to cure) such breach within forty-five (45) days following written notice of such breach to the other Party; or (iii) under Section 7.8.

2.3.1 Effect of Termination. Upon termination of this Agreement and in addition to the provisions of Section 3.6, Customer shall pay SCE&G for all Work performed to the date of termination and for all reasonable, non-cancelable expenses or commitments previously incurred by SCE&G and shall reimburse SCE&G for any liability arising from such non-cancelable commitments. SCE&G will use its reasonable efforts to mitigate non-cancelable expenses.

2.4 Project Schedule Changes. Each Party shall use its reasonable best efforts to maintain the project schedule set forth in the Work Plan. Each Party is responsible to keep the other advised of any significant actual or potential project schedule changes or impacts that might occur with respect to the Facility, Customer's Interconnection Facilities, or SCE&G's Interconnection Facilities, as applicable. If an event of Force Majeure affects the project schedule, including the target In-Service Date for SCE&G's Interconnection Facilities, the Parties shall agree to adjust the Work Plan in accordance with the effects of the Force Majeure. Should key milestones of the project schedule change from those indicated in SCE&G's original Work Plan, discussions regarding the impact of such changes shall be held promptly between the Parties, and if appropriate, the Parties shall develop and implement a reasonable strategy to mitigate any potential delay therefrom, and agree to appropriate amendments required to be set forth in Exhibit 2.

2.5 Preservation of Rights Under Federal Power Act. In executing this Agreement and only to the extent FERC assumes jurisdiction over this Agreement, the Parties acknowledge that: (i) SCE&G may, at any time during the term of this Agreement after notice to Customer, petition the FERC for changes in the rates, charges, classification, rules, regulations, and practices set forth herein or relating to this Agreement, to the extent such rates are within the jurisdiction of the FERC, as more particularly set forth in Section 205 of the Federal Power Act 16 U.S.C. §824d, and (ii) Customer may, at any time during the term of this Agreement after notice to SCE&G, petition the FERC, in the form of a complaint, for a determination that any such rate, charge, classification, rule, regulation or practice is unjust, unreasonable, unduly discriminatory, or preferential, as more particularly set forth in Section 206 of the Federal Power Act 16 U.S.C. §824e, and no provision of this Agreement shall be construed to limit or abridge those rights, unless explicitly agreed to by the Parties in writing.

ARTICLE III
INTERCONNECTION FACILITIES

3.1 Land and Access Rights.

3.1.1 SCE&G shall (at Customer's expense) obtain all land and access rights that are necessary for SCE&G to perform the Work and maintain SCE&G's Interconnection Facilities.

3.1.2 Notwithstanding the foregoing Section 3.1.1, Customer or its Affiliates shall, at Customer's expense, grant, or cause an entity with requisite authority to grant, to SCE&G, in form and substance satisfactory to SCE&G, all easements or rights-of-way upon, over, and across lands owned or controlled by Customer or its Affiliates or property owned or controlled by Eastman Chemical Company-Carolina Operations or its successors for the Term, so that SCE&G shall have free and unobstructed access reasonably necessary for the purpose of construction, operation and maintenance of SCE&G's Interconnection Facilities and shall also include the right to remove or replace SCE&G's Interconnection Facilities including any decommissioning or removal pursuant to Section 3.6. SCE&G's obligation to continue the Work and perform its obligations hereunder is expressly conditioned upon SCE&G's prior receipt of the rights and interests contemplated by this Section 3.1.2.

3.1.2.1 SCE&G shall have the right at all times to enter onto the easement areas described in this Section 3.1.2 for the purpose of taking such action as may be reasonably necessary to exercise SCE&G's rights and perform its obligations under this Agreement. SCE&G will keep records of all visits onto the easement areas described in this Section 3.1.2 outside of normal working hours. For purposes of this Agreement, "normal working hours" means the hours of 8:00 am to 5:00 pm.

3.1.3 Customer shall be responsible for maintaining all common use roadways and access facilities to SCE&G's Interconnection Facilities to the extent that such roadways and access facilities are located on land owned or controlled by Customer or Eastman Chemical Company-Carolina Operations or its successors. Notwithstanding Section 11.1, SCE&G shall reimburse Customer for reasonable expenses incurred by Customer for all damage (excluding wear and tear consistent with Good Utility Industry Practice) to such roadways and access facilities solely attributable to SCE&G or its contractors.

3.1.4 Customer shall grant, or cause an entity with requisite authority to grant to SCE&G, any modifications, expansions, additional easements or rights-of-way that Customer may have over property owned or controlled by Customer; provided that such additional easements, rights-of-way, modifications or expansions are reasonably required by SCE&G to exercise its rights or carry out its obligations pursuant to this Agreement in accordance with Good Utility Industry Practice.

3.2 Customer's Interconnection Facilities. Customer shall be responsible for the design, construction, installation, ownership, operation and maintenance of the Customer's Interconnection Facilities. Customer's Interconnection Facilities shall meet all applicable safety, engineering, regulatory codes, requirements and Standards. Customer shall provide SCE&G with one-line drawings of the proposed Customer's Interconnection Facilities, and Customer shall promptly provide SCE&G with any proposed revisions to said drawings. SCE&G's review of data provided by Customer, or SCE&G requested inspection or testing with respect to the design, construction, operation or maintenance of Customer's Interconnection Facilities shall not constitute a representation, warranty or assumption of responsibility or liability with respect to the economic or technical feasibility, operational capability or reliability of Customer's Interconnection Facilities. Customer is solely responsible for the economic and technical feasibility, operational capability and reliability of the Facility.

3.3 SCE&G's Interconnection Facilities.

3.3.1 SCE&G shall be responsible for the design, construction, installation, ownership, operation and maintenance of SCE&G's Interconnection Facilities. SCE&G's Interconnection Facilities shall meet all applicable Standards.

3.3.2 The estimated costs (exclusive of any regulatory approval costs and/or fees) for SCE&G to perform the Work are set forth in the Interconnection Study at Part V in Exhibit 1 as revised by Exhibit 1A. Customer shall pay SCE&G (i) the total actual and documented costs for the performance of the Work and (ii) the Monthly Facilities Fees, as set forth in Article VII.

3.3.3 SCE&G shall provide Customer with the following: (i) a Work Plan, to be delivered to Customer within sixty (60) days after execution of this Agreement, which Work

Plan shall include the information set forth in Part A of Exhibit 2; (ii) monthly reports on the status of the Work ("Monthly Status Reports"), which Monthly Status Reports shall be delivered by SCE&G to Customer by the fifteenth (15th) of each month and which shall be in the form set forth in Part C of Exhibit 2; and (iii) notification as soon as reasonably practicable of any significant problems or issues with regard to the Work, including any proposed changes pursuant to Section 3.3.5. The project schedule in the Work Plan shall have a target In-Service Date for SCE&G's Interconnection Facilities of eighteen months from the date of this Agreement.

3.3.4 In performing the Work, SCE&G shall: (i) use reasonable best efforts to perform the Work in accordance with the project schedule set forth in the Work Plan in accordance with Good Utility Industry Practice; and (ii) cooperate with all contractors of Customer involved with the construction of the Facility and/or Customer's Interconnection Facilities.

3.3.5 In the event that either Party, during performance of the Work, in good faith believes that a significant change to the Work is needed for the safe and efficient transfer of electric energy from the Customer's Interconnection Facilities to SCE&G's Transmission System or to comply with any change in Standards, whether such change is to scope, specification, cost or schedule, the Party identifying such change shall promptly notify the other Party of the proposed change in writing and provide written documentation of the need for, and scope, specification, cost and schedule of, such change to the other Party. Following the other Party's review of the proposed change, the Parties shall meet and mutually determine whether the proposed change is necessary for the safe and efficient transfer of electric energy from the Customer's Interconnection Facilities to SCE&G's Transmission System or to comply with any change in Standards. If the Parties in good faith and exercising reasonable judgment determine a proposed change to the Work is necessary for the safe and reliable transfer of electric energy from the Customer's Interconnection Facilities to SCE&G's Transmission System or to comply with any change in Standards, such proposed change shall promptly be implemented and the costs for such work shall be added to the Actual Cost. If the Parties in good faith and exercising reasonable judgment fail to mutually agree that a proposed change to the Work is necessary for the safe and reliable transfer of electric energy from the Customer's Interconnection Facilities to SCE&G's Transmission System or to comply with any change in Standards, such proposed change may be implemented and a Party may submit such matter for resolution pursuant to Article XVI. The arbitrator shall base his/her decision on whether the expenditure is necessary for the safe and reliable transfer of electricity or to comply with any change in Standards, whether it complies with Good Utility Industry Practice, whether it complies with the FCR, and is otherwise consistent with this Agreement.

3.3.6 The following items shall be documented and communicated by the originating Party to the other Party in conjunction with the Monthly Status Reports provided for in Section 3.3.3(ii): (i) all significant proposed changes; and (ii) positive cost variances in excess of ten thousand dollars ($10,000) above the total original estimate set forth in the Interconnection Study description set forth in Exhibit 1 as revised by Exhibit 1A, which cost variances do not result from a significant proposed change. A "significant" proposed change shall be any change to the scope, specification, cost, or schedule of the Work that: (i) results in a material modification to a major technical feature of the Interconnection Facilities; or (ii) results in any material change to systems that are part of or associated with protection schemes; (iii) is likely to result in a positive cost variance in excess of fifty thousand dollars ($50,000); or (iv) results in a change in any milestone in the Work Plan project schedule.

3.3.7 SCE&G shall notify Customer at least 30 days in advance of the SCE&G Interconnection Facilities In-Service Date. Customer shall notify SCE&G at least 30 days in advance of the Customer's Interconnection Facilities In-Service Date. Promptly following notification of the applicable In-Service Date, SCE&G and Customer shall inspect SCE&G's Interconnection Facilities, or Customer's Interconnection Facilities, as applicable, and review any appropriate documentation and shall identify any outstanding items that may be in need of further attention by either or both of the Parties with respect thereto.

3.4 Changes to Interconnection Facilities. In the event that either Party desires to make changes to its Interconnection Facilities, or have changes made to the Interconnection Facilities of the other Party, after review by the Parties as set forth in Section 3.3.7 and completion of any outstanding items identified thereby that would reasonably be expected to affect the other Party's Interconnection Facilities, the Facility or SCE&G's Transmission System, the Party desiring such change shall promptly notify the other Party of the proposed change in writing and provide written documentation of the need for, and scope, specification, cost, and schedule of, such change, to the other Party. Following the other Party's review of the proposed change, the Interconnection Committee shall determine whether the proposed change should be implemented, and if such change is to be implemented, how such change will be implemented and the portion of the cost of such change to be paid by each Party. If the Interconnection Committee is unable to reach unanimous agreement on whether such proposed change should be implemented or the method of implementing such change or the portion of the cost of such change to be paid by each Party, the matter shall be submitted for resolution pursuant to Article XVI.

3.5 Changes to Facility. Customer shall have the right to make any changes to the Facility it deems necessary or desirable; *provided, however*, Customer shall take any and all actions necessary to ensure that such changes do not have a material adverse affect on SCE&G's Interconnection Facilities or SCE&G's Transmission System, or SCE&G's exercise of its rights or performance of its obligations under this Agreement. If Customer desires to make changes to the Facility, to the extent that such changes may affect SCE&G's Interconnection Facilities or SCE&G's Transmission System or SCE&G's exercise of its rights or performance of its obligations under this Agreement, Customer shall provide SCE&G with appropriate plans, drawings, or specifications for SCE&G's review and comment.

3.6 Decommissioning Costs. Upon expiration or earlier termination of this Agreement, SCE&G shall at its sole option: (1) retain title to any or all of SCE&G's Interconnection Facilities and pay Customer the fair market value of the material and equipment procured on behalf of Customer for the Works and forming part of SCE&G's Interconnection Facilities, such fair market value not to exceed the depreciated book value; *provided, however*, that Sections 7.5, 7.6, 7.7, and 7.8 hereof shall apply to SCE&G as payor of such costs; or (2) transfer title to Customer of any or all of SCE&G's Interconnection Facilities and Customer shall pay all reasonable documented costs of SCE&G to decommission and/or remove SCE&G's Interconnection Facilities no longer required for interconnection of the Facility to SCE&G's Transmission System in the event that SCE&G elects or is required to remove SCE&G's Interconnection Facilities to comply with a judicial or regulatory agency order or with requirements promulgated or enacted by a Federal, state or local government body. The decommissioning and/or removal shall be accomplished in a manner that restores the full

functionality of SCE&G's Transmission System within eighteen (18) months following the expiration or termination of this Agreement in a manner that is consistent with Good Utility Industry Practice. Customer shall reimburse SCE&G for such actual, reasonable costs within sixty (60) days of invoice by SCE&G; *provided, however*, that the provisions of Sections 7.5, 7.6, 7.7, and 7.8 hereof shall apply to the payment of said decommissioning and/or removal costs by Customer.

## ARTICLE IV
## METERING, METERED DATA AND COMMUNICATIONS

4.1 Installation of Revenue Metering Device. A Revenue Metering Device shall be installed on SCE&G's Interconnection Facilities for each generator of the Facility. Such Revenue Metering Device(s), shall be owned, installed, operated, and maintained by SCE&G. These devices are included as part of SCE&G's Interconnection Facilities at Customer's expense in accordance with Section 3.3.

4.1.1 Points of Delivery. The physical points of delivery ("Points of Delivery") shall be on the connectors of the last SCE&G structure of SCE&G's Interconnection Facilities before Customer's generator step-up breaker as shown in Exhibit 6.

4.2 Meter Testing and Inspection. Revenue Metering Devices shall be tested at least annually. At Customer's request SCE&G will test its Revenue Metering Devices at no charge to Customer provided SCE&G has not performed a test within the last six months. If the Revenue Metering Device has been tested within the last six months and the requested test reveals that such Revenue Metering Device is accurate within the limits of plus or minus 1%, Customer will reimburse SCE&G for the cost of the requested test.

4.3 Adjustment of Inaccurate Meters and Meter Readings.

4.3.1 If any Revenue Metering Device is found to be defective or registering inaccurately, it shall be repaired, replaced, and/or recalibrated as soon as possible to as nearly as practicable to a condition of zero (0) error by SCE&G.

4.3.2 If any Revenue Metering Device fails to register, or if the measurements made by a Revenue Metering Device are found upon testing to be inaccurate by more than one percent (1.0%), such Revenue Metering Device shall be repaired, replaced, and/or recalibrated as near as practicable to a condition of zero (0) error by SCE&G; *provided*, that the costs of the test shall be for the account of SCE&G.

4.3.3 Adjustment to any Revenue Metering Device shall be made correcting all measurements for both the amount of the inaccuracy and the period of the inaccuracy, in the following order of priority: (i) as may be agreed upon by the Parties; (ii) in the event that the Parties cannot agree on the amount of the adjustment necessary to correct the measurements made by any inaccurate or defective Revenue Metering Device, the Parties shall use metering devices as may be installed by SCE&G, if registering accurately within the limits of plus or minus 1%, to determine the amount of such inaccuracy; (iii) if the metering devices as may be installed by SCE&G are also found to be inaccurate by more than one percent (1.0%), the Parties shall estimate the amount of the necessary adjustment on the basis of energy deliveries during

periods of similar operating conditions when such Revenue Metering Device was registering accurately.

4.3.4   SCE&G will provide Customer with meter pulses from the Revenue Metering Devices for its use. These meter pulses will be provided in accordance with the provisions in Exhibit 5.

4.4   Metered Data.   SCE&G shall provide, at Customer's expense, all equipment necessary to allow the following continuous data values generated at the Facility to be telemetered to SCE&G's SCC, pursuant to a mutually agreeable protocol for telemetry of operating data: (i) a generator breaker status (open or closed) digital signal for each generator of the Facility, (ii) an electric generator output MW analog signal for each generator of the Facility, (iii) an electric generator input/output MVAR analog signal for each generator of the Facility, (iv) three electric generator output amperes (3-phase) analog signals for each generator of the Facility, (v) an integrated net MWh digital signal from each Revenue Metering Device, and (vi) an integrated net MVARh digital signal from each Revenue Metering Device.

ARTICLE V
TESTING

Testing of the Interconnection Facilities shall be conducted in accordance with Exhibit 4 as may be amended or modified by the Interconnection Committee from time to time.

ARTICLE VI
INTERCONNECTION REQUIREMENTS AND MAINTENANCE

6.1 Interconnection Requirements.

6.1.1   Customer's Interconnection Facilities shall be connected to SCE&G's Interconnection Facilities in accordance with the FCR. When the FCR is modified, the Interconnection Committee shall seek to reach agreement on what changes, if any, and when such changes, if agreed upon, will be made to the Customer's Interconnection Facilities or SCE&G's Interconnection Facilities. The costs of implementing the required changes, if any, to SCE&G's Interconnection Facilities shall be at Customer's cost and expense; provided that such required changes are consistent with Good Utility Industry Practice and have been approved by any regulatory body having approval authority over the amended or modified FCR. If the Interconnection Committee is unable to reach agreement on any matter under this Section 6.1.1, such matter shall be subject to resolution pursuant to the provisions of Article XVI.

6.1.2 SCE&G's Interconnection Facilities must be capable of accepting electric energy from the Customer's Interconnection Facilities up to the capability levels shown in Exhibit 3. The Customer may submit a request for a supplemental Generation Interconnection Study to determine the cost, if any, for SCE&G's Interconnection Facilities to accept electric energy that exceeds the capability levels shown in Exhibit 3. The costs of any improvements to SCE&G's Interconnection Facilities to accommodate such increased electric energy shall be treated as New Capital Additions under Section 7.2 of this Agreement. For the avoidance of doubt, nothing in this Agreement shall be construed as a representation or obligation that SCE&G will accept onto

-16-

SCE&G's Transmission System and transmit any amount of electric energy from SCE&G's Interconnection Facilities. Any obligation of SCE&G to accept electric energy onto and transmit such electric energy through SCE&G's Transmission System shall be subject to agreement by the Parties to a separate transmission service agreement.

6.1.3 Remote Terminal Unit. Prior to the Commercial Operation Date, a Remote Terminal Unit ("RTU") or equivalent data collection and transfer equipment acceptable to both Parties shall be included in SCE&G's Interconnection Facilities at Customer's expense in accordance with Section 3.3. The RTU shall be capable of gathering accumulated and instantaneous data to be telemetered to a location(s) designated by SCE&G or Third Party System Operator through use of a dedicated point-to-point data circuit(s) as indicated in Section 6.3.3.

6.1.4 Switching and Tagging Rules. The Parties shall abide by their respective switching and tagging rules for obtaining clearances for work or for switching operations on equipment. Such switching and tagging rules shall be developed in accordance with OSHA Standard 29 CFR part 1910 or successor standards.

6.2 Maintenance of Interconnection Facilities. The Parties shall each operate, maintain, repair and replace their respective Interconnection Facilities in a safe, prudent, reliable, and efficient manner, consistent with Good Utility Industry Practices and Standards.

6.3 Facility Requirements.

6.3.1 Protective Equipment.

6.3.1 Customer acknowledges that any protective devices installed in SCE&G's Interconnection Facilities may not isolate or protect equipment beyond the high tension power circuit breaker located in Customer's Interconnection Facilities from any unexpected electrical events such as electrical faults or non-routine switching. Thus, suitable protective devices shall be installed by Customer at Customer's expense to properly isolate the Facility from SCE&G's Transmission System.

6.3.2 SCE&G acknowledges that any protective devices installed in Customer's Interconnection Facilities may not isolate or protect equipment beyond the high tension power circuit breaker located in SCE&G's Interconnection Facilities from any unexpected electrical events such as electrical faults or non-routine switching. Thus, suitable protective devices shall be installed by SCE&G at Customer's expense on SCE&G's Interconnection Facilities in order to properly isolate any facilities beyond Customer's Interconnection Facilities.

6.3.3 Communications. At Customer's expense, SCE&G shall install and maintain communication lines required to transmit information from the RTU to SCE&G's SCC, and (if required) to a Third Party System Operator. The cost and maintenance for these communication lines shall be billed to the Customer in separate line items on the monthly bill provided pursuant to Section 7.4. Customer shall provide a phone line to the SCE&G substation fence for use by SCE&G to collect metering data from the Revenue Metering Devices.

6.4 Reporting Obligations.

6.4.1 Customer shall, as soon as reasonably practicable, disclose to SCE&G any known condition or circumstances at the Facility that could reasonably be expected to materially and adversely impact or result in damage to SCE&G's Transmission System or SCE&G's Interconnection Facilities. SCE&G shall at all times have the right to temporarily disconnect Customer's Interconnection Facilities in order to prevent an Emergency. In the event of an Emergency, SCE&G will give Customer as much advance notice as practicable under the circumstances before SCE&G disconnects Customer's Interconnection Facilities. SCE&G shall reconnect Customer's Interconnection Facilities as soon as reasonably practicable following the events which gave rise to the Emergency.

6.4.2 SCE&G shall, as soon as reasonably practicable, disclose to Customer any known condition or circumstances related to SCE&G's Interconnection Facilities or SCE&G's Transmission System that could reasonably be expected to materially and adversely impact or result in damage to the Facility or to Customer's Interconnection Facilities.

6.4.3 Customer and SCE&G shall use due diligence to correct any such condition or circumstance at the Facility or the Customer's Interconnection Facilities, or SCE&G's Transmission System or SCE&G's Interconnection Facilities, respectively.

6.5 Interconnection Committee.

6.5.1 SCE&G and Customer shall each appoint one representative and one alternate representative to act in matters relating to the performance of the Work and/or the maintenance of the Facility, the Interconnection Facilities and/or SCE&G's Transmission System (the "Interconnection Committee") as provided for herein. The Parties shall notify each other in writing of such appointments and any changes thereto.

6.5.2 The Interconnection Committee shall meet at least monthly until the Commercial Operation Date and thereafter at least once every six months. Additional meetings may be arranged by any representative of the Interconnection Committee.

6.5.3 Matters referred to the Interconnection Committee shall be determined by agreement of both representatives; *provided, however*, that the Interconnection Committee shall have no power to alter or amend this Agreement except with respect to Exhibit 4. All decisions by the Interconnection Committee shall comport with the provisions of this Agreement including, but not limited to, provisions allocating the cost responsibility of each of the Parties. Nothing in this Section shall limit either Party's right to initiate dispute resolution under Article XVI.

6.6 Maintenance Outage Coordination. Two (2) months after the Commercial Operation Date and thereafter on an annual basis at least thirty (30) days prior to the end of each calendar year during the Term, SCE&G shall provide to Customer a forecast of planned maintenance activities and outages for SCE&G's Interconnection Facilities that are expected to exceed one (1) day each during the upcoming calendar year. This forecast shall be adjusted and communicated with the Customer on an as-needed basis during the year.

ARTICLE VII
PAYMENT AND SECURITY REQUIREMENTS

7.1 The Work.

7.1.1 Good Faith Estimates for the Work. As referenced in the Interconnection Study, the good faith estimate of SCE&G (*excluding* interest) for SCE&G to perform the Work on SCE&G's Interconnection Facilities is $7,837,659. This estimate is subject to all assumptions and conditions set forth in the Interconnection Study, and includes the following components: development costs of engineering package; equipment and material costs; construction and labor costs; allocations of shared and overhead costs, all as more fully set forth in the Interconnection Study.

7.1.2 Actual Costs for the Work. Customer shall pay SCE&G for SCE&G's reasonable, documented actual costs for the Work ("Actual Costs"), including: (i) allocations of shared and overhead costs; and (ii) interest accrued on the total cost of construction at the end of each month during construction (as set forth in the Work Plan) calculated pursuant to the methodology specified for interest on refunds in 18 C.F.R. § 35.19a(a)(2)(iii) ("Delayed Payment Rate"). For prepaid amounts, interest accrued on the unused portions at the end of each month during construction (as set forth in the Work Plan) calculated at the Delayed Payment Rate shall reduce the Actual Costs. Actual Costs will be determined separately for SCE&G's Interconnection Facilities.

7.1.3 Payment for the Work. Customer shall make the payments to SCE&G shown in Exhibit 2. Within ninety (90) days following SCE&G's Interconnection Facilities In-Service Date or within a reasonable period of time after such Actual Costs are known, SCE&G shall provide Customer with an invoice that includes a breakdown of the Actual Costs, including supporting documentation for same. The invoice will show prior payments as a credit. In the event that the Actual Costs to be paid by Customer under Section 7.1.2 are more or less than the payments made in accordance with this Section 7.1.3 and Exhibit 2, Customer or SCE&G, as the case may be, will reimburse or pay the other the difference in one (1) lump sum payment within sixty (60) days of such invoice. All amounts not otherwise disputed pursuant to Section 7.5 shall be payable within said 60-day period. During said 60-day period before payment is due Customer shall review SCE&G's invoice and supporting documentation, audit any reasonably available information in SCE&G's possession related to the construction of SCE&G's Interconnection Facilities not previously provided to Customer, and provide SCE&G with written objection to any costs or charges included in SCE&G's invoice, and the Parties shall meet at either Party's request to review same. Promptly following such meeting, SCE&G shall notify Customer of SCE&G's acceptance or rejection of each of Customer's objections. If SCE&G does not agree to all of Customer's objections, Customer may submit any or all such objections for resolution pursuant to Section 7.5.

7.1.4 Furnishing of Security Instrument or Prepayment. Within forty-five (45) days after the Effective Date, Customer shall provide SCE&G with a Security Instrument to secure payment for the Work in a form reasonably acceptable to SCE&G and with respect to a Security Instrument in the form of a letter of credit or surety bond only in an amount equal to twenty (20) percent of the good faith estimate of Actual Costs pursuant to Section 7.1.1 for SCE&G to perform the Work. A Security Instrument in the form of a surety bond or standby letter of credit

shall have a minimum term sufficient to ensure that it is effective to cover the period through the date upon which it is reasonably anticipated that Customer will be required to make payments for the Work including any payments pursuant to a final invoice to be issued pursuant to Section 7.1.3 ("Anticipated Payment Date") plus ninety (90) days. The Security Instrument shall also provide that in the event the Anticipated Payment Date changes and (i) the expiration date of the Security Instrument is no longer more than ninety (90) days after the new Anticipated Payment Date, and (ii) such Security Instrument is not renewed, extended or replaced so that its expiration date is at least 90 days after the new Anticipated Payment Date, on or before thirty (30) days prior to the expiration date of such Security Instrument, SCE&G may draw the full amount of the security and hold such sum as security for payment for the Work. SCE&G's obligation to commence performance of the Work is conditioned upon receipt by SCE&G of a Security Instrument pursuant to this Section 7.1.4.

7.1.5 Draws Upon Security. If Customer fails to make the payments shown in Exhibit 2 or fails to pay SCE&G for sums uncontested by Customer and properly invoiced hereunder when due, or fails to place disputed sums into escrow pursuant to Section 7.6, SCE&G shall be entitled to draw upon the security then required to be in place for such sums, plus interest at the Delayed Payment Rate from the date due, after giving Customer notice and fifteen (15) days from the date of such notice to pay any such unpaid sums. In the event that a partial or full draw is made by SCE&G on said security, Customer shall be required to restore said security to the total amount required pursuant to Section 7.1.4 within fifteen (15) days of the date of said partial or full draw. If partial draws are not permitted against the security, then SCE&G shall immediately refund to Customer any amounts in excess of the amount due SCE&G at the time of SCE&G's draw against the security.

7.1.6 Security No Limitation. The amount of the security required under this Article VII shall in no event be construed as a limitation on any sums that may be due to SCE&G or which SCE&G may claim as damages for Customer's breach of this Agreement. Notwithstanding anything to the contrary herein, neither Party shall be liable for consequential, incidental, special, punitive, exemplary or indirect damages, lost profits or other business interruption damages, by statute, in tort or contract, under any indemnity provision or otherwise with respect to any claim, controversy or dispute arising under this Agreement.

7.2 New Capital Additions. Customer shall be responsible for the reasonable, documented actual costs of New Capital Additions only when the necessity for such additions: (i) arises primarily from safety or reliability considerations related to SCE&G's Interconnection Facilities or to SCE&G's Transmission System or both; (ii) does not primarily result from the load or facilities of other wholesale or retail customers on SCE&G's Transmission System, including load growth or system expansion and (iii) are consistent with Good Utility Industry Practice; provided that, if no changes have been made to the Facility consistent with Standards, Customer shall not be responsible for costs related to SCE&G's Transmission System. In addition, Customer shall be responsible for the reasonable documented actual costs of New Capital Additions where said New Capital Additions arise from a decision to replace components of SCE&G's Interconnection Facilities. Customer shall pay SCE&G the actual costs of the New Capital Additions for which the Customer is responsible, including any improvements pursuant to Section 6.1.2, in one lump-sum payment in accordance with Section 7.4, which shall be subject to interest and tax gross-up if applicable. Customer will receive transmission credits as set forth in Section 7.2.1 if such New Capital Additions are at or beyond the point of

interconnection(s) as identified by the FERC in its March 22, 2004 order in Docket No. ER03-1398-000, 106 FERC ¶ 61,265 (2004). The actual costs for the New Capital Additions shall include interest accrued on the total cost of constructing the New Capital Additions at the end of each month during construction calculated at the Delayed Payment Rate. The Monthly Facilities Fee set forth in Section 7.3 hereof shall be adjusted to include the costs of New Capital Additions (that are the responsibility of Customer) in the actual costs to which the Facilities Fee Charge Multiplier, as defined in Section 7.3, is applied.

7.2.1   Credits for Transmission Facility Upgrades Required for Interconnection. Customer shall be entitled to transmission credits, equal to the total amount paid to SCE&G for the Transmission Facility Upgrades Required for Interconnection, including any tax gross-up or other tax-related payments associated with the Transmission Facility Upgrades Required for Interconnection, to be paid on a dollar-for-dollar basis for the non-usage sensitive portion of transmission charges with respect to the utilization of the Transmission Facility Upgrades Required for Interconnection, as payments are made under SCE&G's OATT for transmission services with respect to the Facility. The credits shall be applied on a percentage basis based on the metered use of the Transmission Facility Upgrades Required for Interconnection. Any time there is a reservation for transmission service but no metered use, credits shall be applied against 70 percent of the total charge for such transmission reservations because the capacity of the generators that utilize the Transmission Facility Upgrades Required for Interconnection represents 70 percent of the Facility's total capacity. Transmission credits shall be applied until such time as all amounts advanced to SCE&G by Customer for the Transmission Facility Upgrades Required for Interconnection have been fully offset, after which time such offset or credits shall no longer apply. Alternatively, SCE&G may, at its sole discretion, choose to repay to Customer any amounts advanced by Customer for Transmission Facility Upgrades Required for Interconnection not credited to Customer at any time. Any credits shall include interest calculated in accordance with the methodology set forth in FERC's regulations from the date of the payment for the Transmission Facility Upgrades Required for Interconnection until the date the credit is applied. Customer may assign its rights to credits or repayment hereunder to any person.

   7.3.1 Monthly Facilities Fee. Customer shall pay to SCE&G a monthly fee ("Monthly Facilities Fee") that will cover SCE&G's Maintenance, repairs, property tax, miscellaneous taxes, and insurance, for SCE&G's Interconnection Facilities, not to include Transmission Facility Upgrades Required for Interconnection, for the Term of this Agreement, beginning with the calendar month following SCE&G's Interconnection Facilities In-Service Date. The Monthly Facilities Fee shall be payable no later than the tenth day of each month. To the extent that SCE&G's Interconnection Facilities are utilized by one or more third parties, the Monthly Facilities Fee shall be prorated to account for the usage by such third party(ies). The Monthly Facilities Fee shall be the sum equal to the Actual Costs as determined pursuant to Section 7.1.2 (as may be adjusted pursuant to Section 7.2) multiplied by the Facilities Fee Charge Multiplier of 0.225% per month. The Parties acknowledge and agree that the Facilities Fee Charge Multiplier has been agreed based on an overall balance of consideration of the terms of this Agreement. Prior to final resolution of the Actual Costs in accordance with Section 7.1.3, the Monthly Facilities Fee will be calculated and applied based upon the good faith estimate for SCE&G's Interconnection Facilities set forth in the Interconnection Study as revised by Exhibit 1A, which is $7,837,659. Following said final resolution of the Actual Costs, the Monthly Facilities Fee will be recalculated and applied based on the Actual Costs (as may be adjusted pursuant to

Section 7.2 hereof), and SCE&G shall refund Customer for any prior overpayment or Customer shall pay SCE&G for any prior underpayment, with interest calculated at the Delayed Payment Rate within fifteen (15) days of notice of such recalculation.

    7.3.2 <u>Payment for Extraordinary Maintenance</u>. In the event SCE&G incurs Extraordinary Maintenance to the Interconnection Facilities, SCE&G will make such replacement or repair (by mutual agreement with Customer). SCE&G will prepare a separate bill to be presented to Customer for the documented costs of the Extraordinary Maintenance in the month following completion of the Extraordinary Maintenance. The amount of costs billed to Customer shall be based on SCE&G's reasonable, documented, actual costs, including allocations of shared and overhead costs, for Extraordinary Maintenance to SCE&G's Interconnection Facilities; *provided, however*, that Customer shall not be responsible for such Extraordinary Maintenance when such Extraordinary Maintenance is primarily caused by SCE&G's failure to operate SCE&G's Transmission System or SCE&G's Interconnection Facilities in accordance with Good Utility Industry Practice or to the extent otherwise covered by insurance

    7.3.3 <u>Escalation for Monthly Facilities Fee Multiplier</u>. Effective January 1, 2004 and January 1 of each succeeding calendar year during the Term (each such date being herein referred to as an "Adjustment Date"), the amount of the Monthly Facilities Fee Multiplier for the then current calendar year shall be the Monthly Facilities Fee Multiplier for the preceding calendar year adjusted in accordance with the following formula:

$$\text{Monthly Facilities Fee Multiplier (as adjusted)} = \text{Monthly Facilities Fee Multiplier} [.50(L_c/L_b) + .50(P_c/P_b)]$$

Where:

    $L_c$ = the final Labor Index for the preceding July.
    $L_b$ = the final Labor Index for the base month of July 2003.
    $P_c$ = the Handy Whitman Index for the preceding July.
    $P_b$ = the Handy Whitman Index for the base month of July 2003.

"Handy Whitman Index" shall mean the Handy Whitman Index of Public Utility Construction Costs, transmission plant – FERC Acct. 353, South Atlantic Region, as published by Whitman, Requardt & Assoc. LLP. If the Handy Whitman Index ceases to be published or is otherwise unavailable, a comparable index will be used as mutually agreed to by the Parties at that time.

"Labor Index" shall mean "not seasonally adjusted", data type AHE (average hourly earnings) for Manufacturing A 1-digit Industry, state and area employment, hours, and earnings for the State of South Carolina as published by the United States Department of Labor, Bureau of Labor Statistics (Series ID: SAU3700003000016). If the Labor Index ceases to be published or is otherwise unavailable, a comparable index will be used as mutually agreed to by the Parties at that time.

    7.4 Charges and Payments (other than Actual Cost of the Work). Within ten (10) days after the end of each calendar month, SCE&G shall provide Customer with an invoice for all charges and payments due under this Agreement (but excluding charges and payments for the

Work pursuant to Section 7.1.2 and 7.1.3) for the preceding billing period, including, but not limited to, payment for New Capital Additions, charges for the Monthly Facilities Fees, charges for leased telephone lines under Section 6.3.3 and interest accrued on unpaid amounts and supporting documentation regarding same. If such invoice reflects a net payment due from SCE&G to Customer, SCE&G shall pay such invoice within twenty (20) days of its date. If such invoice reflects a net payment from Customer to SCE&G, Customer shall pay such invoice within twenty (20) days of Customer's receipt of such invoice and supporting documentation.

    7.5 Disputed Charges and Payments.

    7.5.1 Customer may dispute any charges by or payments from SCE&G set forth in this Article VII. If Customer disputes any charges or payments pursuant to this Article VII, Customer shall pay all undisputed charges. Customer shall notify SCE&G in writing of any disputed amounts, including the amount in dispute, the reason for the dispute, and a proposed resolution and shall pay all such disputed amounts into an escrow account pursuant to Section 7.6. If the dispute involves a payment from SCE&G to the Customer, the Customer shall notify SCE&G of the additional sums claimed by the Customer to be owed to it by SCE&G, and SCE&G shall deposit such sums into the escrow account pursuant to Section 7.6. If the Customer fails to pay the computed amount or to place disputed amounts in an escrow account by the due date for payment of such computed amount or otherwise when such payment is due, Customer shall be in default of this Agreement pursuant to Section 7.8, and such unpaid amounts will accrue interest at the Delayed Payment Rate.

    7.5.2 In the event that Customer disputes the calculation of any charges of, or payments to be made by, SCE&G, such dispute shall be subject to resolution pursuant to the provisions of Article XVI. Payment disputes shall be resolved in accordance with the provisions of this Agreement, including but not limited to provisions allocating the cost responsibility of each of the Parties. Immediately following the resolution of such dispute, SCE&G or Customer, as the case may be, shall make any payment or refund required hereunder to the other plus interest at the Delayed Payment Rate no later than the twentieth (20) day after the final resolution of such dispute.

    7.6 Escrow of Disputed Sums. All disputed sums shall be deposited into an interest-bearing escrow account at a federally insured banking institution (the "Escrow Account"). The Escrow Account will authorize the escrow agent to disburse funds from the Escrow Account upon receipt of either (i) a disbursement authorization signed by both Parties or (ii) a court order entering an award rendered by the arbitrators pursuant to Sections 16.3 and 16.4. The Party depositing the disputed amounts into the Escrow Account ("Escrowing Party") shall be entitled to receive any funds remaining in the Escrow Account attributable to a particular disputed amount following final resolution of such disputed amount. In the event that the funds in the Escrow Account are insufficient to pay all amounts that are determined to be owed by the Escrowing Party to the other Party, including interest at the Delayed Payment Rate (the "Escrow Deficiency"), the Escrowing Party shall pay the other Party the Escrow Deficiency within twenty days of the Escrowing Party's receipt of written notice of such Escrow Deficiency by the other Party.

    7.7 Interest on Unpaid and Escrowed Amounts. Interest shall accrue on: (i) any unpaid amounts invoiced or otherwise due to a Party pursuant to the terms hereunder from the

applicable due date for payment of such invoice and (ii) escrowed amounts from the applicable due date of the underlying invoice, until the date paid, with interest at the Delayed Payment Rate.

7.8 Default for Failure to Pay Invoiced Amounts. Should either Party fail to pay any sums due hereunder or fail to deposit disputed sums into escrow, by the applicable due date for payment, such Party shall be in default of this Agreement and the other Party may, after written notice to the defaulting Party giving it thirty (30) days to remedy such breach by paying or escrowing the disputed sums, as applicable, plus interest, terminate this Agreement and pursue any or all regulatory, legal, or equitable remedies that may be available. Notwithstanding the foregoing, should Customer fail to make any of the payments in accordance with the payment schedule to be provided in Exhibit 2 on the date due, other than amounts disputed in good faith pursuant to Section 7.5, SCE&G shall have the right to suspend performance of the Work until such payment has been made. Such remedy shall be in addition to any other remedies SCE&G may have hereunder.

## ARTICLE VIII
## TAX LIABILITY AND SECURITY

8.1 The Parties acknowledge that under current federal income tax law, including Internal Revenue Service ("IRS") notices and rulings, (i) payments made by Customer to SCE&G with respect to the construction and installation of new facilities or improvements and/or (ii) the transfer, if any, from Customer to SCE&G of SCE&G's Interconnection Facilities or other facilities or improvements, may, under certain circumstances, be considered gross income to SCE&G. Customer agrees to assure SCE&G recovery of any CIAC Tax Liability if the payments or transfer described above are ultimately determined to be gross income to SCE&G (hereinafter referred to as a "Taxable Event"). Customer expressly agrees to indemnify and save SCE&G harmless from and against any increase in actual federal and/or state income tax liability, CIAC Tax Liability, including all interest or penalty claims (as well as all taxes incurred by SCE&G as a result of amounts paid to SCE&G under this indemnity) related to any CIAC Tax Liability incurred as a result of Customer's payments to SCE&G with respect to the construction and installation of the new facilities or improvements and/or the transfer of facilities and/or improvements to SCE&G, under this Agreement ("Potential CIAC Tax Liability").

8.2 Security Arrangements.

8.2.1 In order to provide SCE&G with the assurance set forth in Section 8.1, the Customer agrees to provide SCE&G with a Security Instrument for the Potential CIAC Tax Liability on the earlier of March 15, 2003 or the Commercial Operation Date. Such Security Instrument shall cover an amount calculated in accordance with the terms of Section 8.3 hereof. If Customer fails to provide SCE&G with the Security Instrument by the date required pursuant to this Section 8.2.1, SCE&G may disconnect the Facility from SCE&G's Interconnection Facilities until such Security Instrument is in place. A Security Instrument in the form of a standby letter of credit or surety bond shall have a minimum term of one (1) year and shall be renewed, extended or replaced, as appropriate, at least thirty (30) days prior to expiration, continuously for the Term or until sooner released or reduced pursuant to Section 8.2.2 hereof.